1    IN THE HONORABLE JUSTICE COURT OF TUNICA COUNTY, MISSISSIPPI

2                        CASE NO. 191532

3

4    STATE OF MISSISSIPPI

5    V.

6    MICHAEL THOMPSON,

7         DEFENDANT

8

9

10                      **TRANSCRIPT OF HEARING**

11        Held on Friday, July 18, 2014, commencing at 10:00 a.m.,

12    in the Tunica County Justice Court, Tunica, Mississippi, before

13    the Honorable Joe Brown, Presiding

14

15

16    Appearances Noted Herein

17

18

19    REPORTED BY:

20         KAREN C. REID-EDGE, MS CCR 1276, TN LCR 469

21

22

23

24

25

```
1   APPEARANCES:

2

3   REPRESENTING THE STATE OF MISSISSIPPI:

4        Charles B. Graves, Jr., Esquire

5        Post Office Box 1413

6        Tunica, Mississippi  38676

7

8

9   REPRESENTING MICHAEL THOMPSON, DEFENDANT:

10       Scott W. Colom, Esquire

11       Post Office Box 866

12       Columbus, Mississippi  39703

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TABLE OF CONTENTS

Court Convenes                                                    4

Testimony of Captain James Jones:
    Direct Examination by Mr. Graves                        4
    Cross Examination by Mr. Colom                          15
        Defense Exhibit A, Montgomery County Warrant   41

Testimony of Karen Carter:
    Direct Examination by Mr. Graves                        44
    Cross Examination by Mr. Colom                          48

Testimony of Sheriff K. C. Hamp:
    Direct Examination by Mr. Colom                         49
    Cross Examination by Mr. Graves                         51
    Redirect Examination by Mr. Colom                       53

Testimony of Ellis Pittman:
    Direct Examination by Mr. Colom                         54
    Cross Examination by Mr. Graves                         55

Certificate of Court Reporter                               62

1    (COURT IS CONVENED AT 10:00 A.M.)

2

3        BY THE COURT:  I want to apologize for the prosecutor.

4    Court is now open.  Mr. Prosecutor, you can proceed and let's

5    go forward.

6            BY MR. GRAVES:  Yes, sir.  I call Captain Jones and

7    ask that he be sworn.

8                (WHEREUPON ALL PROPOSED WITNESSES WERE SWORN UNDER

9            OATH BY THE COURT.  THE RULE WAS NOT INVOKED.)

10            BY THE COURT:  All right.  Go ahead and proceed.

11

12   TESTIMONY OF CAPTAIN JAMES JONES:

13   DIRECT EXAMINATION BY MR. GRAVES:

14       Q.   Okay.  Officer Jones, I want to call your attention

15   to Wednesday, the -- this Affidavit does not have a date on it.

16       A.   12th.

17       Q.   Do you recognize the Defendant?

18       A.   That's correct, I do.

19       Q.   Okay.  Can you point him out?

20       A.   Mr. Michael Thompson, gray suit, black shoes, gray

21   socks.

22       Q.   And on what day did you see him?

23       A.   Wednesday, March -- Wednesday, February 12, 2014, the

24   date of the incident.

25       Q.   Okay.  And were -- at that time, were you employed by

1   the Tunica County Sheriff's Department?

2       A.   That's correct, I was.

3       Q.   Okay.  In what capacity were you?

4       A.   Captain, Special Operations; Captain, training in

5   tactical; Captain.

6       Q.   Okay.  All right.  As part of your duties, do you do

7   traffic patrol?

8       A.   That's correct.

9       Q.   Okay.  Were you conducting any traffic patrol on this

10  particular day?

11      A.   That's correct.  Yes, sir, I was.

12      Q.   Okay.  And how did you happen to come in contact with

13  Mr. Thompson?

14      A.   I was traveling down Highway 61 North going towards

15  the casino.  I observed a gray Ford Explorer type vehicle, tag

16  number 486LQX, traveling in the northbound lane, traveling back

17  and forth over the yellow line.  Didn't know whether it was a

18  drunk or someone was intoxicated or someone needed some

19  assistance.  At that particular time, I initiated my blue

20  lights and stopped that vehicle at the intersection of

21  Highway 61 North and Casino Strip, that intersection there.

22      Q.   Okay.  And did the car pull over immediately?

23      A.   That's correct, it did.

24      Q.   Okay.  And what did you do?  Did you approach the

25  vehicle?

1      A.   I approached the driver's side of the vehicle and

2   which, as I approached, I introduced myself and asked him was

3   everything okay, had anybody been drinking.  Mr. Alex T. Wiley

4   was the driver of the particular vehicle at the time.  I

5   approached it.  He told me who he was and he was the county

6   comptroller.  He identified himself.  Also, in the vehicle, I

7   looked and I saw Mr. Michael Thompson to my left here in the

8   gray suit, was in the vehicle.  He introduced himself as the

9   County Administrator, Tunica County.  I had never met him, each

10  one of the individuals before, so I talked to him briefly and

11  asked him for his driver's license, Mr. Alex T. Wiley, the

12  driver of the vehicle.  Upon him giving me his license, he

13  informed he was again the comptroller so I ran his license.

14  Upon me running his driver's license, they came back valid,

15  eligible for reinstatement.  Didn't understand what that was.

16  I asked Mr. Wiley, the driver at that particular time, what was

17  going on with his license.  He informed me he had got a ticket

18  in D.C., I believe, Maryland or D.C., he had just came back

19  from there, and he didn't know whether the license was valid or

20  they were suspended.  So I got them ran through the Tennessee

21  data base.  Tennessee -- we waited for a while.  While waiting

22  to get the correct information on Mr. Wiley's license, I

23  started talking to Mr. Thompson briefly.  After talking with --

24      BY MR. COLOM:  I'm going to object to the narrative,

25  Your Honor.  I mean, are we going to get another question here?

1      BY THE COURT:  We are going to get to it.  All I

2 need to know is just what you stopped and what you found and go

3 from there will be fine.

4      A.    That's correct.  After I run his license, it stated

5 reinstated, eligible for valid.  I asked the dispatcher

6 communication, "What does that mean?"  She couldn't give me an

7 answer.  So that's when I approached Mr. Wiley and asked what

8 was going on with his license.  That's when he informed me he

9 had got a ticket in D.C., I believe it was up there.  He didn't

10 know whether his license was valid or suspended, Your Honor.

11 From that point, I asked Mr. Thompson to wait for a while, for

12 a minute.  And after that particular point waiting, I went and

13 asked Mr. Thompson do he have a driver's license.  He stated

14 yes.  I asked him, "Are your license valid?"  He said yes.  I

15 said, "You need to take control of the vehicle.  Unless we get

16 an answer that Mr. Wiley's license is not valid, I need you to

17 drive the vehicle."  That's when he got into the driver's seat

18 of the vehicle.  From that point, Mr. Thompson left the scene.

19 After he left the scene --

20      Q.    When he left, Mr. Wiley was in the car with him?

21      A.    That's correct.  Both individuals.  Mr. Wiley was the

22 passenger at that particular time.  I did an initial, you know,

23 secondary stop on that particular vehicle.  Me knowing earlier

24 that there's a possibility that Mr. Thompson was being

25 deceptive in his being truthful with me, I did a secondary

1    primary stop on that particular vehicle in question at the

2    intersection of Highway 61 and Casino Way right at the BP/

3    Wendy's.  From that point on, I got him out of the vehicle and

4    asked him do he have a driver's license.  He told me he did

5    have a license.  And I ran his license.  From that point, the

6    license came back suspended.  From that point, due to our

7    policy and procedure in Tunica County, which is here in the

8    case file, I placed him under arrest, and he came to the

9    Sheriff's Office and bonded out.

10        Q.   Okay.  This is the license?  You took the license

11   from him at that time?

12        A.   That's correct.  That's his license.

13        Q.   Okay.  And you didn't write Mr. Wiley --

14        A.   No.  I gave Mr. Wiley a common courtesy, let him go

15   on courtesy.  I didn't write him a ticket or anything like

16   that.  I just talked to him.  I just asked that he switch

17   drivers, and Mr. Thompson said his license was good, but it was

18   suspended.

19        Q.   Okay.  So what -- did you get -- is it --

20             BY THE COURT:  Has he got --

21             BY MR. COLOM:  I'm going to object to this,

22   Your Honor.  I'm going to object here.  If the witness is going

23   to talk to the lawyer, he needs to do it in a way that

24   everybody can hear, particularly my Court Reporter.

25        Q.   Is this a bond sheet of where he was taken to the

1    jail?

2        A.    Yes, sir.

3        Q.    And have you --

4            BY MR. COLOM:  No, I haven't.  (Reviews.)  Okay.

5        Q.    All right.

6            BY THE COURT:  What is the significance of that bond

7    sheet?

8            BY HE WITNESS:  Your Honor, this is a -- in Tunica

9    County, cash bond, you can see right here where it is stated

10    Mr. Michael Thompson by asserting the guilty, pleading guilty,

11    paid the fine of $500, pleading guilty.  That's his signature

12    there and also on that particular date and time of the traffic

13    offense we are here for today.

14            BY THE COURT:  In other words, what you are telling

15    me, this cash bond was put up at that time?

16            BY THE WITNESS:  He paid in full.

17            BY THE COURT:  And he pleaded guilty at that time.

18            BY THE WITNESS:  Yes, sir.

19            BY THE COURT:  But we are here today for another

20    cause.

21            BY THE WITNESS:  We are here today for the same

22    cause, for the same.

23            BY THE COURT:  No.  What I'm saying, though, today

24    he is saying he is not guilty?  Is that what we're --

25            BY THE WITNESS:  That's correct.

1        BY MR. COLOM:  Well, Your Honor, of course, when a

2   person -- they can't plead guilty or not guilty.  So whatever

3   that cash bond says is completely irrelevant.

4        BY THE COURT:  I understand that, but Mr. Colom --

5   is that your name?

6        BY MR. COLOM:  Yes, it is.  Colom.

7        BY THE COURT:  Who?

8        BY MR. COLOM:  Colom.

9        BY THE COURT:  Colom.  Okay.  I am looking at what

10  he undoubtedly signed, putting the money up.  He said he was.

11  You might want to look at that yourself.  I mean, I'm just

12  taking everything into consideration that's put before me.  I

13  will listen to anything you got to say at this time.

14        BY MR. COLOM:  Well, I don't see his signature on

15  there.

16        BY THE COURT:  That's not that crazy sign right

17  there?

18   Q.    Is this Mr. Thompson's signature?

19   A.    That's correct.  He can validate it.

20        BY THE COURT:  Well, let's verify that that is his

21  signature from him, himself, Mr. Prosecutor.

22   Q.    Okay.

23        BY THE COURT:  If you would, at this time let's get

24  Mr. Thompson up here and let him verify his signature on that.

25        BY MR. COLOM:  Well, I'm going to object to that,

