Exhibit "A" (Part One)          Michael Thompson
                                August 12, 2016

1    APPEARANCES:
2
         MS. EUGENE CARLOS TANNER, III
3        TANNER & ASSOCIATES, LLC
         263 EAST PEARL STREET
4        JACKSON, MISSISSIPPI  39201
         Telephone:  601.460.1745
5        carlos.tanner@thetannerlawfirm.com
6
         MR. MICHAEL J. WOLF
7        PAGE, KRUGER & HOLLAND
         10 CANEBRAKE BOULEVARD
8        SUITE 200
         FLOWOOD, MISSISSIPPI  39232
9        Telephone:  601.420.0333
         mwolf@pagekruger.com
10            COUNSEL FOR DEFENDANTS
11
12
13
14
15
16
17
18
19            KELLYE S. SHOWS
         DAVIS COURT REPORTING
20        Post Office Box 44
         Madison, Mississippi  39130
21          (601) 856-8889
22
23
24
25

Michael Thompson
August 12, 2016

Page 3

1                    I N D E X
2

                                           PAGE

3
     Style                                  1
4    Appearances                            2
     Index                                  3
5    Examination by Mr. Wolf                4
     Examination by Mr. Tanner              141
6    Examination by Mr. Wolf                145
     Certificate of Witness                 149
7    Certificate of Court Reporter          150
8    Exhibit 1  CD                          148
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Michael Thompson
August 12, 2016

Page 4

1         MR. WOLF:  We're taking this pursuant to

2    Notice.  All the substantive objections can be

3    reserved.  All procedural objections should be stated

4    on the record.  Is that agreeable, the standard

5    stipulation?

6         MR. TANNER:  Yes.

7              MICHAEL THOMPSON,

8         having been first duly sworn, was

9         examined and testified as follows:

10                 EXAMINATION

11   BY MR. WOLF:

12        Q.    Mr. Thompson, my name is Michael Wolf.

13   I'm the attorney for Calvin Hamp and James Jones in

14   a lawsuit you filed against them.  I'm here today to

15   take your deposition.  I expect you've spoken to your

16   attorney about depositions a little bit.  I'm going

17   to go over them, but first let me get your full name

18   spelled, if you would.

19        A.    Michael Thompson, M-I-C-H-A-E-L

20   T-H-O-M-P-S-O-N.

21        Q.    And your current address?

22        A.    227 Turtle Lane, Brandon, Mississippi 39047.

23        Q.    If I can have the last four digits of your

24   Social Security number.

25        A.    6113.

Michael Thompson
August 12, 2016

Page 5

1      Q.     That's just to make sure we've got the
2   right Michael Thompson here today.  The reason we're
3   here, obviously, is to ask you some questions about
4   allegations you made and the lawsuit that you filed
5   against Calvin Hamp and James Jones.
6          My goal is to ask you questions and try
7   to get the best response as I can.  I'm not going to
8   try to trip you up at all because I'm not that clever,
9   but when I ask you a question I'll be real clear
10  when I'm trying to get something.  All right.  If
11  I'm trying to be clever, I'll probably announce it.
12  What I'm getting at is we're just trying to get some
13  honest testimony here today.
14          To help the process along, we've got to
15  remember that we have a court reporter here.  The
16  court reporter takes down everything you say and
17  everything I say, so in order to make her job more
18  efficient it's useful for us to do a couple of
19  things:  Number 1, wait for the question to be
20  completed before you answer and, in turn, I'll wait for
21  you to complete your answer before I ask the next
22  question.  This does two things:  Number 1, it
23  allows the court reporter to hear one voice at a
24  time and it also allows you to hear the fullness of
25  my question and also allows your attorney to hear

Michael Thompson
August 12, 2016

1    the fullness of the question.

2         If it's an objectionable question or

3    there's something wrong with the question -- and I'll

4    admit I ask bad questions all day long.  Nobody's

5    perfect here.  We make mistakes and fumble along the

6    best we can.  But when they're objectionable you're

7    lawyer will step in.  If there's not an objection we

8    expect that you'll answer.

9         If you jump in too quick you may not know

10   the fullness of the question and later on it may not

11   read -- your answer may not read as you intended based

12   on the only partial part of the question that you got.

13   So it's useful to answer -- or listen and then answer

14   and then, in turn, I'll listen and answer.  Will you

15   do that?

16        A.    Yes, sir.

17        Q.    All right.  The next part is that you've

18   got to remember all your answers and responses have

19   got to be audible.  I use a lot of hand gestures.

20   Those don't translate well into the court reporter's

21   book there.  The uh-huhs, huh-uhs, nods of the head,

22   things like that that aren't audible, English

23   responses, they do not translate well; therefore,

24   I'd ask that to the best of your ability let's use

25   audible responses.  Will you do that?

Michael Thompson
August 12, 2016

Page 7

1    A.    Yes.

2    Q.    All right.  I also mentioned that a

3  transcript -- she's going to put together a book.

4  You'll have a chance later on to read it and sign it

5  and check anything and make any changes.  This is

6  where I'm going to tell you I'm clever.  All right.

7  If you make a simple change; that is, maybe

8  somebody's middle initial or maybe the date was

9  wrong, something little, something minor like that,

10  I'm not going to point it out at trial, but if later

11  on when you read it and you change something from a

12  "yes" to a "no" or change something very material I

13  guarantee I will point that out at trial.  That's

14  when I'll say, look on this date you said this.  On

15  this date you said that.  I'll point those things

16  out at trial.  I'm telling you that not because I'm

17  a great lawyer but because I'm asking you today to

18  give us your best answers as possible.  Will you do

19  that?

20    A.    Yes, sir.

21    Q.    All right.  Sometimes things happen in

22  the past and, you know, so many things happen in our

23  day-to-day lives that we forget details, we forget

24  parts of it.  I'm going to ask you to give us your

25  best deposition testimony based on what you actually

Michael Thompson
August 12, 2016

Page 8

1    recall.  All right?  If you don't remember something

2    or you're thinking you have to guess at it, that's

3    not -- don't guess at anything today.  Just tell us

4    what you know.  Okay?  Will you do that?

5         A.    Yes.

6         Q.    All right.  Now, you may from time to time

7    estimate.  That's different than a guess.  Do you

8    understand the difference between a guess and an estimate?

