Exhibit "A" (Part Two)

Michael Thompson
August 12, 2016

Page 52

```
1      A.    No.
2      Q.    Have you attempted in any way as a CPA to
3  provide future income estimates to any individual
4  clients?
5      A.    No.
6      Q.    Have you as a CPA ever attempted to
7  provide future income estimates to any governmental
8  entity clients?
9      A.    No.
10     Q.    All right.  Have you in any way attempted
11 to determine your own future wage loss in any
12 monetary terms as a result of the incident alleged
13 within the Complaint?
14         MR. TANNER:  We object on the grounds of
15 privilege as well as on the grounds of the form of
16 the question.  To the extent that the question calls
17 for information that Mr. Thompson has shared with
18 his counsel I would instruct him not to answer to
19 that regard.
20         MR. WOLF:   So your estimates of future
21 wage loss, you're claiming an attorney-client
22 privilege with those.  Is that correct?
23         MR. TANNER:  No.  We're claiming privilege
24 as to anything he may have said to me.  For example,
25 if he's given me a number that would not be
```

Michael Thompson
August 12, 2016

Page 53

1    competent in a court of law as to an estimate of

2    future earnings and we have then used that number to

3    give to somebody who's qualified to make such a

4    determination then what he said to me, One, does not

5    answer your question in terms of whether he's

6    attempted to make any such projections.

7            And Two, it is privileged to that degree.

8            MR. WOLF:  All right.  A couple of

9    problems with that argument.  Number 1, if you've

10   given any number to any third party to make any

11   estimates, including an expert, then you've waived

12   the privilege.  We've asked for your experts to be

13   identified if you're not providing that.

14           The other side, too, is as a plaintiff he

15   can testify to his own estimates.

16   BY MR. WOLF:

17       Q.    I'm not asking what -- I'm not asking what

18   you told your lawyer.  I'm asking what you believe

19   to be the value of your future wages, not just what

20   you believe, not necessarily what you told your

21   lawyer or you told some third party, what you

22   believe to be the estimate of your future wage loss.

23           MR. TANNER:  We object to the form of the

24   question.

25       A.    I don't know.

Michael Thompson
August 12, 2016

1  BY MR. WOLF:

2      Q.    You don't know what your -- okay.  I'll

3  come back to this wage question later.  We'll see if

4  we can cover some other.  Have you ever taught any

5  courses in accounting or any other subject at an

6  advanced level?

7           MR. TANNER:  I object to the form of the

8  question.

9  BY MR. WOLF:

10      Q.    Answer if you can.

11      A.    I'm not clear on the question.

12      Q.    Have you ever served as a teacher of any

13  accounting courses or courses that use your CPA

14  background?

15           MR. TANNER:  Note my objection.

16      A.    No.

17  BY MR. WOLF:

18      Q.    Have you ever stood before a classroom

19  filled with potential students whether paid or not

20  paid, paying for the education and lectured them on

21  any subjects?

22           MR. TANNER:  Object to the form of the

23  question.

24      A.    Could you repeat that for me.

25  BY MR. WOLF:

Michael Thompson
August 12, 2016

Page 55

1      Q.    Have you ever lectured on any subjects
2  before an audience?
3      A.    Yes.
4      Q.    What was the subject?
5      A.    Accounting.
6      Q.    How many times have you lectured on
7  accounting?  More than ten?
8      A.    No, no.
9      Q.    All right.  When was the last time you
10  spoke to a group or lectured a group regarding the
11  subject accounting?
12      A.    2010.
13      Q.    Do you recall which group that was in
14  front of?
15      A.    The National Association of Black
16  Accountants.
17      Q.    I know you're a CPA.  Is that licensed by
18  state or some other association?  Your CPA.
19      A.    Is?
20      Q.    What's that?
21      A.    Is what?  I'm sorry.
22      Q.    Your CPA licensed, is that issued by a
23  state or other agency?  Is it a national license or
24  a state-issued license?
25      A.    State.

Michael Thompson
August 12, 2016

1      Q.      Do you have one in Mississippi?

2      A.      Yes.

3      Q.      Do you have one in Georgia?

4      A.      No.

5      Q.      Do you hold any other licenses or

6  certifications?

7      A.      I'm certified in financial forensics.

8      Q.      Could you restate that.

9      A.      Certified in financial forensics.

10      Q.      What exactly does that mean, financial

11  forensics?

12      A.      It involves understanding potential acts

13  of fraud and misconduct.

14      Q.      And when did you get this certification?

15      A.      2008.

16      Q.      And who was the certifying agency

17  organization?

18      A.      AICPA.

19      Q.      What does the AICPA stand for?

20      A.      American Institute of Certified Public

21  Accountants.

22      Q.      Okay.  Do you hold any other licenses or

23  certifications?

24      A.      No.

25      Q.      Do you have a current driver's license?

Michael Thompson
August 12, 2016

Page 57

1    A.    Yes.

2    Q.    All right.  In February of 2014, was your

3 license either revoked or suspended?

4         MR. TANNER:  Object to the form of the

5 question.

6    A.    At that time, to my knowledge, they were

7 valid.

8 BY MR. WOLF:

9    Q.    And have you since discovered that at

10 some point in February of 2014 your license was, in

11 fact, suspended?

12   A.    I later learned that my license were

13 suspended.

14   Q.    And the suspension was a result of an

15 unpaid ticket out of Montgomery County.  Is that your

16 understanding?

17   A.    An unpaid ticket out of Montgomery County,

18 yes.

19        MR. WOLF:  Let's take five minutes.

20        (OFF RECORD 10:51 A.M. TO 10:54 A.M.)

21 BY MR. WOLF:

22   Q.    Can you tell me the reason you left Tunica

23 County as the county administrator.

24   A.    The board voted to appoint a new county

25 administrator.

Michael Thompson
August 12, 2016

Page 58

1     Q.    And you served at the will and pleasure

2  of the board.  Is that correct?

3     A.    Yes.

4     Q.    Were you given any reason for their

5  selecting a new administrator?

6           MR. TANNER:  Object to the form of the

7  question.

8     A.    No.

9  BY MR. WOLF:

10    Q.    Was there a change in the board members

11 at the time you were terminated and a new

12 administrator appointed?

13    A.    Yes.

14    Q.    So the makeup of the board actually

15 changed at the time you were terminated.  Is that

16 correct?

