Exhibit "A" (Part Three)

Michael Thompson
August 12, 2016

Page 102

1    and see.

2       Q.   Well, have you read a transcript of that

3    hearing?

4       A.   I'm not sure.

5       Q.   All right.  Do you recall ever having in any

6    kind of form in front of you a transcript which

7    appeared to describe the comments and statements and

8    words and questions and answers made during the hearing

9    at Tunica County?

10      A.   Which hearing?

11      Q.   All right.  Let's take a look at this.

12   I'm going to show you a copy of this transcript from

13   the circuit court hearing regarding your criminal case.

14           MR. TANNER:  Are you going to make this

15   an exhibit?

16           MR. WOLF:  No.

17   BY MR. WOLF:

18      Q.   It's Cause Number 2014-0113.  Have you

19   ever --

20           MR. TANNER:  Well, if he's going to refer

21   to it I would ask that it be marked for identification

22   only if it's not going to be an exhibit, like

23   substantive exhibit.  If it can be marked so that --

24   because, you know, if there are any issues that come

25   up related to this deposition I would want the Court

Davis Court Reporting, LLC  601.856.8889
marytodd@daviscourtreporting.com  877.496.0079

Michael Thompson
August 12, 2016

Page 103

1  to be able to see what we were referring to.

2          MR. WOLF:  I'll tell you what I'm referring

3  to.  It's a copy of the transcript cover page,

4  Thompson versus State, transcript dated 11/10/2014

5  before Judge Johnny Walls.  Barbara Crawford, court

6  reporter.  Her certificate of -- the court reporter's

7  certificate is attached.  I don't feel like attaching

8  an entire copy of this transcript to the deposition.

9  I don't know that it serves any purpose other than

10  to -- let me go a different way.

11  BY MR. WOLF:

12      Q.   How many transcripts did you read related

13  to any hearings that you might have had?

14          MR. TANNER:  Object to the form of the

15  question.

16      A.   I don't recall.

17  BY MR. WOLF:

18      Q.   Have you read one transcript?

19          MR. TANNER:  Object to the form of that

20  question.

21      A.   I don't recall.

22  BY MR. WOLF:

23      Q.   All right.  So as you sit here today you

24  don't have any recollection of actually reading a

25  transcript from any hearing that you were involved

Michael Thompson
August 12, 2016

Page 104

1    in regarding these events?

2              MR. TANNER:   Objection to the form of that

3    question.

4        A.    As I stated before, it's in the transcript.

5    Now, as I stated before, it's in the transcript.

6    BY MR. WOLF:

7        Q.    All right.  Which transcript?  From what

8    court?  Where is it that you're....

9        A.    I can't recall.

10       Q.    All right.  But you have read a transcript.

11   Is that true?

12       A.    Yes.

13       Q.    You have?  Okay.  And do you recall

14   whether it was a hearing in front of Judge Johnny

15   Walls at the Circuit Court or was it another

16   hearing?

17       A.    I can't recall.

18       Q.    All right.  To your knowledge, have you

19   ordered or obtained more than one hearing transcript

20   in this case?

21       A.    Have I?

22       Q.    Yes.  Yes, you.  Let me rephrase it.

23   Bottom line, I'm just trying to figure out if

24   there's some other second transcript out there.  I'm

25   not aware of one.

Michael Thompson
August 12, 2016

Page 105

1          MR. WOLF:  Is there another one out there,

2   Counsel?

3          MR. TANNER:  I'm not sure.

4          MR. WOLF:  All right.  Fair enough.

5   We'll move on.

6          MR. TANNER:  I was not this man's lawyer.

7          MR. WOLF:  I know.

8          MR. TANNER:  Okay.  So I can't say to you

9   what there is.  I know there were two hearings which

10  we both can agree on.

11          MR. WOLF:  Yes, one was at lower court

12  and then circuit court.

13          MR. TANNER:  I don't know if there was a

14  transcription of the first one.  I don't have a clue.

15          MR. WOLF:  Yes.  It's my understanding

16  there wasn't.

17          MR. TANNER:  I don't know.  I can't

18  answer that.  If I had been there in the beginning

19  as the attorney I'd tell you.  I don't know.

20          MR. WOLF:  I understand.  I appreciate that.

21  We'll figure it out together.

22  BY MR. WOLF:

23      Q.   Do you have in your possession in your

24  home or in any of your documents which you may have

25  access to or control copies of any transcripts?

Michael Thompson
August 12, 2016

1    A.    I don't know.

2    Q.    All right.  When we're done with this,

3  will you go look through your papers and if you find

4  any transcripts give them to your counsel?

5        MR. TANNER:  Object to the form of the

6  question.

7  BY MR. WOLF:

8    Q.    Would you be willing to do that?

9        MR. TANNER:  Object to the form of the

10  question.

11  BY MR. WOLF:

12    Q.    Now, do you have any information outside

13  of what you recall reading in a transcript regarding

14  what you understood to be the conspiracy that you

15  allege between Jones and Hamp?

16    A.    No.

17    Q.    Okay.  Factually, what is it you're

18  claiming that Calvin Hamp or Sheriff Hamp did to you?

19  Why are you suing him?

20    A.    What's the question again?

21    Q.    Why are you suing Sheriff Hamp?

22        MR. TANNER:  Object to the form of the

23  question.

24    A.    Sheriff Hamp is the elected official for

25  Tunica County sheriff.

Michael Thompson
August 12, 2016

Page 107

1    BY MR. WOLF:

2         Q.    So are you suing him for anything he did

3    on the night of your arrest?

4         A.    I don't know what he did on that night.

5              MR. TANNER:  I object to the form of the

6    question.

7    BY MR. WOLF:

8         Q.    You don't have any information regarding

9    what he did or didn't do on the night you were

10   arrested, do you?

11        A.    I can't recall.

12        Q.    Well, let's get beyond this "I can't recall."

13             MR. TANNER:  I object.

14   BY MR. WOLF:

15        Q.    To your knowledge, do you have any

16   information regarding the conduct or actions of

17   Sheriff Hamp on the date you were arrested?

18             MR. TANNER:  I object to the form of the

19   question:

20        A.    I'm not sure I understand the question.

21   BY MR. WOLF:

22        Q.    You've sued the sheriff.  You're alleging

23   that he violated your constitutional rights.  I just

24   want to know what facts you contend support your

25   claims from your personal knowledge of his actions

Michael Thompson
August 12, 2016

Page 108

1    on the night of the event.

