Exhibit "B" (Part One)

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

MICHAEL THOMPSON                            PLAINTIFF

VS.                           NO. 3:14cv274NBB-SAA

CALVIN HAMP, in his individual
capacity and in his official
capacity as sheriff of Tunica
County, MS, JAMES JONES, in his
individual capacity and in his
official capacity as a captain in
Tunica County sheriff's office, and
UNKNOWN DEFENDANTS "A", "B" AND "C"        DEFENDANTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF SHERIFF CALVIN K. HAMP, SR.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TAKEN AT THE INSTANCE OF THE PLAINTIFF
IN THE OFFICES OF TUNICA COUNTY SHERIFF'S DEPARTMENT
5126 OLD MHOON LANDING ROAD, TUNICA, MISSISSIPPI
ON NOVEMBER 29, 2016, BEGINNING AT 2:16 P.M.

APPEARANCES NOTED HEREIN

Reported by:  REGINA D. RUSSELL, RPR, CCR 1110

_____

ADVANCED COURT REPORTING
P.O. BOX 761
TUPELO, MS 38802-0761
(662) 690-1500

ORIGINAL

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 2

```
 1    APPEARANCES:

 2    For the Plaintiff:        E. CARLOS TANNER, III,
                                  ESQUIRE
 3                              Tanner & Associates, LLC
                                Post Office Box 3709
 4                              Jackson, MS  39207
                                (601) 460-1745
 5

 6    For the Defendants:       MICHAEL J. WOLF, ESQUIRE
                                Page Kruger & Holland
 7                              Post Office Box 1163
                                Jackson, MS  39215-1163
 8                              (601) 420-0333

 9
      Also Present:             JAMES JONES
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

1                    TABLE OF CONTENTS
2
3     WITNESS                                           PAGE
4     SHERIFF CALVIN K. HAMP, SR.
5          Examination by Mr. Tanner.............     4
6          Examination by Mr. Wolf...............    71
7
8     EXHIBITS
9          1        Justice Court Arrest Warrant,
10                    dated 2-12-14.................    21
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 4

```
 1                    CALVIN K. HAMP, SR., after being
 2     duly sworn, testified as follows:
 3                         EXAMINATION
 4     BY MR. TANNER:
 5          Q.   Sheriff Hamp, we're here today in Michael
 6     Thompson versus Calvin Hamp, James Jones and
 7     Defendants, Unknown Defendants "A", "B" and "C".
 8     That's Civil Action Number 3:14cv274-NBB-SAA, in the
 9     United States District Court for the Northern
10     District of Mississippi, Oxford Division.  And we're
11     here today beginning the deposition of Defendant
12     Calvin Hamp, the sheriff of Tunica County.  This
13     deposition is being taken down by a certified court
14     reporter, Ms. Regina D. Russell.  And Mr. Hamp is
15     present with his attorney, the Honorable Michael
16     Wolf, Michael J. Wolf.
17          Now, Sheriff Hamp, as you know, the court
18     reporter is taking down everything that's being
19     asked, asked by me and answered by you.  Your
20     attorney is present and he has the right to object to
21     certain questions.  He knows what he can and cannot
22     object to.  But unless you're instructed by your
23     attorney not to answer, even if he objects, you'll
24     still have to give an answer in most circumstances.
25     All we're looking for is for you to give truthful
```

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

1  answers to the best of your ability to all the

2  questions I ask.  And as you know, you've testified

3  at least once in this case or in a related criminal

4  case, a misdemeanor charge that was charged against

5  Michael Thompson in two separate courts previously.

6  So as you are aware, there's already a transcript of

7  both of those proceedings.

8      A.   I am familiar, sir.

9      Q.   Yes, sir.  As you're aware, there are

10  transcripts of both of those proceedings, so we

11  already have a written record of what you've

12  testified in the past.  And so this deposition will

13  be shortened, I just want to fill in some things that

14  I had questions about related to your prior

15  testimony.

16      A.   Yes, sir.

17      Q.   All right.  Are you aware that at any time

18  if you need to consult with your lawyer about

19  anything, you know, if you feel that way just let me

20  know and we'll take the time for you to be able to

21  consult with your lawyer.

22      A.   Yes, sir.

23      Q.   And if there's anything -- from time to

24  time I speak a little too fast or a little too slow.

25  If there's anything about what I say that you don't

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

1  understand, will you please just let me know that you

2  need me to repeat it or explain it or ask my question

3  in a different way?

4      A.   I most certainly will.

5      Q.   Okay.  All right.  So I want to start at

6  the beginning.  You have been the sheriff of Tunica

7  county since 2004?

8           MR. WOLF:  Let me enter a quick -- I

9  request we stipulate that the deposition is taken

10  pursuant to the Rules of Civil Procedure.  The

11  objections to form shall be stated on the record.

12  We'll have an opportunity to correct.  And subsequent

13  objections are reserved for later at trial if

14  necessary or other pleadings, and that the witnesses

15  will read and sign.

16           MR. TANNER:  So noted.

17      Q.   (Mr. Tanner)  So you've been sheriff of

18  Tunica County since 2004?

19      A.   Yes, sir.  That's correct.

20      Q.   All right.  Were you elected?

21      A.   Elected.  Yes, sir.

22      Q.   Each of your terms of office were elected;

23  you were never appointed?

24      A.   Never appointed, always elected.

25      Q.   Okay.  What experience did you have in law

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

1    enforcement prior to becoming sheriff of Tunica

2    County?

3         A.   I had done work with the Tunica County

4    Sheriff's Office for nine years.  I started a few

5    months in corrections in 1994, July 1.  I graduated

6    from the Mississippi Police Academy at Pearl -- well,

7    I'm sorry, not the police academy, the Mississippi

8    Law Enforcement Officer Academy at Pearl in 1996.

9         Q.   Okay.

10        A.   I had the rank as patrol supervisor,

11   internal affairs officer, as well as sheriff.

12        Q.   All those positions you just told us about,

13   were they here with Tunica County Sheriff's

14   Department?

15        A.   All my years has been here in Tunica

16   County.

17        Q.   Now, you mentioned previously or in

18   previous testimony about a fleet safety management

19   policy?

20        A.   Yes.

21        Q.   I want to talk about that for a moment.

22   All right?

23        A.   Okay.

24        Q.   All right.  Tell us what the fleet safety

25   management policy is.

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

1    A.   It's a policy that's in place by an

2  insurance company.  It's a liability policy for those

3  employees for anyone operating a county vehicle.  We

4  have to make sure that their driver's license is up

5  to par.