```
 1    Your Honor.  That's improper procedure.  Mr. Thompson has the
 2    right -- he doesn't have to testify.
 3                BY THE COURT:  Well, you don't want him testifying.
 4    Is that correct?
 5                BY MR. COLOM:  Well, I haven't made the decision
 6    about whether or not he'll testify.
 7                BY THE COURT:  Well, I'll ask that question later.
 8                BY MR. COLOM:  Yes, sir.  Thank you.
 9                BY THE WITNESS:  Your Honor, right here, this is the
10    particular phone video that was shot inside the Tunica County
11    interview room.
12                BY THE COURT:  Let me see it.  I can't see it there.
13                BY THE WITNESS:  Where he is saying that --
14    Mr. Thompson is saying, "They got me.  They caught me
15    slipping."
16                BY THE COURT:  (Reviews video.)  When does he
17    finally say --
18                BY THE WITNESS:  Said, "They caught me slipping."
19                BY MR. COLOM:  Well, I'm going to object to that,
20    Your Honor.  The video speaks for itself.
21                BY THE COURT:  That's good.  Go ahead and proceed.
22        Q.    Yes, sir.  Did you get a printout of his driving
23    history to see why his license was suspended?
24        A.    That's correct, I did.
25        Q.    And what did you find out?
```

1      A.    Failure to appear in Montgomery County.

2            BY THE COURT:  Have you got a copy of that with you?

3            BY THE WITNESS:  I do, Your Honor.  (Retrieves

4      document.)

5            BY MR. COLOM:  Your Honor, I'm going to object.  I

6      haven't seen these documents.

7            BY THE COURT:  Well, have y'all had time to review

8      this before we get in here and start, before we go to objecting

9      to everything that we are going to present?

10           BY MR. GRAVES:  Judge, I have not had any discovery

11     requests from him, you know, no discovery rules in Justice

12     Court on misdemeanors.  I'll be glad for him to look at it now.

13           BY THE COURT:  Let him see them at this time.

14           BY MR. COLOM:  (Reviews.)

15           BY THE COURT:  Are you satisfied with them?

16           BY MR. COLOM:  I still have an objection,

17     Your Honor, I'll note for the record.  It's improper

18     foundation, Your Honor.  These documents, they can't

19     authenticate these documents.  The documents are also hearsay.

20           BY MR. GRAVES:  I think these come under the

21     exception to the hearsay rule.

22     Q.    That's the warrant from Montgomery County, as I

23     understand it?

24     A.    That's correct.

25           BY THE COURT:  All right.  This has been voided.

1    Right there.  Have you seen this?

2           BY MR. COLOM:  Yes, I have seen there was a warrant

3    after the fact that was voided.  But, Your Honor, there was no

4    arrest warrant at the time he was arrested.

5           BY THE WITNESS:  Your Honor, look right here.  The

6    warrant wasn't voided.  The day of the arrest this warrant was

7    made out on hand right here.  And I can come right here and

8    show you.  After I filed the initial, politics got involved in

9    it.  You can see Judge Roberts put here for a dismissal.  We

10   have a clerk here today that can verify that.  Dismissal --

11   Keith Roberts, dismissal of a motion of that particular warrant

12   the day of the arrest.  Now, it was verified through Tunica

13   County that there was an active warrant on Mr. Thompson.

14          BY THE COURT:  Let me look at all of this before we

15   go any further.  (Reviews.)  Now, where is the date?  Is this

16   the correct date, 8/9/2013?  Is that what that is?

17          BY THE WITNESS:  No, sir.  No, sir.

18          BY THE COURT:  It was mailed to him on August 9, is

19   that correct, of 2013?

20          BY MR. GRAVES:  That's the correct date.

21          BY THE WITNESS:  No, sir, it's not the correct date.

22   Yes, that's the correct date.

23          BY MR. GRAVES:  I think the document speaks for

24   itself.

25          BY MR. COLOM:  I'll object again to the witness

```
 1   directing comments to the Judge without a question being asked

 2   from the --

 3            BY THE COURT:  To the Judge or to the prosecutor?

 4            BY MR. COLOM:  Well, the prosecutor can ask the

 5   witness a question, but the witness is sua sponte testifying to

 6   the Judge about a question he asked him, which is

 7   inappropriate.  If the Judge asks a question, of course, he can

 8   answer that question.

 9            BY MR. GRAVES:  Judge, here's what -- the question I

10   asked is if he had run his driving history to show a

11   suspension, and I think that's --

12            BY THE WITNESS:  That's correct.

13            BY THE COURT:  All right.  This is from the State of

14   Mississippi; isn't that correct?

15            BY THE WITNESS:  Yes, sir.

16            BY THE COURT:  Saying they were suspended on

17   1/21/14.

18            BY THE WITNESS:  Yes, sir, that's correct.

19            BY THE COURT:  You also got a copy run on

20   Mr. Wiley's, right?

21            BY THE WITNESS:  Yes.

22            BY THE COURT:  Which he's got no ticket today.  I'm

23   not interested in that at all.