9         A.    (Nodded head affirmatively.)

10         Q.    All right.  Just so we're on the same page,

11    I'll tell you what I understand it to be and we can

12    work off my definition.  If I was to ask you to

13    estimate the length of this table, you'd look and say

14    that's maybe 9, 10 feet.  You know, you're looking

15    at it.  You have a visual reference.  Whether it is

16    or it isn't, it's an estimate based on some objective

17    criteria, something you can observe.  That's an estimate

18    in my mind.

19              Now, if I ask you to tell me the length of

20    the table in my kitchen, you would be guessing.  You

21    don't even know whether I have a table in the kitchen.

22    You don't know whether it's a big one or a small one.

23    You've never been -- to my knowledge, you've never been

24    in my kitchen, so that's a guess.  All right?  So can

25    we work on that as the distinction between the two?

Michael Thompson
August 12, 2016

Page 9

1     A.    Yes.

2     Q.    Okay.  Is there any reason you can't give

3 your best testimony today?  By that, I'm asking

4 about any medical conditions, any lack of sleep,

5 anything that might impair your recollection as you

6 sit there today that you're aware of?

7     A.    Not that I'm aware of.

8     Q.    All right.  The other thing is I don't

9 know exactly how long this deposition is going to

10 last.  I usually try to -- typically try to get done

11 in a couple of hours.  That's my estimate again

12 today, but I've had them go all day.  I just never

13 know for certain.

14        As we start at the front end, is there

15 anything that you need to handle today that we need

16 to accommodate for on the front end?  Do you need to

17 be anyplace at a certain time that we need to make

18 an adjustment for?

19     A.    No.

20     Q.    All right.  My hope is that we'll get through

21 this and be done before lunch and move on, but I can't

22 guarantee it.  If it looks like it's going to be a

23 long day, we'll take reasonable breaks and we'll take

24 a lunch break.

25        Also, along that line, this isn't a courtroom.

Michael Thompson
August 12, 2016

Page 10

1    The testimony you give is the same type of testimony
2    you give in a courtroom.  That is, it's got to be
3    honest.  You're giving the same oath that you give in
4    court, but this isn't such a formal place that you can't
5    take breaks and you can't be -- and I'm not going to
6    ask that you be uncomfortable here.  This is one of
7    those depositions where I'm not breaking out the big
8    white light and shining it on you and turning up the
9    air conditioner and trying to make you uncomfortable.
10   In fact, I want just the opposite.  So if for any
11   reason you need to take a break, we have restrooms,
12   we have beverages.  We have anything like that that
13   you need.  Just let us know and we'll take the
14   appropriate break.  All right?
15        A.    Yes.
16        Q.    I'd ask that if ever you take a break, though,
17   that you don't discuss any of the questions that are
18   being answered because you're continuing to be under
19   oath.  You may talk to your attorney about -- you may
20   talk to your attorney using attorney-client privilege
21   and he knows what's appropriate and not appropriate
22   to talk about at that time.  I'd ask that if you take
23   a break or something, unless there's some agreement
24   to the contrary don't go calling folks and asking what's
25   this or what's that.  All right?  Will you promise to

Michael Thompson
August 12, 2016

Page 11

1   do that?

2       A.   Yes.

3       Q.   All right.

4            MR. TANNER:  Are you about to ask him the

5   first question?

6            MR. WOLF:  Yes, I'm about to.

7            MR. TANNER:  Can I just counsel him one

8   second, please.

9            MR. WOLF:  Please, please.

10           (OFF RECORD.)

11  BY MR. WOLF:

12      Q.   You're going to hate me because I'm going

13  to go through a lot of preliminary stuff before I

14  even get to the heart of it, but that's just -- I try

15  to get it out of the way and make sure I cover the

16  bases.  So you've given us your name, your last Social.

17  And your present address, you've given us that on Turtle.

18  What was your address before that?  Where did you live

19  before the Turtle address?

20      A.   That's the only place I've lived.

21      Q.   How long have you lived there?

22      A.   Ten years.

23      Q.   How old are you now?

24      A.   Thirty-eight.

25      Q.   All right.  Where did you live prior to moving

Michael Thompson
August 12, 2016

Page 12

1    on Turtle Lane in Brandon?

2         A.    Atlanta, Georgia.

3         Q.    How long did you live in Atlanta?

4         A.    Three years.

5         Q.    Before living in Atlanta, where did you live?

6         A.    Memphis, Tennessee.

7         Q.    How long did you live there?

8         A.    Twenty-three years.

9         Q.    All right.  So it's fair to say you were

10   raised in Memphis, Tennessee.

11        A.    Yes.

12        Q.    All right.  And what's your current phone

13   number?

14        A.    (901) 233-6784.

15        Q.    And what is your cell phone number currently?

16        A.    The same.

17        Q.    All right.  And how long have you had that

18   number?

19        A.    Since 1996.  It's about 20 years.

20        Q.    All right.  And who is your current cell

21   phone provider?

22        A.    AT&T.

23        Q.    How long have you been with them?

24        A.    Ten years.  About ten years.

25        Q.    Now at the time of the incident which was

Michael Thompson
August 12, 2016

Page 13

1   in February of 2014, I believe, did you have any other

2   cell phones that you kept with you?  Let me be more

3   specific.  On the date of the incident, did you have

4   any other cell phones with you?

5         A.    I cannot recall.

6         Q.    All right.

7         A.    I cannot recall.

8         Q.    About that time did you ever have or

9   regularly use another cell phone other than your

10  (901) 233-6784 number?

11        A.    At that particular time I cannot recall.

12  That was -- I cannot recall at that particular time.

13        Q.    All right.  Well, let me ask you this way:

14  In 2014, did you have another cell phone?

15        A.    At some point during 2014, yes.

16        Q.    Do you recall the number for that phone?

17        A.    (662) 541-5807.

18        Q.    And do you recall who the service provider

19  was for that?

20        A.    C Spire.

21        Q.    And in 2014, did you have any other phones

22  other than those two?

23        A.    No.

24        Q.    All right.  Do you know if you had a

25  phone issued to you through the county that employed

Michael Thompson
August 12, 2016

Page 14

1   you that year?  Did you have an office phone?