17    A.    Yes.

18    Q.    Now since leaving Tunica have you applied

19 for any other jobs with any counties?

20    A.    Yes.

21    Q.    Which counties have you applied?

22    A.    Sunflower County.

23    Q.    Was there an application filled out?

24    A.    No.

25    Q.    And in Sunflower County, who did you speak

Michael Thompson
August 12, 2016

1    to about a job?

2        A.    The board.

3        Q.    Were you interviewed by the board?

4        A.    Yes.

5        Q.    When was that interview?

6        A.    In March of 2011.

7        Q.    2011?

8        A.    Excuse me.  Forgive me.  March of 2016.

9    Forgive me.

10       Q.    And was this before the entire board or

11   was it a committee of the board?

12       A.    The entire board.  Entire board.

13       Q.    And did they ultimately hire someone else?

14       A.    I don't know.  I don't know.

15       Q.    Were you given any reason for not being hired?

16       A.    Yes.

17       Q.    And what was the reason given to you?

18       A.    My past arrest.

19       Q.    And who told you that the reason that they

20   weren't hiring you was because of your past arrest?

21       A.    The newspaper.

22       Q.    Which newspaper was that?

23       A.    The local newspaper in Sunflower County.

24       Q.    All right.  And did you speak with anyone

25   from the board regarding the reasons for not hiring you?

Michael Thompson
August 12, 2016

1    That's the board of Sunflower County.

2         A.    Yes.

3         Q.    Who did you speak with?

4         A.    Anthony Clark and Gloria Dickson.

5         Q.    Is that D-I-X-O-N?

6         A.    I think C-K.  Yes, C-K-S-O-N.  Dickson.

7         Q.    And what did Anthony Clark tell you?

8              MR. TANNER:  Object to the form of the

9    question.

10         A.    I can't recall.

11   BY MR. WOLF:

12         Q.    Do you recall generally what he said to

13   you?

14         A.    That I had a past negative history.  The

15   arrest.

16         Q.    Would you agree that suing a county might

17   be perceived by another county as a negative history?

18              MR. TANNER:  Object to the form of the

19   question.

20         A.    I don't know.

21   BY MR. WOLF:

22         Q.    How about Gloria Dickson?  What did she

23   say to you?

24              MR. TANNER:  Object to the form of the

25   question.

Michael Thompson
August 12, 2016

Page 61

1      A.      I can't recall.

2  BY MR. WOLF:

3      Q.      Do you recall generally what she told you?

4      A.      I can't recall.

5      Q.      Was anything put to you in writing or

6  otherwise conveyed to you in an e-mail or other form

7  directing you to the reasons why you weren't hired

8  by Sunflower County?

9      A.      No.

10      Q.      And have you applied anywhere other than

11  Sunflower County for a government job since your

12  termination with Tunica County?

13      A.      Since termination, no.

14      Q.      All right.  Prior to your termination

15  were you talking to other counties about employment?

16      A.      Other counties?

17      Q.      Or other governmental entities regarding --

18      A.      Other governmental entities?

19      Q.      Yes, regarding employment.

20      A.      No.

21      Q.      Have there been any other places whether

22  public or private where you've applied for a job

23  since leaving Tunica County?

24      A.      Since?

25      Q.      Since leaving Tunica County.

Michael Thompson
August 12, 2016

Page 62

1      A.      Since leaving Tunica County.  I continue
2  to look for opportunities.
3      Q.      Give me the name of anyplace that you
4  have sent your resume to since leaving Tunica County.
5      A.      Hinds County.
6      Q.      Anyplace else?
7      A.      I can't recall.
8      Q.      All right.  Prior to your termination were
9  you looking for work at any other public or private
10 institution?
11     A.      Say again.  I'm sorry?
12     Q.      Prior to your termination did you look
13 for work at any other private or public institution
14 outside of Tunica County?
15             MR. TANNER:  Object to the form.
16     A.      I can't recall.
17 BY MR. WOLF:
18     Q.      Prior to your termination did you send
19 your resume to any other public or private
20 institution looking for work?
21     A.      Jackson Redevelopment Authority.
22     Q.      What position did you seek there?
23     A.      Consultant.
24     Q.      And that was while you were at Tunica.
25 Correct?

Michael Thompson
August 12, 2016

Page 63

1       A.      Yes.

2       Q.      How about that resume you sent to Hinds

3   County?  What job were you applying for there?

4       A.      Consultant.

5       Q.      Are you claiming you were physically

6   injured in any way as a result of the incidents you

7   allege in the Complaint?

8       A.      Yes.

9       Q.      Okay.  Could you tell me what injuries

10  you suffered as a result of the incidents alleged in

11  the Complaint.

12      A.      Increased blood pressure.

13      Q.      Anything else?

14      A.      Stress.

15      Q.      Anything else?

16      A.      Depression.

17      Q.      Anything else?

18      A.      Anxiety.

19      Q.      Anything else?

20      A.      Physical?

21      Q.      Yes, physical.

22      A.      I can't recall.

23      Q.      Any other mental injuries that you're

24  claiming other than the stress, depression, and

25  anxiety that you've stated?

Michael Thompson
August 12, 2016

Page 64

1    A.    Mental?

2    Q.    Yes, any mental injury.

3    A.    Other than what I've stated?

4    Q.    Yes, other than what you've stated.

5    A.    I can't recall.

6    Q.    Well, I'm going to ask you again, is

7  there any reason you wouldn't recall other injuries?

8  As you sit there today is there any reason you can

9  think of that you just don't recall this stuff?

10        MR. TANNER:  Object to the form of the

11  question.

12    A.    I'm not sure I understand your question.

13  BY MR. WOLF:

14    Q.    Well, a lot of people use the answer in a

15  deposition "I don't recall" as a convenient way of

16  escaping an answer presently only to later come and

17  suddenly say they recall and then give another

18  answer at a later point.  I'm asking you right now

19  as you sit here today is there any reason why you don't

20  recall information today regarding your physical or

21  mental health?

22        MR. TANNER:  I'd like to make a more

23  defined objection on the record.  My objection -- I

24  objected to the form of the question primarily

25  because of the use of the word "injuries" because I

Michael Thompson
August 12, 2016

Page 65

1  think with a slight variation and what he's asking

2  if you were not to refer to it as injuries, although

3  I agree that what the answer would be if he used the

4  word other than injuries you would get the answer that

5  I think would develop -- and I'm trying to avoid

6  coaching him. I don't want to say anything.