2          MR. TANNER:  I object to the form of the

3    question.  Can I be more specific on this one?  Do

4    you mind?  I object to the issue of personal

5    knowledge because that would require the deponent to

6    have heard, seen, or witnessed anything himself.

7          I also object to any implication -- and

8    there may be none, but to the extent that this

9    question requires him to say whether there's

10   evidence of something outside of what he knew

11   himself happened.  That's all I have.  You can

12   answer the question.

13   BY MR. WOLF:

14        Q.    Go ahead and answer if you can.

15        A.    What's the question?

16        Q.    What information do you have that

17   supports your contention that Sheriff Hamp did

18   something to violate your constitutional rights?

19   What information?  What do you know he did that day?

20          MR. TANNER:  Object to the form.

21        A.    Is there a -- I'm not sure I understand

22   your question.  Now there are two questions.

23   BY MR. WOLF:

24        Q.    Well, yes, there were two questions but

25   they're consistently the same.  What I'm trying to

Michael Thompson
August 12, 2016

Page 109

1  get at is do you have any personal knowledge --
2  let's start with that, what you know personally about
3  what Sheriff Hamp did or didn't do on the day you
4  were arrested.
5       A.   I don't recall.
6       Q.   Is there a reason you don't recall what
7  Sheriff Hamp did or didn't do on the day you were
8  arrested?
9       A.   Is there a reason?
10      Q.   Yes.  Is there a reason you don't recall
11  his conduct or lack of conduct on the day?
12      A.   I don't recall.
13      Q.   All right.  So as you sit here today you
14  don't have any recollection of the conduct of
15  Sheriff Hamp on the date you were arrested.  Is that
16  a correct statement?
17      A.   I can't recall.  What's the question again?
18      Q.   I was asking you if you can think of any
19  reason why you don't recall his conduct on the date
20  in question?
21           MR. TANNER:   Object to the form of the
22  question.
23  BY MR. WOLF:
24      Q.   There's a question out there.
25      A.   Which is?

Michael Thompson
August 12, 2016

Page 110

1      Q.     Let me ask you a better way.  What
2  happened to your memory or has something happened to
3  your memory that doesn't allow you to recall?
4      A.     No.
5      Q.     Okay.  So as you sit here today you have
6  a good recollection of the events of that day that
7  you were arrested?
8      A.     Good?
9      Q.     Yes.  You do recall the events of that day
10 that you were arrested.  Correct?
11     A.     I'm not sure which events you're talking
12 about.
13     Q.     The date you were arrested.
14     A.     Okay.
15     Q.     Do you recall that day?
16     A.     Yes.
17     Q.     Okay.
18     A.     Yes, yes.
19     Q.     Do you recall having seen Sheriff Hamp at
20 any point that day?
21     A.     I can't recall.
22     Q.     All right.  Did you see him during your
23 arrest that day?
24     A.     No.
25     Q.     Did you see him after your arrest that day?

Michael Thompson
August 12, 2016

Page 111

1    A.    No.

2    Q.    Okay.  Have you spoken to anybody or has

3  anybody told you that Sheriff Hamp did something to

4  conspire to violate your constitutional rights?

5    A.    I can't recall.

6    Q.    Have you spoken to anybody or been told

7  by anybody, other than your lawyer, about conduct of

8  Sheriff Hamp that you believe relates to this event

9  in which you were arrested?

10   A.    I can't recall.

11   Q.    How about Deputy Jones?  Do you recall

12  seeing him on the date of the arrest?

13   A.    Yes.

14   Q.    All right.  And, in fact, he arrested you.

15  Correct?

16   A.    Yes.

17   Q.    All right.  And other deputies were there

18  and present that day as well.  Correct?

19   A.    Yes.

20   Q.    And, in fact, another deputy -- did another

21  deputy transport you to the jail?

22   A.    Yes.

23   Q.    Do you recall who that deputy was?

24   A.    I can't recall.  I can't recall.

25   Q.    Do you believe that Sheriff Hamp and

Michael Thompson
August 12, 2016

Page 112

1  Deputy Jones conspired to cause your arrest?

2          MR. TANNER:  Object to the form of that

3  question.

4      A.      The question is?

5  BY MR. WOLF:

6      Q.      Do you believe that Deputy Jones and

7  Calvin Hamp conspired to cause your arrest?

8          MR. TANNER:  Object to the form.

9      A.      You're asking for my opinion?

10 BY MR. WOLF:

11     Q.      Yes, your opinion or your belief.  Do you

12 believe that they conspired to cause your arrest?

13          MR. TANNER:  Objection to form.

14     A.      I know that I was arrested that night and

15 I feel it was unlawful.

16 BY MR. WOLF:

17     Q.      And what information forms this feeling

18 that it was unlawful?

19          MR. TANNER:  Object to the form.

20 BY MR. WOLF:

21     Q.      I mean, it's okay if it's just a feeling,

22 that's fine, but do you have any other information

23 that supports this feeling or that leads you to this

24 feeling?

25     A.      The fact that I was not initially driving.

Michael Thompson
August 12, 2016

Page 113

1      Q.    All right.  Anything else?

2      A.    Not that I can recall.

3      Q.    All right.  Approximately what time of day

4  had you left the office on the date you were arrested?

5      A.    Approximately?

6      Q.    Approximately.

7      A.    Approximately 6 o'clock p.m.

8      Q.    And how long was it between the time you

9  left the office and the time Mr. Wiley was stopped

10 approximately?

11     A.    The time?

12     Q.    Yes.  About how many minutes?

13     A.    Approximately -- approximately five or

14 ten minutes.

15     Q.    Okay.  And could you tell me in your own

16 words what happened at that initial stop that

17 Mr. Wiley was driving, what you recall from that

18 initial stop.

19     A.    I recall Mr. Wiley being pulled over by a

20 vehicle with the blue lights on.

21     Q.    Do you recall anything else or what happened

22 next?

23     A.    I recall an officer approaching the vehicle.

24     Q.    What happened next?

25     A.    And he asked if anyone had been drinking.

Michael Thompson
August 12, 2016

Page 114

1      Q.    What happened next that you recall?

2      A.    I recall Mr. Wiley saying no.

3      Q.    Do you recall what happened next?

4      A.    I recall the officer requesting Mr. Wiley's

5   license.