6    Q.   All right.  Now, you say it's a policy by

7  the insurance company.  Are you saying -- is it a

8  written policy issued by the Tunica County Board of

9  Supervisors or are you saying something different?

10    A.   It's adopted by -- it should be adopted by

11  the Tunica Board of Supervisors.  We have an annual

12  check for the county and twice a year for the

13  sheriff's office.  I'm the policy maker here.

14  Therefore, I go a step beyond.  Not only do the

15  employees here have to submit their operator's

16  driver's license, but I check their personally

17  insured cars as well.

18        THE COURT REPORTER:  Excuse me.

19        THE WITNESS:  I said not only do they

20  have to turn in their driver's license here so we can

21  check them, I check their personal issuance on their

22  own vehicle as well as they report in to work.

23    Q.   (Mr. Tanner)  Does the fleet safety

24  management policy apply to all Tunica County

25  employees or just a certain portion?

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

1     A.    Anyone operating a county-owned vehicle.

2     Q.    All right.  And when you say operating a

3  county-owned vehicle, who authorizes a given employee

4  in Tunica County to operate a Tunica County vehicle?

5     A.    On the board of supervisors they have the

6  department heads, like the road manager, maintenance

7  director, county administrator.  They all fall under

8  the county board of supervisors.  As sheriff I

9  authorize all my employees to operate vehicles.  But

10  to enforce the law I check civilians and sworn status

11  here.

12     Q.    Okay.  Now, you said you check.  Are you

13  the person that runs these licenses pursuant to --

14     A.    No, sir.

15     Q.    Let me finish my question so she can get

16  the whole thing down.

17     A.    Okay.

18     Q.    And the other thing that it does, in

19  addition to allowing her to get the whole question

20  down, I don't want you to give an answer --

21     A.    I understand.

22     Q.    -- to part of my question and then I say

23  something else so it throws off the meaning of what

24  you're trying to convey.  All right?

25     A.    Okay.

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 10

1      Q.   All right.  So according to the fleet

2  safety management policy, are you personally the one

3  who checks those licenses?

4      A.   No, I do not.

5      Q.   All right.  Who checks the licenses?

6      A.   We have a lieutenant in place over our

7  communications division who check all the licenses,

8  either her or the tac officer.

9      Q.   And who is that person, the first person

10 you mentioned who checks licenses, who is she?

11     A.   Lieutenant Pearlie Guice.  She's over the

12 dispatcher center here in Tunica County Sheriff's

13 Office.  She supervises 10, 11 employees.

14     Q.   All right.  Who is the other person that

15 runs the licenses?

16     A.   Evelyn Paige.  She's the assistant tac

17 officer.

18              THE COURT REPORTER:  The first name?

19              THE WITNESS:  Evelyn.  E-V-E-L-Y-N,

20 P-A-I-G-E.  She's -- if the lieutenant doesn't run

21 them then she'll assign that job to Evelyn Paige, who

22 is the tac officer.

23     Q.   (Mr. Tanner)  Okay.  Pursuant to your fleet

24 safety management policy, how often are employees'

25 driver's licenses and insurance checked?

Page 11

1     A.    Twice a year here.

2     Q.    All right.  When you say twice a year, is

3  it always the same two months?

4     A.    Every six months.

5     Q.    All right.  So which months are those?

6     A.    I don't know exactly, but we do have an SOP

7  in place whereas the thing about the lieutenant who

8  checks them.  It's in place.  I mean, we have a

9  uniform check.  Now, what dates, I can't give you

10  what dates because I have a total of over 100 plus

11  employees here and I have division leaders, like a

12  chief deputy who run the day-to-day operations.  I

13  have a lieutenant to run communications, a warden to

14  run the jail, a commander in charge of internal

15  affairs.  I have the lieutenant again over

16  communication, a major over EOC as well as a major

17  over patrol and one over investigations.  So we have

18  a large operation.  So my hands are not involved in

19  the day-to-day operation of the Tunica County

20  Sheriff's Office.

21     Q.    Okay.  All right.  So earlier you said SOP.

22  For the record, SOP is standard operating procedure?

23     A.    That's correct.

24     Q.    Okay.  So now, prior -- you are aware of

25  who Michael Thompson, the plaintiff in this case is,

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 12

1   right?

2       A.   I am.

3       Q.   All right.  And in February of 2014, you

4   know that Michael Thompson was the county

5   administrator for Tunica County, right?

6       A.   Yes, sir.

7       Q.   Were you aware of when Michael Thompson was

8   hired to be the Tunica County administrator?

9       A.   I know Michael Thompson was -- I don't know

10  the exact date when Michael Thompson was hired in as

11  an auditor at first, and then after he was auditing

12  the county there was some problems in-house with the

13  board of supervisors and they relieved the former

14  county administrator of his duties and they hired

15  Michael Thompson full time.

16      Q.   Okay.  But as of February 12, 2014, he was

17  still in that position as county administrator?

18      A.   Yes, sir.

19      Q.   All right.  Now, isn't it true, sir, that

20  you and -- that your office, and by your office I

21  mean the Tunica County Sheriff's Department, had an

22  open investigation into Mr. Thompson, Mr. Michael

23  Thompson, prior to February 12th of 2014?

24      A.   That is true.

25      Q.   Tell me what the nature of that

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 13

1    investigation is.

2        A.    The nature of that investigation, I had

3    citizens reporting to my office that Michael

4    Thompson, who was the county administrator at that

5    time, gave a contract to his brother.  And we went to

6    a page and it showed that Thompson and Wiley had a

7    business, Wiley being the CEO of the business and

8    Thompson being an officer and auditor of the

9    business.  We looked into that information and that's

10   a different thing than what his claim is now.

11       Q.    I'm aware of that.

12       A.    I want to clear that up.  You're aware of

13   that.  Okay.  The citizens raised questions about

14   that.  And our job was to -- my job was to look into

15   it as sheriff and make sure that the county taxpayers

16   wasn't being robbed when it comes to frivolous

17   contracts.

18       Q.    Okay.  The Thompson -- I mean, did you ever

19   institute charges against Michael Thompson for this

20   investigation that you had against him?

21       A.    No, I did not.

22       Q.    Did you ever find any wrongdoing associated

23   with that investigation?

24       A.    We was building.  No.  We was building that

25   to give to the ethics commission concerning that.

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 14

1    Q.   Did you ever file a report to the ethics
2    commission about the activities you were
3    investigating on Michael Thompson?