24            BY MR. GRAVES:  Right.

25            BY THE COURT:  But I do need to write it down.
```

1    1/21/14.  Okay.

2         Q.   Officer, that date on this driving history,

3    February 12, is that the same date you stopped Mr. Thompson?

4         A.   That's correct, it is.

5         Q.   And is that the same date you ran his driving

6    history?

7         A.   That's correct.

8         Q.   And they came back suspended?

9         A.   That's correct.

10        Q.   Okay.  And this happened on Highway -- the ticket

11   says Highway 61 North?

12        A.   That's correct.  That's the secondary initial stop.

13   Highway 61 North/Casino Center.

14        Q.   And that's in Tunica County?

15        A.   That's correct.

16        Q.   I tender the witness.

17

18   CROSS EXAMINATION BY MR. COLOM:

19        Q.   Mr. Jones, where do you work now?

20        A.   I'm retired.

21        Q.   Retired?

22        A.   Retired Captain.

23        Q.   When did you retire?

24        A.   February 28.

25        Q.   So shortly after --

1      A.   This year.

2      Q.   Of this year?  So shortly after Mr. Thompson got his

3  ticket?

4      A.   Yes, if you want to say that, yes, sir, that's

5  correct.

6      Q.   All right.  And you said that you are a Captain in

7  special operations and training.  Correct?

8      A.   That's correct.

9      Q.   Okay.  Explain what your responsibilities were in

10  special operation.

11      A.   Supervise individuals under me, carry out the duties

12  of the Tunica County Sheriff's Office, whether it be serving

13  high intensive drug warrants, investigating narcotics

14  trafficking or investigating homicide, whatever it may be, or

15  either traffic as far as Tcapping on Highway 61, which was the

16  main corridor to narcotics trafficking.

17      Q.   Okay.  But you were a supervisor in the Tunica County

18  Sheriff's Office?

19      A.   That's correct.

20      Q.   You weren't a patrolman?

21      A.   I'm always patrolling.

22      Q.   But, again, you were a Captain.  You may have had the

23  responsibility of patrolman, but you weren't a patrolman.

24  Right?

25      A.   No, sir, I wasn't a patrolman.

1    Q.   Okay.  So your only responsibility wasn't patrolling;

2    that wasn't your only responsibility.

3    A.   No, sir, I have a lot of responsibilities.

4    Q.   And, in fact, you were also, I think you said,

5    supervisor over training.  Right?

6    A.   That's correct.

7    Q.   All right.  Okay.  Now, you said that you approached

8    the vehicle because it was swerving in the road?

9    A.   That's correct.

10   Q.   When did you observe the car swerving?

11   A.   Somewhere past the Bowdry, Bowdry -- 61 north travel.

12   I can't say an exact location, but somewhere up in the Bowdry

13   area, which is about maybe five to seven miles north of here.

14   Q.   So it's close to the Tunica County administration

15   office building?

16   A.   No, sir.  The Tunica County administrative office is

17   downtown.  61 North is north.

18   Q.   How far is that away?

19   A.   Approximately maybe about -- I guess maybe about ten

20   -- talking from where the traffic stop was initiated at?

21   Q.   Right.

22   A.   From Tunica to Robinsonville, I don't know exact

23   miles.  It's maybe twelve.  Maybe ten to twelve miles, I'll

24   say.

25   Q.   Okay.  When did you first observe the car that

1    Mr. Wiley was in?

2        A.    When it was on Highway 61.

3        Q.    Okay.  And you said that you saw it swerve a couple

4    of times.  When is the first time you saw it swerve?

5        A.    What do you mean?  Repeat that question.

6        Q.    When is the first time you saw it swerve?  What did

7    you see?

8        A.    I saw it cross over the yellow line.

9        Q.    Which side of the highway?  Right lane or left lane?

10       A.    He was in the right lane.  Then we switched over to

11   the -- he came and went into the left lane.  He came back into

12   the right lane.

13       Q.    Okay.  Did he do that once or more than once?

14       A.    More than once.

15       Q.    Okay.  Now, were you in a marked car, police car, or

16   not?

17       A.    Not a marked car.

18       Q.    Okay.  So he wouldn't have known you were a police

19   when you were behind him?

20       A.    No, sir.

21       Q.    Okay.  Now, how many -- you said you saw him go in

22   the left lane and come back in the right lane.  How many times

23   did he do that before you stopped him?

24       A.    Twice.

25       Q.    So he did it twice?

1      A.    Correct.  And also he made an illegal lane change
2    that made me initiate that.
3      Q.    So when you say an illegal lane change, you mean he
4    went into the left lane without putting his turn signal on?
5      A.    That's correct.
6      Q.    Okay.  But was that a part of the two times you say
7    you saw him swerve?
8      A.    No, sir.
9      Q.    So three times he swerved?
10     A.    That's correct.  That's correct.
11     Q.    Okay.  All right.  And on the third time you stopped
12   him?
13     A.    That's correct.
14     Q.    All right.  Now, you said you approached the vehicle
15   and you found out the driver was the county -- or that he was
16   the comptroller for the county.
17     A.    Yes, sir.
18     Q.    And you understand that means he has a big
19   responsibility for the budget in Tunica County, correct?
20     A.    That's correct.
21     Q.    All right.  And at that time, you didn't give him a
22   ticket for improper driving?
23     A.    No, sir.
24     Q.    You didn't give him a ticket for careless driving?
25     A.    No, sir.

1   Q. Reckless driving?

2   A. He wasn't even doing any reckless driving.

3   Q. Okay.  So you -- and, in fact, you said you are

4 trained -- you train other police officers.  Right?

5   A. That's correct.

6   Q. All right.  So you know that, you know, it's illegal

7 for somebody to careless drive.  Is that right?

8   A. That's correct.

9   Q. But you didn't give him a ticket?

10   A. That's something for my discretion.

11   Q. Okay.  Now, you decided not to give him a ticket and

12 you found out -- you said you found out that the passenger was

13 a guy named Michael Thompson.  Is that right?

14   A. That's correct.

15   Q. And he told you that he was the county administrator?

16   A. Yes, sir.

17   Q. You know he has a big responsibility with the county

18 budget.  Correct?

19   A. That's correct.

20   Q. And the Sheriff's budget falls under the county

21 budget.  Is that right?

22   A. That's correct.

23   Q. All right.  So that means he had a big responsibility

24 over the budget for your top supervisor, the Sheriff, doesn't

25 it?

1      A.    I guess he do.

2            BY MR. GRAVES:  Judge, I want to --

3            BY THE COURT:  Let's hold on just a minute.  I'm not

4      here to get into a budget.  I'm in here for one thing.  We got

5      a suspended driver's license so I want the date they were

6      suspended, the date of the tickets and stuff.  This personal

7      history and the county administration, I have nothing to do

8      with that ticket today, Mr. Colom.

9            BY MR. COLOM:  Your Honor, may I respond to that on

10     the record?

11           BY THE COURT:  Yes.

12           BY MR. COLOM:  My defense is going to be entrapment,

13     Your Honor, based upon what the officer has testified to.  And

14     with that type of defense, the motive of the officer is

15     relevant.  And so that's all I'm trying to establish.  And if

16     you give me a little bit of discretion here, I'll move on.

17           BY THE COURT:  Well, we are going to move in a hurry

18     because I'm concerned with three things, is my concern, were

19     they good, were they bad, or were they suspended.  Let's move.

20     Q.    Okay.  Now, you said that you talked to Mr. Wiley and

21     you said you ran Mr. Wiley's license.  Right?

22     A.    Yes, sir.

23     Q.    And it came back valid.

24     A.    No.  I didn't say that.

25     Q.    Were they suspended or not suspended?

1      A.   Don't know.  It came back reinstated, eligible for

2  valid.  As you can see in his, in this particular --

3      Q.   Let me ask you a question, yes or no.  Was his

4  license suspended, Mr. Wiley suspended, yes or no?

5      A.   They wasn't suspended after we found out a little

6  later.  Tennessee data base did call us back and did notify his

7  license was valid.

8      Q.   So his license was not suspended?

9      A.   We didn't know that, Your Honor, on the traffic stop.

10     Q.   But when you stopped him and you ran his license,

11  nobody told you Mr. Wiley's license was suspended.