2       A.    Yes.

3       Q.    And do you recall the number of that?

4       A.    (662) 541-5807.

5       Q.    So that second one was a business line, then.

6       A.    Yes.

7       Q.    Okay.  And it was Tunica County that provided

8   that?

9       A.    Yes.

10      Q.    Now, this case is going to be tried in north

11  Mississippi which currently has a pretty broad number

12  of counties.  It's scheduled to go before a jury.  One

13  of the things I need to know when I ask questions of

14  a jury is who might be related to you in some way,

15  anybody -- any kin you might have.  So are you aware of

16  any family members that live in north Mississippi?

17      A.    No.

18      Q.    And are you aware of any family names of

19  yours?  Your last name is Thompson.  Are there any other

20  family names that you think might be distant kin to you

21  in some way --

22      A.    No.

23      Q.    -- in north Mississippi?  Your immediate

24  family, they're from Memphis, Tennessee?  Your parents.

25      A.    Yes.

Michael Thompson
August 12, 2016

Page 15

```
 1        Q.    Are they still there in that area, Memphis?
 2        A.    Yes.
 3        Q.    All right.  Let's go through a little
 4   educational history if we can.  Tell us:  What high
 5   school did you graduate from?
 6        A.    Central High School, Memphis, Tennessee.
 7        Q.    And after that did you continue your education?
 8        A.    Yes.
 9        Q.    Where did you go to school after high school?
10        A.    Rhodes College.
11        Q.    Where is Rhodes College?
12        A.    Memphis, Tennessee.
13        Q.    Did you graduate?
14        A.    Yes.
15        Q.    And what year was that?
16        A.    2000.
17        Q.    What was your degree in?
18        A.    Business administration.
19        Q.    And did you continue your education after
20   Rhodes College?
21        A.    Yes.
22        Q.    Where did you go to school after that?
23        A.    Rhodes College.
24        Q.    Did you get another degree there?
25        A.    Yes.
```

Michael Thompson
August 12, 2016

Page 16

1    Q.    What year did you finish that degree?

2    A.    2001.

3    Q.    And what was that degree in?

4    A.    Master's of accountancy.

5    Q.    Did you continue with your education after that?

6    A.    No.

7    Q.    So the highest level of education is a master's

8    degree from Rhodes College?

9    A.    Yes.

10   Q.    Let's talk about your work history a little

11   bit if we can.  Are you currently employed?

12   A.    No.

13   Q.    Do you own any businesses?  Are you the owner

14   of any businesses at this time?

15   A.    Yes.

16   Q.    What are the names of those businesses?

17   A.    Thompson CPA.  Michael L. Thompson, CPA,

18   PLLC, doing business as Thompson CPA.

19   Q.    Is that a registered company with the Secretary

20   of State?

21   A.    Yes.

22   Q.    Where is it located?

23   A.    5260 Cedar Park Drive, Suite E2, Jackson,

24   Mississippi 39206.

25   Q.    And how long have you had this company,

Michael Thompson
August 12, 2016

Page 17

1    Thompson CPA?

2        A.    Approximately five years.

3        Q.    All right.  I'll come back to businesses you

4    own and we'll work on employment.  And you said you're

5    not currently employed.  Who was your last employer?

6        A.    Tunica County Board of Supervisors.

7        Q.    And how long were you in that position?

8        A.    Two years.  Approximately two years.

9        Q.    Do you recall the start month and year?

10       A.    January 2014.

11       Q.    When did you leave there?

12       A.    February 2016.

13       Q.    What was your position there?

14       A.    County administrator.

15       Q.    And did you report to anybody in particular

16   or was it to the board of supervisors directly?

17       A.    The board of supervisors.

18       Q.    What was your rate of pay or annual salary

19   when you were there?

20       A.    140,000.

21       Q.    Plus benefits?

22       A.    Yes.

23       Q.    Do you recall what those benefits were at the

24   time?

25       A.    Retirement, PERS, health insurance.

Michael Thompson
August 12, 2016

Page 18

1    Q.    Anything else?

2    A.    Vacation and sick leave.

3    Q.    Were there any perks involved in that?  Any

4  fringe benefits that you're aware of?

5    A.    No.

6    Q.    All right.  When you hired on to that job,

7  what was the process?  Did you put in an application

8  or did you hear -- how did you go about getting that job?

9    A.    The board of supervisors appointed me to that

10  position.

11    Q.    And before they appointed you how did you

12  become aware of the position, the vacancy of the position?

13    A.    I was not aware of a vacancy.

14    Q.    Was the position occupied at the time you were

15  appointed?

16    A.    Yes.

17    Q.    And how did you become aware that the board

18  was interested in you?

19    A.    The board -- could you repeat the question

20  for me.

21    Q.    I don't know if I can repeat it but let me

22  ask it maybe another way to help you along.  How did

23  you become aware of this job opening or this job

24  opportunity?

25    A.    Through the board appointing me to that

Michael Thompson
August 12, 2016

Page 19

1   position.

2       Q.   Did you work for the county before this?

3   Before you were appointed to the position of county

4   administrator, had you ever worked for the board?

5       A.   Thompson CPA was engaged with the board.

6       Q.   Okay.  What was Thompson CPA's role with

7   the county?

8       A.   Thompson CPA was engaged to conduct an internal

9   audit.

10      Q.   And how did Thompson CPA -- who called

11  Thompson CPA to engage y'all for the internal audit?

12      A.   I'm trying to recall.  A board member.

13      Q.   What was the name of the board member?

14      A.   Henry Dixon.

15      Q.   All right.  And when was it -- what month

16  and year was Thompson CPA first contacted to conduct

17  an internal audit?

18      A.   Approximately July 2013.

19      Q.   And did Thompson CPA complete that internal

20  audit?