7  　　　　MR. WOLF: Well, let me rephrase the

8  question and see if we can get it.

9  BY MR. WOLF:

10  　　Q. Are you claiming any other mental

11  suffering or illness as a result of the incidents

12  alleged in the Complaint, other than the stress,

13  depression, and anxiety that you've stated already?

14  　　A. Reputational.

15  　　Q. Reputation.

16  　　A. Embarrassment, worry.

17  　　Q. Anything else that you claim you suffered

18  as a result of the incident alleged? Is that a no?

19  　　A. Yes, could you repeat your question.

20  　　Q. The question was is there anything else.

21  　　A. I can't recall.

22  　　Q. You talked about increased blood pressure.

23  What doctors have you seen regarding the increased

24  blood pressure? What are the names of the doctors

25  you've seen?

Michael Thompson
August 12, 2016

Page 66

1    A.    I went to Baptist Desoto the night of the

2  arrest.  I can't recall the doctor's name.

3    Q.    Is there any follow-up, any other doctors

4  following the visit to Baptist?

5    A.    Michael Morgan, Dr. Michael Morgan.

6    Q.    Where is Dr. Morgan located?

7    A.    St. Dominic's.

8    Q.    Is he a primary care physician or what type

9  of doctor is he?

10    A.    I can't recall his exact title.

11    Q.    Have you seen him more than once?

12    A.    Yes.

13    Q.    Did you go to him before the incident alleged

14  in the Complaint?

15    A.    I can't recall.

16    Q.    Do you have a primary care physician?

17    A.    Yes, Michael Morgan.  Yes, Michael Morgan.

18    Q.    Do you know the name of the group he's with

19  at St. Dominic's?

20    A.    I don't.

21    Q.    How many years have you seen him as your

22  primary care physician?

23    A.    Approximately two.

24    Q.    Has any doctor ever said your blood pressure

25  is a permanent condition?

Michael Thompson
August 12, 2016

Page 67

1      A.    I can't recall.

2      Q.    Have you taken any medications as a result

3  of blood pressure?

4      A.    Yes.

5      Q.    What blood pressure medications are you

6  taking?

7      A.    Lisinopril HCI.

8      Q.    How long have you been taking the

9  Lisinopril HCI?

10     A.    Approximately since the arrest.

11     Q.    Do you recall on the date of the arrest

12  what your blood pressure actually was at the Baptist?

13     A.    I cannot recall exactly.  Very high.  Very

14  high.

15     Q.    Do you get your blood pressure checked

16  regularly now that you're on a blood pressure medicine?

17     A.    Yes.

18     Q.    How often do you go to see Michael Morgan?

19  Do you have six-month visits?

20     A.    Approximately annually.

21     Q.    Have you seen any other doctors apart from

22  Baptist Desoto and Michael Morgan regarding your

23  blood pressure?

24     A.    Tunica County Clinics.

25     Q.    When did you go there?

Michael Thompson
August 12, 2016

Page 68

1    A.    As I was county administrator, that was the

2 closest facility.

3    Q.    Which pharmacy do you get your prescriptions

4 filled at?

5    A.    Walmart.

6    Q.    Walmart in Pearl or another one?

7    A.    Lakeland.

8    Q.    Lakeland.  Now for your mental suffering,

9 which doctors have you gone to see regarding this?

10   A.    None.

11   Q.    How do these conditions manifest themselves

12 in your life since the incident?

13        MR. TANNER:  Object to the form of the

14 question.

15   A.    I don't understand.

16 BY MR. WOLF:

17   Q.    How do you experience -- as we just

18 described them, how do you experience any of these

19 mental sufferings of stress, depression, anxiety?

20 How do they manifest themselves in your daily life?

21        MR. TANNER:  Same objection.

22   A.    I'm not sure I understand your question.

23 BY MR. WOLF:

24   Q.    All right.  You said you suffer from

25 depression, anxiety, and stress.  Do they take on

Michael Thompson
August 12, 2016

Page 69

1   any specific forms of behavior or feelings in your

2   daily life since this event?

3          A.    Increased heartbeat, increased blood

4   pressure, weakness.

5          Q.    Have you been diagnosed by any mental

6   health providers with the diagnosis of stress?

7          A.    No.

8          Q.    Have you been diagnosed by any mental

9   health providers with the diagnosis of depression?

10         A.    No.

11         Q.    Have you been diagnosed by any mental

12  health providers regarding the diagnosis of anxiety?

13         A.    No.

14         Q.    You claim that your reputation was harmed

15  as a result of this incident.  What do you mean by that?

16         A.    That I lost an engagement at Sunflower

17  County as a result.

18         Q.    Who will be testifying that that was the

19  reason you lost your engagement?  Have you spoken --

20              MR. TANNER:  Objection.  I'm sorry.

21  BY MR. WOLF:

22         Q.    Let me rephrase that.  Have you spoken to

23  anybody or asked anybody to testify from Sunflower

24  County about the reasons you were terminated?

25         A.    Not that I recall.

Michael Thompson
August 12, 2016

1    Q.    Do you have the names of any persons who might

2  be a witness to the reasons you weren't hired in

3  Sunflower County?

4         MR. TANNER:  Object to the form of that

5  question.

6    A.    I don't understand your question.

7  BY MR. WOLF:

8    Q.    Have you asked anybody from Sunflower County

9  to testify on your behalf regarding the reasons for

10 not being hired in Sunflower County?

11   A.    No.

12   Q.    Have you spoken to any experts regarding any

13 of the incidents alleged within the Complaint?

14   A.    No.

15        MR. TANNER:  I object to the form of that

16 question.

17 BY MR. WOLF:

18   Q.    Prior to this incident had you ever seen

19 any mental health providers regarding any mental

20 suffering?

21        MR. TANNER:  Object to the form of the

22 question.

23   A.    No.

24 BY MR. WOLF:

25   Q.    Prior to this incident did you ever seek

Michael Thompson
August 12, 2016

Page 71

1   professional health from any mental health provider

2   regarding depression?

3       A.    No.

4       Q.    Prior to this event did you ever seek

5   mental health counseling or advice regarding your

6   anxiety?

7       A.    No.

8       Q.    Prior to this incident had you ever sought

9   professional mental health counseling or advice

10  regarding stress?