6      Q.    At this point did you recognize the officer?

7      A.    No.

8      Q.    After the officer requested the license,

9   what do you recall happening next?

10     A.    At some point thereafter I recall the

11   officer stating that there was a problem with

12   Mr. Wiley's license.

13     Q.    Then what happened next?

14     A.    I recall the officer asking Mr. Wiley

15   what that problem was.

16     Q.    And do you recall what happened or was

17   said next?

18     A.    I recall Mr. Wiley trying to explain

19   something but I can't recall specifically what.

20     Q.    All right.  After that what happened?

21     A.    I recall at some point thereafter -- at

22   some point I recall the officer requesting that I

23   operate the vehicle.

24     Q.    Do you recall exactly what was said?

25     A.    I recall the officer saying because

Michael Thompson
August 12, 2016

Page 115

1    something is wrong with Mr. Wiley's license that you

2    need to let your passenger drive.

3         Q.    All right.  What happened next?

4         A.    At some point I entered the driver seat.

5         Q.    And at any point prior to you entering

6    the driver seat did you inform the officer that your

7    license was suspended?

8         A.    No.

9         Q.    Okay.  After entering the driver seat,

10   what happened next?

11        A.    Thereafter I pulled off to continue to

12   head to Memphis.

13        Q.    During that initial stop did you or

14   Mr. Wiley attempt to inform the officers -- the

15   stopping officer that you were county employees?

16        A.    I recall Mr. Wiley stating that he was

17   the comptroller.

18        Q.    Did you ever indicate who you were?

19        A.    I don't recall.

20        Q.    Did you ever hear Mr. Wiley say this is

21   the county administrator here or indicate your name

22   to the officer?

23        A.    I don't recall.

24        Q.    Did you ever have any contact with Deputy

25   Jones prior to the date of the arrest?

Michael Thompson
August 12, 2016

Page 116

1      A.      Not that I recall.

2      Q.      And you began to drive off towards Memphis.

3  What happened after that?

4      A.      Thereafter I saw blue emergency lights in

5  the rearview mirror.

6      Q.      About how long between the time you left

7  that first stop until you saw the blue lights?

8      A.      Approximately less than a quarter mile.

9      Q.      And what happened when you saw the blue

10  lights?

11      A.      I pulled over into the gas station

12  parking lot.

13      Q.      And what happened next?

14      A.      The officer came to the window and said I

15  forgot to check your license.

16      Q.      What happened next?

17      A.      He requested my license.

18      Q.      And then what happened?

19      A.      I provided him with my license.

20      Q.      Then what happened?

21      A.      He contacted dispatch for a run of my

22  license.

23      Q.      All right.  Then what happened?

24      A.      He told me that my license were suspended.

25      Q.      And then what happened?

Michael Thompson
August 12, 2016

Page 117

1      A.      And then he asked dispatch to repeat what
2  they said so I could hear what they said.
3      Q.      What happened next?
4      A.      Dispatch repeated what they had stated to
5  the officer.
6      Q.      Did you hear that repeated dispatch?
7      A.      I did.
8      Q.      What is it you heard?
9      A.      I recall dispatch saying license XXX was
10 suspended.
11     Q.      And then what happened?
12     A.      The officer said we have to arrest you.
13 We have to follow protocol and we have to arrest you.
14     Q.      And were you aware that since 2004 at
15 least the county policy was to arrest people on all
16 suspended licenses?
17             MR. TANNER:  Object as to form.
18 BY MR. WOLF:
19     Q.      Were you aware of that prior?
20             MR. TANNER:  Object as to form.
21     A.      I don't recall.
22 BY MR. WOLF:
23     Q.      What happened after that?
24     A.      After what?
25     Q.      After he said he had to arrest you.

Davis Court Reporting, LLC   601.856.8889
marytodd@daviscourtreporting.com   877.496.0079

Michael Thompson
August 12, 2016

Page 118

1    A.    I recall at some point him asking me to
2    step out of the car.

3    Q.    What happened next?

4    A.    I recall the officer placing me in handcuffs.

5    Q.    Now, did the officer use profanity towards
6    you or insult you with any kind of verbal insult that
7    evening?

8    A.    I can't recall.

9    Q.    What was Mr. Wiley doing at this point?

10   A.    I can't recall.

11   Q.    After you were placed in handcuffs, what
12   happened?

13   A.    At some point thereafter an officer arrived
14   to transport me to the jail.

15   Q.    When you arrived at the jail, did you
16   contact the county attorney or speak to the county
17   attorney at your arrival at the jail?

18   A.    What's the question again?

19   Q.    What you arrived at the jail, did you
20   speak to the county attorney?

21   A.    When I arrived at the jail?

22   Q.    Yes.  Let me ask it a different way.  Who
23   was the county attorney at that time?

24   A.    Ellis Pittman.

25   Q.    On the evening of your arrest did you speak

Michael Thompson
August 12, 2016

Page 119

1   to Ellis Pittman?

2           MR. TANNER:  I'm going to ask -- I know

3   he was county attorney.  Okay?  I think that he

4   might have represented him in some context.  Can we

5   just ask.  Could you ask that because I don't want

6   there to be an issue.  If he says no then he can

7   answer the question.

8   BY MR. WOLF:

9       Q.     Prior to this were you ever involved in

10  litigation?

11      A.     No.

12      Q.     Prior to this event had you ever hired

13  Ellis Pittman as your personal attorney?

14      A.     No.

15      Q.     All right.  The date of this event, you

16  didn't understand Ellis Pittman to be your lawyer,

17  did you?

18      A.     No.

19      Q.     In fact, Ellis Pittman was the county

20  attorney at the time.  Correct?

21      A.     Yes.

22      Q.     On the date of the event did you speak to

23  him?

24      A.     Yes.

25      Q.     All right.  Tell me what was said at that

Michael Thompson
August 12, 2016

Page 120

1    conversation.

2        A.    He asked -- if I recall, he asked me if he

3    needed to call my wife for me and I said no.

4        Q.    Where did this conversation take place?

5        A.    At the jail.

6        Q.    Do you know how Ellis Pittman became aware

7    of your arrest?