4    A.   I filed a report with the attorney
5    general's office, met with the ethics commission.  We
6    had a round table discussion on this and they
7    proceeded with that investigation.
8    Q.   Did it ever result in charges being levied
9    against Mr. Michael Thompson?
10   A.   No, it did not.  But they came to Tunica
11   County, the state auditor's office, and they pulled a
12   lot of information.  So things could be ongoing.  I
13   do not know.  My job is to report.
14   Q.   Is your investigation in that matter
15   concluded?
16   A.   Can you expound on that question?
17   Q.   Have you ended your investigation into the
18   Michael Thompson allegations that came from citizens?
19   A.   I gathered all that I could and I passed it
20   on to the appropriate authorities to move forward,
21   with the state auditor's office and the ethics
22   commission and the attorney general's office.
23   Q.   So your portion of that investigation has
24   concluded?
25   A.   Yes.

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

1     Q.   All right.  Now, did you find that Michael

2  Thompson had given a contract to his brother?

3     A.   Yes.  It's in the minutes.  Well, I don't

4  know if that was his brother or not.  I gave it to

5  the other agencies.  I sat there at the board table

6  when they reappoint things and will give contracts to

7  them.  So once they agreed to hire his business

8  partner, Mr. Alex Wiley, then that's when --

9             THE COURT REPORTER:  Alex Wiley?

10           THE WITNESS:  Alex T. Wiley.  I don't

11  know if he's a junior or the third.  But those

12  questions was raised and I started getting complaints

13  from the citizens.  And I got what I collected, you

14  probably have a copy of the e-mails and web page of

15  his business.  Do you have copies of those things?

16     Q.   (Mr. Tanner)  Uh-huh (Indicating yes).

17     A.   Okay.  So I forwarded those to the ethics

18  commission, attorney general's office and state

19  auditor's department and I was hands off.  Once that

20  was done I was hands off.

21     Q.   Who else in your department was

22  participating in that investigation?

23     A.   At that time, I'm sure -- this is something

24  that I looked at personally and I called a meeting

25  with those groups.

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 16

1     Q.    All right.  In any way, was Captain James

2  Jones participating in that investigation?

3     A.    He was.

4     Q.    Okay.  Captain James Jones, is he -- you

5  mentioned earlier that the licenses are run pursuant

6  to your fleet management safety -- fleet safety

7  management policy?

8     A.    That's correct.

9     Q.    By Lieutenant Guice and Ms. Evelyn Paige?

10     A.    Right.

11     Q.    It was not normal for Captain James Jones

12  to run licenses as part of that fleet safety

13  management policy, is it?

14     A.    If a flag was raised, a person had a

15  warrant or a suspended license or what have you, then

16  it would come to our warrant division or special

17  operations.  Captain Jones was in charge of special

18  operations at the time.  We had a guy named Alvin

19  Harris, who was the maintenance director, he had a

20  charge come up in DeSoto County during the same time

21  for burglary and he was arrested and transported to

22  DeSoto County.

23     Q.    Okay.  As of February 12, 2014, did Michael

24  Thompson have a valid warrant out for his arrest?

25     A.    I called personally Carroll County clerk

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

1    once I was alerted that Thompson had a suspended

2    driver's license based on my training and experience

3    that something else was in place.  And I called

4    Carroll County.  They confirmed with me that Michael

5    Thompson had a warrant.  And I told them that this

6    guy is in my county every day and if they sent a

7    warrant over I'm sure it probably could be served and

8    we'll bring it to his attention.

9        Q.   Did you ever receive a copy of a warrant

10   from Carroll County?

11       A.   The clerk confirmed that once the judge

12   signed his signature to this warrant that he would

13   send it to us.

14       Q.   All right.

15       A.   And that was that.

16       Q.   My question is whether you ever received a

17   copy of a valid warrant that had been issued for

18   Michael Thompson's arrest?

19       A.   Not that night.  Because Ellis Pittman, who

20   is now deceased, had gotten involved and somehow the

21   warrant was stopped that night, the warrant was

22   stopped once they were supposed to be faxing it over.

23   And I don't want to lose my train of thought.  The

24   county attorney at the time, Ellis Pittman, had

25   gotten involved.  And I'm sure you received the

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 18

1    footage on that as well.

2        Q.    My question, sir, is whether you ever

3    received from Carroll County a valid warrant for

4    Michael Thompson's arrest?

5        A.    Not that night.  I had to call the attorney

6    general's office to go get that information, and

7    which they did.

8        Q.    All right.  When did you receive a valid

9    warrant for Michael Thompson's arrest?

10       A.    I never received a valid warrant because it

11   was stopped.

12       Q.    So you've never to this day received a

13   valid warrant for Michael Thompson's arrest?

14       A.    What I received was a transcript of a

15   warrant that was created without the judge's

16   signature that the attorney general's office went and

17   got for me.

18       Q.    And you're aware that if a judge does not

19   sign a warrant it is not valid, right?

20       A.    I am totally aware of that.

21       Q.    Okay.  Do you know when the warrant, the

22   invalid warrant you received, or I guess -- I'm not

23   sure if you can call it a warrant at all.  Whatever

24   document you received that purported to be a warrant,

25   do you know when that document was created, sir?

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

1    A.    Do you have a copy, Mr. Wolf?

2            MR. WOLF:  No, I don't.

3    A.    I have a copy with me if I can go get it.

4    Q.    (Mr. Tanner)  Please do.

5    A.    Okay.

6            (Pause in proceedings.)

7    A.    Here I hold a copy of a warrant that was

8    created, Case Number 006085, Case Number 006085.

9    This warrant was created and cut on February 12,

10   2014, on Michael Thompson.  Have you seen that

11   document before from Carroll County?

12           MR. WOLF:  A copy of that was provided

13   in disclosures.

14   Q.    (Mr. Tanner)  Do you want to sit down?  I

15   mean, it's your office.

16   A.    Okay.  No problem.

17   Q.    Thank you.  All right.  So you keep saying

18   Carroll County.  Do you mean Montgomery County?

19   A.    Montgomery County.  I'm sorry.

20   Q.    So every answer you've given us where you

21   claim to have called Carroll County you actually mean

22   Montgomery County.

23   A.    Montgomery County.  Thank you, sir.  Thank

24   you, ma'am, if you can correct that for me.  It has

25   been a long time, sir.

ADVANCED COURT REPORTING
662-690-1500

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

1     Q.   That's fine.  Now, I hold in my hand what

2  you're calling to be the warrant that you received?