12     A.   No one knew.  I had to check with another state.

13          BY THE COURT:  I understood that while ago.

14     Q.   Okay.  Now, you claim that you asked Mr. Thompson if

15  his license was valid.

16     A.   That's correct, I did.

17     Q.   Okay.  Now, did you have a recorder on at that time?

18     A.   No, I didn't -- I don't wear recorders.

19     Q.   Okay.  So that conversation is not going to be

20  recorded?

21     A.   No, sir.

22     Q.   Okay.  Now, you said that you asked Mr. Thompson to

23  drive.  Correct?

24     A.   No.  I asked Mr. Thompson was his license valid.  He

25  advised me that they were.  Mr. Wiley wasn't going to drive the

1   vehicle when we didn't know what the status of his license was.

2   Mr. Thompson said that his license was valid and that he would

3   drive the vehicle.  He got in the driver's seat.  I didn't

4   force him.  He did it on his own accord.

5       Q.   Okay.  I want to be clear.  You understand the laws

6   of perjury in Mississippi.  Correct?

7       A.   Yes.

8       Q.   You understand that you are testifying under oath

9   right now?

10      A.   I do understand.

11      Q.   And that's a felony if you perjure.

12      A.   Yes.

13      Q.   Okay.  And I'm going to advise you -- you did a

14  direct examination.

15      A.   Uh-huh.

16      Q.   And in that direct, you said in the record -- the

17  Court Reporter's record will indicate you said, "I asked him to

18  drive the vehicle."  Okay.  Are you changing that testimony

19  now?

20      A.   Well, when I say I asked him, he told me his license

21  was valid.  Then I asked, "Well, you need to drive the

22  vehicle."  That's what I'm referring, sir.

23      Q.   So you told him he needed to drive the vehicle.

24      A.   No.  I didn't tell him -- well, I told him he needed

25  to drive the vehicle in the sense of -- but you are trying to

1    be a more assertive motion.  His license was valid and

2    Mr. Wiley wasn't going to drive the vehicle.  We didn't know

3    the status of his license.  Mr. Thompson advised me his license

4    was valid so he had to drive the vehicle.

5         Q.   Well, he didn't have to drive the vehicle, did he?

6    Somebody else -- he could have left the vehicle there.

7         A.   He could have called his cousin from Chicago to get

8    it.  That's up to him.

9         Q.   So you told him to drive the vehicle?

10        A.   That's correct.

11        Q.   Now, at that point you said you became suspicious

12   because you say it's a possibility that he was deceptive?

13        A.   That's correct.

14        Q.   What made you think he might be deceptive?

15        A.   Well, we had an initial investigation going on with

16   Mr. Thompson.  That's the particular reason why.

17        Q.   What investigation did you have and what was the

18   investigation you had with Mr. Thompson?

19        A.   Some business things referring to the county and him

20   and Mr. Wiley in a business together.

21        Q.   Okay.

22        A.   Working possibly --

23        Q.   I don't want to interrupt you.  I'm sorry.  Go ahead.

24        A.   No.  Go ahead.  A business.

25        Q.   So at the time you told Mr. Thompson to drive that

1    vehicle, you knew you had an investigation into Mr. Thompson.

2    Right?

3         A.    That's correct.

4         Q.    So when you went to the vehicle -- previously you

5    testified that when you went to the vehicle, you didn't know

6    Mr. Thompson or Mr. Wiley.  But that wasn't true, was it?  You,

7    in fact, knew who they were, didn't you?

8         A.    I didn't know the individuals personally.  That's

9    what I was referring to.

10        Q.    Okay.  But you knew Michael Thompson and Alex Wiley

11   because you were investigating them, weren't you?

12        A.    Just by picture.

13        Q.    Okay.  So, now, your reason -- so you asked

14   Mr. Thompson to drive.  And after you asked him to drive, you

15   do a second stop.  How far along did Mr. Thompson drive before

16   you did the second stop?

17        A.    From the Casino Strip area to Casino Way, maybe five

18   or six miles maybe.  Don't quote me on that.  That's

19   approximately.

20        Q.    Were there any other police officers on that scene?

21        A.    That's correct.  Lieutenant Lee Clay made the scene

22   at the BP/Wendy's.  Commander Cedric Davis made the scene.

23   Another one made the scene, Strickland, Agent Mike Strickland,

24   made the scene.

25        Q.    At the scene.  You mean the first scene, the stop,

1    the first stop of Mr. Wiley?

2         A.    No, sir, they all didn't make that scene at first.

3    What stop did you ask me, the second or first?

4         Q.    Let's talk about the first.  Were you alone at the

5    first stop or did another officer arrive?

6         A.    Agent Mike Strickland arrived at the first stop.

7         Q.    Okay.  Did they come in their own car, another police

8    car?

9         A.    They came in the same unmarked vehicle.

10        Q.    Another unmarked vehicle.  So he is not going to have

11   -- we are not going to have a tape from him, either, are we?

12        A.    No, sir.

13        Q.    Okay.  All right.  Now, the second stop, you said --

14             BY MR. GRAVES:  Your Honor, I -- Your Honor, I don't

15   know where he is going with this.  I mean, he's already been

16   through the first stop one time.  Now he is going back to it.

17   I know the Court wants to --

18             BY THE COURT:  I tell you what I want to address

19   here.  I am not here to try a case where there's some

20   disruption between two individuals.  All I'm here to try is was

21   the license valid, were they good or not good, to make a

22   determination that these license were suspended.  Now, what the

23   difference between somebody that you -- and I don't know any of

24   the folks and don't know you.  But I'm here for one thing, to

25   determine if license were suspended, not the history of

1    disagreements between administrator, the Sheriff's Office, or

2    whoever is the case.  I don't know whether -- you was with the

3    Sheriff, you testified at that time, I understand?

4              BY THE WITNESS:  Yes, sir, I was.

5              BY THE COURT:  Let's -- all of this other,

6    Mr. Colom, I'm not here to hear it.  I'm here to prove the

7    license are good, they are valid, they are not good, or they

8    were suspended.  That's what is the information I need to look

9    at.

10             BY MR. COLOM:  Well, Your Honor, under the laws of

11   Mississippi, a Defendant has a right to a defense of

12   entrapment.  I mean, I can provide the Court the case that lays

13   out that law, Beal versus State of Mississippi, right here.

14             BY THE COURT:  I understand what you are saying, but

15   can you address this Court and tell me what all you are asking,

16   whether that made the license good, bad, or suspended?

17             BY MR. COLOM:  Well, what I'm saying, Your Honor, is

18   it doesn't matter because if he was induced to --

19             BY THE COURT:  It does to the Judge.

20             BY MR. COLOM:  Okay.  Your Honor, the license were

21   not suspended.  They may have been suspended at the time, but

22   the ticket that he got for that suspended license, it was

23   dismissed.  So --

24             BY THE COURT:  Before this ticket or after?

25             BY MR. COLOM:  After the ticket.

1    BY THE COURT:  Well, that's a different ball game,

2  too.

3    BY MR. COLOM:  But, Your Honor, can I finish

4  questioning the witness?

5    BY THE COURT:  Yes, sir, but let's proceed.  Let's

6  don't get into a long history where there's disagreement

7  between two individuals in Tunica County.

8    BY MR. COLOM:  Your Honor, I understand, but,

9  Your Honor, I believe that's certainly relevant to what the

10  motive was for the stop, but I'll move on.  I think we've

11  established it.

12    BY MR. GRAVES:  Judge, I want to be clear on

13  something.  He had offered some testimony there about the

14  ticket.  The original ticket, I guess, was dismissed in

15  Montgomery County.  Is that what you said?

16    BY MR. COLOM:  That's my understanding.

17    BY MR. GRAVES:  I didn't know.

18    BY THE COURT:  Well, did I hear while ago that

19  there's somebody here from Montgomery County?

20    BY MR. GRAVES:  Yes, sir, the clerk.

21    BY THE COURT:  The lady back here?

22    BY MR. GRAVES:  Yes, sir.

23    BY THE COURT:  We might need to interject that after

24  he gets through.  I'd like to know that, too.

25    Q.   Thank you.  Now, you said that you had a concern that