21      A.   I'm not clear on the question.

22           MR. TANNER:  Can I -- you see I'm easy.

23  I mean, you know, no problem here.  Judge Starrett

24  out of Hattiesburg --

25           THE COURT REPORTER:  Do you want to go

Davis Court Reporting, LLC   601.856.8889
marytodd@daviscourtreporting.com   877.496.0079

Michael Thompson
August 12, 2016

Page 20

```
 1    off the record?

 2              MR. TANNER:  Oh, can we go off record.

 3    I'm sorry.

 4              (OFF RECORD 9:30 A.M. TO 9:33 A.M.)

 5    BY MR. WOLF:

 6         Q.    As I understand your testimony, you were

 7    hired to conduct -- Thompson CPA was engaged to

 8    conduct an internal audit.  Is that correct?

 9         A.    Correct.

10         Q.    And was this internal audit completed?

11         A.    No.

12         Q.    All right.  Did you provide findings in any

13    way to the board of supervisors based on this internal

14    audit?

15         A.    Yes.

16         Q.    Were these provided prior to your being

17    appointed county administrator?  Were these results

18    provided to you before you were appointed county

19    administrator or were they provided to the board

20    before or after you were appointed county

21    administrator?

22         A.    Before.

23         Q.    All right.  And were they in written form?

24         A.    Yes.

25         Q.    Do you know if a copy of those findings
```

Michael Thompson
August 12, 2016

Page 21

1    were made part of the county record in any way?

2        A.    Yes.

3        Q.    What was the internal audit?  Describe

4    the nature of it.  Was it a general audit?  Was it a

5    specific investigative audit looking for some specific

6    information?  What was the purpose of the audit?

7        A.    To identify internal control improvements.

8        Q.    Do you know approximately when that report

9    was provided to the board?

10       A.    I'm not sure I understand the question.

11       Q.    What month was it that your findings --

12   were your findings presented to the board?

13       A.    I recall presenting the findings to the

14   board in September 2013.

15       Q.    All right.  And let's go back to employment.

16   Prior to being employed by the Tunica County Board

17   of Supervisors, who were you employed by?

18       A.    KPMG.

19       Q.    And when were you employed by KPMG?

20       A.    From 2001 to 2011.

21       Q.    What was your position with KPMG?

22       A.    Manager.

23       Q.    What was your annual salary in 2011?

24       A.    119,000.

25       Q.    And where were you?  Where was your office

Michael Thompson
August 12, 2016

Page 22

1    located for KPMG?

2        A.    Jackson, Mississippi.

3        Q.    How long did you have the title as manager?

4        A.    Five years.

5        Q.    Before being manager what was your title?

6        A.    Senior associate.

7        Q.    And prior to being a senior associate, what

8    was your title?

9        A.    Associate.

10       Q.    Who was your supervisor in 2011?  Did you

11   have somebody you reported to in 2011 while at KPMG?

12       A.    Phillip Oswald.

13       Q.    Where was his office located?

14       A.    Atlanta, Georgia.

15       Q.    And why did you leave KPMG?

16             MR. TANNER:  Object to the form of the

17   question.

18   BY MR. WOLF:

19       Q.    You can go ahead and answer if you can.

20       A.    To pursue other endeavors.

21       Q.    Did you announce your resignation or did they

22   ask you to leave?

23             MR. TANNER:  Object to the form of the question.

24       A.    I presented them with a two weeks' resignation

25   notice.

Michael Thompson
August 12, 2016

Page 23

1    BY MR. WOLF:

2        Q.    And what were the other endeavors that you

3    intended to pursue at that time?

4        A.    An accounting firm.

5        Q.    Is that when you formed Michael Thompson, CPA?

6        A.    Yes.

7        Q.    Okay.  Was Michael Thompson, CPA, a general

8    accounting firm or did it have a specialized practice?

9        A.    General.

10       Q.    Did Michael Thompson, CPA, market or

11   advertise to counties or other municipal entities?

12       A.    No.

13       Q.    Did you know Henry Dixon before he contacted

14   you for this internal audit?

15       A.    No.

16       Q.    Prior to working at KPMG, where were you

17   employed?

18       A.    Ernst & Young.

19       Q.    Which office was this located in?

20       A.    Memphis, Tennessee.

21       Q.    Was that job while you were in college?

22       A.    Yes.

23       Q.    What was your position there?

24       A.    Intern.

25       Q.    In your career, have you ever worked for

Michael Thompson
August 12, 2016

Page 24

1  a governmental agency other than Tunica County?

2          MR. TANNER:  Can we go off record.  It's 9:41.

3          (OFF RECORD 9:41 A.M. TO 9:50 A.M.)

4  BY MR. WOLF:

5      Q.    I was asking you prior to your employment

6  with Tunica County had you ever been employed by a

7  governmental entity?

8      A.    No.

9      Q.    Had Thompson CPA ever done internal audits

10 for any other governmental entities prior to Tunica?

11     A.    Governmental, no.

12     Q.    Had Thompson CPA ever been hired to do any

13 kind of accounting for governmental entities prior to

14 Tunica?

15     A.    No.

16     Q.    While you were at KPMG, were you ever involved

17 with any accounting assignments for governmental entities?

18     A.    Yes.

19     Q.    Can you tell me the name of the entities that

20 you had done these assignments for.

21         MR. TANNER:  Object to the form of the question.

22 BY MR. WOLF:

23     Q.    Go ahead and answer.

24     A.    The FDIC.

25     Q.    Any others?

Michael Thompson
August 12, 2016

1    A.    I cannot recall.

2    Q.    Do you recall if KPMG worked for any Mississippi

3  state agencies?

4         MR. TANNER:   Object to the form of the

5  question.

6  BY MR. WOLF:

7    Q.    Go ahead and answer if you can.

8    A.    Can you repeat.  I'm sorry.

9    Q.    Yes.  Do you recall while you were at KPMG

10  you worked on any assignments for the state of

11  Mississippi or any of its agencies?

12    A.    No.

13    Q.    That was a bad question.  Is it no that

14  you did not or no, you don't recall?  I think I asked

15  do you recall.

16    A.    And what's the question?

17    Q.    Did you work for any Mississippi state

18  government agencies while you were at KPMG?  Work

19  with.

20         MR. TANNER:   Object to the form of the

21  question.

22    A.    I can't recall.

23  BY MR. WOLF:

24    Q.    Now, other than Thompson CPA have you owned

25  any other businesses?