11      A.    No.

12      Q.    At the time you were hired as the county

13  administrator for Tunica County, what were your

14  specific experiences -- job experiences related to

15  the position of a county administrator?

16      A.    Could you repeat that.

17      Q.    Yes, I'll rephrase it, in fact.  Prior to

18  being hired by Tunica County as the county

19  administrator, what were your professional experiences

20  that qualified you for the position?

21          MR. TANNER:   Object to the form of the

22  question.

23      A.    I'm not sure I understand your question.

24  BY MR. WOLF:

25      Q.    When you took the job as Tunica County

Michael Thompson
August 12, 2016

Page 72

1    administrator, did you represent to the county that

2    you were qualified for the position?

3           A.    No.

4           Q.    Were you qualified for the position?

5           A.    I'm not sure I understand your question.

6           Q.    Were you qualified for the position of

7    county administrator before you took the job at

8    Tunica County?

9           A.    Yes.

10          Q.    What made you qualified for that position?

11          A.    My background.

12          Q.    What part of your background qualified

13   you to --

14          A.    My educational background.

15          Q.    Any professional background?

16          A.    My educational background.

17          Q.    Your educational background.  Okay.  What

18   educational courses had you taken that qualified you

19   to be a county administrator?

20          A.    I'm not sure I understand your question.

21          Q.    What part of your educational background

22   qualified you to be a county administrator?

23                MR. TANNER:  Object to the form.

24          A.    My business courses.

25   BY MR. WOLF:

Michael Thompson
August 12, 2016

Page 73

1      Q.    Had you had any courses related to
2  Mississippi government?
3      A.    No.
4      Q.    Had you had any courses related to county
5  budgeting?
6      A.    No.  In college?  No.
7      Q.    Your educational background, yes.
8      A.    No.
9      Q.    Had you had any courses regarding human
10  resources and personnel?
11     A.    Yes.
12     Q.    What courses had you had regarding human
13  resources and personnel?
14     A.    Manager training at KPMG.
15     Q.    Had you had any training regarding public
16  employees?
17     A.    I don't recall.
18     Q.    Were there any unions -- employee unions
19  in Tunica County?
20          MR. TANNER:  I object to the form of the
21  question.
22     A.    I don't recall.
23  BY MR. WOLF:
24     Q.    Had you had any experience prior to being
25  appointed regarding budgeting for law enforcement

Michael Thompson
August 12, 2016

1   agencies like a sheriff's department?

2       A.    Courses?

3       Q.    Yes, courses.

4       A.    No.

5       Q.    Any other education related to budgeting

6   for a law enforcement agency like a sheriff's

7   department?

8       A.    Education?

9       Q.    Yes.

10      A.    No.

11      Q.    Do you have any other experience that

12  prior to being chosen for the job related to

13  budgeting for a sheriff's department or other law

14  enforcement agency?

15      A.    No.

16      Q.    Are you presently married?

17      A.    Yes.

18      Q.    What is your spouse's name?

19      A.    Regina Thompson.

20      Q.    All right.  I asked you in a set of what

21  are called interrogatories to respond to some

22  questions and we'll go through some of these.  I asked

23  you to provide the name, address, and telephone

24  number of all persons who may have discoverable

25  knowledge or any other information that supports

Michael Thompson
August 12, 2016

1    your claims or allegations of your complaint or who

2    have discoverable knowledge or any other information

3    regarding the allegations contained in the Complaint

4    and with respect to each so identified state the

5    subject matter which person has knowledge.

6              And you indicated that you've already

7    provided that information but I'd just like to know

8    as you sit there today who do you know -- just the

9    names of the people you know that have information

10   regarding your claim.

11             MR. TANNER:  Object to the form.

12        A.    Could I see that?

13   BY MR. WOLF:

14        Q.    Yes, absolutely.  It's Question Number 2.

15        A.    Could you repeat your question again.

16        Q.    Yes.  Let me ask it a different way.  I'll

17   go back to your core discovery and we'll go through

18   some names.  Alex Wiley:  What does he know about

19   this event?

20             MR. TANNER:  Objection.  Calls for

21   speculation, so we object to the form of the question.

22   BY MR. WOLF:

23        Q.    Alex Wiley:  What do you understand him

24   to know about the event?

25             MR. TANNER:  My objection stands.

Michael Thompson
August 12, 2016

Page 76

1      A.    That he was present.  I don't know.  He

2  was present.

3  BY MR. WOLF:

4      Q.    Okay.  At the time of the arrest?

5      A.    Yes.

6      Q.    All right.  Where were you and Mr. Wiley

7  traveling on the day of the event?  Where were you

8  and Mr. Wiley traveling on the day of the event?

9          MR. TANNER:  Objection as to form.

10     A.    Where were we traveling?

11  BY MR. WOLF:

12     Q.    Yes.

13     A.    To Memphis.

14     Q.    To Memphis.  And you were leaving Tunica

15  headed towards Memphis.  Is that right?

16     A.    Yes.

17     Q.    You also indicate that, Other employees,

18  officers, agents, and assigns of Tunica County

19  Sheriff's Department unknown to the plaintiff were

20  involved in the unlawful arrest.

21          Since providing these have you come up

22  with the names of any other Tunica County employees

23  who might have information regarding your arrest?

24     A.    I can't recall.

25     Q.    All right.  Rachel Siggers, S-I-G-G-E-R-S,

Michael Thompson
August 12, 2016

Page 77

1   has knowledge of Mr. Thompson's notice of claim to

2   Tunica County.  Who is Rachel Siggers?

3         A.    Tunica County chancery clerk.

4         Q.    Okay.  Was she present at the time of your

5   arrest?

6         A.    No.

7         Q.    Have you spoken to her regarding your arrest?

8         A.    No.

9         Q.    Do you know if she's still the county clerk?

10        A.    Chancery clerk.

11        Q.    Chancery clerk.

12        A.    Yes.

13        Q.    You also identify a Randy Stewart.  Who is

14   Randy Stewart?

15        A.    Chief deputy.

16        Q.    For Tunica County?

17        A.    Yes.

18        Q.    What do you believe he would know about

19   your arrest?

20        A.    He's the chief deputy.  Second in command.

21        Q.    Did you speak with him on the date of your

22   arrest?