8        A.    I don't recall.

9        Q.    Did you call him directly?

10       A.    Yes.

11       Q.    All right.

12       A.    Yes.

13       Q.    And that was from the jail?

14       A.    Yes.

15       Q.    And when you called him what were you

16   asking him?  What did you request of him?

17       A.    If I can recall at the time --

18             MR. TANNER:  Object to the form.

19       A.    I can't recall.

20   BY MR. WOLF:

21       Q.    And after the day of the arrest did you

22   speak to Ellis Pittman about any of the details

23   regarding your arrest?

24       A.    I can't recall.

25       Q.    And just for my edification, is this the

Michael Thompson
August 12, 2016

Page 121

1    same Ellis Pittman who died in the last two years?

2        A.    Yes.

3        Q.    Did you ever speak to any of your board

4    members regarding your arrest for the Tunica County

5    Board of Supervisors?

6        A.    I can't recall.

7        Q.    I'm going to switch over here to -- I've

8    got some video.  I'm going to show you some video

9    from -- it purports to be from the date of the event

10   through dashboard cameras and several other items.

11   A copy of this was provided to your counsel previously.

12   I'm going to show you what is labeled as VT01-1.

13   This is a dashboard camera.  I'll move forward to

14   minute 9 and 14.

15       A.    Can I ask a question?

16       Q.    Yes, sir.

17       A.    Can I watch the whole thing?

18       Q.    Yes.  Absolutely.  If you want to watch

19   the whole thing, we can watch the whole thing.  I

20   was just going to cut to where there's about nine

21   minutes of driving.  I'm starting the video at 8:41.

22       A.    Could you pause it?  I can't hear.

23       Q.    All right.  Let me get some speakers.

24             (OFF RECORD 1:57 P.M. TO 2:01 P.M.)

25   BY MR. WOLF:

Michael Thompson
August 12, 2016

Page 122

1          Q.     I'll stop it there.  Does this appear to

2     be the site of the first stop with Mr. Wiley driving

3     or is this the second stop?

4               MR. TANNER:  For the record, we stopped

5     at the 10 minute 6 second mark.

6               MR. WOLF:  Thank you.

7               MR. TANNER:  Also, for the record, that's

8     a video labeled VTS_01_1.

9          A.     It appears to be the first stop.

10    BY MR. WOLF:

11         Q.     Okay.  Let's stop the video at 11:23.  To

12    your knowledge, what type of vehicle were you and

13    Mr. Wiley driving in that evening?

14         A.     What's the question?

15         Q.     What type of vehicle were you and Mr. Wiley

16    in that evening?

17         A.     What were we in?

18         Q.     Yes.  What type of vehicle?

19         A.     A Ford Explorer.  Ford Explorer pickup truck.

20         Q.     I'll roll it again.

21               MR. TANNER:  13:16 is the time.

22    BY MR. WOLF:

23         Q.     At this point do you recognize this officer

24    at the window of the car?  Do you know who that is?

25         A.     From this video?

Michael Thompson
August 12, 2016

Page 123

1     Q.     Yes, from this video or from your own

2  recollection that evening.

3     A.     I can't -- I can't see that video clearly.

4     Q.     Okay.  Another officer stepped into the

5  frame at 13:31.  Do you know who this officer is?

6     A.     I don't.

7     Q.     Okay.  All right.  I'm going back to --

8            MR. TANNER:  We just stopped at 16:49.

9  BY MR. WOLF:

10    Q.     Yes, 16:49.  I'm going to roll back just a

11 little bit before that.  I'm taking you back to 14:11

12 and I'll roll from there.  I'm going to stop when it

13 appears to be two people coming and going out of the

14 vehicle.  I'm just going to ask you to identify those

15 if you can.  All right.  I'm stopping it at 15:14.  It

16 appears that the deputy who stopped you is returning

17 to the vehicle that you were traveling in.  At this

18 point does that appear to be, to your knowledge,

19 Deputy Jones?  Do you know if that's Deputy Jones

20 there at 15:14?

21    A.     Where?

22    Q.     I'll point to him here.  He's the deputy

23 wearing the vest with the hat coming from the edge

24 of the truck walking towards the vehicle that appears

25 to be pulled over.  Do you recognize him as Deputy

Michael Thompson
August 12, 2016

Page 124

1    Jones?

2         A.    I can't tell if his back is turned.  I can't

3    make it out.

4         Q.    Okay.  Now, the driver that exited the

5    vehicle, do you understand that to be Alex Wiley to

6    your knowledge?

7              MR. TANNER:  We're talking about 15 minutes

8    53 seconds, for the record.

9    BY MR. WOLF:

10        Q.    That's right.  In that neighborhood.  Do

11   you understand that Alex Wiley got out of the vehicle.

12   Is that correct?

13        A.    Yes.

14        Q.    All right.  And then another person enters

15   into the driver side and that would be you.  Correct?

16        A.    Yes.

17        Q.    All right.  That's at 15:53 you're

18   entering into the vehicle.  And at 16:24 it appears

19   that the vehicle is driving away.  You were driving

20   at that point.  Correct?

21        A.    Yes.

22        Q.    All right.  All right.  There was another

23   deputy at -- I stopped the video at 16:54.  I'll roll

24   it back to 16:25 and play it.  A new deputy at 16:50

25   enters into the screen.  Do you know who this deputy is?

Michael Thompson
August 12, 2016

Page 125

1       A.      I do not.

2       Q.      All right.  And just at 17:23 the patrol

3   car that was videoing this event has pulled out and

4   is going to head -- turn in a different direction,

5   other than Deputy Jones and the other deputies.  Is

6   that your understanding at that point?  Just looking

7   at the video, is that a fair assessment?

8       A.      It's stopped right now.  I don't know.

9       Q.      Okay.  I'll play it some more.  So moving

10  from 17:23.

11          MR. TANNER:  It's broken.  Can you go back

12  to 17:23?  It was broken and then the audio kicked in.

13  BY MR. WOLF:

14      Q.      I'm taking it back to 17:20.  There's a

15  vehicle -- we're at 20:02.  The patrol vehicle in

16  the video has pulled up to a gas station and there's

17  a truck in the middle of the screen.  That's not the

18  vehicle that you were driving in, was it?  That truck.