3     A.   An abstract.  An unsigned warrant document

4  that was created on the above date and time of

5  Michael Thompson's arrest showing the same date of

6  Michael Thompson's arrest.  It's an abstract from

7  their court that was provided to me from the

8  Mississippi Attorney General's Office.

9     Q.   So the Mississippi Attorney General's

10  Office sent this to you on what date?

11     A.   They had an investigator, I can't think of

12  his name.  He's in my notes.  He did an investigation

13  into this matter and he brought me this from Carroll

14  County -- I'm sorry, Montgomery County.  I can't -- I

15  don't remember the date, but he did go and get all

16  this information.

17     Q.   So you never got this prior to, this

18  document in my hand, you never got this prior to

19  Michael Thompson's arrest on February 12, 2014?

20     A.   Not until the local attorney got involved.

21  Michael Thompson had posted bail, so my thing was to

22  call the Mississippi Attorney General's Office

23  because that warrant was stopped.

24          MR. TANNER:  Okay.  At this time I

25  would ask that this be marked as Exhibit A or 1 to

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

1    this deposition.

2                   MR. WOLF:  Hold on.  We'll make a

3    copy.

4                   (Off record discussion.)

5                   (Exhibit No. 1 -- Justice Court Arrest

6    Warrant dated 2-12-14 -- marked and may be found

7    attached to the transcript.)

8         Q.   (Mr. Tanner)  Sir, the document we've been

9    referencing, which has now been marked as Exhibit 1,

10   this is what you say, what you've said is the

11   purported warrant in this case.  Now, do you see that

12   Exhibit 1 is dated February 12 of 2014?

13        A.   That's correct.

14                  MR. WOLF:  Object to the form of the

15   question.  I think it misstates the prior testimony,

16   but answer the question if you can.

17        A.   Yes.  I see that warrant dated February 12,

18   2014.

19        Q.   (Mr. Tanner)  Now, you're calling it a

20   warrant, but you've already acknowledged that a

21   warrant is not valid unless it's signed by a judge;

22   is that right?

23        A.   That's correct.

24        Q.   And that document is not signed by a judge,

25   is it?

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 22

1     A.    That's correct.

2     Q.    Now, there are two handwritten words on

3   this document that say void.

4     A.    Right.

5     Q.    You see those two markings, sir?

6     A.    I do.

7     Q.    All right.  Do you know who marked void on

8   that warrant or on this document?

9     A.    I wouldn't know.  It came from Montgomery

10  County.

11    Q.    Okay.  Was this at all part of the basis

12  for which Mr. Thompson was arrested on February 12th,

13  2014?

14    A.    I would say yes.

15    Q.    Okay.  When were you told that this

16  document existed, Exhibit 1?

17    A.    I guess the 11th or the 12th.

18    Q.    The 11th or the 12th of February 2014?

19    A.    If my memory serves me correctly, that's

20  when I talked to the clerk.

21    Q.    Either on February 12th or 11th of 2014?

22    A.    That's correct.

23    Q.    All right.  But you did not receive that

24  document from them on either of those dates, right?

25    A.    No.

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 23

1    Q.    Who did you communicate -- did you

2    communicate to anyone that there was a warrant out

3    for Michael Thompson's arrest?

4    A.    I spoke with Lieutenant Jones.  That's who

5    confirmed there was a warrant on Thompson.

6    Q.    When you say Lieutenant Jones, is that the

7    same --

8    A.    I'm sorry.  Captain Jones.

9    Q.    All right.  So you meant -- what you meant

10   to say was that you told Captain James Jones that

11   there was a warrant out for Michael Thompson's

12   arrest?

13   A.    That's correct.

14   Q.    And you said you asked --

15        MR. WOLF:  Objection.  Vague as to

16   time.

17   Q.    (Mr. Tanner)  All right.  That happened on

18   February 12, 2014?

19   A.    The Eleventh or the Twelfth.  I'm sure it

20   was probably the morning of the 12th.

21   Q.    That's when you told Captain James Jones

22   that there was a warrant for Michael Thompson's

23   arrest?

24   A.    Yes.

25   Q.    All right.  You said you asked Captain

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 24

1  Jones to confirm the existence of a warrant; is that

2  correct?

3       A.   No.  I confirmed that.

4       Q.   Okay.  So you just told him about the

5  warrant?

6       A.   Yeah.  I told him that there was a warrant

7  on Michael Thompson and that was that.

8       Q.   All right.  Did you notice -- or do you

9  know why Michael Thompson's, why a warrant was issued

10  for Michael Thompson's arrest?

11       A.   According to the court clerk he had an

12  arrears in Montgomery County and he failed to go to

13  court and they issued a warrant, they was going to

14  issue a warrant.

15       Q.   All right.  Do you know when it was that

16  Michael Thompson missed his court date?

17       A.   All of that is in a file, sir.  I do have

18  those abstracts.

19       Q.   Do you want to get those for us?

20            MR. WOLF:  If you have a question

21  about a document, you don't need to present any

22  documents.  Let's save our time here.

23            THE WITNESS:  Thank you.

24            MR. WOLF:  If there's any specific

25  documents, if your memory recalls it, go ahead and

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 25

1   share what your memory recalls about them.  If you

2   want to present some documents to him, present the

3   documents, but we're not going to go --

4        A.   Mr. Thompson had an arrears in Montgomery

5   County that led them to create such an abstract

6   that's before me that show a cause and a case number,

7   0060851, which reads Justice Court Arrest Warrant on

8   top.

9        Q.   (Mr. Tanner)  Okay.  But whenever that

10  happened, whenever Michael Thompson had a missed

11  court date or whenever you say an abstract was

12  created imposing a fine and a penalty on Michael

13  Thompson, that date was prior to February 12, 2014,

14  was it not?

15       A.   Yes, sir.  Probably a year or better, I

16  believe.

17       Q.   Right.  But, ironically, a warrant or what

18  you claim is a warrant was not created until the day

19  of or the day after you called over to Montgomery

20  County; is that right?

21       A.   Right.  That's the same date.

22       Q.   Do you know how Captain James Jones ended

23  up running the license as part of your fleet safety

24  management policy if that wasn't normally his job?

25       A.   Lieutenant Guice ran the license and I

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 26

1  guess when the flag came up he had a suspended
2  license, the information was moved from him to --
3  same thing with Allen Harris.  A warrant came up, he
4  was arrested.  If there was a warrant in place
5  then -- I mean, the law of the land prevailed.