```
 1  there was a possibility that Mr. Thompson was being deceptive
 2  after you let him drive the car and go.  Right?
 3       A.   That's correct.
 4       Q.   And that was the reason -- I'm sorry.  I didn't mean
 5  to stop you.  Go ahead.
 6       A.   Repeat your question again.
 7       Q.   You said that the -- I mean, the record is clear that
 8  you said under oath that the reason you decided to do a
 9  secondary stop was you had a possibility that Mr. Thompson was
10  being deceptive.  Right?
11       A.   That's correct.
12       Q.   All right.  And so you initiated a second stop?
13       A.   That's correct.
14       Q.   Okay.  So at the time you initiated the second stop,
15  Mr. Thompson had violated no Mississippi traffic law.
16       A.   He lied to me.
17       Q.   Okay.  So you do understand as a police officer that
18  trains other officers that lying is not a violation of a
19  traffic law.
20       A.   No.  Lying to a police officer, that's a violation of
21  law.
22       Q.   All right.  What law says a person can't lie to a
23  police officer?
24       A.   The law -- the charge is resisting arrest by giving
25  false information.
```

1      Q.    Okay.  So your probable cause for the stop was that

2  he gave false information about whether his license was

3  suspended or not.  That's why you initiated the second stop.

4      A.    Repeat that again.

5      Q.    You said you initiated the stop -- let me ask you

6  this.  When you initiated the secondary stop, had you ran

7  Mr. Thompson's license?

8      A.    Beforehand, no, sir.  That particular date, yes, sir,

9  I did.

10     Q.    That day?

11     A.    That's correct.

12     Q.    What time of day did you do it?

13     A.    Let me look here.  (Reviews.)  I know it was that

14  day.  It happened that particular day.

15     Q.    Before the first stop?

16          (Break in the hearing for the Court Reporter to

17           move due to noise constraints.)

18  CONTINUING:

19     Q.    I want to be clear about this.  So before you stopped

20  Mr. Wiley that first stop, you knew Mr. Thompson's license was

21  suspended.

22     A.    That's correct.

23     Q.    Okay.  All right.  So at the time you asked

24  Mr. Thompson to drive the car, you knew his license was

25  suspended.

1     A.    That's correct.

2     Q.    Okay.  All right.  Now, had you seen Mr. Thompson --

3     A.    Let me refer back on that question.

4           BY MR. COLOM:  Your Honor, I didn't have a question

5     so --

6     A.    Let me refer back to the last statement I made.

7           BY MR. COLOM:  Your Honor, I'm moving it's

8     inappropriate for him just to assert a comment.

9           BY MR. GRAVES:  He has a right to clarify his

10    answer.

11          BY THE COURT:  He has to clarify what he says.  You

12    can proceed.

13    A.    Yes, Your Honor.  When I seen him, yes, that means an

14    individual license can be suspended.  You can call to Jackson

15    and make a payment, and within a 50-minute time frame, they

16    will be valid on the computer.  That's how instantly -- I

17    couldn't swear on a stack of Bibles that Mr. Thompson's license

18    was suspended at that particular time, but through additional

19    investigation we had going on, and, also, the county, Tunica

20    County, runs all employees' driver's license, all employees.  I

21    have a list.  This is the county.  Just recently several months

22    ago, we ran the supervisor in the road department.  It came

23    back he had a possible warrant in another county,

24    DeSoto County.

25          BY MR. COLOM:  I'm going to object to this,

1  Your Honor.  This is completely irrelevant, and it's not even a

2  question before him.  He is just running off.  He is just

3  talking.

4          BY THE WITNESS:  I'm trying to explain.

5          BY MR. COLOM:  But, Your Honor, somebody has to ask

6  him a question.

7          BY THE COURT:  All right.  Turn around and ask your

8  question.

9      Q.   Okay.  Thank you.  Now, so after you approached

10  Mr. Thompson the second time, did you run his license again

11  before you gave him the ticket?

12     A.   I did.  I ran Mr. Thompson's license, Tunica County,

13  NCIC, National Criminal Information Center, with the dispatcher

14  Debra Ellington.  Mr. Thompson's license came back suspended,

15  failure to appear, Montgomery County.

16     Q.   Okay.  And that was after the second stop.  And at

17  that point, you placed Mr. Thompson under arrest.

18     A.   I advised Mr. Thompson of his rights and placed him

19  under arrest, that's correct.

20     Q.   Okay.  And did you check and see if there was an

21  arrest warrant for that ticket in Montgomery County?

22     A.   Did I check?

23     Q.   Yes.

24     A.   I didn't check.

25     Q.   Okay.  So you don't know if Montgomery County had an

1    arrest warrant for Mr. Thompson or not.

2    A.    Well, I was instructed that they possibly did.

3    Q.    Who instructed you that?

4    A.    Through initial investigation, the Sheriff.

5    Q.    The Sheriff of Tunica County?

6    A.    That's right.

7    Q.    So during the investigation -- was that before or

8    after you arrested Mr. Thompson?

9    A.    After.

10   Q.    Okay.  So after you arrested Mr. Thompson, you called

11   the Sheriff?

12   A.    Hmmm.  I did call the Sheriff.

13   Q.    Why did you call him?

14   A.    That's my boss.  Why would I not call him?  That's my

15   main supervisor.

16   Q.    Okay.  Do you call the Sheriff after every arrest you

17   do for a traffic citation?

18   A.    Any sensitive arrest or political -- my job is to

19   contact the Sheriff.

20   Q.    Okay.  Did he tell you right away that Mr. Thompson

21   might have an arrest warrant in Montgomery County?

22   A.    No, he didn't tell me that.

23   Q.    Okay.  So did he call you back and tell you that?

24   A.    That's correct.  I was advised of that.

25   Q.    Now, other than driver's license suspended,

1  Mr. Thompson didn't get any other ticket, did he?

2      A.   I'm sorry?

3      Q.   Other than driving while license suspended,

4  Mr. Thompson didn't get any other ticket, did he?

5      A.   No, sir.

6      Q.   No careless driving tickets?

7      A.   He wasn't driving careless driving.  Mr. Wiley was

8  driving.

9      Q.   Okay.  So he didn't do anything wrong other than you

10 found out after you asked him to drive that his license was

11 suspended?

12     A.   That's the violation.  That's what he did.

13     Q.   But you had no probable cause to stop him other than

14 your belief that he lied to you.  Do you understand?

15     A.   That's correct.

16     Q.   Okay.

17     A.   Let me -- repeat that again.

18     Q.   Your probable cause you had to stop Mr. Thompson was

19 the fact that you believe that he might be deceptive.  Right?

20 That's the reason you stopped him the second time.

21     A.   That's correct.  He was deceptive and lying, that's

22 correct.

23     Q.   All right.  Okay.  Now, do you know what happened --

24 do you know if there's ever been an arrest warrant from

25 Montgomery County to arrest Mr. Thompson?

1     A.   Yes.   That's what we just showed Your Honor.   There
2   was an arrest warrant in Montgomery County.
3          BY THE COURT:   I would love to have the date of that
4   ticket.   I've been trying to get that, too.   Looks like the
5   clerk would probably testify to this information.
6     A.   Right.   And going back to his question, your
7   question --
8          BY MR. COLOM:   I'm done with that question,
9   Your Honor.
10         BY THE COURT:   He come back and asked you a question
11  to get it.   Then we asked this date.   I'm trying to get the
12  date.
13         BY MR. COLOM:   Well, if he has testimony related to
14  the date, but just him clarifying something is inappropriate.
15  I'd asked him about a warrant.
16         BY THE COURT:   You don't want him to clarify, I
17  understand what you're saying.   He's made his statements.
18         BY MR. COLOM:   Yeah.   Thank you.
19         BY THE COURT:   But I'm going to repeat one more
20  time, we are sitting here getting stuff.   They are trying to
21  prove somebody against somebody, looks like to me, and I'm not
22  here to hear that in Court, Mr. Colom.   I'm here to see whether
23  the man's license is good, whether it's bad, or whether it's
24  suspended.   That's what the ticket is for.   And you went into
25  things that has nothing to do with the suspended driver's

1  license.  You are trying to accuse, and this Judge is saying

2  that there's a personality conflict between either him or him

3  and the Sheriff that I know nothing about and I don't care to

4  hear it.  I'm here to find out if the license was suspended or

5  not suspended.

6          BY MR. COLOM:  Well, Your Honor, again --

7          BY THE COURT:  I want to make it clear.

8          BY MR. COLOM:  -- I want to state for the record

9  that under the laws of Mississippi, if someone is entrapped to

10 violate a law, that is a defense to the crime.  And so the

11 Judge can, you know, ignore that law if he wants to, but the

12 issue before the Court is not just whether his license was

13 suspended or not.  The issue is I raise the defense of

14 entrapment, and I have a right to go into that defense.  And if

15 the Court is going to deny my client that right under

16 Mississippi law, then we just need to be clear about that on

17 the record.

18         BY THE COURT:  Well, I haven't denied anything at

19 this point in time.

20         BY MR. COLOM:  Okay.  Thank you.

21         BY THE COURT:  But what I am instructing you to do

22 is let's get on to the point, what we are here for, for

23 suspended driver's license.

24         BY MR. COLOM:  I appreciate that, Your Honor.

25         BY THE COURT:  Okay.

1          BY MR. GRAVES:  Judge, in response to your question,

2     this is the copy of the purported warrant from Montgomery

3     County?

4          BY THE COURT:  All right.  Where is the date?

5          BY MR. GRAVES:  As I read it, February 12, which is

6     the same day as the violation in Tunica.  That's the only date

7     I see.

8          BY THE COURT:  Where is your time or anything?  What

9     is the time of the traffic stop?

10          BY THE WITNESS:  1827 hours.

11          BY MR. GRAVES:  Which is --

12          BY THE WITNESS:  6:27 hours.

13          BY MR. GRAVES:  6:27 p.m.

14          BY THE COURT:  All right.  And this was suspended --

15     well, I'm going to ask the lady the question.  Ma'am, what is

16     your name?  I'm sorry.

17          BY MS. CARTER:  Karen Carter.

18          BY THE COURT:  Who?

19          BY MS. CARTER:  Karen Carter.

20          BY THE COURT:  Carter?

21          BY MS. CARTER:  Yes.

22          BY THE COURT:  Can you tell me, this is a copy of

23     yours right there?

24          BY THE CARTER:  Uh-huh.

25          BY THE COURT:  What time of the day was this done

1   away with, dismissed, or something on February 12, the same

2   date the ticket was done here in Tunica County, and at what

3   hour was this done?  It's void.  And so is that saying this

4   piece of paper is no good?

5               BY MS. CARTER:  Correct.  The Judge did not sign it.

6               BY THE COURT:  Okay.  Let's move ahead.  I got one

7   other question for you, though, at this time.

8               BY MS. CARTER:  Yes, sir.

9               BY THE COURT:  Do you have a dismissal of this or a

10  paid receipt of this?

11              BY MS. CARTER:  Of our ticket in Montgomery County?

12  It was paid.

13              BY THE COURT:  At what time?

14              BY MS. CARTER:  It was on February 18, I believe,

15  but I do not have times on our payments.

16              BY MR. COLOM:  But isn't it also true that he was

17  given that money back?

18              BY MS. CARTER:  The fine part.

19              BY MR. COLOM:  Okay.

20              BY THE COURT:  And he was given what back?

21              BY MS. CARTER:  The fine.  After he made the

22  payment, the Judge wrote me an order to suspend the fine.  But

23  we had already taken the payment so I had to turn it over to

24  Chancery for them to get the money --

25              BY THE COURT:  For them to return it back.  I

1  understand that.  Okay.

2           BY MR. COLOM:  So the underlying charge from

3  Montgomery County was dismissed?

4           BY MS. CARTER:  He pled guilty and paid it.  It

5  wasn't dismissed.

6           BY THE COURT:  Wait a minute.  I want -- that

7  question you said was what, now?

8           BY MR. COLOM:  My understanding was was that charge

9  -- was he found guilty of that charge or not?