Michael Thompson
August 12, 2016

Page 26

```
 1        A.    Yes.

 2        Q.    What was the name of those businesses?

 3        A.    Extravajazza.

 4              THE COURT REPORTER:  Can you spell that.

 5        A.    E-X-T-R-A-V-A-J-A-Z-Z-A.

 6  BY MR. WOLF:

 7        Q.    Any other businesses that you've owned?

 8        A.    Valiant, Steersman & Strong.

 9        Q.    Any others?

10        A.    America's Best Taxes.

11        Q.    Any others?

12        A.    Collegiate Transport.

13        Q.    Have you owned any other businesses?

14        A.    Thompson & Wiley, LLC.

15        Q.    Anything else?  Any other businesses that

16  you've owned?

17        A.    No.

18        Q.    All right.  Extravajazza, what type of

19  business is that?

20        A.    Concert promotion.

21        Q.    When did you own this business?

22        A.    2007.  No, we started around 2007.

23        Q.    Is it still in existence?

24        A.    No, no.

25        Q.    When was the last concert that Extravajazza
```

Michael Thompson
August 12, 2016

Page 27

1   promoted?

2       A.    February of 2012.

3       Q.    And who were the artists, lead artists?

4             MR. TANNER:  Object to the form of the

5   question.

6       A.    That's so long.  I can't recall.

7   BY MR. WOLF:

8       Q.    In February 2012, do you recall the name

9   of the headliners at that event?

10            MR. TANNER:  Object to the form of the

11  question.

12      A.    No.

13  BY MR. WOLF:

14      Q.    I'm sorry, was that a no, you don't recall?

15      A.    I don't recall.

16      Q.    Okay.  And that event, do you recall where

17  it was held?

18      A.    Duling Hall.

19      Q.    And Duling Hall, where is that located?

20      A.    Fondren.

21      Q.    Could you estimate how much income

22  Extravajazza made on average in the years 2008 to 2012?

23      A.    Zero.

24      Q.    All right.  Now, Valiant, Steersman & Strong,

25  what type of company was this?

Michael Thompson
August 12, 2016

Page 28

1     A.    Consulting.

2     Q.    What type of subjects did they consult on?

3     A.    Accounting, tax advisory.

4     Q.    Where was it located?

5     A.    227 Turtle Lane, Brandon, Mississippi 39047.

6     Q.    Did you have partners in Valiant,

7  Steersman & Strong?

8     A.    No.

9     Q.    Was it a franchise of some sort?

10    A.    No.

11    Q.    All right.  And what years did Valiant,

12 Steersman & Strong operate?

13    A.    2011.  It started in 2011, yes.

14    Q.    Do you know when it ended?

15    A.    It's still active.

16    Q.    Still active.  All right.  And the name

17 "Valiant, Steersman & Strong," that doesn't refer

18 to actual people?

19    A.    No.

20    Q.    Is there some significant meaning to the

21 name?

22          MR. TANNER:  Object to the form of the

23 question.

24    A.    No.

25 BY MR. WOLF:

Michael Thompson
August 12, 2016

1    Q.    You're the sole proprietor of this company

2  or was it incorporated?

3    A.    LLC.

4    Q.    In the state of Mississippi?

5    A.    Yes.

6    Q.    America's Best Taxes, where is this

7  business located?  Or I'm sorry.  What does this

8  business do?

9    A.    Tax preparation.

10   Q.    Where is it located?

11   A.    Atlanta, Georgia.

12   Q.    And when did you own this business?

13   A.    2012.

14   Q.    Is it still in existence?

15   A.    Yes.

16   Q.    Do you have any partners?

17   A.    Yes.

18   Q.    Who are your partners?

19         MR. TANNER:  Object to the form of the

20  question.

21  BY MR. WOLF:

22   Q.    You can answer if you can.

23   A.    Carl Thompson and Charles Thompson.

24   Q.    Are they related to you?

25   A.    Yes.

Michael Thompson
August 12, 2016

Page 30

1    Q.    How are they related?

2    A.    Brothers.

3    Q.    Okay.  Is either one a CPA?

4    A.    No.

5    Q.    Does either of them hold any certificates

6    or special licensing in accounting?

7    A.    Could you repeat the question again.

8    Q.    Does either one hold any licenses or

9    certificates in bookkeeping or accounting?

10   A.    I don't recall.  I don't recall.

11   Q.    America's Best Taxes, is it incorporated

12   or an LLC?

13   A.    LLC.

14   Q.    Is it registered in Atlanta -- I mean in

15   Georgia or Mississippi?

16   A.    Georgia.  Georgia and Mississippi.

17   Q.    And you continued to own America's Best

18   Taxes while you were employed by Tunica County.  Is

19   that correct?

20   A.    Yes.

21   Q.    And you continued to own Valiant,

22   Steersman & Strong while you were employed by Tunica

23   County.  Is that correct?

24   A.    Yes.

25   Q.    Now Collegiate Transport, what type of

Michael Thompson
August 12, 2016

Page 31

1   business is that?

2        A.    Storage.

3        Q.    Where is it located?

4        A.    Atlanta, Georgia.

5        Q.    Is it registered with any Secretary of State?

6        A.    LLC.

7        Q.    All right.  In Georgia?

8        A.    Yes.

9        Q.    Do you have any partners in that business?

10       A.    Yes.

11       Q.    Who are they?

12       A.    Carl Thompson and Charles Thompson.

13       Q.    All right.  And is that business still in

14  operation?

15       A.    Yes.

16       Q.    How long has it existed under your ownership?

17       A.    2009.

18       Q.    Thompson & Wiley, what type of business was

19  that?

20       A.    Accounting firm.

21       Q.    Where was it located?

22       A.    It never had an address.

23       Q.    Okay.  Was it ever registered with the

24  Secretary of State?

25       A.    It was.

Michael Thompson
August 12, 2016

Page 32

1    Q.    In what states?

2    A.    Tennessee.

3    Q.    And does it still exist?

4    A.    No.

5    Q.    When did it exist?

6    A.    2003.

7    Q.    Until?

8    A.    2003.  Never active.

9    Q.    All right.  With Valiant, Steersman &
10   Strong, what would you estimate your annual income or
11   your average annual income was from 2011 to present?

12   A.    I'm not clear on the question.

13   Q.    How much money did Valiant, Steersman &
14   Strong declare on its taxes in 2011?

15   A.    I can't recall.

16   Q.    How much money did Valiant, Steersman &
17   Strong declare on its taxes in 2012?

18   A.    I can't recall.

19   Q.    How much did Valiant, Steersman & Strong
20   declare on its taxes in 2013?

21   A.    I can't recall.

22   Q.    How much did Valiant, Steersman & Strong
23   declare on its taxes in 2014?

24   A.    I can't recall.

25   Q.    How much did Valiant, Steersman & Strong

Michael Thompson
August 12, 2016

Page 33

1   declare on its taxes in 2015?