23        A.    No.

24        Q.    In your prior pleas you indicate that he

25   has knowledge regarding posting of the bond to be

Michael Thompson
August 12, 2016

Page 78

1    released from Tunica County.  What do you believe he

2    knows about your posting of bond?

3         A.    He's chief deputy.  He is second in charge.

4         Q.    Did you post the bond directly to Mr. Stewart?

5         A.    I can't recall.  I can't recall.

6         Q.    It also indicates that he has knowledge

7    regarding your length of time in the jail.  How long

8    exactly were you in the jail?

9         A.    I can't recall.

10         Q.    On the night of the incident you were

11    transported to the hospital shortly after arriving

12    at the jail.  Correct?

13              MR. TANNER:  Object to the form of the

14    question.

15    BY MR. WOLF:

16         Q.    Were you transported to the hospital by

17    ambulance shortly after arriving at the Tunica

18    County jail?

19         A.    Shortly?  I cannot say shortly.  I can't

20    recall the amount of time.

21         Q.    Was it more than an hour?

22         A.    I can't recall.

23         Q.    Was it less than two hours?

24         A.    I was transported to the hospital.  I can't

25    recall the timing.  My blood pressure was elevated.

Michael Thompson
August 12, 2016

Page 79

1      Q.      Okay.

2              MR. TANNER:  Did you ask him if it was an

3   ambulance?

4              MR. WOLF:  I suggested it was an ambulance.

5   BY MR. WOLF:

6      Q.      Were you transported by ambulance?

7      A.      I was not transported by ambulance.

8      Q.      Okay.  How were you transported to the

9   hospital?

10     A.      In the back seat of a sheriff's deputy's

11  car.

12     Q.      Okay.  You identify employees of Pafford

13  Medical Services.  What do you expect employees of

14  Pafford Medical Services to be able to testify to?

15             MR. TANNER:  I object to the form.

16  BY MR. WOLF:

17     Q.      What do you understand that they might

18  testify to?

19     A.      I know that they came to the jail.  I know

20  that they checked my blood pressure.

21     Q.      Go ahead.

22     A.      And I know that they insisted that I go

23  to the hospital in the ambulance.

24     Q.      And you also identify secretary and

25  keeper of the minutes of the board of supervisors of

Michael Thompson
August 12, 2016

Page 80

1   Sunflower County.  What do you believe that will be

2   in the minutes of the board of Sunflower County?

3           MR. TANNER:  Objection.  Calls for

4   speculation.  Object as to form.

5       A.    Could you repeat the question for me.

6   BY MR. WOLF:

7       Q.    You identified the secretary and keeper

8   of minutes of the board of supervisors of Sunflower

9   County.  What do you anticipate that the minutes of

10  the board of supervisors of Sunflower County would

11  have related to your claims?

12      A.    The vote to approve my hiring and also

13  the vote to rescind my hiring.

14      Q.    And that vote to hire you, how much were

15  you offered in that position?

16      A.    $200 an hour.

17      Q.    So it wasn't as an employee that you were

18  being offered to be hired, was it?

19      A.    No.

20      Q.    What was the position that you were being

21  offered by Sunflower County?

22      A.    Position or engagement?

23      Q.    Position or engagement.  Which was it?

24      A.    It was a consultant position at $200 an hour.

25      Q.    And this would have been through Michael

Michael Thompson
August 12, 2016

Page 81

1   Thompson, CPA?

2        A.    Yes.

3        Q.    So you were not applying for a position

4   there as a county administrator, were you?

5        A.    No.

6        Q.    You were simply looking for additional

7   work as a CPA from this governmental entity?

8        A.    Correct, correct.

9        Q.    All right.  And what exactly was the

10  nature of the engagement?

11       A.    Internal audit.  Internal audit.

12       Q.    And how much did you estimate would be the

13  cost of an internal audit?

14       A.    As stated, the standard hourly rate of

15  $200.  That was the hourly rate.  So the estimate is

16  it would just be a matter of $200 times the amount

17  of hours spent doing the engagement.

18       Q.    Well, how many hours did you estimate

19  that you would spend on an internal audit?

20            MR. TANNER:  Object to the form of the

21  question.

22       A.    It will vary depending upon, you know,

23  various factors.  It varies.  That's why there's an

24  hourly rate of $200 an hour.

25  BY MR. WOLF:

Michael Thompson
August 12, 2016

Page 82

1    Q.    Well, did anybody ever ask you what you
2 anticipated for your number of hours or were you
3 simply given cart blanch to bill and work until you
4 were satisfied that you completed the job?
5    A.    Could you repeat.  I'm not sure I understand.
6    Q.    Was there a time limit set for you to do
7 this internal audit?
8    A.    Was there a time limit set?
9    Q.    Yes, correct.
10   A.    No.
11   Q.    Okay.  Were there any limits placed on
12 the amount that would be spent on an internal audit
13 in this engagement?
14   A.    No, no.
15   Q.    By way of comparison, the only other
16 internal audit of governmental agency that you had
17 done prior to this was Tunica County.  Correct?
18   A.    Could you repeat that.
19   Q.    Yes.  Let me be more specific.  The only
20 other internal audit of a county you had done prior
21 to this was Tunica.  Correct?
22   A.    Yes.  Of a county, yes.
23   Q.    Or county.  And in doing that internal audit
24 for Tunica County, how many hours did you spend?  Or
25 if it's easier to answer, what was your total income,

Michael Thompson
August 12, 2016

Page 83

1   if you will, for that?

2       A.    Approximately 100-plus thousand.

3       Q.    Let me ask you this question: While you

4   were the county administrator for those two years in

5   Tunica County, did you maintain a residence or other

6   place to stay in or near Tunica?

7       A.    I want to make sure I understand what

8   you're asking me.

9       Q.    Yes. I mean, did you commute every day

10   between Brandon and Tunica while you were county

11   administrator?

12       A.    Not every day.

13       Q.    Where did you stay when you were up there?

14       A.    In Memphis.

15       Q.    All right. How many days a week would you

16   commute?

17       A.    It varied. It varied.

18       Q.    It's roughly a three-hour drive each way?

19       A.    (Nodded head affirmatively.)

20       Q.    Is that a yes?

21       A.    Yes, yes.

22       MR. TANNER: Object. Three-hour drive

23   each way where?