19      A.      I don't understand your question.

20      Q.      On the screen at 20:02, there's a truck

21  at the center of the video there.  Do you recognize

22  that vehicle?

23      A.      That truck?

24      Q.      Yes, that truck.

25      A.      On this picture?

Michael Thompson
August 12, 2016

Page 126

1      Q.    On that picture.

2      A.    Yes.

3      Q.    Whose vehicle is that?

4      A.    Alex Wiley.

5      Q.    All right.  That's the vehicle that y'all

6  were traveling in that evening.  Correct?

7      A.    Yes.

8      Q.    Okay.

9            MR. TANNER:  We're resuming.

10  BY MR. WOLF:

11     Q.    We're resuming.  I'm going to stop again

12  at 20:27.  To your recollection, is this the gas

13  station that you were stopped at for the -- I guess the

14  second stop that evening?

15     A.    Yes.

16     Q.    I'm going to stop it at 20:56.  I don't have

17  any more questions regarding this particular video,

18  but for your edification if you want to look through

19  the rest of it I can run the next 14 minutes if you

20  want.

21            MR. TANNER:  We're fine.

22            MR. WOLF:  All right.  Are you good?

23            MR. TANNER:  We're fine.

24  BY MR. WOLF:

25     Q.    I want to show you another video.  It's

Michael Thompson
August 12, 2016

Page 127

1  VTS_01_2.  I'll represent to you that this is a

2  separate patrol car and to my knowledge it will

3  represent your ride back to the jail, but I'll have

4  questions as we go along.  Again, this is VTS_01_2.

5  There is a deputy speaking talking about how he's

6  from Clarksdale, down the road.  Do you recall

7  having a conversation with that deputy in the back

8  while you were in that patrol vehicle?

9       A.     The question is?

10      Q.     Do you recall having a conversation with

11  that deputy while you were in the patrol vehicle?

12      A.     According to the video?

13      Q.     According to your own personal recollection

14  do you recall that?

15      A.     Yes.

16      Q.     Okay.  At any time between the time you left

17  the gas station -- and I've stopped the video here

18  at 5:26.  At any time between the time you left the gas

19  station and the time you reached the jail did you express

20  any concerns about your health to the deputy?

21      A.     I can't recall.

22      Q.     Okay.  I'm stopping it here at 7:22.  There's

23  a garage door facing the vehicle or the vehicle is

24  facing the garage door.  Do you understand this to be

25  the county jail?

Michael Thompson
August 12, 2016

Page 128

1      A.     Yes.

2      Q.     All right.  They're inside a garage.  This

3  is at 7:50 on the video.  Do you recognize the deputy

4  at the window there?  Do you know who that is?

5      A.     No.

6      Q.     All right.  In front of the vehicle now,

7  is that you with the scarf and the handcuffs?

8      A.     Yes.

9             MR. TANNER:  Is that 8:41?

10 BY MR. WOLF:

11     Q.     That's at 8:41.  At this point have you

12 expressed to this deputy at any time concerns about

13 your health?

14     A.     I can't recall.

15     Q.     All right.  That video ends.  It's called

16 video TS.

17            MR. TANNER:  It's Video _TS?

18            MR. WOLF:  Yes.

19            MR. TANNER:  Can I use the restroom first?

20            MR. WOLF:  Sure.  Let's take a break.

21            (OFF RECORD AT 2:35 P.M. TO 2:39 P.M.)

22 BY MR. WOLF:

23     Q.     Now, at lunch I was trying to make sense

24 of your future wage losses and according to your

25 initial disclosures your statement was, Plaintiff

Michael Thompson
August 12, 2016

Page 129

1    claimed compensatory damages in the amount of

2    $150,000 in lost wages associated with the job he

3    was denied based on his unlawful arrest and detention

4    to the county.

5            We've gone over this a bit, but I just

6    want to know are there any other future wage or

7    losses of -- you know, losses of income that you're

8    associating with this event.

9            MR. TANNER:  Object to the form.

10   BY MR. WOLF:

11       Q.    Yes.  Answer if you can.

12       A.    Could you repeat the question.

13       Q.    Yes.  We've talked at length about the

14   Sunflower County loss that you're claiming.  Are

15   there any other future wage or income losses that

16   you claim are related to this event?

17       A.    At this point I can't recall.

18       Q.    All right.  And was there a written job

19   offer or -- I'm sorry.  You didn't call it a job.

20   It was a -- what's the term you used to describe

21   employment or a -- employment with a county through

22   Michael Thompson, CPA?  Is there a better term than

23   job?

24       A.    Engagement.

25       Q.    Engagement.  Okay.  Was there ever a

Michael Thompson
August 12, 2016

Page 130

1   written agreement regarding your engagement with

2   Sunflower County?

3       A.    No.

4       Q.    Have you made any claims against

5   Sunflower County for breach of contract or any other

6   theory related to the lost engagement?

7       A.    No.

8       Q.    And that occurred -- you mentioned March

9   of this year is when your Sunflower County deal was

10  happening.  Did the offer and denial all occur in

11  March of this year or was it over several months?

12      A.    It was within the same month.

13      Q.    You have asserted that the sheriff was --

14  and you can use a different word but I'll use the

15  word "frustrated," if that describes it.  The sheriff

16  and you were at odds over department funding for the

17  sheriff's department.  Is that an accurate description

18  of that period of time?

19      A.    I don't recall.

20      Q.    Had you and the sheriff prior to your

21  arrest ever talked about department funding for the

22  sheriff's department?

23      A.    Yes.

24      Q.    About how many times had you and he

25  discussed department funding?

Michael Thompson
August 12, 2016

Page 131

1      A.    I can't recall.

2      Q.    And do you recall the last conversation

3   you and the sheriff had before your arrest?

4      A.    I can't recall.

5      Q.    All right.  Do you recall any of the

6   conversations you had with the sheriff regarding

7   funding before your arrest?

8      A.    (Shook head negatively.)

9      Q.    Is that yes or no?

10     A.    I can't recall.

11     Q.    Were there conversations between you and

12  the sheriff regarding funding before your arrest?

13     A.    Yes.

14     Q.    And how would you describe the tone of

15  those conversations?

16     A.    You know, as I can recall I would say

17  serious.

18     Q.    Okay.  Now, the date of the arrest was on

19  February 13, 2014.  Does that to your recollection

20  sound accurate?