6              THE COURT REPORTER:  I didn't
7  understand what you said.
8              THE WITNESS:  The law has prevailed.
9  No one is above the law.
10              MR. WOLF:  Law of the land.
11              THE WITNESS:  The law of the land
12  prevailed.  No one is above the law.  And any time
13  you're working in law enforcement, if we have a
14  warrant or not, they could be from Chicago to New
15  York, and if the clerk of the court tells us that
16  they have a warrant in place they're going to send
17  after that person, then law enforcement acting in
18  good faith judgment until we get that warrant, we can
19  hold and detain.
20      Q.   (Mr. Tanner)  And you normally arrest
21  people on a warrant even if you never see a copy of
22  the warrant or anything?
23      A.   On a good faith effort.  If we speak to the
24  agency or courts and they say they have a warrant on
25  the way, yes, we hold and detain until we get that

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

1  warrant in hand.

2      Q.    Can you think of anybody else you've done

3  that to?

4      A.    I've been here 13 years.  Where do you want

5  me to start at?

6      Q.    Give me a name.

7      A.    I can't give you a name, but you can

8  subpoena every record I've got here though.

9      Q.    But as we sit here today --

10      A.    We're taking about Michael Thompson today.

11      Q.    No.  We're talking about whatever I ask

12  you.  My question, sir, is as we sit here today

13  during this deposition, you can't name me one other

14  person for who you arrested without seeing the

15  warrant first when somebody tells you they have a

16  warrant?

17      A.    Sir, I'm sheriff of the county.  I have a

18  chief deputy in place.  I don't run the day-to-day

19  operations of the sheriff's office.  This is an

20  agency with 100 plus employees here both sworn and

21  civilian.  Now, you have full access to our records

22  and I'm sure you will find --

23          MR. WOLF:  I'm going to object to

24  volunteering full access.  You have access according

25  to our discovery.

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 28

```
 1                    MR. TANNER:  We'll accept the full
 2     access, Mike.
 3                    MR. WOLF:  Well, it's not being
 4     granted or offered.
 5                    MR. TANNER:  Thank you.
 6          Q.   (Mr. Tanner)  So my question now is, you
 7     said there are other instances but you just can't
 8     name any personally, right?
 9          A.   Right.
10          Q.   Okay.  All right.  Now, as far as Michael
11     Thompson is concerned, you say -- how long have you
12     all been doing these license checks every six months?
13          A.   Since there has been an agency here as far
14     as I'm concerned.  I can't speak on what the other
15     sheriff did, but over a decade I have.
16          Q.   Over a decade?
17          A.   A decade.
18          Q.   Have you had any other situations where
19     city employees were discovered to have suspended
20     licenses when y'all did these checks?
21          A.   I'm sure we have.  Yes, sir.
22          Q.   Can you give me any examples?
23          A.   I can't give you an example.  I'm sure we
24     have.  Trust me, sir, it has been over a decade.  So
25     you're asking me something, I could be wrong if I
```

1    answered that what you're asking me in a certain way.

2    But I'm positive that I'm right.  I've been here a

3    long time.  And, sure, employees come up suspended.

4    I can't tell you how other agencies handle theirs.

5        Q.    Let me ask you more directly.  So what

6    you're saying is that you have run these six-month

7    checks pursuant to your fleet safety management

8    policy and you have had employees who through those

9    license checks you discovered had suspended licenses?

10       A.    Yes.

11       Q.    All right.  Now, any of those other people

12   who had those suspended licenses, did you then go out

13   and arrest those people based on the fact that they

14   had a suspended license?

15       A.    I did not go out to arrest anyone.  But if

16   they was driving a vehicle and was stopped by law

17   enforcement, I'm sure they was arrested.

18       Q.    My question is different though.  Have you

19   ever discovered through your license check policy

20   that someone who worked for the county had a

21   suspended license and as a result of that you went

22   out and arrested them?

23       A.    I did not.

24       Q.    Have you ever had an officer working under

25   your supervision with the Tunica County Sheriff's

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 30

1   Department who went out and arrested one of the

2   county employees after you learned that that person

3   had a suspended license?

4       A.   A warrant.  A warrant.  Yes, sir.  Not

5   suspended license.

6       Q.   I'm not asking about a warrant.  I'm asking

7   about a suspended license.

8       A.   Well, I'm telling you if they had a

9   warrant, yes, sir.  I don't know anything about the

10  suspended license other than what was given to me.

11      Q.   You don't know if any of your deputies or

12  any of your law enforcement personnel have gone out

13  and arrested someone for a suspended license

14  violation when your license checks revealed that that

15  employee or any of those employees had a suspended

16  license?

17      A.   Sir, if they were operating a car at the

18  time, I'm sure they was arrested.

19      Q.   Okay.  And you can't give us any names of

20  those folks, can you?

21      A.   No, sir.  I'm sure we got a record of it.

22  We keep a record of it.

23      Q.   Do a lot of people get stopped in this

24  county for suspended licenses?

25      A.   Yes.

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 31

1     Q.   Is that a frequent occurrence by your

2  sheriff's deputies --

3     A.   Yes.

4     Q.   -- to arrest people for suspended licenses?

5     A.   Yes.

6     Q.   When you say frequent occurrence, about how

7  many, to the best of your recollection, do you have a

8  year?

9     A.   So many a day.

10    Q.   How many a day?

11    A.   I don't know.

12    Q.   So almost on a daily basis you arrest

13  multiple people for suspended licenses?

14    A.   That is correct, sir.  We got a jail log

15  you could look at it.

16    Q.   Would you like to produce that?

17    A.   If you provide funding for the copies.

18         MR. WOLF:  Send us an interrogatory

19  request for production and we'll respond according to

20  the rules.

21    Q.   (Mr. Tanner)  When Mr. Thompson was

22  arrested, did you receive a call from Captain James

23  Jones letting you know that Mr. Thompson had been

24  arrested?

25    A.   I was off that night.  I was off eating.

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 32

1    And a call came, I don't know if it was the dispatch

2    or somebody first probably called me and told me

3    Thompson had been arrested on a suspended license.

4    Then I received a call later from Captain Jones, he

5    said the county attorney, Ellis Pittman, was here

6    representing Michael Thompson.