10          BY MS. CARTER:  Yes.

11          BY THE COURT:  What was the date of your ticket,

12  when it was written?  Was it written before this February 12?

13          BY MS. CARTER:  I don't think -- I need my glasses.

14  Sorry.

15          BY THE COURT:  I hate to bring in stuff like this,

16  but we are getting into stuff that I need to get something on

17  paper so I can be looking at it.

18          BY MS. CARTER:  Our ticket was written February 12,

19  2013, at 6:20 p.m.

20          BY THE COURT:  Do what, now?

21          BY MS. CARTER:  July 12, 2013.

22          BY THE COURT:  July 12.  I thought you said

23  February 12.

24          BY MS. CARTER:  I may have.  I didn't mean to.

25  July 12, 2013.

1     BY THE COURT:  July 12, 2013.  You can sit down at

2  this point in time.  I just wanted to get in my mind what we

3  got.  All right.  Now you go back to the place you were.

4     Q.   Now, I think you just saw the clerk come up there and

5  give you the arrest warrant that was voided.  And you see that

6  was never signed by a Judge.  Right?  You see that.

7     A.   I didn't see it.

8     Q.   Where is that document at?

9        BY MR. GRAVES:  What document?

10        BY THE COURT:  The one where the Judge wouldn't sign

11  it, that it was dismissed.  It is here somewhere, the one that

12  is void.  The Judge signed that, would not dismiss it.  He

13  accepted the Court cost, but he didn't take the fine.  Am I

14  correct, ma'am?

15        BY MS. CARTER:  Yes, sir.

16        BY THE COURT:  Okay.

17        (Attorneys review documents.)

18        BY THE COURT:  There's one laying there because I

19  just saw it.  It's right there.

20        BY MR. COLOM:  Your Honor, I move to make this an

21  exhibit.

22        BY THE COURT:  Exhibit A?

23        BY MR. COLOM:  Exhibit A, Defense Exhibit A.

24        BY THE COURT:  Understanding that the Judge did not

25  dismiss the ticket.  He just took the fine off instead of the

1 other.  You are going to make a copy of this, Ms. --

2     (Document marked as Defense Exhibit A and retained

3     with clerk.)

4   Q. We got Exhibit 1 here.  Now, this is in your file.

5 Right?

6   A. I just got that.

7   Q. Okay.  Now, you see where it says -- you know, this

8 is a copy of what could be an arrest warrant.  You see it says

9 Justice Court arrest warrant?

10   A. That's correct.

11   Q. And you see it is not signed by the Judge?

12   A. Yes, sir.

13   Q. So it was never signed by the Judge.  A

14 Montgomery County Judge never signed the arrest warrant against

15 Mr. Thompson based on the document you gave me.  Right?

16   A. That's correct.

17   Q. All right.  You said that that -- that it was y'all's

18 policies and procedures to arrest people when they would drive

19 with suspended license?

20   A. That's correct, it is.

21   Q. Okay.  Do you have those policy and procedures with

22 you?

23   A. I do.

24   Q. So I want to ask one final question of you.

25   A. Yes, sir.

1    Q.   If I research the arrests in Tunica County, you are

2  telling me every time somebody is getting a ticket for a

3  suspended driver's license, Tunica County arrested them and

4  booked them?

5    A.   I can't tell you that.

6    Q.   Okay.  So if that didn't happen, it was a violation

7  of y'all's policies and procedures.

8    A.   Look at the date on that.  What did you ask me?

9    Q.   I want to be clear about this because you would agree

10  with me that lots of people drive with suspended license in

11  Tunica County.

12    A.   That's correct, through Tunica County.

13    Q.   Right.  And you would agree with me that it's your

14  testimony -- and I want to make sure I'm clear about this --

15  that every time a police officer finds somebody is driving with

16  a suspended license, it's y'all's policy to arrest them and

17  book them, make them bond out of jail for that charge, rather

18  than giving them a citation and let them leave.

19    A.   I can't tell you what other officers do.  I can tell

20  you the policy.

21        BY MR. COLOM:  Now, Your Honor --

22        BY THE COURT:  Let me read this just a minute.

23        BY MR. COLOM:  Sure.

24        BY THE COURT:  (Reviews.)  I want you to read it.

25        BY MR. COLOM:  (Reviews.)  Okay.

1          BY MR. GRAVES:  (Reviews.)

2      Q.   So you would agree with me, though, that you could

3  have just given Mr. Thompson a ticket for driving while license

4  suspended.  You didn't have to arrest him.

5      A.   I had to follow the policy.

6      Q.   And so you are telling me since December 2012, the

7  policy for Tunica County is that if somebody has a suspended

8  driver's license and they are caught driving in Tunica County,

9  y'all arrest them and make them -- book them and make them bail

10  out of jail.

11      A.   You are saying that.  I'm stating I followed the

12  policy.

13      Q.   Let me ask you, since December 2012, have you

14  arrested anybody else and booked them and made them bail out of

15  jail for driving while license suspended?

16          BY MR. GRAVES:  Your Honor, this has got nothing to

17  do with whether the license was suspended.  I don't see where

18  it is going.

19          BY THE COURT:  We are still, Mr. Colom, trying to

20  prove a point in my opinion of somebody has got something

21  against somebody.  And, again, for the last time, I'm not

22  interested in that.  The charge I'm looking at before me is

23  driving with suspended license.  That's all I'm concerned

24  about, whether he was driving with suspended license or what.

25  This other part, I care nothing about it.

1           BY MR. COLOM:  Okay.

2           BY THE COURT:  You can present it, but --

3           BY MR. COLOM:  Can I get an answer to that

4  last question?

5           BY THE COURT:  Yeah.  Re-ask it.

6    Q.   Yes.  Since December 2012, have you or do you know of

7  any other police officer in Tunica County that has arrested

8  someone, booked them, and made them bail out of jail for

9  driving while license suspended?

10    A.   Yes.  Officers have made arrests for suspended

11  license since December 2012.

12           BY MR. COLOM:  Nothing further, Your Honor.

13           BY THE COURT:  Okay.  You got any further questions?

14           BY MR. GRAVES:  No, sir.  I don't think so.  Call

15  the clerk of Montgomery County.

16

17  TESTIMONY OF KAREN CARTER:

18  DIRECT EXAMINATION BY MR. GRAVES:

19    Q.   What is your name?

20    A.   Karen Carter.

21    Q.   Okay.  And where do you work?

22    A.   Montgomery County Justice Court.

23    Q.   Okay.  The Judge has already called you up here

24  earlier.  Are you familiar with the subject matter --

25    A.   Yes, sir.

1      Q.    -- of our trial?  As the Clerk of Montgomery County,

2  was Michael Thompson's license suspended on February 12, 2014?

3            BY MR. COLOM:  Object.  Lack of foundation.

4      Q.    Part of your duties of being the Clerk is to send in

5  suspension notices; is that correct?

6      A.    Correct.

7      Q.    Well, as of February 12, 2014, had you sent in a

8  suspension for Michael Thompson?

9      A.    The suspension was sent in on August 10, 2013.  I

10 can't tell you when it was suspended, but that's when we sent

11 it in.

12     Q.    And as far as you know, as the Clerk, had that ticket

13 been satisfied --

14     A.    No.

15     Q.    -- before February 12 of this year?

16     A.    (Shakes head side to side.)

17     Q.    Okay.

18     A.    No, not February 12, February 18.

19     Q.    So the suspension you sent in for Montgomery County

20 was still valid on February 12.

21           BY MR. COLOM:  Object to that, mischaracterizing her

22 testimony.

23           BY THE COURT:  Go ahead and proceed.

24     A.    As far as I know.

25           BY THE COURT:  I want to get something clarified

1    with you again, with both you and him here.  I understand this

2    ticket in your county happened July 12 of 2013.  Is that

3    correct?

4              BY THE WITNESS:  Yes, sir.

5              BY THE COURT:  All right.  I understand as of

6    February 13, when this ticket was written, according to yours,

7    they were suspended on August 10 of 2013 according to your

8    records.

9              BY THE WITNESS:  That's when we sent it in, yes,

10   sir.

11             BY THE COURT:  Okay.  The gentleman did not pay

12   until February 18 of 2014.

13             BY THE WITNESS:  Correct.

14             BY THE COURT:  Now, we had a copy here while ago

15   which said that they were still suspended on 1/21/14 from the

16   State of Mississippi.  I believe I got the correct date.

17             BY MR. JONES:  That's the suspended date,

18   Your Honor, when we ran them.

19             BY THE COURT:  (Reviews.)

20             BY MR. JONES:  Basically, Your Honor --

21             BY MR. COLOM:  I'm going to object.  He is not even

22   a witness right now.  We have a new witness.

23             BY THE COURT:  I asked him a question, though,

24   Mr. Colom.  I'm wanting to get dates off of this thing here on

25   my paper where I'm not going back through them.  I'm only

1  wanting dates at this point in time.

2            BY MR. COLOM:  Okay.  Well, then, I'll object to him

3  testifying.  He can give dates.

4            BY THE COURT:  I don't need that.  Don't show me

5  that now.  I just -- this is what I asked for, is the date.

6  Now, back to where I said on February 13, which is the ticket

7  here in Tunica County --

8            BY MR. GRAVES:  I believe it's February 12, Judge.

9            BY THE COURT:  Was it the 12th?  I wrote down the

10 13th.  I thought it was the 13th.  All right.  The ticket here

11 in Tunica County was February 12 of 2014.  Is that correct?

12           BY MR. GRAVES:  Yes, sir.

13           BY THE COURT:  And you are testifying in front of

14 the Court that on February 18 of 2014 you got the fine.  That's

15 when you got paid.

16           BY THE WITNESS:  Correct.

17           BY THE COURT:  But you also testified at that time

18 that the Judge -- let's get this straight.  He was still found

19 guilty, but he took the fine off as some do from time to time.

20           BY THE WITNESS:  Yes, sir.

21           BY THE COURT:  He paid the other part.  He didn't

22 pay the full --

23           BY THE WITNESS:  He paid the full part at the time,

24 but I had to reimburse the fine.

25           BY THE COURT:  Okay.  That's what I want clear in my

1  mind.  Okay.  Are you through with her?

2          BY MR. GRAVES:  Yes, sir.

3          BY MR. COLOM:  One or two quick questions.

4

5  CROSS EXAMINATION BY MR. COLOM:

6      Q.    Are you sure he was found guilty because I recall the

7  charges were dismissed.  Are you sure he was found guilty of

8  that charge?

9      A.    When he paid it, it goes into Jackson as being paid

10 and a guilty.

11     Q.    Okay.  But did a Judge in Montgomery County ever find

12 him guilty of the charge?

13     A.    No.  He never went to Court.  He just came in and

14 paid it.

15     Q.    Okay.

16          BY THE COURT:  Which you can do.

17     Q.    Right.  Do you know if a Judge ever dismissed that

18 charge?

19     A.    Not to my knowledge.  I was never given any paperwork

20 where he dismissed it.

21     Q.    But the Judge told you to give him his money back,

22 part of his money back, the part that she could give back.

23     A.    He told me to suspend the fine and we had to

24 reimburse it because I had already turned it over.

25     Q.    Okay.  Nothing further.

1    BY THE COURT:  Suspended the fine, so that he will

2  understand, does not give away the full amount of the money, or

3  did you --

4    BY THE WITNESS:  No, sir.

5    BY THE COURT:  Okay.  That's what I wanted

6  understood.  I knew it didn't in our county.  I just wanted it

7  understood.

8    Q.    Nothing further.

9    BY MR. GRAVES:  Judge, that's all from the State.

10    BY MR. COLOM:  We are going to call the Sheriff,

11  Your Honor, just briefly.

12    BY THE COURT:  Are you going to want to question the

13  Sheriff when he gets through?

14    BY MR. GRAVES:  I probably will.

15    BY THE COURT:  I just want it clarified that you are

16  not letting him go.

17

18  TESTIMONY OF SHERIFF K. C. HAMP:

19  DIRECT EXAMINATION BY MR. COLOM:

20    Q.    Based on the Judge telling me he wants to keep this

21  inquiry limited, let me ask you, Sheriff, the day that

22  Mr. Thompson was given his ticket, do you or do you know of

23  anyone at the Sheriff's Department that has evidence that

24  Mr. Thompson drove before he was pulled over by the Captain?

25    BY THE COURT:  Wait a minute.  Ask that again.