2        A.    I can't recall.

3        Q.    Do you have an idea or an estimate as to

4   what the average amount of money it is that Valiant,

5   Steersman & Strong made from 2011 until 2015?

6              MR. TANNER:  Object to the form of the

7   question.

8        A.    I can't recall.

9   BY MR. WOLF:

10       Q.    Okay.  Does Valiant, Steersman & Strong

11  file taxes?

12             MR. TANNER:  Object to form of the

13  question.

14  BY MR. WOLF:

15       Q.    You can answer if you can.

16       A.    I can't recall.

17       Q.    Do you have a tax ID number?

18       A.    Yes.

19       Q.    Do you recall what that tax ID number is?

20       A.    I can't recall.

21             MR. TANNER:  Object to the form of the

22  question, just for the record.

23  BY MR. WOLF:

24       Q.    America's Best Taxes, approximately how

25  much did they make on average in each year from 2012

Michael Thompson
August 12, 2016

Page 34

1    to date?

2         A.    I can't recall.

3         Q.    Do they file taxes?

4         A.    I don't know.

5         Q.    Do they have a tax ID number?

6         A.    Yes.

7         Q.    Do you know what that is?

8         A.    I can't recall.

9         Q.    Who handles the bookkeeping for America's

10   Best Taxes?

11        A.    I can't recall.

12        Q.    Who handles the bookkeeping for Valiant,

13   Steersman & Strong?

14        A.    I can't recall.

15        Q.    Do you handle the bookkeeping for Valiant,

16   Steersman & Strong?

17        A.    No.

18        Q.    How about for America's Best Taxes?  Do

19   you handle the bookkeeping for that company?

20        A.    No.

21        Q.    Collegiate Transport, how much do they

22   make annually on average from 2009 to date?

23        A.    I can't recall.

24             MR. TANNER:  Object to the form of the

25   question.

Michael Thompson
August 12, 2016

Page 35

1   BY MR. WOLF:

2       Q.    Do you recall who does the bookkeeping

3   for Collegiate Transport?

4       A.    I can't recall.

5       Q.    Okay.  Does collegiate Transport file taxes?

6       A.    I can't recall.

7             MR. TANNER:  Object to the form of the

8   question.

9   BY MR. WOLF:

10      Q.    Do they have a tax ID number?

11            MR. TANNER:  Object to the form of the

12  question.

13  BY MR. WOLF:

14      Q.    Does Collegiate Transport have a tax ID

15  number?

16      A.    Yes.

17      Q.    Do you recall what that is?

18      A.    I can't recall.

19      Q.    Who would have that information related

20  to Collegiate Transport's tax ID number?

21            MR. TANNER:  Object to the form of the

22  question.

23  BY MR. WOLF:

24      Q.    Other than the federal government.

25      A.    I can't recall.

Michael Thompson
August 12, 2016

Page 36

1    Q.    Thompson & Wiley, you said they existed
2  only in 2003.  Is that correct?
3    A.    (Nodded head affirmatively.)
4    Q.    Is that a yes?
5    A.    Yes.
6    Q.    And they never did any business, did they?
7    A.    No, no.
8    Q.    Did you have a partner in that business?
9    A.    Yes.
10   Q.    Who was your partner?
11   A.    Alex Wiley.
12   Q.    Is this the same Alex Wiley that was with
13  you on the date of your arrest in Tunica?
14   A.    Yes.
15   Q.    Do you know where Alex Wiley lives now?
16   A.    Memphis, Tennessee.
17   Q.    Prior to your being employed for the
18  County of Tunica, do you know if Alex Wiley was
19  employed in that county?
20   A.    Could you repeat that question.
21   Q.    I understand at some point in time Alex
22  Wiley was the comptroller for Tunica County.  Is that
23  correct?
24   A.    Yes.
25   Q.    When did he become comptroller, to your

Michael Thompson
August 12, 2016

Page 37

1   knowledge?  Was it before you were hired as county

2   administrator or after?

3         A.    After.

4         Q.    Do you know if he ever held a position

5   with Tunica County before that?

6         A.    No, I don't know.

7         Q.    Just generally speaking, what does a

8   comptroller do?  I've heard that title but I've never

9   taken the time to figure out what a comptroller

10  actually is.  Help me out there.

11        A.    Bookkeeping.

12        Q.    Okay.  Do you know if Alex has any

13  particular specialized licenses in accounting or

14  bookkeeping?

15        A.    Certified public accountant.

16        Q.    Were you the one that hired him to work

17  at Tunica?

18        A.    The board voted to employ him.

19        Q.    You recommended his hiring?

20        A.    Yes, yes.

21        Q.    And you solicited him to take on this job.

22  Is that correct?

23              MR. TANNER:  Object to the form of the

24  question.

25  BY MR. WOLF:

Michael Thompson
August 12, 2016

Page 38

1    Q.    Solicited is a confusing word.  Did you

2  call him up and say hey, listen, we need a

3  comptroller.  Would you come on over and let me

4  recommend you to the board or something to that

5  nature?

6          MR. TANNER:  Object to the form of the

7  question.

8    A.    I can't recall.

9  BY MR. WOLF:

10   Q.    Was there a request for proposal for a

11 comptroller or a job advertisement for comptroller

12 that you brought his attention to?

13   A.    I can't recall.

14   Q.    Now just so we're clear on this, though,

15 you didn't happen to just all of a sudden run across

16 him there in Tunica County and say, you know, hey,

17 look, you're working here now.  You were involved in

18 his hiring.  Correct?

19         MR. TANNER:  Object to the form of the

20 question.

21 BY MR. WOLF:

22   Q.    You were involved in bringing him in to

23 the county -- correct? -- as an employee.  Correct?