24       MR. WOLF: Estimating from Brandon to

25   Tunica County.

Michael Thompson
August 12, 2016

Page 84

1  BY MR. WOLF:

2      Q.    It that rough estimate correct?

3      A.    From Brandon to Tunica?

4      Q.    Yes.

5      A.    Each way?

6      Q.    Each way.

7      A.    Three going?

8      Q.    Three coming, yes.

9      A.    Three coming.  Yes.

10     Q.    Okay.  Do you recall what your bond --

11  the cost of your bond was to be released from jail?

12     A.    Approximately 500 bucks.

13     Q.    Okay.  Now, in your responses to

14  discovery or your preliminary disclosure, you

15  indicate that --

16         MR. TANNER:  Are you switching gears?

17         MR. WOLF:  A little bit.

18         MR. TANNER:  Can we take a break.

19         MR. WOLF:  Sure.

20         (OFF RECORD 11:41 A.M. TO 11:46 A.M.)

21  BY MR. WOLF:

22     Q.    Previously in discovery provided by your

23  attorney there was a statement, Plaintiff claims as

24  compensatory damages the amount of 150,000 in lost

25  wages associated with the job he was denied based on

Michael Thompson
August 12, 2016

Page 85

1   this unlawful arrest and detention in Tunica County.

2           Is that $150,000 the amount you're

3   associating with Sunflower County?

4       A.   Can I see that?

5       Q.   Sure.

6       A.   Your question was?

7       Q.   Where does that $150,000 estimate come from?

8       A.   Sunflower County.

9       Q.   How did you calculate that number of

10  $150,000?

11      A.   That would be the rate of $200 an hour

12  times how many hours it takes to get to 150-.

13      Q.   And you don't have any idea how long it was

14  going to take to do that job, do you?

15      A.   I have to do the -- you know, I have to do

16  the math.  I don't know how long it would take.  That

17  was just an estimate.

18      Q.   All right.  So you were able to -- earlier

19  you said you couldn't estimate what the number was.

20      A.   No, no.

21      Q.   I just want to know how you came up with

22  150,000 yet you don't know how to estimate your

23  total job -- were unable to estimate your total job

24  today.

25           MR. TANNER:  I object to the form.  I'm

Michael Thompson
August 12, 2016

Page 86

1   not sure --

2   BY MR. WOLF:

3       Q.      Sure.  Tell me exactly how it is you came

4   up with that number, $150,000.

5       A.      That would be the rate of $200 an hour

6   times the number of hours.

7       Q.      All right.  And what did you use to

8   estimate the number of hours on that job?

9       A.      Could you repeat that and make sure I'm

10  clear on it.

11          MR. WOLF:  Could you repeat that question

12  back to him.

13          THE COURT REPORTER:  What did you use to

14  estimate the number of hours on that job?

15          MR. TANNER:  Object to the form.

16      A.      On that job?  When you say that job....

17  BY MR. WOLF:

18      Q.      On that engagement.  On that engagement.

19      A.      On?

20      Q.      That $150,000.  You have testified today

21  that it was $200 an hour times an estimated number

22  of hours.

23      A.      Right.

24      Q.      Tell me what information you had to estimate

25  that number of hours.

Michael Thompson
August 12, 2016

Page 87

1      A.     The prior -- the prior Tunica County internal

2 audit.

3      Q.     Okay.  And that one only, according to

4 your testimony, 108- or $109,000.  Right?

5      A.     No, I didn't say that.  I said approximately

6 over 100,000.

7      Q.     Oh, okay.  And you're 100 percent sure

8 that that's exactly what you said earlier,

9 approximately over 100,000, not 108- or 109,000?

10      MR. TANNER:  May we have her repeat it

11 back.  I'm pretty sure --

12      MR. WOLF:  No, no.  He doesn't get the

13 benefit of his -- he's sitting here right.  He's

14 telling me what he said earlier.

15 BY MR. WOLF:

16      Q.     I want to know are you accurate then or

17 are you accurate now?

18      MR. TANNER:  May I object, then.  I'll

19 put my objection on the record.  I think the problem

20 here is that the question incorrectly assumes what

21 he said.  The question assumes that he said 108- or

22 109,000.  The witness said this.  He said over 100,000.

23 I have it written down right here exactly as he said

24 it.  So neither one of the parties is correct in what

25 he said.  So if we want it accurate can we have it --

Michael Thompson
August 12, 2016

Page 88

1          MR. WOLF:  We'll move on to a new question.

2          MR. TANNER:  Thank you.

3    BY MR. TANNER:

4       Q.    All right.  Now that your counsel has coached

5    you on the 108- --

6          MR. TANNER:  I have not coached anything.

7    BY MR. WOLF:

8       Q.    Let me ask you this:  How did a prior job of

9    at or near 108- or 109,000 or in excess of that

10   translate to your knowledge that this next job would

11   take $150,000?

12         MR. TANNER:  I object to the form.

13      A.    Could you repeat that.

14   BY MR. WOLF:

15      Q.    Just tell me how it is that you came up with

16   an estimate of $150,000 for that job in Sunflower County.

17      A.    The hourly rate of $200 an hour times the

18   amount of hours.

19      Q.    All right.  How many hours did you anticipate

20   it would take?

21      A.    I'd have to do the math.

22      Q.    Well, go ahead and do the math.  You're the

23   CPA.  It should be simple enough.

24         MR. TANNER:  Do you have a calculator?

25   BY MR. WOLF:

Michael Thompson
August 12, 2016

Page 89

1      Q.     No.  I did it in my head.  I'm just sitting

2 here going -- come on.  You know how many hours that

3 would take.  Right?  How many hours would it take to

4 make 150,000 on 200 an hour?

5      A.     You want me to do it?

6      Q.     Yes, yes, do the math.

7      A.     Do you got a calculator?

8      Q.     No, I don't have a calculator.  So as you

9 sit there without a calculator you can't give us an

10 estimate?

11      A.     I didn't say that.

12      Q.     All right.

13      A.     I didn't say that.

14      Q.     All right.  Well, then can you do it without

15 a calculator?

16            MR. TANNER:  Objection to the form of the

17 question.