21     A.    No.

22     Q.    When was the arrest?  I'm sorry.  I said

23  13, didn't I?

24     A.    Uh-huh.

25     Q.    So February 13, 2014.  Does that sound

Michael Thompson
August 12, 2016

Page 132

1    roughly accurate?

2        A.    February what, now?

3        Q.    February of 2014, the 13th day.

4        A.    That was the month.

5        Q.    So on February 13, 2014, is that the date

6    you were arrested?

7        A.    What day of the week is that associated

8    with?

9        Q.    I can find out.  It's a Thursday.

10       A.    No.

11       Q.    All right.  What day of the week was it

12   that you were arrested?

13       A.    Wednesday.

14       Q.    All right.  Now, I'm just looking at the

15   cash bond.  So it might have been posted the next day.

16   Correct?

17       A.    (Indicating).

18       Q.    So you were arrested on February 12, 2014.

19   Is that accurate?

20       A.    Yes.

21       Q.    And you had been in your position as the

22   county administrator almost 45 days at the time of

23   your arrest?

24       A.    Approximately.

25       Q.    Okay.  Were you aware of the policy of

Michael Thompson
August 12, 2016

Page 133

1    the county to regularly check county employees'

2    driver status for insurance purposes and otherwise?

3        A.    I don't recall.

4        Q.    Well, in the two years that you were the

5    county administrator did you ever consider it

6    prudent to check driver's license status of county

7    employees, particularly those that might be driving

8    county vehicles?

9        A.    I don't recall.

10       Q.    You don't recall it ever being prudent?

11       A.    What's the question?

12       Q.    During that entire two years that you

13   were there -- let me ask it another way.  Would you

14   agree that it's prudent for a county to know the

15   status of its employees who drive public vehicles?

16            MR. TANNER:  Object to the form.

17       A.    Yes.

18   BY MR. WOLF:

19       Q.    All right.  Now, as a result of that

20   prudence it would be reasonable to run driver's

21   license checks annually.  Correct?

22       A.    I'm not sure I understand your question,

23   but it's....

24       Q.    Well, as a former county administrator

25   would you expect your employees' driver's licenses

Michael Thompson
August 12, 2016

Page 134

1    to be checked on a regular basis?

2        A.    Yes.

3        Q.    Okay.   And new employees also have their

4    driver's license history checked also.   Do you consider

5    that to be a reasonable thing to do?

6        A.    Yes.

7        Q.    Going back to 2013, generally what were

8    your findings as an auditor for the county?   In very

9    broad terms, what had you discovered?

10            MR. TANNER:   Object to the form.   I

11   object on relevancy ground.

12   BY MR. WOLF:

13       Q.    Answer if you can.

14       A.    Could you repeat.

15       Q.    Yes.   In very general terms, what were

16   your findings regarding your audit in 2013?

17            MR. TANNER:   Again, object on the same

18   grounds.

19       A.    That the county spent a lot of money.

20   BY MR. WOLF:

21       Q.    Now, you indicated earlier that you had a

22   certificate in fraud and misappropriations or

23   forensic accounting of some sort.   Did you find that

24   the county -- there was any evidence of fraud or

25   misappropriation in the county budget from your

Michael Thompson
August 12, 2016

Page 135

```
 1    internal audit?
 2            MR. TANNER:  Object as to form and
 3    relevancy.
 4        A.    I can't recall.
 5    BY MR. WOLF:
 6        Q.    Okay.  And your findings, were they put
 7    together in a book form and provided to the board?
 8    Maybe book isn't the right word.  Were they put in
 9    written form and offered to the board?
10        A.    Yes.
11        Q.    All right.  Do you recall the title of
12    that document?
13        A.    I can't recall.
14        Q.    All right.  Now, were there any more
15    specific details other than they were spending too
16    much money?
17        A.    I can't recall.
18        Q.    All right.  And in the time that you were
19    the county administrator, did you resolve their
20    spending problems?
21            MR. TANNER:  I object to the form of that
22    question.
23        A.    I can't recall.
24    BY MR. WOLF:
25        Q.    And while you were county administrator
```

Michael Thompson
August 12, 2016

Page 136

1    did you work with the board to increase revenues for
2    the county?
3                    MR. TANNER:   I object to the form of that
4    question as well.
5         A.    I can't recall.
6    BY MR. WOLF:
7         Q.    Would you agree that in two years as county
8    administrator you did not significantly improve the
9    condition of the county during your tenure?
10                   MR. TANNER:   I object to the form.
11        A.    I can't recall.
12   BY MR. WOLF:
13        Q.    Are there any assessments or job
14   evaluations that are done for a county administrator
15   in Tunica County that you're aware of?
16        A.    I can't recall.
17        Q.    While you were the county administrator
18   were you ever reviewed by the board of supervisors
19   for your accomplishments or otherwise?
20        A.    I can't recall.
21        Q.    But after two years they determined that
22   it was necessary to let you go.   Correct?
23        A.    They appointed another county administrator.
24        Q.    And that necessarily means that you're
25   not there anymore.   Correct?

Michael Thompson
August 12, 2016

1      A.    Say again.

2      Q.    That necessarily means that they're not

3  continuing to keep you on.   Correct?

4      A.    Correct.

5      Q.    Do you know if Alex Wiley still works for

6  the county?

7      A.    No.

8      Q.    Do you know when he left Tunica County as

9  comptroller?

10      A.    Approximately June 2014.

11      Q.    Do you know where Alex Wiley is living now?

12      A.    I don't recall.

13      Q.    When is the last time you spoke with Alex

14  Wiley?

15      A.    I don't recall.

16      Q.    Have you seen him in the last year?

17      A.    I don't recall.

18      Q.    I've asked you questions today and the

19  majority of your answers, frankly, have been that you

20  don't recall.  Are you anticipating doing any additional

21  research or reviewing any documents to refresh your

22  recollection after today?

23          MR. TANNER:   Objection as to the form.

24  BY MR. WOLF:

25      Q.    Do you have any plans to look at any

Michael Thompson
August 12, 2016

Page 138

1   documents or to refresh your recollection following

2   today's deposition?

3       A.    I don't know.

4       Q.    As you sit here today do you have any fixed

5   plans in your mind that man, I need to go back and

6   read this document or that document?  Do you have

7   anything in your mind fixed and determined in that

8   regard?