7        Q.   My question to you, sir, is whether you got

8    a call from Captain James Jones --

9        A.   Later that night I did.  Yes, sir.

10       Q.   -- to tell you -- let me finish my

11   question, please.  Did you get a call from Captain

12   James Jones on February 12, 2014, during which

13   Captain Jones told you that he arrested Michael

14   Thompson for having a suspended license?

15       A.   Yes, I did.

16       Q.   Now, you said -- where exactly were you

17   when you received that call?

18       A.   I was at the Hotel Marie located in

19   Downtown Tunica eating.

20       Q.   Okay.  So you got that call on your cell

21   phone, I presume?

22       A.   Yes, I did.

23       Q.   Was that a personal cell phone or a

24   county-issued cell phone?

25       A.   A county-issued cell phone.

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 33

1    Q.    What's the phone number, sir?

2    A.    662-910-0492.

3    Q.    0492?

4    A.    That's correct.

5    Q.    Is that the phone number you received the

6    call on on February 12th, 2014?

7    A.    That's correct.

8    Q.    From Captain James Jones?

9    A.    That's correct.

10   Q.    Telling you that he had arrested Michael

11   Thompson?

12   A.    That's correct.  And also I received a call

13   from the attorney, Ellis Pittman.

14   Q.    Do you know, does Captain -- on that date,

15   February 12, 2014, do you know whether Captain Jones

16   had a county-issued vehicle?

17   A.    He did.  Yes, sir.

18   Q.    Was it a marked vehicle or an unmarked

19   vehicle?

20   A.    Unmarked vehicle.  Special operations drive

21   unmarked vehicles.

22   Q.    All right.  Do your vehicles in Tunica

23   County, your patrol or fleet vehicles in Tunica

24   County, the ones that are used by your sheriff's

25   department officials, are they equipped with

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 34

1    audio-video recording devices?

2        A.    Yes, sir.

3        Q.    Would that include the vehicle that Captain

4    James Jones was in that night?

5        A.    No, sir.  Just radio communication, not

6    audio or surveillance equipment.

7        Q.    So he can't -- so Captain Jones' car cannot

8    record what goes on in traffic while he's on patrol?

9        A.    Not the unmarked vehicles.

10       Q.    Okay.  All right.  Had you discussed

11   arresting Michael Thompson prior to his actual

12   arrest?

13       A.    I did not.

14       Q.    So you and Captain Jones discussed a

15   warrant but you didn't discuss the arrest?

16       A.    Absolutely.  I discussed the warrant, that

17   there was a potential warrant there in Montgomery

18   County.

19       Q.    So now is it a potential warrant or is it a

20   warrant?

21       A.    A warrant.  That's what was told to me.

22       Q.    So potential was a mistake that you just

23   stated.

24       A.    Potential was a mistake.

25       Q.    Do you know who was driving the vehicle

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 35

1    that -- are you aware that Captain Jones initiated

2    two traffic stops of the vehicle in which Michael

3    Thompson was traveling that night, February 12, 2014?

4        A.   I was not familiar with the stop that

5    night.  I learned all of that after the stop that you

6    just asked me.

7        Q.   Okay.  So you now know that there were two

8    stops of that vehicle?

9        A.   I know now.

10       Q.   All right.  And do you know who was driving

11   during the first stop of the vehicle?

12       A.   According to what I learned, Alex Wiley was

13   the driver, according to what I learned.

14       Q.   Do you know whether Alex Wiley was issued

15   any kind of citation or tickets for anything, any

16   traffic ordinance he violated?

17       A.   What I learned, no.  But what I learned was

18   he ran Alex Wiley's driver's license and it came back

19   eligible for reinstatement.  I learned that while he

20   was interviewing Alex Wiley.  Michael Thompson asked

21   Captain Jones, "Do you know who I am?  Do you know

22   who I am?"  And meanwhile, they was on the phone with

23   dispatch trying to see did Thompson -- no, Wiley have

24   a valid driver's license.  But it was not confirmed

25   that his license was valid that night.  Now, I cannot

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 36

1  articulate his stop.  He will have to do that.  I'm
2  telling you what was told to me.
3       Q.   All right.  Would it surprise you to know
4  and haven't you testified before that what dispatch
5  said was that his license came back valid, eligible
6  for reinstatement?
7       A.   No.
8       Q.   Okay.
9       A.   I got a document of that too.
10      Q.   So that would surprise you to hear that?
11      A.   That would surprise me, but I have a
12  document based on the conversation that the
13  lieutenant had with the Memphis, Tennessee, people.
14  That means that he had some -- he had -- he was
15  eligible to be reinstated.  But there were some other
16  things out there, so his license would have shown
17  unlicensed.  But because they did not discover that
18  that night, on what was told to me, he gave him a
19  professional courtesy.  But Michael Thompson asked,
20  "Do you know who I am?"  Again, he would have to
21  articulate his entire stop.  I can't do that.
22      Q.   Right.  Because you weren't there?
23      A.   I wasn't there.
24      Q.   All right.  When did you get this document
25  from Memphis saying that the license was not valid?

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

1    A.    When the investigation started and the

2  complaint on Michael Thompson, when he filed the

3  complaint, that's when the lieutenant, they started

4  their investigation.  And it's in writing who she

5  spoke with.  I can get that document for you if you

6  want me to copy that as well.

7    Q.    Sure.

8          MR. WOLF:  We'll supplement the record

9  with that.  We'll supplement.  Just send us an

10  interrogatory request for production.  There's no

11  request for any particular documents be provided

12  today.

13    A.    This office have nothing to hide.  I want

14  you to know we're straightforward, we're a

15  professional agency.

16          MR. TANNER:  Can I finish my depo?  I

17  mean, you're free to make -- I'm just saying.

18          MR. WOLF:  Let's just answer his

19  questions as they come and then we'll worry about

20  documents later on and he'll make requests as needed.

21  We'll handle it that way.

22          THE WITNESS:  Okay.

23    Q.    (Mr. Tanner)  All right.  How many

24  conversations did you have with people outside of

25  your department about Michael Thompson's driver's

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 38

1    license issue?

2         A.    Other than the attorneys, Mr. Pittman, we

3    had conversations.

4         Q.    Prior to the arrest?

5         A.    Nobody.

6         Q.    All right.  So you did -- the lady in

7    Montgomery County would count as one, right?

8         A.    She would count as one.

9         Q.    All right.  Are there any others?

10        A.    No.

11        Q.    All right.  And inside your department

12   prior to the arrest, who else did you discuss the

13   warrant issue with concerning Michael Thompson's

14   license?