```
 1        Q.    Captain Jones -- we've already established Captain

 2    Jones pulled Mr. Thompson over.  Correct?

 3        A.    Okay.

 4        Q.    All right.  Before Captain Jones pulled Mr. Thompson

 5    over, did you see Mr. Thompson drive?

 6        A.    No, sir, I cannot articulate Captain Jones' stop.

 7        Q.    Okay.  I'm not asking you that.  Listen to my

 8    question.  Before Captain Jones stopped Mr. Thompson, did you

 9    see Mr. Thompson drive?

10        A.    No, sir, I did not.

11        Q.    Okay.  Do you know of anyone from the Sheriff's

12    Office, before Captain Jones stopped him, that saw Mr. Thompson

13    drive that day?

14        A.    On that day, no, sir.

15        Q.    Okay.  Now, and just one question, did you know that

16    day that Mr. Thompson's license was suspended as part of your

17    investigation, the investigation that Captain Jones testified

18    about?

19        A.    Yes, sir, I did.

20        Q.    You knew it was suspended?

21        A.    Yes, sir.

22        Q.    Before Captain Jones stopped him?

23        A.    Yes, sir.

24        Q.    All right.

25              BY MR. COLOM:  Nothing further, Your Honor.
```

```
 1            BY MR. GRAVES:  I don't have any questions for the
 2   Sheriff.
 3            BY MR. COLOM:  I'm going to object, Your Honor.
 4            BY THE COURT:  He don't want him talking to you.
 5            BY MR. COLOM:  He can ask him a question, but, you
 6   know, he can't --
 7            BY THE COURT:  Ask it out loud so that he'll have no
 8   objections to it.
 9            BY MR. GRAVES:  Judge, I think the Sheriff wants to
10   clarify.  I want to ask him one question.
11
12   CROSS EXAMINATION BY MR. GRAVES:
13       Q.   How did you know his license was suspended?
14       A.   Your Honor, every six months we check every person
15   that operate a county vehicle in Tunica County according to our
16   fleet management policy.  And that's a list of Sheriff's Office
17   employees, as well as Tunica.  Anyone operating a vehicle, we
18   check everyone.  If they have a warrant, so to speak, then we
19   -- there was one guy prior to that -- we will make an arrest
20   and transport him to whatever agency there is so, yes, I did
21   know.
22            BY MR. GRAVES:  That's all.
23            BY THE WITNESS:  And this information here on the
24   fleet safety management, it is our job to -- I mean, we are
25   police officers.  Our job is not to tip people off.  Our job is
```