24   A.    I recommended him, as I stated previously.

25   Q.    Did you have any other business dealings

Michael Thompson
August 12, 2016

Page 39

1    with Alex Wiley prior to -- apart from the Thompson
2    & Wiley of 2013?
3            A.    No.
4            Q.    Did y'all go to school together?
5            A.    Yes.
6            Q.    How is it y'all know -- is it from school
7    that you knew each other?
8            A.    Yes.
9            Q.    What school or schools did you go together?
10           A.    Rhodes College.
11           Q.    And Thompson CPA, does it file taxes each
12    year?
13           A.    Yes.
14           Q.    And what would you estimate Thompson CPA
15    made in 2013?
16                 MR. TANNER:  Object to the form of the
17    question.
18    BY MR. WOLF:
19           Q.    Let me put it a different way:  What do
20    you estimate Thompson CPA reported as income in 2013?
21                 MR. TANNER:  Object to the form of the
22    question.
23           A.    I can't recall.
24    BY MR. WOLF:
25           Q.    And what did it record as income in 2014?

Michael Thompson
August 12, 2016

```
 1            MR. TANNER:   Object to the form of the
 2   question.
 3        A.    I can't recall.
 4   BY MR. WOLF:
 5        Q.    All right.  And what has it reported as
 6   income in 2015?
 7        A.    I can't recall.
 8        Q.    Did it report income in 2013?
 9            MR. TANNER:   Object to the form of the
10   question.
11        A.    I can't recall.
12   BY MR. WOLF:
13        Q.    Did Thompson CPA report income in 2012?
14        A.    I can't recall.
15        Q.    Does it have a tax ID number?
16        A.    Yes.
17        Q.    And what is the tax ID number?
18        A.    I can't recall.
19        Q.    All right.  Did Thompson CPA pay you,
20   Michael Thompson, as an employee or as an owner?
21            MR. TANNER:   Object to the form of the
22   question.
23        A.    I can't recall.
24   BY MR. WOLF:
25        Q.    I guess I'll need to get your full Social
```

Michael Thompson
August 12, 2016

Page 41

```
 1    Security number if I can.  What is that?
 2         A.    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.
 3         Q.    All right.  And how about you, Michael
 4    Thompson, what did you report as income -- personal
 5    income in 2013 approximately?
 6               MR. TANNER:  Object to the form of the
 7    question.
 8         A.    I can't recall.
 9    BY MR. WOLF:
10         Q.    Did you do your own taxes in 2013?
11         A.    I can't recall.
12         Q.    Who keeps your tax records other than the
13    federal government?  Do you keep them in a safe
14    place someplace or do you have somebody holding them
15    for you?
16               MR. TANNER:  Object to form of the
17    question.
18         A.    I can't recall.
19    BY MR. WOLF:
20         Q.    How about 2014?  What did you report on
21    your taxes as income?
22         A.    I can't recall.
23         Q.    How about 2015, you know, within -- just
24    estimate it.  What did you report as your income on
25    your taxes?
```

Michael Thompson
August 12, 2016

Page 42

```
1           MR. TANNER:   Object to the form of the
2   question.
3       A.   I can't recall.
4   BY MR. WOLF:
5       Q.   Did you file taxes in 2012?
6           MR. TANNER:   Object to the form of the
7   question.
8   BY MR. WOLF:
9       Q.   On behalf of yourself, Michael Thompson.
10  I know you work for a lot of folks, but did you file
11  taxes on your own behalf in --
12      A.   I can't recall.
13      Q.   How about in 2013?  Did you file taxes
14  with the federal government in your name?
15      A.   I can't recall.
16      Q.   How about 2014?  Did you file taxes?
17      A.   I can't recall.
18      Q.   How about 2015?  Do you recall filing
19  taxes then or are you still --
20      A.   I can't recall.
21      Q.   All right.  Taxes were due in April of
22  this year.  Is that about right?  Tax season is
23  about in April unless there's an extension.  Is that
24  accurate?  Is that about right, that taxes are due
25  in April unless there's an extension?
```

Michael Thompson
August 12, 2016

Page 43

1            MR. TANNER:  Object to the form of the

2    question.

3    BY MR. WOLF:

4        Q.    Taxes for 2015 were due in April of 2016

5    unless there's an extension.  Is that an accurate

6    statement?

7        A.    Yes.

8        Q.    Did you file for an extension of your

9    2015 taxes?

10       A.    I can't recall.

11       Q.    All right.  Where would I go to find out

12   whether or not you've -- without talking to the

13   federal government, where would I go to find out

14   about your taxes?  If you can't recall, if you don't

15   know about your own taxes, where would you suggest I

16   look for your tax history or your income history?

17           MR. TANNER:  I object to the form of the

18   question.

19   BY MR. WOLF:

20       Q.    You don't know?

21       A.    So what's the question again?

22       Q.    What I'm trying to find out is since you

23   don't recall what you do with your own taxes or tax

24   records I'd like to know who you think I should speak

25   with or contact or subpoena, other than the federal

Michael Thompson
August 12, 2016

Page 44

1  government at this point, to get your tax records?

2       MR. TANNER:  I object to the form of the

3  question.

4       A.    I don't know.

5  BY MR. WOLF:

6       Q.    Do you keep your taxes on a computer?

7       MR. TANNER:  Object to the form of the

8  question.

9       A.    Could you repeat that.

10 BY MR. WOLF:

11      Q.    Yes.  Do you keep your taxes on a

12 computer or on some software that maintains your tax

13 record?

14      A.    I don't recall.

15      MR. TANNER:  Object to the form of the

16 question.

17 BY MR. WOLF:

18      Q.    Okay.  I'll go down a little different path

19 here.  Is there some reason you don't recall your

20 own financial history?  I mean, is there something about

21 that, some reason that you wouldn't recall your own

22 financial history that you're aware of?

23      MR. TANNER:  I object to the form of the

24 question.

25      A.    I don't understand the question.

Michael Thompson
August 12, 2016

Page 45

1   BY MR. WOLF:

2       Q.   I just want to know is there -- again,

3   you're a CPA.  Correct?  Is that correct?

4       A.   Yes.

5       Q.   All right.  And you have some knowledge

6   about filing taxes.  Correct?

7       A.   Yes.

8       Q.   All right.  And you know that every

9   citizen of America, unless there's some specific

10  exemption or some reason, they're required to file

11  taxes every year.  Correct?

12           MR. TANNER:  I object to the form of the

13  question.

14  BY MR. WOLF:

15      Q.   Is that a fair statement?

16      A.   Yes.

17      Q.   Is there any reason or special reason or

18  exemption that you had to not file taxes from 2012

19  to 2015?