18 BY MR. WOLF:

19      Q.     Go ahead and answer.

20      A.     You got a cell phone?

21      Q.     I do.

22            MR. TANNER:  Are you looking for an answer?

23            MR. WOLF:  I am.  I'm looking for an answer.

24            MR. TANNER:  Just the math?

25 BY MR. WOLF:

Michael Thompson
August 12, 2016

Page 90

1      Q.      Yes, what's the math?  How many hours would
2   it take to make $150,000 at $200 an hour?  Using the
3   calculator on your cell phone, what number did you come
4   up with?
5      A.      The amount of hours?
6      Q.      What's that?
7      A.      The amount of hours?
8      Q.      Yes, the amount of hours it would take.
9      A.      750 hours.
10      Q.      750 hours were anticipated.  So a third of
11   your year would be spent on that internal audit.  Is
12   that accurate?
13      A.      A third of the year?
14      Q.      Uh-huh.
15      A.      Is that the question?  How long would it
16   -- 750 hours --
17      Q.      Let me move on.  So you expected 750 hours.
18      A.      750 hours.
19      Q.      And that's just an estimate.  Correct?
20      A.      Just an estimate.
21      Q.      All right.  And it's not based on -- and the
22   only other reference you have for that estimate is the
23   Tunica County event.  Correct?
24      A.      The Tunica County project is a -- is a good
25   estimate.

Michael Thompson
August 12, 2016

Page 91

1      Q.    Okay.  Did you speak to Sheriff Hamp after

2  you were arrested regarding the arrest?

3      A.    After?

4      Q.    After the arrest.

5      A.    I'm not sure I understand the question.

6      Q.    After you were arrested, did you speak

7  directly with Sheriff Hamp regarding the incident?

8           MR. TANNER:  Object to the form.

9      A.    After?

10  BY MR. WOLF:

11      Q.    After.

12      A.    At or any time or --

13      Q.    At any time.  After you bailed out of jail,

14  after you're out of the hospital that day --

15      A.    I don't recall.

16      Q.    Okay.  Did you speak with Deputy Jones that

17  day?

18      A.    That day?

19      Q.    I'm sorry.  After the event.  Let's start

20  there.  Did you speak with Deputy Jones regarding the

21  arrest after that event?

22      A.    I don't recall.

23      Q.    All right.  Now, could you tell us each fact

24  upon which you allege that Deputy Jones knew your license

25  was suspended before he stopped you.

Michael Thompson
August 12, 2016

Page 92

1        MR. TANNER:  Object to the form of the

2   question.

3        A.    Could you say it again.

4   BY MR. WOLF:

5        Q.    Yes.  All the facts that you know that

6   support your contention that Deputy Jones knew your

7   license was suspended before he stopped you.

8        A.    We've skipped some.  Like, I'm not sure

9   I'm understanding your question because, you know....

10       Q.    State each fact --

11       A.    I wasn't initially driving.

12       Q.    But I want to know when he stopped you.

13       A.    Oh, so specifically --

14       Q.    Yes.

15       A.    -- when he stopped me?

16       Q.    Yes.  How do you know that he knew your

17   license was suspended before he stopped you?

18       A.    Could I see that?

19       Q.    No.

20       A.    As I recall, from trial transcripts he

21   stated that.

22       Q.    So it was after some trial transcripts that

23   you got that?

24       A.    Say that again.

25       Q.    From trial transcripts that you got that

Michael Thompson
August 12, 2016

Page 93

1   information?

2        A.    I got what information?

3        Q.    That he knew your license was suspended before

4   he stopped you.

5        A.    So from -- could you repeat that.

6        Q.    I think you've answered.  I'll move on to

7   the next question.

8        A.    I want to make sure I have.  I want to

9   make sure that I've answered this one.

10       Q.    I'm going to move to the next question.

11             MR. TANNER:  Well, he gets the opportunity

12   to answer it.

13   BY MR. WOLF:

14       Q.    Yes, go ahead and answer it.

15       A.    I want to make sure I'm answering this right.

16       Q.    You answered it as far as I can tell.

17             MR. TANNER:  You get the right to answer the

18   question.  Go ahead.

19       A.    So from -- from -- I understand that the

20   officer stated that he knew my license were suspended

21   prior to stopping me.

22   BY MR. WOLF:

23       Q.    In Interrogatory Response Number 17 --

24   I'll show you this one.  You were asked, Please

25   identify the source of authority which you as the

Michael Thompson
August 12, 2016

1  county administrator was empowered to reduce the

2  budget of the sheriff's department.

3           And your response says, Plaintiff's

4  contractual agreement with Tunica County and the

5  laws of the state of Mississippi empower the

6  plaintiff to reduce the budget of the Tunica County

7  Sheriff's Department.

8           Let me do a couple of follow-up questions

9  to that.  Was there a written contractual agreement

10  between you and Tunica County?

11     A.    I don't recall.

12     Q.    And do you recall, then, whether oral or

13  written, which terms of that agreement granted you

14  the authority to reduce the budget of the Tunica

15  County Sheriff's Department?

16     A.    I'm not sure I understand your question.

17     Q.    Whether the contract whether it was

18  written or oral what terms are you referring to that

19  gave you the authority to reduce the budget of the

20  Tunica County Sheriff's Department?

21     A.    What part of the -- I want to make sure I

22  answer your question.

23     Q.    Yes.  I'm just trying to find out -- you

24  state that you were given the power to reduce the

25  budget of the sheriff's department and I'm just

Michael Thompson
August 12, 2016

1    trying to figure out where that power came from.

2    You say it's a contractual agreement and state law.

3    That contractual agreement, you don't know if it's

4    in writing or not.  I'm just trying to figure out

5    where did you get those specific directions?

6         A.    I don't recall.  I don't recall.

7         Q.    Do you recall where you got that specific

8    direction to reduce the budget of the sheriff's

9    department?

10        A.    You mentioned state law?

11        Q.    I'm talking about the contract right now.

12        A.    Okay, okay.  I just want to make sure

13   we're clear.  So I'm sorry.

14        Q.    Where in the contract, either oral or

15   written, do you recall it being empowered to reduce

16   the budget of the sheriff's department?

17        A.    The duties of a county administrator are

18   clearly laid out in the Mississippi Code.

19        Q.    All right.  So we're talking now about

20   state law and not the contract.  Is that....

21        A.    What's your question again?  I'm sorry.

22        Q.    I just want to know where were you given

23   the power to reduce the budget of the sheriff's

24   department and you're telling me it's in state law,

25   but you also told me it was in a contractual

Michael Thompson
August 12, 2016

Page 96

1   agreement.  I just need to figure out where this

2   contractual agreement is, whether it's oral or

3   written.