9       A.    I don't understand the question.

10      Q.    Okay.  Do you have any plans presently

11  set in your mind to review documents to refresh your

12  recollection related to any of the questions asked

13  today?

14      A.    Plans?

15      Q.    Yes.  Do you have any plans?

16      A.    No.

17      Q.    All right.  Are you aware of any people that

18  you might talk to following this deposition regarding

19  any of the incidents alleged in the Complaint or any

20  of the questions asked today?

21          MR. TANNER:  Object to the extent that it

22  calls for privileged information.

23  BY MR. WOLF:

24      Q.    Other than your lawyer.  Do you have any

25  plans?

Michael Thompson
August 12, 2016

Page 139

1      A.    What's the question?

2      Q.    Do you have plans to talk to anybody now

3  that might have been a witness or might know

4  something that you haven't thought of before today?

5      A.    No.

6      Q.    All right.  Now, during discovery we asked

7  for copies of your tax returns from 2008 to date and

8  you objected to the request.  Would you be willing

9  to sign a document that allows us to subpoena or

10  gather with your consent your tax documents from 2008

11  through today?

12      MR. TANNER:  No, he would not.

13  BY MR. WOLF:

14      Q.    All right.  I want to ask that you -- at

15  the end of this deposition I'll have a document

16  prepared real quickly that we can get for

17  authorization for release and have that signed today.

18      MR. TANNER:  Okay.

19      MR. WOLF:  In fact, why don't we take two

20  minutes and I'll have my secretary work on that so

21  we'll have it before we get out of here.  Let's just

22  take a two-minute break.

23      (OFF RECORD 3:00 P.M. TO 3:02 P.M.)

24      MR. WOLF:  Would you consent to have an

25  authorization for release of medical information so

Michael Thompson
August 12, 2016

Page 140

1    I can get records from Baptist in Desoto?

2           MR. TANNER:  No.

3           MR. WOLF:  I know you were looking for that.

4    They've been slow to respond to you, too.  Whatever

5    documents I'll provide copies to counsel opposite.

6    BY MR. WOLF:

7       Q.    Have you spoken with Deputy Jones in any

8    way after the date of the event regarding any of the

9    incidents alleged in the Complaint?

10      A.    I don't recall.

11      Q.    And to your knowledge have you spoken --

12   have you spoken with anybody presently employed with

13   Tunica County regarding the allegations in the

14   Complaint since the arrest?

15      A.    I don't recall.

16          MR. TANNER:  Has he spoken to anybody --

17   what now?

18          MR. WOLF:  With Tunica County, employed

19   by Tunica County.  And we'll exclude Ellis Pittman.

20   BY MR. WOLF:

21      Q.    I'm not going to have any other questions

22   today, but if for some reason in reviewing these

23   documents your memory suddenly finds itself and you

24   need to change them, I'm going to reserve my right

25   to reopen this deposition to explore responses which

Michael Thompson
August 12, 2016

Page 141

1  were nonresponsive today but may be cleared by

2  additional information in the future.

3          MR. TANNER:  Can I very brief re-direct?

4          MR. WOLF:  Please.

5                  EXAMINATION

6  BY MR. TANNER:

7      Q.    Mr. Thompson, you were asked a moment ago

8  about your effectiveness at raising revenue in Tunica

9  County during your time as county administrator.  Do

10  you recall that?

11      A.    That question?

12      Q.    Yes.

13      A.    Yes.

14      Q.    Now, as county administrator did you have

15  to understand millage rates and how they worked?

16      A.    Yes.

17      Q.    Are you at all familiar with any

18  regulations or rules about how much millage can be

19  cut versus how much millage can be restored in any

20  given year?

21      A.    Yes.

22      Q.    Okay.  You don't control that as county

23  administrator, do you?

24      A.    No.

25      Q.    Now, Tunica County, they based a lot of

Michael Thompson
August 12, 2016

Page 142

1  their revenue and spending on gambling.  Well, on

2  funds received from the gambling industry.

3      A.    Yes.

4      Q.    What was happening with the gambling

5  industry and Tunica County's money at the time you were

6  there at the time leading up to when you were hired?

7      A.    I recall a significant decrease in the

8  amount of gaming revenue received by the county.

9      Q.    Okay.  Did anything in your role as

10 county administrator have anything to do with that?

11     A.    No.

12     Q.    I think at some point you were asked or about

13 to be asked a question concerning whether the third

14 officer in line at the initial traffic stop of Mr. Wiley

15 went in a different direction from the other two officers.

16 Did he, in fact, end up at the same location as you and

17 Mr. Wiley and the officers who were first and second

18 in line immediately behind Mr. Wiley's vehicle during

19 the first traffic stop?

20     A.    According to the video, yes.

21     Q.    You made several references to the trial

22 transcript or transcripts.  Regardless of how many

23 transcripts there are and regardless of which one or

24 ones you might have read, were you present at both

25 trials?

Michael Thompson
August 12, 2016

Page 143

1     A.    Yes.

2     Q.    Were you attentive to all the testimony at

3  both trials?  The testimony of the officers.

4     A.    Yes.

5     Q.    Were you living in Memphis at the time you

6  were working the county administrator's job?

7     A.    Yes.

8     Q.    Tell us how that worked.  When were you in

9  Memphis versus in Jackson?  I wanted to make sure that's

10  clear on the record.

11     A.    I would be in Memphis overnight and in Jackson

12  on weekends primarily.

13     Q.    Now, I think you were asked about whether

14  Sunflower County eventually gave the job you applied for

15  to someone else.  Did Sunflower County ever actually

16  approve your getting the engagement rather than job?

17  Did Sunflower County actually vote to bring you on or

18  enter into an engagement with you for that position?

19     A.    Yes.

20     Q.    Can you give me approximately how long after

21  they approved you for the job was the vote rescinded?

22     A.    At the next board meeting.

23     Q.    Okay.  The ticket that supposedly gave

24  rise to your driver's license being suspended, how much

25  was that ticket for?  What was the fine on that ticket?

Michael Thompson
August 12, 2016

Page 144

1        A.     I can't recall.

2        Q.     Are you an economist, sir?

3        A.     No.

4        Q.     Have you ever had any background or

5   experience or training in future income accounting?