15        A.    Captain Jones.

16        Q.    And no one else?

17        A.    No one else.

18        Q.    Okay.  Was there anything special about

19   your arresting Michael Thompson?

20        A.    Nothing special.

21        Q.    All right.  Did you think anything was

22   significant about arresting him?

23        A.    Nothing.  No, sir.

24        Q.    Nothing at all?

25        A.    Nothing significant.

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 39

1    Q.   The fact that he was county administrator

2    of Tunica County was not significant to you?

3    A.    It wasn't significant.  I think what was

4    significant is that the dispatcher, when we do the

5    records check for the police safety, in the past we

6    would check people.  And he drive a county vehicle,

7    so he left himself off of the check.  So if he was

8    operating a vehicle, he had the right to be checked

9    too.

10   Q.   My question is, was there anything

11   significant or special to you about the fact that you

12   arrested the Tunica County Administrator?

13   A.   No, sir.

14   Q.   Not nothing whatsoever?

15   A.   No, sir.

16   Q.   Who sets the policies and procedures for

17   Tunica County Sheriff's Department?

18   A.   I do.

19   Q.   All of the policies and procedures come

20   from you?

21   A.   Yes, sir.

22   Q.   For the Tunica County Sheriff's Department?

23   A.   Yes, sir.

24   Q.   What about the job roles and

25   responsibilities of each of your sheriff's department

Page 40

1　　employees, who sets those roles and responsibilities?

2　　　　A.　　I do.

3　　　　Q.　　Who insures that those roles and

4　　responsibilities meet expectations?

5　　　　A.　　The chief deputy and the command staff.

6　　　　Q.　　All right.　And do you take any

7　　responsibility for people doing their job according

8　　to the policies and procedures that you set?

9　　　　　　　　MR. WOLF:　Object to the form of the

10　　question.　The context of the question, I didn't

11　　understand the word responsibility.　It could mean

12　　any range of things.

13　　　　　　　　MR. TANNER:　That's fair.

14　　　　Q.　　(Mr. Tanner)　Do you hold people

15　　accountable within your department to live up to the

16　　policies and procedures that you set?

17　　　　A.　　Yes, sir.

18　　　　Q.　　Do you have a media policy?

19　　　　A.　　Yes, sir.

20　　　　Q.　　Do you have a policy on press releases?

21　　　　A.　　Yes, sir.

22　　　　Q.　　All right.　Did you issue, you or your

23　　office issue a press release concerning the arrest of

24　　Michael Thompson?

25　　　　A.　　Mr. Pittman, who is now deceased, did all

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 41

1  of that.  So if you ask me I would say no, sir.

2      Q.   My question to you is whether anybody in

3  your office issued a press release concerning the

4  arrest of Michael Thompson?

5      A.   After the question was raised, I believe I

6  authorized it.  Yes, sir.

7      Q.   You authorized a press release from your

8  office concerning the arrest of Michael Thompson?

9      A.   After the question was raised from our

10  county attorney, Mr. Pittman, who went on the news

11  first, then it came to me.

12     Q.   Did your office issue a press release, sir,

13  concerning the arrest of Michael Thompson?

14     A.   Yes, it did.  It become public record after

15  the arrest.

16              THE COURT REPORTER:  Excuse me.  After

17  the --

18              THE WITNESS:  After an arrest is made

19  on anyone, it becomes public record.  And

20  Mr. Pittman, the county attorney, initiated that.

21     Q.   (Mr. Tanner)  What do you mean when you say

22  he initiated it?

23     A.   He initiated the media blitz and all this

24  kind of stuff.

25     Q.   All right.  So as a result of that, what

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 42

1    did you do?

2         A.    The media, I guess, contacted me and we

3    have to concur that Michael Thompson was arrested.

4         Q.    You mean the media contacted you and you

5    just confirmed with them that Michael Thompson was

6    arrested?

7         A.    Was arrested.

8         Q.    You do understand that saying that in

9    response to a question is different than issuing a

10   press release, right?

11        A.    It has been going on for a while, sir.  I

12   have to reflect back on my records.

13        Q.    Do you check your own press release log,

14   sir?

15        A.    I do.

16        Q.    Do you know even as we sit here today

17   Michael Thompson as county administrator being

18   arrested, a press release from your office issued on

19   February 13, 2014, is still to this day on your

20   website, sir?

21        A.    I mean, you can Google those things.  It

22   shouldn't be on my website.  Well, let me take that

23   back.

24        Q.    Please do.

25        A.    Let me take that back.  Please do.  Once a

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 43

1    person is arrested it becomes public record.  So

2    whatever news media is out there, all those things

3    that have taken place in Tunica County that we

4    created for that website is still there.

5         Q.    I'm not talking about what somebody can

6    Google.  I'm asking if on your website, sir, your

7    department's website if there is listed a press

8    release for the arrest of Michael Thompson?

9         A.    Okay.  Is there, like every other release.

10        Q.    That's fair.

11        A.    Okay.

12        Q.    Now, you said you get multiple people

13   arrested every day in Tunica County by your

14   department --

15        A.    Right.

16        Q.    -- for driving with a suspended license?

17        A.    Right.

18        Q.    How many of those people, those multiple

19   people every day arrested for having a suspended

20   license are posted on your website, sir, other than

21   Michael Thompson?

22        A.    They are posted daily.

23        Q.    Okay.

24        A.    Any arrest in Tunica County is posted

25   daily.  Look under the inmate log.

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 44

1      Q.    Is it against your policy to allow people

2   to drive vehicles, sir, if you catch a person who has

3   got a suspended license?

4      A.    Yes.

5      Q.    All right.  So if someone -- if an officer

6   knows that someone has a suspended license in your

7   department where you make sure people don't violate

8   your policies, they're not supposed to let that

9   person drive; is that right?

10     A.    That's correct.

11     Q.    Do you know whether Captain Jones, based on

12  if nothing else what you told him, knew that Michael

13  Thompson's license had been suspended at the time he

14  arrested him?

15     A.    Ask me that question again, sir.

16     Q.    Yes, sir.  Do you know whether Captain

17  James Jones knew of Michael Thompson's suspended

18  license at the time he told Michael Thompson that he

19  needed to drive the vehicle on the night in question?

20     A.    He did.

21          MR. WOLF:  Object to the form.

22  Assumes facts not in evidence.

23     Q.    (Mr. Tanner)  So that violates your policy

24  if he let or told a man to drive a vehicle knowing

25  that that man had a suspended license?