```
 1   to enforce the law.  So according to our fleet safety
 2   management policy, there was one guy with the county.  He had a
 3   warrant and he was arrested, as well, prior to Mr. Michael
 4   Thompson.
 5              BY MR. COLOM:  You just keep talking.  Keep talking.
 6   Were you the one --
 7              BY MR. GRAVES:  I think he is out of order.
 8              BY THE COURT:  This is a little out of order,
 9   Mr. Colom.
10              BY MR. COLOM:  Well, he is testifying.
11              BY THE COURT:  If you can't talk in this Court and
12   talk with a voice, I'll be the one screaming.  We are in here
13   to talk like human beings to each other.  I'm not here for
14   popularity or no popularity.  Do you understand?  Do you
15   understand?
16              BY MR. COLOM:  Judge, I only talk as an --
17              BY THE COURT:  I asked you a question.  Do you
18   understand?  We are not here to be raising voices and pointing
19   fingers at folks.  Do you understand, yes or no?
20              BY MR. COLOM:  I understand what you are saying,
21   yes.
22              BY THE COURT:  Okay.  Okay.
23              BY MR. GRAVES:  I don't have any more questions,
24   Judge.
25              BY THE COURT:  You can proceed.
```

1 REDIRECT EXAMINATION BY MR. COLOM:

2     Q.   Now, so when did you know that Mr. Thompson's license

3 was suspended?

4         BY MR. GRAVES:  Your Honor, I think he's finished

5 questioning the Sheriff, now, and I just did a cross.

6         BY THE COURT:  You did.

7         BY MR. COLOM:  This is redirect, Your Honor.

8         BY THE COURT:  Let him go ahead with this one thing.

9     Q.   When did you know Mr. Thompson's license was

10 suspended.

11     A.   I knew it the day of the arrest.

12     Q.   But how far before that did you know or did you just

13 know that day?

14     A.   I knew that day, early part of the day.

15     Q.   So you found out that day his license was suspended?

16     A.   I called Montgomery County after knowing that there

17 was a possible warrant, and the clerk told me she would forward

18 that warrant to my office.

19     Q.   That day, the day he was arrested?

20     A.   That's correct.

21     Q.   Nothing further.

22         BY THE COURT:  I'm not worried about personal

23 situations.  Let's proceed.

24         BY MR. COLOM:  I'm going to call Mr. Pittman to the

25 stand and testify, Ellis Pittman.

1    TESTIMONY OF ELLIS PITTMAN:

2    DIRECT EXAMINATION BY MR. COLOM:

3        Q.    What knowledge do you have of the day of the arrest

4    of Mr. Thompson?

5        A.    That evening, late that evening, I learned of it

6    while having dinner with my family.

7        Q.    How did you find out about it?

8        A.    I received a telephone call, and we were in a

9    restaurant in Clarksdale.

10       Q.    Did you talk to the Sheriff or anybody from the

11   Sheriff's Office after that point?

12       A.    I spoke with the Commander.

13       Q.    What Commander is that?  What is his name?

14       A.    I don't remember.

15       Q.    What did he tell you?

16       A.    I first tried to contact the Sheriff.  I called and

17   left several messages for the Sheriff.  I called the Commander

18   because I'm attorney for Tunica County Board of Supervisors,

19   and county employee, county Sheriff's Department.  I inquired

20   as to whether or not they had a warrant from Montgomery County.

21       Q.    Okay.  And what did they tell you?

22       A.    I was advised that they did not have a warrant in

23   hand, and I advised them that if they were going to hold him

24   and not let him bond out of jail, they needed to get a copy of

25   that warrant from Montgomery County.  If they did not have a

1   copy of the signed warrant from Montgomery County, let him bail

2   out of jail.

3       Q.   Okay.  Nothing further, Your Honor.

4

5   CROSS EXAMINATION BY MR. GRAVES:

6       Q.   Mr. Pittman?

7       A.   Yes, sir.

8       Q.   Have you reviewed any of the documents as far as the

9   ticket or anything?

10      A.   (Shakes head side to side.)

11      Q.   Do you have an opinion as to whether or not

12  Mr. Thompson's license was suspended?

13          BY MR. COLOM:  I'm going to object to that,

14  Your Honor.  That's improper opinion.

15      A.   I have not seen any of the documents.

16      Q.   Okay.

17      A.   The documents that you all have.

18          BY THE COURT:  I'll strike that.  If he has seen it,

19  he has no knowledge.

20      Q.   Okay.  That's all.

21          BY MR. COLOM:  Thank you.  Can I have one second,

22  Your Honor, to talk to my client?

23          BY THE COURT:  Yes.

24          (Break in the hearing.)

25

1    CONTINUING:

2              BY THE COURT:  You were in the process of asking --

3              BY MR. COLOM:  Your Honor, we rest.  Defense rests.

4              BY MR. GRAVES:  Judge, just what you want to know, I

5    think it's clear from the dates that the license was suspended

6    on the day he was stopped.

7              BY THE COURT:  All right.  I want to make sure with

8    both of you here that I have the dates of what happened.

9              BY MR. GRAVES:  Yes.

10             BY THE COURT:  The first date in Montgomery County

11   that Karen -- is that correct?

12             BY MS. CARTER:  Yes, sir.

13             BY THE COURT:  -- presented the ticket was July 12

14   of 2013.  Is that correct?

15             BY MS. CARTER:  Yes, sir.

16             BY THE COURT:  All right.  You did not get paid

17   until February 18 of 2014.

18             BY MS. CARTER:  Correct.

19             BY THE COURT:  You collected the fine, you dismissed

20   the fine, and collected the other part.

21             BY MS. CARTER:  I collected the whole amount and

22   then I had to --

23             BY THE COURT:  I understand that.  But at the end,

24   what you got was just the fine.  The Judge dismissed the fine

25   part and collected just the other part.

1          BY MS. CARTER:  The assessments, yes.

2          BY THE COURT:  Which found him guilty at that point

3   in time when you sent that money in to Jackson, correct?

4          BY MS. CARTER:  Correct.

5          BY THE COURT:  Okay.  Then on February 12, here in

6   Tunica, we get a ticket.  And I understand it was 6:27 p.m.

7   The ticket was paid in Montgomery County on February 18, after

8   the ticket here.  Are those dates correct?  Both of you agree

9   with those dates?

10         BY MR. GRAVES:  Yes, sir.

11         BY THE COURT:  Okay.

12         BY MR. GRAVES:  I agree.

13         BY MR. COLOM:  I'm not going to state on record

14  whether I agree or disagree with that.

15         BY THE COURT:  Well, I have no alternative -- I'm

16  here for driving with license suspended -- but to find the

17  party guilty.

18         BY MR. COLOM:  Your Honor, can I make an argument on

19  the record before you make that finding?

20         BY THE COURT:  Yes, sir.  I've pretty well made up

21  my mind because I have found the ticket that I've got here, I

22  got my dates, I got the money was put up back there and the

23  money has been refunded down yonder and got the dates.

24         BY MR. COLOM:  I think there's a couple of things

25  that go beyond that, Your Honor, and I would like the

opportunity to present that. You know, you said you don't have
any alternative, but that's not true, Your Honor. Under the
Supreme Court, the state laws of Mississippi, and I gave the
Court a copy of this case, Beal versus State of Mississippi --
and I'm going to read it. It's at 86 Southern Reporter, 3rd
Edition, 887. It says -- and this is a Supreme Court case,
Mississippi Supreme Court case -- says entrapment occurs when
the individual acts to induce or lead another person to commit
a crime not originally envisioned by that purpose for the
purposes of trapping that person for the offenses committed.
Okay. We've raised the defense of entrapment. The officer has
admitted at the time he stopped Mr. Wiley, not Mr. Thompson, he
knew Mr. Thompson's license was suspended. He admits that
Mr. Wiley's license was not suspended. He said they were
suspicious, that it wasn't reinstated or something like that,
but he didn't have information that they were suspended, but he
asked Mr. Thompson to drive. So knowing that Mr. Thompson's
license was suspended, he induced Mr. Thompson to drive the
car. And then shortly after he induced Mr. Thompson to drive
the car, he pulled him over and gave him a ticket. That's
classic entrapment. Now, they've got no evidence he was
predisposed to drive. They have got no evidence that he had
driven that day, zero evidence before the officer asked him to
drive. The officer did not give Mr. Wiley a ticket for
careless driving, the original reason he claimed he pulled over

1   Mr. Wiley and Mr. Thompson.  He didn't give him a ticket.  He

2   didn't give Mr. Wiley a ticket for suspended license or

3   careless driving.  So classic entrapment, Your Honor, under

4   Mississippi law.  Now, second, before an officer can pull over

5   an individual, he has to have probable cause. That's guaranteed

6   by the United States Constitution, which governs even

7   Mississippi law.  And the officer again admitted that he had no

8   probable cause.  His only probable cause was that he thought

9   Mr. Thompson was lying.  Well, Your Honor, I will submit to you

10  under the jurisprudence in the history of this country, it has

11  never been determined by a Judge that an officer has probable

12  cause to stop someone because he believes they are lying.  He

13  admits Mr. Thompson did not careless drive.  He didn't do

14  anything to violate the laws of Mississippi.  Judge, he admits

15  that.  He said, "The only reason I stopped him is I thought he

16  was lying."  Now, if that's true, Your Honor, a police officer

17  can stop a United States citizen any time he or she wants.  A

18  citizen does not have a Fourth Amendment right anymore because

19  the officer can always say, "I believe this person is lying so

20  I pulled him over."  That's not probable cause, Your Honor, and

21  it would totally make people's Constitutional rights invalid.

22  So based on that, I think the Court has no alternative but to

23  find, one, there was no probable cause for the stop and so,

24  therefore, the fruits of the stop are illegal; and, two, even

25  if the stop was probable, which it could never be, Mr. Thompson

1   was induced and entrapped to drive.  So, therefore, the Court

2   has no alternative but to find him not guilty.  Nothing else.

3   　　　　　　　BY THE COURT:  I'd like to clarify a thing or two

4   that you said.  If the man -- if Mr. Thompson knew that his

5   license was suspended, he never should have got under the

6   steering wheel if I tell him, you tell him, or anybody tells

7   him.  Do we agree or disagree?

8   　　　　　　　BY MR. COLOM:  This is what I say.  There's no

9   testimony before the Court that Mr. Thompson knew his license

10  was suspended.  A lot of time people --

11  　　　　　　　BY THE COURT:  There was testimony before the Court

12  he told the officer his license was good.  That testimony is

13  before the Court.

14  　　　　　　　BY MR. COLOM:  Right.  So he may have thought his

15  license was valid.  The reality is a lot of times, people get

16  their license suspended and they don't know.

17  　　　　　　　BY THE COURT:  Well, Mr. Thompson probably realizes,

18  as any citizen, as I'll go back and argue against you, that he

19  got a ticket in Montgomery County.  Why did he go pay it on

20  February 18 after he got this other ticket?  To try to get

21  himself off the case.  That's all I've got to say.  My finding

22  is guilty.  You have your time to appeal it.

23  　　　　　　　BY MR. COLOM:  We are clear.

24  　　　　　　　BY THE COURT:  It will be $1,250 to appeal this case

25  to the higher county, to appeal this case to the Circuit Court.

1    That's all.

2              (Hearing concluded at 11:14 a.m.)

1    <u>CERTIFICATE OF COURT REPORTER</u>

2        I, KAREN CARNELL REID-EDGE, MS CCR 1276,

3    TN LCR 469, Notary Public commissioned by the State of

4    Mississippi, do hereby certify that the foregoing pages, and

5    including this page, contain a true and correct transcript of

6    the Justice Court Hearing as taken by me at the time and place

7    heretofore stated, and later reduced to typewritten form to the

8    best of my skill and ability; and that I am not in the employ

9    of, or related to, any counsel or party in this matter, and

10   have no interest, monetary or otherwise, in the final outcome

11   of the proceeding.

12       Witness my signature and seal on this the 1st day of

13   August, 2014.

14

15   _____

16   KAREN CARNELL REID-EDGE,

17   MS CCR 1276, TN LCR 469

18   My Commission Expires:  3/5/16

19

20

21

22

23

24

25