20      A.   I can't recall.

21           MR. TANNER:  I object to the form of the

22  question.

23  BY MR. WOLF:

24      Q.   Did you file taxes from 2012 to 2015 on

25  your own behalf?

Michael Thompson
August 12, 2016

Page 46

1        A.      I can't recall.

2        Q.      How much money did you make -- forget the

3    taxes.  How much money did you make in 2012 estimated?

4                MR. TANNER:  We object to the form of the

5    question.

6        A.      I can't recall.

7    BY MR. WOLF:

8        Q.      All right.  How about in 2013?  How much

9    money did you make that year?

10               MR. TANNER:  We object to the form of the

11   question.

12       A.      I don't recall.

13   BY MR. WOLF:

14       Q.      How about in 2014?  How much money did

15   you make that year?

16               MR. TANNER:  Object to the form of the

17   question.

18       A.      I can't recall.

19   BY MR. WOLF:

20       Q.      And in 2015, about how much did you make

21   last year?

22               MR. TANNER:  I object to the form of the

23   question.

24       A.      I can't recall.

25   BY MR. WOLF:

Michael Thompson
August 12, 2016

1     Q.   All right.  And let me ask you this:  For

2  the first six months of 2016, how much money have

3  you made?

4          MR. TANNER:  I object to the form of the

5  question.

6     A.   I can't recall.

7  BY MR. WOLF:

8     Q.   You can't recall or you don't know?

9     A.   I can't recall.

10     Q.   All right.  Is there something that would

11  help jog your memory and tell you exactly what you

12  made in any of these years from 2013 to 2015?  Is

13  there a document that you could look at and say oh,

14  yes, that's how much I made?

15          MR. TANNER:  I object to the form of the

16  question.

17     A.   I can't recall.

18  BY MR. WOLF:

19     Q.   Okay.  You know earlier when I said that

20  if you later on change your answers I'm going to

21  point it out at trial.  We're getting very close to

22  the kind of stuff right here that I'm going to point

23  out at trial, just to put you on the front end.  So

24  I'm going to ask you one more time, is there any

25  document or source of materials that you could look

Michael Thompson
August 12, 2016

Page 48

1    at that would refresh your recollection regarding
2    what you've made in the last five years?
3            MR. TANNER:  Object to the form of the
4    question.
5       A.    I can't recall.
6    BY MR. WOLF:
7       Q.    All right.  You're making a claim for
8    lost wages.  Is that correct?  Are you claiming that
9    you've lost any income as a result of the incident
10   which occurred in this Complaint because if you're
11   not I can move away from all of this income stuff
12   real fast, but if you are we're going to get down
13   deep into what you make and what you haven't made.
14   All right.  So let me ask you, are you making a
15   claim for lost income as a result of any of the
16   incidents alleged within the Complaint?
17           MR. TANNER:  We object to the form of the
18   question, and if I could say for the record the
19   Complaint expressly makes a claim for lost wages.
20   BY MR. WOLF:
21      Q.    All right.  I'm asking you, Mr. Thompson,
22   are you asking for lost wages?  Are you continuing
23   to ask for lost wages as a result of any of the
24   claims alleged in the Complaint?
25      A.    Yes.

Michael Thompson
August 12, 2016

Page 49

1     Q.     Now, when the Complaint was filed -- let

2  me ask you this:  What wages are you claiming you lost

3  as a result of the allegations in this Complaint?

4     A.     Could you repeat that.

5     Q.     Yes.  What wages are you claiming you lost

6  as a result of any actions alleged in the Complaint?

7             MR. TANNER:  I object to the form of the

8  question to the extent that it may call for a

9  question that an expert has to determine based on

10  wages lost that Mr. Thompson did not have the

11  training or the ability to testify to specifically.

12  BY MR. WOLF:

13     Q.     Go ahead and answer the question.  What

14  wages are you claiming you lost as a result of the

15  allegations alleged -- the actions alleged in the

16  Complaint?  Your objection is noted.

17             MR. TANNER:  Same objection.

18     A.     Potential wages for engagements where

19  I've tried to find work.

20  BY MR. WOLF:

21     Q.     To follow up on that, your counsel

22  objected suggesting that you're not qualified to

23  give testimony regarding wages and that an expert

24  might be required.  You are a CPA.  Correct?

25     A.     Yes.

Michael Thompson
August 12, 2016

Page 50

1    Q.    Are you qualified to testify regarding

2 wages and lost income yourself?

3         MR. TANNER:  I object to the form of the

4 question.

5 BY MR. WOLF:

6    Q.    Is that a no?

7    A.    I don't know.

8    Q.    As you sit there today, you're not

9 holding yourself out as an expert in lost wage and

10 future income accounting, are you?

11   A.    Can you repeat that.

12   Q.    You don't hold yourself out as an expert

13 in future income accounting, do you?

14   A.    I'm not clear on your question.

15   Q.    Are you an expert in future income

16 accounting?

17   A.    I'm a CPA.

18   Q.    All right.  Does that mean you're an

19 expert in future income accounting?

20   A.    No.

21   Q.    So as you sit there you're not holding

22 yourself out as an expert in future income

23 accounting, are you?

24   A.    Well, I'm holding myself out as a CPA.

25   Q.    You raise an interesting question.  Are

Michael Thompson
August 12, 2016

1    you qualified to project future income and future --

2    is that something that a CPA does is projects future

3    income?

4              MR. TANNER:  I object to the form of the

5    question.

6         A.    Is that -- I'm sorry.  Could you repeat

7    that.

8    BY MR. WOLF:

9         Q.    Is that something that you as a CPA, --

10   that you particularly as a CPA have done, project

11   future income?

12             MR. TANNER:  I want to renew my objection

13   and I'd like to make a more definite statement about

14   my objection.  I object generally to the form of the

15   question but I want to point out that my objection

16   includes a vagueness and an overbroad argument.

17   There's no specific references to what type of future

18   income projections we're talking about.  There's no

19   reference to whether we're talking about for

20   companies or individuals or any of the various sorts

21   of projected income calculations.

22   BY MR. WOLF:

23        Q.    I'll refresh my question.  Have you as a

24   CPA attempted to provide future income estimates to

25   any corporate clients?