4        A.     I don't recall.  I can -- I don't recall.

5        Q.     Now, the state law, Mississippi, you say

6   it's clearly laid out.  What sections of the state law

7   lay out county administrator's duties?  Do you know?

8             MR. TANNER:  Object to the form of the

9   question.

10       A.     The state -- the Mississippi Code

11  includes several sections.  It talks about county

12  officers and duties of county administrators.  Those

13  sections.

14       Q.     All right.  And it's clearly laid out there.

15  Is that your testimony?

16       A.     Yes.

17       Q.     All right.  And what does it say about a

18  county administrator's duty with regard to the budget

19  of the sheriff's department?

20       A.     Are you asking me or is that written there?

21       Q.     No, I'm asking you.

22       A.     What's the question again?

23       Q.     What does the state law that you say is

24  clearly laid out say about the duties of a county --

25  or the power of the county administrator to reduce the

Michael Thompson
August 12, 2016

Page 97

1    budget of the sheriff's department?

2        A.    Only the budget of the sheriff's department

3    or just budgets?

4        Q.    Yes, the budget of the sheriff's

5    department.

6        A.    I don't recall.

7        Q.    Well, isn't it actually the board that's

8    entitled to reduce the budgets and you recommend to

9    the board their action?

10       A.    Can you repeat that.

11       Q.    Is it the power of the county

12   administrator to reduce budgets or is it the power

13   of the board for each county to handle that?

14       A.    The board would vote to -- the board's

15   vote speaks.  It's the board's vote.

16       Q.    Okay.  And did the board vote to reduce

17   the budget of the sheriff's department in Tunica

18   County?

19       A.    Yes.

20       Q.    And that would have been in January or

21   February of 2014?

22       A.    I can't recall.

23       Q.    What was the purpose for which you and

24   Mr. Wiley were traveling to Memphis, Tennessee, on

25   the date you were arrested?

Michael Thompson
August 12, 2016

Page 98

1           MR. TANNER:  Object to the form.

2      A.    The purpose?

3  BY MR. WOLF:

4      Q.    Yes, the purpose for you headed towards

5  Memphis, Tennessee, on the date of your arrest.

6      A.    Previously I stated that Memphis was the

7  location where I stayed.

8      Q.    Okay.  So it was the end of the day.  You

9  were going home.  Is that it?  You were going home

10 from work?  Nothing clever about this.  Is that....

11     A.    Yes.

12          MR. WOLF:  All right.  It's 12 o'clock now.

13 We're fixing to move on to a different topic.  We can

14 cut for an hour and come back.

15          (OFF RECORD 12:06 P.M. TO 1:17 P.M.)

16 BY MR. WOLF:

17     Q.    We're back on the record after lunch.

18 Now, in the Complaint you allege that Calvin Hamp

19 and Deputy Jones conspired to violate your

20 constitutional rights.  What evidence do you have or

21 information do you have that they actually conspired

22 to do anything against you?

23          MR. TANNER:  Object to the form of the

24 question.

25     A.    Could you repeat the question.

Michael Thompson
August 12, 2016

Page 99

1    BY MR. WOLF:

2        Q.    Yes.   What information do you have to

3    support your allegation that Deputy Jones and Sheriff

4    Hamp in some way conspired to cause damages to you?

5            MR. TANNER:   Again, object to the form of

6    the question to the extent that it's based on a

7    legal premise of what a conspiracy is.

8    BY MR. WOLF:

9        Q.    You can answer.

10       A.    The trial transcript statements.

11       Q.    What specifically was said that supports

12   your contention that they conspired?

13       A.    I cannot recall verbatim.   I would have

14   to point it out to you.

15       Q.    All right.   I'm not looking for verbatim,

16   but just generally speaking what do you contend went

17   on between them that was a conspiracy against you?

18           MR. TANNER:   Same objection.

19       A.    I can't recall the specific statements in

20   there.

21   BY MR. WOLF:

22       Q.    I'm not looking for specifics.   What do

23   you contend that they did that would constitute a

24   conspiracy against you?

25           MR. TANNER:   Same objection as to the

Michael Thompson
August 12, 2016

Page 100

1   legal conclusion.

2        A.    I'm not sure I understand the question.

3   BY MR. WOLF:

4        Q.    Do you contend that Sheriff Hamp and

5   Deputy Jones had some conversations in which they

6   hatched a plan to arrest you?

7        A.    I don't know.

8        Q.    Do you have some information about any

9   conversations that took place between Deputy Jones and

10  Sheriff Hamp in which your arrest was contemplated?

11       A.    What's the question again?

12       Q.    Do you have any information regarding any

13  conversations between Sheriff Hamp and Deputy Jones

14  where they contemplated arresting you before the event?

15       A.    The trial transcript.

16       Q.    So apart from the trial transcript you don't

17  have any independent knowledge, then, of any conversations

18  between Hamp and Jones regarding a conspiracy before

19  the event, do you?

20       A.    I want to make sure I -- I don't understand

21  the question.

22       Q.    Twice you've referred to the transcript as

23  the source of your information regarding conspiracy.

24  Do you have any information outside of that trial

25  transcript regarding your allegations of conspiracy?

Michael Thompson
August 12, 2016

Page 101

1          MR. TANNER:  Same objection as to the word

2     "conspiracy."

3          A.     I don't recall.

4     BY MR. WOLF:

5          Q.     Do you know what the word "conspiracy"

6     means?  Let me ask it a different way.  What is your

7     understanding of the word "conspiracy"?

8          A.     The question is -- what's the question?

9          Q.     What is your understanding of the meaning

10    of the word "conspiracy"?

11         A.     I don't know.

12         Q.     So when you say that the information you have

13    regarding a conspiracy is in the trial transcript, I

14    want to know what I'm looking for when I look for your

15    understanding of that.  When I read through that

16    trial transcript, I want to know what you mean by

17    conspiracy when you say yes, that's where I heard it.

18         A.     A plan to attempt to arrest you.

19         Q.     All right.  A plan to attempt to arrest you.

20    All right.  Have you read the transcript from the

21    Circuit Court of Tunica County, Michael Thompson versus

22    the State of Mississippi?  It's your appeal from the

23    lower court's guilty conviction.  Have you read this

24    transcript?

25         A.     I don't know.  I would have to look at that