6        A.     No.

7        Q.     You mentioned earlier that when you --

8   during some year that you were with KPMG -- I think

9   it may be 2011, but if not forgive me, but at some

10  year you made $119,000 per year.  Do you recall that?

11       A.     Yes.

12       Q.     Is that plus benefits?  Were you also given

13  benefits or compensation benefits for your work at KPMG?

14       A.     Yes, yes.

15       Q.     You told Mr. Wolf that you were hired by

16  Tunica board of supervisors to be the county

17  administrator in January of 2014.  Are you sure of

18  that date?  Could it have been December instead of

19  January?

20       A.     The board took the vote in December and

21  made the start date effective January.

22       Q.     Okay.  So it could be said that you were

23  hired in December even though the start date was in

24  January?

25       A.     Yes.

Michael Thompson
August 12, 2016

Page 145

1    Q.    As far as the Tunica County Sheriff's

2    Department's budget, were you the person -- was that

3    budget ever cut or did the board of supervisors

4    implement a cut of that budget?

5    A.    The board of supervisors did make cuts to

6    county department budgets.

7    Q.    Okay.  Was Sheriff Calvin Hamp's budget for

8    the sheriff's department the only budget to get cut?

9    A.    No.

10    Q.    Did you actually cut the budget?

11    A.    I didn't vote.  The board -- the board votes

12    and whatever policy they pass that's what happens in

13    county government.  The board votes to make policy where

14    they cut budgets.

15    Q.    So regardless of your recommendation the

16    board could have voted your recommendation down.  Right?

17    A.    Yes.

18        MR. TANNER:  I'm done with cross or

19    whatever.

20            FURTHER EXAMINATION

21    BY MR. WOLF:

22    Q.    With regard to the testimony that you heard

23    at trial, could you tell me what it is that was said

24    by either Jones or Hamp that led you to believe that

25    there was a conspiracy.

Michael Thompson
August 12, 2016

Page 146

1          MR. TANNER:  I object to the form of the

2   question to the extent that he's required to answer

3   what a conspiracy is.

4   BY MR. WOLF:

5       Q.     Go ahead and answer if you can.

6       A.     The trial transcript stated that they

7   knew my license were suspended before they arrested me.

8       Q.     Anything else?

9       A.     Not that I recall.

10          MR. WOLF:  All right.  I have no further

11   questions.  While we're still here and got those

12   authorizations I'll ask that you go ahead and fill

13   out the first one or if you just want to return them

14   to me that would be fine also.  I'll let you look at

15   them, take the time to look at them and send them back

16   to me if you want.

17          THE COURT REPORTER:  Did you need a copy

18   of this?

19          MR. TANNER:  I do.  The only other thing

20   is that I would ask that the videos that have been

21   identified on the record about which Mr. Thompson

22   was questioned, one being VTS_01_1 which was a 34

23   minute 21 second video and VTS_01_2 which was a

24   9 minute 12 second video, I would ask that those be

25   given to the court reporter and marked as exhibits

Michael Thompson
August 12, 2016

Page 147

1  to the proceeding because they were played and used

2  and there were questions asked about those.  So to

3  the extent that we have --

4          MR. WOLF:  I'll stipulate to that.  All

5  right.  I'm going to give this to you as Exhibit 1

6  to attach to the deposition.  Do you need me to make

7  a copy now or can you make a copy and just send it

8  back with the transcript?

9          MR. TANNER:  Would you accept a

10  substitution?  Here's why I ask.  We can stipulate

11  on the record -- here's the problem.  I think there

12  were four, maybe five videos but you used two.

13          MR. WOLF:  Yes, there were five.

14          MR. TANNER:  I know she may not want to

15  have us send it to her later kind of deal.

16          MR. WOLF:  Right.  I'll burn a copy of

17  those two and I can try to do it before you leave here

18  today.

19          MR. TANNER:  That works.

20          MR. WOLF:  We'll attach it as Exhibit 1

21  to the deposition.

22          MR. TANNER:  Both of them on one?

23          MR. WOLF:  Yes, both of them on one disc.

24  All right.  That's all we've got going on here.  You're

25  free to go.  Thank you, Mr. Thompson.  I appreciate

Michael Thompson
August 12, 2016

Page 148

1    your time.

2              (DEPOSITION CONCLUDED AT 3:15 P.M.)

3              (EXHIBIT 1 SUBSEQUENTLY MARKED.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Michael Thompson
August 12, 2016

Page 149

```
 1              CERTIFICATE OF DEPONENT
 2           I, Michael Thompson, do solemnly swear that
 3   I have read the foregoing pages and that the same is
 4   a true and correct transcript of the testimony given
 5   by me at the time and place hereinbefore set forth,
 6   with the following corrections:
 7   PAGE:  LINE:   SHOULD READ:      REASON FOR CHANGE:
 8   ____   ____   _____      _____
 9   ____   ____   _____      _____
10   ____   ____   _____      _____
11   ____   ____   _____      _____
12   ____   ____   _____      _____
13
14
15                  _____
16                       Michael Thompson
17
18
19   STATE OF    _____
20   COUNTY OF   _____
21           SWORN TO AND SUBSCRIBED before me on this
22   the ____ day of _____, 2016.
23
24                  _____
                            NOTARY PUBLIC
25   My Commission Expires: _____
```

Davis Court Reporting, LLC   601.856.8889
marytodd@daviscourtreporting.com   877.496.0079

1             CERTIFICATION OF REPORTER

2

3        I, Kellye S. Shows, Court Reporter and

4 Notary Public for the state of Mississippi, do

5 hereby certify that the above and foregoing pages

6 contain a full, true and correct transcript of the

7 proceedings had in the aforenamed case at the time

8 and place indicated, which proceedings were recorded

9 by me to the best of my skill and ability.

10        I also certify that I placed the witness

11 under oath to tell the truth and that all answers

12 were given under that oath.

13        I certify that I have no interest,

14 monetary or otherwise, in the outcome of this case.

15

16

17     This the 20th. day of August , 2016.

18

19                   *Kellye S. Shows*

20                   KELLYE S. SHOWS
                      MS CSR #1290

21

22

   My Commission Expires:
23 January 17, 2020

24

25

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 13202
KELLYE S. SHOWS
Commission Expires:
Jan. 17, 2020
MADISON COUNTY