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 45

1      A.   I cannot articulate his stop or what was

2   said out there, sir.  I'm answering the question you

3   asked me.  I cannot articulate the stop or the

4   conversation between him and Michael Thompson.  He

5   will have to answer that, sir.

6      Q.   Do you know what phone number Captain Jones

7   called you from?

8      A.   I don't know, sir.  If he called me, it

9   would be from his department-issued phone at the

10  time.  Again, I have a nice size agency here.  And if

11  you ask me for anyone phone number off the top of my

12  head based on the technology and communication with

13  the iPhones now, they have made our brains a little

14  lazy and we just click on the name and come up with a

15  number.

16     Q.   All right.  So I beat you to the punch,

17  sir.  Do you know Captain James Jones' phone number

18  that he used that night to reach out to you?

19     A.   No, sir.  He would show up in my phone as

20  Captain James Jones at the time.

21     Q.   You said he was a captain of special ops in

22  February of 2014, referring to James Jones?

23     A.   Yes, sir.

24     Q.   Tell us what special ops entails.

25     A.   Special ops entails narcotics

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 46

1    investigation, gaming investigations, warrants, human

2    trafficking, prostitution, pretty much anything where

3    the law is violated.

4        Q.   Couldn't you say the same thing for one of

5    your regular patrolman deputies?

6        A.   Yes.

7        Q.   All right.  So what makes special ops

8    different than a regular patrolman deputy?

9        A.   It's just a plain clothes officers,

10   investigators.  It's a difference.

11       Q.   Is it a promotion over -- I mean, if

12   someone is a patrolman and they get named captain of

13   special ops, would that be a promotion?  I'm trying

14   to figure this out.

15       A.   He was a supervisor at the time.

16       Q.   Okay.

17       A.   Yes.

18       Q.   Was Captain James Jones promoted during

19   your tenure as sheriff?

20       A.   He was.

21       Q.   You issued that promotion to him?

22       A.   Yes, I did.

23       Q.   When did he get that promotion?

24       A.   I have to reflect back on my records, sir.

25       Q.   Okay.  Is Captain James Jones still in your

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 47

1   department?

2        A.   He's retired.

3        Q.   Okay.  When did he retire, sir?

4        A.   You have to look into our records, sir.  A

5   lot of employees have came through here.

6        Q.   Do you know whether Mr. Alex Wiley was

7   issued any citations or tickets --

8        A.   According to --

9        Q.   -- on February 12, 2014?

10        A.   According to what I've learned, no, sir.

11        Q.   All right.  Now, you and -- prior to

12   February 12, 2014, you and Michael Thompson had a

13   dispute, did you not?

14        A.   I don't call it a dispute.

15        Q.   What do you call it, sir?

16        A.   We was talking in Thompson's office about

17   they hadn't paid for the fuel for the Tunica County

18   Sheriff's Office.

19             THE COURT REPORTER:  Excuse me?

20             THE WITNESS:  They had not paid for

21   fuel.  We were trying to get some fuel delivered and

22   I believe they had not paid for fuel.  And I asked

23   him to pay for the fuel.  Thompson went on and

24   started to talk about a budget.  And I shared with

25   him that I don't talk with him about my budget.  I

1  don't talk with him about my budget.  The county

2  administrator has no charge of the sheriff's budget.

3  The sheriff's office -- the sheriff have exclusive

4  authority over his budget and personnel.  I deal with

5  the board of supervisors.  I always have.  I never

6  meet with the county administrator about budgets.  I

7  meet with the board of supervisors.  And I have the

8  laws and statutes to support me on that.  Thompson

9  had an attitude and he asked me to leave his office

10  and I left.

11      Q.   All right.  So is that the only -- you said

12  you wouldn't call it a dispute.  Would you call it a

13  disagreement?

14      A.   It was a disagreement.  Well, he probably

15  disagreed with it.  I stated the facts.

16      Q.   Sir, haven't you called it a disagreement

17  in the past?

18      A.   Sir, this thing has been going on since --

19  it has been going on a while.  We are in November

20  2016.  We're in November of 2016.  This happened in

21  February 12, '14.

22      Q.   Uh-huh (Indicating yes).

23      A.   I've handled probably another thousand

24  issues and another hundred plus meetings since then.

25  Okay?

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 49

1      Q.    Uh-huh (Indicating yes).

2      A.    So it's fair for me not to remember

3    verbatim everything I have said when it comes to --

4    well, whether it be a disagreement or short talk.  If

5    it was a disagreement, him and I had a disagreement,

6    yes, you could say that.

7      Q.    All right.  So the answer is yes, you've

8    called it a disagreement in the past?

9      A.    I don't know what I've called it in the

10   past.

11     Q.    Do you call it a disagreement -- would it

12   be fair to say now that it was a disagreement?

13     A.    I asked him to pay for fuel.  He wanted to

14   talk to me about a budget.

15     Q.    He said he had authority over your budget?

16     A.    The law states different than what he said.

17     Q.    Listen to my question.  Did he say he had

18   some authority over your budget?

19     A.    I can't recall.  I can't recall that.

20     Q.    Did he say he wanted to cut your budget?

21     A.    I can recall that.

22     Q.    You said you can?

23     A.    I can recall that.

24     Q.    Okay.

25     A.    And the conversation went across he wanted

Deposition of Calvin K. Hamp, Sr., taken November 29, 2016

Page 50

1    to cut my budget.  I told him I'm not there to talk

2    about my budget with him.  I was there to talk about

3    a bill being paid.

4         Q.   Did he express to you that he had the

5    authority to cut your budget?

6         A.   He expressed that and I referred him to the

7    law, state statutes.

8         Q.   All right.  So you disagreed with his

9    position that he had the authority to cut your

10   budget?

11        A.   Yes.  I wasn't having those conversations

12   with him.  I told him to look at the statute.  I

13   don't -- I wasn't going to talk to him about a

14   budget.  I told them to read the law.  He was newly

15   assigned to this position.  I told him to read the

16   law, be familiar with his job, don't try to do my

17   job.  I told him the sheriff have exclusive authority

18   over his budget and it's the law.  I talk with the

19   board of supervisors, I don't talk with him.  I was

20   just hoping we could pay some bills.

21        Q.   When did that conversation occur, sir?

22        A.   Prior to his arrest, sometime prior to,

23   down the road.

24        Q.   Was he the county administrator at the

25   time?