Michael Strickland
September 29, 2016

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF MISSISSIPPI

OXFORD DIVISION

MICHAEL THOMPSON                                    PLAINTIFF

V.                              CIVIL ACTION NO. 3:14cv274-NBB-SAA

CALVIN HAMP, in his individual capacity and in

his official capacity as Sheriff of Tunica County,

MS, JAMES JONES, in his individual capacity and in

his official capacity as a Captain in Tunica County

Sheriff's Office, and UNKNOWN DEFENDANTS "A", "B",

AND "C"                                            DEFENDANTS

DEPOSITION OF MICHAEL STRICKLAND

Held on Thursday, September 29, 2016, at 10:38 a.m., in

the Boardroom of the Tunica County Courthouse, 1300 School

Street, Tunica, Mississippi, at the instance of the Defendants

Appearances Noted Herein



Reported by:

KAREN C. POPERNIK, MS CCR 1276, TN LCR 469

Michael Strickland
September 29, 2016

Page 2

```
 1    APPEARANCES:

 2    REPRESENTING THE PLAINTIFF:

 3         CARLOS TANNER, ESQUIRE

 4         Attorney at Law

 5         263 E. Pearl Street

 6         Jackson, MS   39201

 7         601.460.1745

 8         Carlos.tanner@thetannerlawfirm.com

 9

10    REPRESENTING THE DEFENDANTS:

11         MICHAEL J. WOLF, ESQUIRE

12         Page, Kruger & Holland, P.A.

13         P. O. Box 1163

14         Jackson, MS   39215

15         601.420.0333

16         Mwolf@pagekruger.com

17

18

19

20

21

22

23

24

25
```

Michael Strickland
September 29, 2016

Page 3

TABLE OF CONTENTS

Stipulation                                                    4

Examination by Mr. Wolf                                        5

Exhibit No. 1, Affidavit of Michael Strickland               18

Examination by Mr. Tanner                                     23

Examination by Mr. Wolf                                       54

Certificate of Court Reporter                                 57

Deponent's Certificate                                        58

Michael Strickland
September 29, 2016

1                              Stipulation

2        It is stipulated by and between the parties that the

3   Deposition of MICHAEL STRICKLAND is being taken pursuant to

4   notice under the Federal Rules of Civil Procedure and for all

5   purposes permitted thereunder.  All objections, except as to

6   the form of the question, are reserved until such time as the

7   deposition, or any portion thereof, is sought to be introduced

8   into evidence.  The reading and signing of the deposition by

9   the deponent is not waived.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Michael Strickland
September 29, 2016

Page 5

1                    MICHAEL STRICKLAND,

2          After being duly sworn, testified as follows:

3

4   EXAMINATION BY MR. WOLF:

5          Q.    Please state and spell your name for the record.

6          A.    Michael Strickland, M-I-C-H-A-E-L

7   S-T-R-I-C-K-L-A-N-D.

8          Q.    And can I get the last four digits of your Social

9   Security number?

10         A.    0714.

11         Q.    And your present street address for home?

12         A.    3515 Dorchester Drive, Horn Lake, Mississippi 38637.

13         Q.    And how long have you lived at that address?

14         A.    Since March of '15.

15         Q.    And are you presently employed?

16         A.    Yes.

17         Q.    Where are you employed?

18         A.    Sardis Police Department.

19         Q.    And how long have you been with Sardis?

20         A.    Since July of '16.

21         Q.    All right.  Just to get started a little bit here, my

22   name is Michael Wolf.  I'm an attorney for Calvin Hamp and

23   Captain Jones who were employed with the Tunica County

24   Sheriff's Department -- one is, obviously, the Sheriff -- in a

25   lawsuit filed against them by Michael Thompson.  My goal today

Michael Strickland
September 29, 2016

Page 6

1   is simply to get some questions to help fill in some blanks and

2   understand the scope of this claim.  And your name has come up

3   as someone who has some information.  In fact, there's been an

4   Affidavit that you signed that has become part of the -- part

5   of the scope of evidence.  Our goal is explore that affidavit

6   and explore who you are and try to figure out what, if this

7   thing goes to trial, you might be saying in a Courtroom.

8           My goal is not to trick you or be clever or

9   anything like that.  I've found that I'm not that clever.  What

10  I have found, though, is that my questions aren't always that

11  great.  Sometimes I'll stumble through my own words.  Sometimes

12  I'll say stuff that doesn't make much sense.  And when I'm

13  doing that, I'm not trying to be clever.  I'm just failing in

14  my task as a lawyer.  If that happens, I want you to know on

15  the front end that you have a right to ask me to rephrase the

16  questions, to reask the questions, to tell me that you just

17  didn't get it, and I'll do the best I can to try to get to the

18  heart of it and get -- so that way you can answer it.

19          When you answer the questions -- you've been in

20  Court before, I assume.  Correct?

21      A.  Yes.

22      Q.  All right.  Much like a Courtroom, although less

23  formal, everything is being taken down by a court reporter.

24  And in order to make her job easier, it's useful for you to

25  wait for me to complete my questions.  In exchange, I'll wait

Michael Strickland
September 29, 2016

Page 7

1   for you to complete your answer.  That does two things.  Number

2   one, it allows the Court Reporter to hear your voice -- it

3   allows the Court Reporter to hear one voice at a time.  It also

4   allows you to hear the fullness of my question.  That is, I'll

5   ask you a question.  You get to say, "Wait a second.  I either

6   didn't understand it," or you can go ahead and give us an

7   answer.

8            All right.  If you interrupt my question and

9   jump in, you may not have known where I was headed with it, but

10  your answer, whatever it is, is going to be part of the record

11  and might be used against you later on in some fashion.  To

12  that end, I may ask you a question.  My goal is to get your

13  best answer today.  That is, I want you to think long and hard

14  if you need to so that the testimony you give is as accurate as

15  possible today.  That way -- and, you know, I said I'm not

16  going to be clever.  So I'm going to tell you what happens.

17           If I ask you a question and you say "yes" and

18  then later on you read the thing and say, "Oh, I might want to

19  change that to a 'no'," that's a significant change in

20  testimony.  I may point that out in Court and say why is it

21  that you changed your testimony here or there and point out

22  changes and inconsistencies.  So in order to avoid that, it

23  benefits -- although if you don't want avoid it, that's fine.

24  It will only give us more fodder to play with.  But if you want

25  to avoid that -- and I think most folks do -- try to give us

Michael Strickland
September 29, 2016

Page 8

1    your best testimony today.  Will you do that?

2        A.   Sure.

3        Q.   All righty.  By best testimony, the way to do that is

4    to, you know, search your recollection.  And I understand that

5    time causes memories to fade, but there are other things that

6    cause memories to fade like lack of sleep or medication or

7    things like that.  As you sit here today, is there anything

8    that you can think of that would affect your memory?

9        A.   No.

10       Q.   All right.  And, again, I ask you this because if it

11   changes -- your testimony changes in any way, I don't want

12   later on to say, "Well, you know, that day I didn't sleep well

13   or I" --

14       A.   Short of time, no.

15       Q.   Okay.  And, again, time is one of those things that

16   affects everybody, and I understand that.  You've been given an

17   opportunity, also, to read and sign this.  When we're done, a

18   copy of this transcript is going to come to you.  You can look

19   through it and make any changes you want to it, all right?

20   Again, I'd recommend as few changes as possible.  Big changes

21   get pointed out later.  Minor changes are understandable.  For

22   instance, if you give me a distance or a time or a -- any other

23   kind of estimate or maybe a house number or something -- and

24   those are just -- listen, we all make mistakes there.  And when

25   you look at, do correct it.  Just a little bit here or there,

Michael Strickland
September 29, 2016

Page 9

1   it's not a big deal.  That's life.  I think everybody

2   understands that.

3              Is there any reason you can think of that we

4   can't go forward with your deposition today?

5       A.   No.

6       Q.   All right.  Well, let me jump to it, then, and try to

7   get to the best of our questions sooner rather than later.

8   Prior to working at Sardis Police Department, where were you

9   employed?

10      A.   Self-employed.

11      Q.   What line of work?

12      A.   Security work.

13      Q.   Okay.  Did you have a name for your company, or was

14  it just a sole proprietorship?

15      A.   MASS Security.

16      Q.   All right.  Did you form a corporation or was it just

17  something you --

18      A.   Sole proprietorship.

19      Q.   Okay.  By MASS was it M-A-S?

20      A.   M-A-S-S.

21      Q.   M-A-S-S.  Is there any special meaning to that?

22      A.   Metro Area Security and Subpoena.

23      Q.   Okay.  You still have that business?

24      A.   Yes.

25      Q.   All right.  Now, Sardis Police Department, what's

Michael Strickland
September 29, 2016

Page 10

1    your rank there?

2         A.   Patrolman.

3         Q.   And who's your supervisor?

4         A.   Chris Martin.

5         Q.   How long have you been running MASS security?

6         A.   I started it in 2011 and was still -- from 2011 to

7    present.

8         Q.   Okay.  Now, along the way, I assume you've carried

9    other jobs with you.  What was your -- did you have any other

10   jobs while working at MASS in the last ten years?

11        A.   Tunica County Sheriff's Office.

12        Q.   Okay.  When did you finish at Tunica County?

13        A.   December '14.

14        Q.   And by '14, that's the year '14, two thousand --

15        A.   Correct.

16        Q.   All right.  And what was your position there?

17        A.   Investigator.

18        Q.   And how long had you been an investigator there?

19        A.   Hmmm, approximately a year and a half.

20        Q.   Okay.  And as an investigator, were you -- did you

21   wear a uniform?

22        A.   Off and on.

23        Q.   Okay.  And prior to working at Tunica County

24   Sheriff's Department, where were you employed?

25        A.   Walls Police Department.

Michael Strickland
September 29, 2016

1    Q.   And how long were you at Walls?

2    A.   Approximately one year.

3    Q.   And prior to working at Walls, where were you

4    employed?

5    A.   MASS from 2011.

6    Q.   And at Walls, what was your position there?

7    A.   I was Assistant Chief of Police.

8    Q.   Who was the Chief at the time?

9    A.   Gary Boisseau.

10   Q.   Have you -- are you a certified law enforcement

11   officer?

12   A.   Yes.

13   Q.   And where -- when did you do your law enforcement

14   training?

15   A.   I went to the Tennessee Law Enforcement Training

16   Academy in 2001, and I went to the law enforcement refresher in

17   Tupelo in 2006.

18   Q.   Okay.  What other departments have you worked with in

19   the State of Mississippi?

20   A.   Byhalia Police Department.

21   Q.   And did you work in Tennessee before that?

22   A.   I did.

23   Q.   All right.  What departments were you there?

24   A.   Rossville Police Department sent me to the training

25   academy, and I worked for the Wayne County Sheriff's Office

Michael Strickland
September 29, 2016

1 prior to that. More recently I worked for Mason Police

2 Department.

3     Q. So I've got you having been employed by Mason, Wayne

4 County -- was it Wayne County Sheriff?

5     A. Correct.

6     Q. I can't read my own handwriting. Roadville or

7 Roseville?

8     A. Rossville.

9     Q. Rossville Police Department. Byhalia?

10     A. Byhalia in Mississippi.

11     Q. In Mississippi. And I've also got you at the Walls

12 PD.

13     A. Uh-huh.

14     Q. Tunica County Sheriff's and Sardis. Anybody -- any

15 place else that you worked for in law enforcement?

16     A. Yeah, I worked for quite a few different departments

17 in Tennessee prior to coming to Mississippi.

18     Q. All right. What other departments did you work for

19 in Mississippi -- in Tennessee, rather?

20     A. Moscow Police Department. I worked for Oakland

21 Police Department, Grand Junction Police Department. And

22 that's it as far as I can recollect.

23     Q. All right. I've got -- if you went to the Tennessee

24 Law Enforcement Training Academy in 2001, is it fair to say

25 you've got approximately fifteen years of law enforcement

Michael Strickland
September 29, 2016

Page 13

1    experience?

2         A.   Oh, yeah.  Yeah.

3         Q.   All right.  If I might ask, why did you leave the

4    Walls Police Department?

5         A.   I was -- I was terminated, and I fought the

6    termination, and they changed my termination to a resignation

7    after going to the Board.  So I guess, essentially, I resigned.

8         Q.   Well, what was the -- the basis for the alleged

9    termination?

10        A.   Well, it was without cause.  So I would say that -- I

11   would say that their reasonings were -- are not relevant, but I

12   can tell you.

13        Q.   Yeah.  Yeah.

14        A.   Well, I was very aggressive.  I was a very aggressive

15   officer, wrote a lot of tickets, made a lot of arrests.  And,

16   in turn, that resulted in a lot of complaints.  So the Mayor at

17   the time decided to terminate me based on getting too many

18   complaints.

19        Q.   All right.  Now, Tunica -- Tunica is where you went

20   after Walls, right?

21        A.   Correct.

22        Q.   And at the Tunica County Sheriff's Department, did

23   you resign or were you terminated?

24        A.   I resigned.

25        Q.   All right.  And what was your reason for resigning?

Michael Strickland
September 29, 2016

Page 14

1    A.   No other reason other than I just didn't want to be

2   here anymore.

3    Q.   All right.  And were you ever terminated from any

4   other jobs, including those in Tennessee --

5    A.   No.

6    Q.   -- in law enforcement?

7    A.   No.

8    Q.   You said you were -- you're an aggressive cop.  And I

9   just need to -- I'm not making any judgment.

10    A.   No, I understand.

11    Q.   I need to understand what you mean by that statement.

12   What do you -- what do you mean when you say you're an

13   aggressive officer?

14    A.   Well, I stop a lot of cars typically and make a lot

15   of arrests.

16    Q.   Okay.  You stay busy?

17    A.   Pretty much.  I try to.

18    Q.   All right.  While you were at Tunica, had you been

19   the object or had you ever received any disciplinary actions

20   while at Tunica?

21    A.   Yes.

22    Q.   All right.  Tell me about how many times you were

23   disciplined there.

24    A.   One time that I can recollect I was suspended for a

25   day.

Michael Strickland
September 29, 2016

1    Q.   And what was the reason?

2    A.   Assistant Chief Dunn called me out to a scene one

3  night, and there was approximately 20 grams of marijuana on the

4  scene.  And due to my position as an investigator, he wanted me

5  to collect the evidence and talk to the suspect.  And I talked

6  to the suspect, and the suspect wasn't wanting to cooperate in

7  any way.  So I basically told him to arrest him, you know.  So,

8  anyway, Chief Dunn wanted me to sign the Affidavit on the

9  arrest, and I refused.  So he suspended me for a day.

10    Q.   Okay.  Any other disciplinary actions there?

11    A.   No.

12    Q.   All right.  When you say you wanted to leave, what

13  did you mean by that?  When you wanted to leave Tunica

14  Sheriff's Department at your resignation, what was -- was there

15  a reason for that?  Did you want to be out of the area or out

16  of the department?

17    A.   I just wanted to be out of the department.

18    Q.   Okay.  And did you have any criticisms with the

19  department at that time?

20    A.   Oh, sure.

21    Q.   And what were the nature of those criticisms?

22    A.   Well, the -- you can't do anything right when you

23  work here.  That's my main criticism.  What's good for one

24  person isn't good for another.  You know, I could potentially

25  get disciplined for something that someone else did.  And, you

Michael Strickland
September 29, 2016

1   know, I mean, you can't -- no matter what you do, you cannot do

2   anything right.  That was my main criticism.

3       Q.   All right.  And you felt that that was particularly

4   directed at you or --

5       A.   No.  It was everybody.

6       Q.   And where was the source of this feeling that you

7   can't do anything right?  Was it from the Sheriff or was it

8   from his Captains or assistants or what?

9       A.   I would say it was from the supervisors.  I never --

10  I hardly encountered the Sheriff.

11      Q.   Okay.  By "supervisors," are those Sergeants and that

12  level there?

13      A.   Captain, commanders, command staff, administration.

14      Q.   Okay.  Who was your supervisor at Tunica?

15      A.   Well, when I started, it was Commander Biggens, and

16  then -- well, he was -- he was the Commander my entire time

17  here.  Then I went to -- I went from narcotics into CID, the

18  criminal investigative division.  And it was shortly after that

19  is when I left.

20      Q.   Prior to going -- moving over to the CID in Tunica,

21  had you ever worked as an investigator as a titled job?

22      A.   Well, no.  Prior to --

23      Q.   Prior to being in the Criminal Investigation Division

24  at Tunica, had you ever served as an investigator by title?

25      A.   With Tunica County?

Michael Strickland
September 29, 2016

Page 17

1    Q.   With any -- with any department.

2    A.   No.

3    Q.   All right.  Had you ever served as a detective by

4    title with any department?

5    A.   No.

6    Q.   All right.  Had you had any specialized training

7    before being moved over to the CID in Tunica County?

8    A.   No.

9    Q.   All right.  After being moved over to CID, were you

10   given any training regarding investigations?

11   A.   Well, I was only in CID for two or three days.

12   Q.   Okay.

13   A.   So I was, essentially, an investigator with Tunica

14   County from the date of hire until I went to CID and,

15   essentially, left.

16   Q.   All right.

17   A.   So, I guess, in order to properly answer your

18   question, I was given extensive specialized training by the

19   Sheriff's Office from my date of hire.

20   Q.   Okay.  And by way of specialized training, what do

21   you mean by that?  Just investigative?

22   A.   Investigative training, extensive patrol training,

23   basically, yes.

24   Q.   All right.  Now, the incident alleged in this case is

25   supposed to have occurred in February of 2014.  Were you on --

Michael Strickland
September 29, 2016

Page 18

1    do you recall this incident?

2         A.   Yes.

3         Q.   All right.  And you were employed that day?

4         A.   Uh-huh.  (Nods head up and down.)

5         Q.   And on duty that day?

6         A.   Yes.

7         Q.   And the reason your name came up, frankly, is because

8    there was an affidavit provided by the Plaintiffs' attorneys in

9    a motion.  I'm just going to ask you to take a look at this.

10        A.   (Reviews.)

11                  BY MR. TANNER:  May I see it first?

12                  BY MR. WOLF:  And we'll have this marked as

13   Exhibit 1.

14             (AFFIDAVIT MARKED AS EXHIBIT NO. 1.)

15        A.   (Reviews.)

16        Q.   (By Mr. Wolf)  Have you ever seen this document

17   before?

18        A.   Yes.

19        Q.   And is your signature somewhere on that document?

20        A.   Yes.

21        Q.   And where is your signature?

22        A.   At the top.

23        Q.   All right.  If I could see that real quick.

24        A.   Sure.

25        Q.   At the top, there's two signatures there.  One

Michael Strickland
September 29, 2016

Page 19

1    appears to be that of a notary, and then the other one is --

2    the second signature, is that your signature?

3        A.    Correct.

4        Q.    All right.  This document is undated, and so I'm

5    trying to figure out do you recall when it was that you had

6    signed this?

7        A.    (Reviews.)  This is a total guess.  I would say, give

8    or take, January, February of '15.

9        Q.    Okay.  And were you still employed by the department

10   in January or February of 2015?

11       A.    No.

12       Q.    All right.  So this document was signed by you after

13   you were -- had left the department, correct?

14       A.    Correct.

15       Q.    And who brought this document to you, do you recall?

16       A.    Counsel for Mr. Thompson e-mailed it to me.

17       Q.    Was that Wilbur Colom?

18       A.    I -- I don't recollect.

19       Q.    All right.  Did he ever contact you by phone and talk

20   to you?

21       A.    Yes.

22       Q.    All right.  And do you recall -- do you recall who it

23   was that counsel for -- that counsel was?

24       A.    No.

25       Q.    And do you know if it was Ellis Pittman that

Michael Strickland
September 29, 2016

Page 20

1   contacted you about this?

2       A.   I don't think it was him, no.

3       Q.   All right.  And did you actually write anything up by

4   handwriting and provide it to him?

5       A.   No.

6       Q.   No?

7       A.   No.

8       Q.   All right.  Did you have a conversation with him

9   before this was sent to you by e-mail?

10      A.   Correct.

11      Q.   All right.  And in that conversation, do you recall

12  what was said?

13      A.   Essentially, what is in the affidavit.  That's

14  basically it to my recollection, yes.

15      Q.   All right.  But you didn't prepare this document

16  yourself, did you?

17      A.   I did not.

18      Q.   All right.  And did you take it to a notary yourself

19  or did a notary come to you to have it prepared?

20      A.   I took it to a notary.

21      Q.   All right.  And then you sent it back to the

22  attorney?

23      A.   Correct.

24      Q.   All right.  And that e-mail at the time -- what was

25  your e-mail address at the time?

Michael Strickland
September 29, 2016

1    A.    I've got a couple.  If I had to guess, I would say it

2    was 1metroareasecurity@gmail.com.

3    Q.    Do you still happen to have that e-mail --

4    A.    Yes.

5    Q.    -- conversation between him and you?

6    A.    Oh, no.

7    Q.    All right.  And I might -- I'm going to just ask you

8    to kind of go down that.

9    A.    Yes.

10    Q.    It says that your immediate supervisor at the time

11    was James Jones.

12    A.    Yes.

13    Q.    All right.  And was he always your supervisor?

14    A.    Yes, he was.

15    Q.    All right.  And do you recall on February 12th you

16    received a call from Captain Jones to meet him at the

17    Courthouse.

18    A.    Yes.

19    Q.    And at what time was that that you received the call?

20    Do you know?

21    A.    Lunchtime, give or take.

22    Q.    All right.  And then you -- did you come and meet him

23    at the Courthouse?

24    A.    Yes.

25    Q.    All right.  And at that time, do you recall the

Michael Strickland
September 29, 2016

Page 22

1  conversation between you and Captain Jones?

2      A.   Well, we -- we did speak on a vehicle in reference to

3  an arrest that he had made a couple of days prior, and the

4  vehicle of the arrest -- the suspect's vehicle was parked

5  somewhere at the SO where it shouldn't have been parked.

6      Q.   Okay.

7      A.   And the -- the person in charge of evidence and

8  storage wanted the vehicle moved, and I guess she didn't have

9  the keys for the vehicle to move it.

10     Q.   Uh-huh.

11     A.   And Captain Jones had the keys.  So if I remember

12 correctly, I want to say Captain Jones called me, asked me to

13 meet him and pick the keys up and take them to her at the

14 Sheriff's Office so that the vehicle could be moved.

15     Q.   Okay.  About how long did that conversation last?

16     A.   Between me and Captain Jones?

17     Q.   Yeah.

18     A.   Two, three minutes.

19     Q.   All right.  And so you were -- you were, essentially,

20 called over to pick up a set of keys?

21     A.   Correct.

22     Q.   And then return them to the vehicle at the Sheriff's

23 Department?

24     A.   Correct.

25     Q.   All right.  And was anything else said during that

Michael Strickland
September 29, 2016

Page 23

1    conversation with Captain Jones when you picked up the keys?

2        A.   Yes.  He asked me -- oh, actually, he just said to me

3    that he needed assistance in stopping a vehicle later on and he

4    would -- he would get with me later, and I would assist him.

5        Q.   All right.  Was anything else said about that

6    circumstance then?

7        A.   No.

8        Q.   He didn't tell you who the person was?

9        A.   No.

10       Q.   He didn't tell you why he was stopping them?

11       A.   No.

12       Q.   He didn't tell you anything about him having

13   conversations with the Sheriff about this?

14       A.   No.

15       Q.   Did he tell you why he was at the courthouse?

16       A.   No.

17       Q.   All right.  When is the next time you spoke to

18   Captain Jones?

19       A.   I believe it was later on in the evening.  I was

20   supposed to get off at 6 p.m., and I want to say it was

21   approximately right -- right close to me getting off that

22   evening.  It was 5:50, 5:55.  And he contacted me.  I want to

23   say he called me on the phone and said that he was fixing to

24   attempt to stop this vehicle.

25       Q.   All right.  And where were you when you received the

Michael Strickland
September 29, 2016

Page 24

1    call?

2        A.    Gosh, I was not far from him.  I was in the area of

3    -- there was a subdivision called The Old Sub off 61 and

4    Pritchard, and I want to say that's where I was.

5        Q.    Were you in a patrol car at that time?

6        A.    No.  I was in an unmarked Tahoe.

7        Q.    All right.  And the Tahoe, did it carry with it at

8    the time video cameras or audio cam?

9        A.    No.

10       Q.    No.  All right.  And from where you were, where did

11   you -- where did you travel to?

12       A.    From there, when he contacted me, I believe he said

13   he was northbound on 61 fixing to pass Parker Tractor.  Well, I

14   was at 61 and Pritchard, and Parker Tractor is just south of

15   that location.

16       Q.    Uh-huh.

17       A.    So I went south on 61 towards Parker Tractor, and I

18   observed Captain Jones northbound on 61.  I actually turned

19   around in the parking lot of Parker Tractor and got behind him.

20       Q.    All right.  And about what time of day was this?  Do

21   you recall?

22       A.    It was six, six p.m.

23       Q.    All right.

24       A.    -Ish.

25       Q.    All right.  And after you got behind Captain Jones,

Michael Strickland
September 29, 2016

Page 25

1    what did you observe next?

2         A.    I observed him driving northbound on 61.  I stayed

3    behind him the whole time.

4         Q.    About how long -- we know that ultimately there's a

5    stop that takes place on 61.

6         A.    Yes.

7         Q.    About how long between the time you first observed

8    him until the time you got behind him -- I mean until there was

9    a stop?

10              BY MR. TANNER:  I object to the form of the

11   question.

12              BY MR. WOLF:  Yeah, let me -- let me rephrase

13   that.

14        Q.    (By Mr. Wolf)  From the time you got behind

15   Captain Jones on 61 until there was a stop made --

16        A.    What was the approximate time?

17        Q.    Yeah.

18        A.    The approximate time frame?

19        Q.    Yeah, or mileage.  How many miles passed between

20   the --

21        A.    I would say -- well, the stop occurred initially at

22   61 and Casino Center, and I want to say that's approximately

23   five to seven miles north of our initial location.

24        Q.    All right.  And when the stop was made, what did you

25   observe next?

Michael Strickland
September 29, 2016

1      A.   I observed Captain Jones speaking to the driver of

2   the vehicle, and then I observed him having the drivers switch

3   seats -- or the driver and passenger switch seats.

4      Q.   Well, let me ask you first --

5      A.   Yes.

6      Q.   -- when you said you observed him speaking to the

7   driver, did you hear what was being said, or did you just see

8   them talking?

9      A.   No, I just saw them talking.

10      Q.   All right.  Did you hear any of the conversation

11   between him and the passenger?

12      A.   Not that I can recall.

13      Q.   All right.  Now, you said you observed them switch

14   seats.  Did they do this by just scooting over the seat or

15   getting out of the car or what -- what did --

16      A.   I want to say that they actually got out of the car

17   and walked around and switched seats.

18      Q.   Did you hear any of the conversation between the

19   driver and Captain Jones or the passenger and Captain Jones

20   while you were there that day?

21      A.   Well, to my recollection, I mean, the exchange was

22   pleasant, and I want to say something was said along the lines

23   of the passenger stating that he was an employee of the County

24   of some sort.  I don't want to -- like I said, it was a

25   pleasant, you know, heehaw conversation.

Michael Strickland
September 29, 2016

Page 27

1    Q.    Uh-huh.  And were you aware of Captain Jones running

2    the license of the driver that day?

3    A.    I don't recall.

4    Q.    Do you recall any conversations where Captain Jones

5    and the driver were discussing the status of the driver's

6    license?

7    A.    The --

8    Q.    The first driver, yes.

9    A.    I don't recall.  I don't recall.

10   Q.    Okay.  All right.  The passenger and driver switch

11   sides.  What did you observe next?

12   A.    Well, they continued north on 61, and Captain Jones

13   makes the statement along the effect of, "Oh, heck, I didn't

14   check the passenger's license before they left."

15   Q.    Okay.  Did he say anything else?

16   A.    "Let's see if we can make contact," along those

17   lines, "and stop them again."

18   Q.    All right.  So the -- and was that said to you by

19   phone, by radio, or in person?

20   A.    In person.

21   Q.    Okay.  And after this -- the statement was made to

22   you by Captain Jones, did you say anything back to him?

23   A.    I can't recall.

24   Q.    All right.  And then what did you observe next?

25   A.    Captain Jones went northbound to attempt to make

Michael Strickland
September 29, 2016

Page 28

1   contact with the vehicle again and stopped the vehicle again in

2   the parking lot of Shell-Wendy's.

3        Q.   Okay.  And did he effect that stop?

4        A.   He did.

5        Q.   All right.  And what did you observe at that point?

6        A.   Well, I believe at that time was when he ran the

7   driver's license of the passenger who then became the driver,

8   ran the driver's license, and they came back suspended.

9        Q.   All right.  Now, we've been talking about a driver

10  and a passenger.  Did you recognize the -- let's start with the

11  driver of the vehicle at the first stop.  Did you recognize who

12  that was?

13       A.   No.

14       Q.   All right.  Had you ever seen him before to your

15  knowledge?

16       A.   No.

17       Q.   All right.  And the person who was the passenger who

18  then became the driver, did you recognize who that was?

19       A.   No.

20       Q.   Okay.  Did you -- tell me what else you observed

21  there at the second stop at the gas station.

22       A.   Well, then when the driver's license was determined

23  to be suspended, he then took that subject into custody.

24       Q.   Okay.  At the time, I know you had only been with the

25  department a year or so and getting used to their rules, but

Michael Strickland
September 29, 2016

Page 29

1   were you familiar with their general policies and practices at

2   the Tunica County Sheriff's Office with regard to tickets and

3   arrests on suspended licenses?

4       A.   Well, I know what the -- what the general rule was.

5   Now, if it was in our policy and procedure book, I cannot say,

6   but the general rule was if there was someone who was suspended

7   or determined to be suspended on a traffic stop, they were

8   taken into custody.

9       Q.   All right.  And that's what you understood the

10  practice, at least, to be?

11      A.   Yes.

12      Q.   And if that's consistent with the rule book, then so

13  be it.

14      A.   (Nods head.)

15      Q.   All right.  And the -- and you understood this to be

16  the practice before the day of this arrest, correct?

17      A.   Yes.

18      Q.   All right.  Now, your affidavit says that you later

19  learned that Captain Jones was pulled over -- the vehicle

20  Captain Jones pulled over was driven by Alex Wiley.  When did

21  you learn that Alex Wiley was the initial driver?

22      A.   I want to say on the stop.

23      Q.   Okay.  And then how did it come about that

24  Captain Jones asked Michael Thompson to drive?  When did you

25  learn that Michael Thompson was the name of the person present

Michael Strickland
September 29, 2016

Page 30

1   that day?

2       A.   I want to say during the Shell-Wendy's encounter.

3       Q.   Okay.

4       A.   So shortly thereafter.

5       Q.   All right.  Now, frankly, this is the reason we're

6   here today is there's a statement in Paragraph No. 8.  I'll

7   read it and let you look at it.  It says, "Based on my previous

8   conversation with Captain Jones earlier in the day, I'm certain

9   that Captain Jones had planned to pull Michael Thompson over

10  and arrest him for driving with a suspended license prior to

11  seeing Mr. Wiley drive the vehicle that day."  And if you

12  would, go ahead and read Paragraph 8.  Again, you didn't

13  actually write this paragraph, did you?

14      A.   I did not.

15      Q.   All right.  And would you agree that the statement

16  there is really speculation on your part?

17             BY MR. TANNER:  Objection to the form of the

18  question.

19      Q.   (By Mr. Wolf)  You didn't hear Captain Jones say,

20  "I'm going to pull over Michael Thompson because he's got a

21  suspended license and I'm planning to do this later in the

22  day," did you?

23      A.   He did not say that, correct.

24      Q.   And so your assessment there -- and nobody ever told

25  you that was the circumstances, was it?

Michael Strickland
September 29, 2016

1    A.   No.

2    Q.   All right.  Again, that was -- I'm sorry.  That was a

3  double negative.

4          Did anyone ever tell you that was the

5  circumstances, that Michael Thompson was the intended arrestee

6  of Captain Jones?

7    A.   No.

8    Q.   All right.  And so the statement that you say you're

9  certain, that's really your own speculation or opinion --

10         BY MR. TANNER:  Objection to the form of the

11  question.

12    Q.   (By Mr. Wolf)  -- opinion regarding the

13  circumstances, correct?

14         BY MR. TANNER:  Objection to the form of the

15  question.

16    A.   Well, I would say based on my training and

17  experience, my opinion is that that was the case.  When I made

18  contact with Captain Jones -- and I'm trying to -- this is the

19  Courthouse.  And I want to say that's the administration

20  building to -- directly to the south of where we are right now

21  in the building, if I'm facing correctly.  Captain Jones was to

22  the east of the building where we are right now facing south in

23  the parking lot.

24    Q.   Uh-huh.  Did you observe the vehicle that was pulled

25  over that day at the Courthouse?

Michael Strickland
September 29, 2016

1    A.   No.  But I wasn't looking for it, either.

2    Q.   Okay.  And did you -- how did you know at the -- on

3    that date that Michael Thompson or Alex Wiley even worked at

4    the Courthouse?

5    A.   Prior to that day?

6    Q.   Yeah, prior to that day.

7    A.   I didn't.

8    Q.   So after the fact -- this is after the fact you put

9    -- you put together -- you formed an opinion?

10   A.   Uh-huh.

11   Q.   And was that opinion formed, in part, after the

12   conversation with the Plaintiff's attorney on the phone?

13   A.   No.

14   Q.   Did you ever have reason to form an opinion before

15   that?

16   A.   I did that evening.

17   Q.   All right.  And who did you -- did you express that

18   opinion to anybody that evening?

19   A.   No.

20   Q.   Did you file a report of any misconduct?

21   A.   No.

22   Q.   All right.  In your experience as a law enforcement

23   officer, if an -- if an officer knows somebody is a potential

24   -- likely to commit a crime, it's not unusual to observe that

25   person, correct?

Michael Strickland
September 29, 2016

Page 33

1      A.   Correct.

2      Q.   All right.  And, in fact, that's sometimes what good

3  police officers do when they suspect that a crime may be

4  committed, that they can observe it and watch it and make an

5  arrest thereon.  It's called police work, isn't it?

6      A.   Yes.

7      Q.   All right.  And whether it's a small crime or a big

8  crime, it's still good police work to gather information and

9  investigate and, if you observe a crime, to make an arrest,

10 correct?

11     A.   Correct.

12     Q.   All right.  And in your experience -- in your

13 experience when you do that, you observe somebody who you know

14 has a likelihood of committing a crime and you observe them

15 until they commit it, that's not an entrapment, is it?

16          BY MR. TANNER:  Objection to the form of the

17 question.

18     Q.   (By Mr. Wolf)  To your knowledge?

19          BY MR. TANNER:  Objection to the form of the

20 question.

21     A.   No.

22     Q.   (By Mr. Wolf)  All right.  And, in fact, that's

23 almost common in typical street level drug sales and things

24 like that where -- where officers entice somebody to sell a

25 drug undercover and that person does, in fact, sell a drug

Michael Strickland
September 29, 2016

Page 34

1   undercover and a crime is committed and an arrest can then be

2   made.  Correct?

3            BY MR. TANNER:  Objection to the form of the

4   question before you answer.

5        A.   (Nods head up and down.)

6        Q.   (By Mr. Wolf)  All right.  And you're not -- let me

7   go to the next one.  In investigating -- in doing an

8   investigation and you're looking at somebody who you may know

9   is or may suspect is committing crimes at one level, you may

10  use smaller crimes and smaller incidents to try to create

11  legitimate contact with that suspect, correct?

12       A.   Correct.

13       Q.   And, in fact, you may make smaller arrests if you

14  believe that that's -- that suspect is up to larger crimes,

15  correct?

16       A.   Correct.

17       Q.   Provided that smaller arrest is legitimate in and of

18  itself, correct?

19       A.   Yes.

20            BY MR. WOLF:  All right.  I have no other

21  questions.

22

23  EXAMINATION BY MR. TANNER:

24       Q.   Sir, you were asked a question about entrapment.  Are

25  you familiar with entrapment?

Michael Strickland
September 29, 2016

1      A.    My understanding of the wording of entrapment is to

2    entice someone to commit a crime that they were not originally

3    going to commit.

4      Q.    Right.  So in the drug context, since we used

5    examples from that, have you ever sought out a person who you

6    didn't know had a predisposition to sell drugs and tried to

7    entice them to sell drugs?

8      A.    No.

9      Q.    That would be entrapment?

10      A.    That would be entrapment.

11      Q.    All right.  Now, you commented about observing a

12    crime and stopping a person who you observed committing a

13    crime.  Could you explain -- is there a difference between that

14    and giving somebody instructions to do what you know otherwise

15    is criminal activity?

16      A.    Repeat the question.  I'm trying to understand.

17            BY MR. WOLF:  I'm going to object to the form.

18      Q.    (By Mr. Tanner)  Sure. Let me rephrase it.

19            Do you think it's proper law enforcement

20    procedure to tell somebody to -- for a law enforcement officer

21    to instruct somebody to do something that is criminal activity

22    without having a pre- -- without having information that this

23    person is predisposed to committing that crime?

24      A.    One more time, please.

25            BY MR. WOLF:  I'm going to object to the form.

Michael Strickland
September 29, 2016

1      Q.    (By Mr. Tanner)  No problem.  Should an officer tell

2   a person to commit a crime if that person is otherwise not

3   committing a crime or there's no indication that this person

4   intends to commit a crime?

5      A.    No.

6      Q.    All right.  Now, you talked about your office's -- or

7   the Tunica County Sheriff's Department's practice on arresting

8   people who drive on suspended licenses.  During the year and a

9   half you worked for Tunica County Sheriff's Department, how

10   many people would you say or how many tickets or citations were

11   issued for driving on a suspended license?

12               BY MR. WOLF:  Objection, vague as to number and

13   who.

14      A.    It was a daily occurrence, I would say.  It was -- it

15   was pretty common to -- for any patrol deputy to make contact

16   during the course of their patrol with a suspended driver and

17   effect an arrest.

18      Q.    (By Mr. Tanner)  Okay.  So would it be fair to say

19   that the Tunica County Sheriff's Department officers and law

20   enforcement officers frequently issued tickets for -- tickets

21   or citations for motorists who were driving with their licenses

22   suspended?

23      A.    Yes.

24      Q.    All right.  Did you issue such tickets while you were

25   with the Tunica County Sheriff's Department?

Michael Strickland
September 29, 2016

Page 37

1      A.    Yes.

2      Q.    All right.  Would you characterize that number in the

3  tens, in the hundreds, or in the thousands during your year and

4  a half?

5      A.    Oh, tens.

6      Q.    Okay.  But this was a frequent occurrence amongst the

7  law enforcement officers to issue these sorts of citations?

8      A.    Correct.

9      Q.    At the time you were -- at the time you were a part

10 of this particular traffic stop, did you think there was

11 anything special about this particular traffic stop?

12     A.    No.

13     Q.    You said you met Captain Jones.  Would you describe

14 it as in front of the Courthouse or behind the Courthouse?

15     A.    Behind the Courthouse.

16     Q.    Okay.  Now, the Courthouse, is that the Courthouse at

17 1300 School Street in Tunica, Mississippi?

18     A.    Correct.

19     Q.    All right.  And where is the -- what is the building

20 you say you were facing, that Captain Jones was facing, at the

21 time he was talking to you?

22     A.    He was facing south, which is between -- from the

23 south of the Courthouse is the administration building.

24     Q.    All right.

25     A.    And you can see it from his location.

Michael Strickland
September 29, 2016

Page 38

1    Q.   All right.  What is -- what is housed or located in
2    the County Administration Building?
3    A.   I don't really know, to be honest.  I know we went
4    there for, you know, our insurance purposes, you know.
5    Basically, the administrative purpose of the building for the
6    entire county offices.
7    Q.   Would it be fair to say that the folks who run the
8    county from an administrative level are housed in the
9    administration building?
10   A.   Yes.
11   Q.   Okay.  Is there a parking lot to that particular
12   building or at that particular building?
13   A.   Yes.  Yes.
14   Q.   All right.  Where you were facing, were there cars
15   anywhere parked between you and the facade -- you and
16   Captain Jones and the facade of the county administration
17   building?
18   A.   I can't recall specifically.
19   Q.   Okay.  Now, you mentioned that during this
20   conversation that you and Captain Jones had on the day of this
21   particular arrest that Captain Jones commented to you that he
22   was going to make a stop that night.
23   A.   Uh-huh.
24   Q.   Is that fair?
25   A.   That's fair.

Michael Strickland
September 29, 2016

Page 39

1    Q.    All right.  Did he say what type of stop?

2    A.    No.

3    Q.    Did he say who he was going to stop?

4    A.    No.

5    Q.    Did he give you any kind of indication of what time

6    he was going to make the stop?

7    A.    No.

8    Q.    How did -- how were you supposed to find out about

9    the stop?

10   A.    To my recollection, he was going to contact me when

11   the time presented itself.

12   Q.    Okay.  Did there come a time on this particular date

13   that he did contact you?

14   A.    Yes.

15   Q.    All right.  About what time was that?

16   A.    Approximately 5:50 to 6:00 p.m.

17   Q.    Okay.  And this particular stop, this was the only

18   time -- other than him contacting you to come pick up these

19   keys to move this vehicle, was there any other time that day

20   that Captain Jones called you about participating in a traffic

21   stop?

22   A.    No.

23   Q.    All right.  So would it be reasonable for you to

24   conclude that this stop was the stop he was talking about

25   earlier in the day?

Michael Strickland
September 29, 2016

Page 40

1          BY MR. WOLF:  Object to the form.

2      A.   Yes.

3      Q.   (By Mr. Tanner)  All right.  Did you conclude that

4  this was the stop he was talking about earlier in the day?

5      A.   Yes.

6      Q.   All right.  After the particular stop that we're

7  talking about that you participated in at or about 6:00 p.m. on

8  that day, did he call you about any other stops -- helping him

9  with any other stops?

10      A.   No.

11      Q.   The person you identified in your affidavit as

12  Michael Thompson, this was not the person who was driving the

13  vehicle during the first of the traffic stops you assisted

14  Captain Jones with, was it?

15      A.   He was not.

16      Q.   All right.  Can you explain to us why Captain Jones

17  did not check Mr. Thompson's license prior to Mr. Thompson

18  actually driving away in the vehicle?

19      A.   No.

20      Q.   All right.  About how long after Mr. Thompson drove

21  away in the vehicle y'all had stopped did Captain Jones have

22  his, I guess, eureka moment, "I forgot to check the guy's

23  license," and commented to you in that vein?

24      A.   Seconds.

25      Q.   Okay.  How many vehicles were -- law enforcement-

Michael Strickland
September 29, 2016

Page 41

1  related vehicles were on the scene at the time of that

2  particular stop?

3      A.   I do know that a marked patrol unit made the scene,

4  but I can't say definitively if it was the initial stop or the

5  second stop.

6      Q.   Okay.

7      A.   I want to say -- so for the purpose of your question,

8  I'd just say two.

9      Q.   Okay.  All right.  To the best of your recollection,

10 there were two law enforcement vehicles plus Mr. Thompson's

11 vehicle or Mr. Wiley's vehicle?

12     A.   Correct.

13     Q.   All right.  Now, when you first mentioned -- when

14 Captain Jones mentioned to you that he failed to check -- or

15 claimed he failed to check Mr. Thompson's license or who you

16 later learned to be Mr. Thompson's license, were you -- where

17 were y'all at that particular point?

18     A.   We were still on the side of the road out of our

19 patrol units.

20     Q.   Okay.  Did you immediately follow Captain Jones at

21 that point, or did you turn off in a different direction first?

22     A.   Hmmm, to my recollection, I immediately followed him.

23     Q.   Okay.  Now, you commented that you all drove

24 approximately five to seven miles before the traffic stop

25 occurred.  How was the traffic stop initiated?  Did somebody

Michael Strickland
September 29, 2016

Page 42

1  blue light the vehicle, or how was it initiated?

2      A.  Captain Jones initiated the traffic stop by putting

3  his blue lights on.

4      Q.  All right.  When you first got behind Captain Jones,

5  where was he, sir?

6      A.  61 and Pritchard area.

7      Q.  Okay.  Was he parked?  Was he driving?  What

8  happened?

9      A.  He was driving northbound.

10     Q.  Okay.  So you turned off a different street behind

11 him, and he was already turning or -- I mean, he was already

12 going north or what?

13     A.  He was -- he was going north from the time I made

14 contact continually.

15     Q.  How were y'all communicating?

16     A.  Phone.

17     Q.  All right.  Are you talking cell phones --

18     A.  Correct.

19     Q.  -- or dispatch?

20     A.  Cell phones.

21     Q.  Do you recall what -- does the Tunica County

22 Sheriff's Department issue you cell phones?

23     A.  Yes.

24     Q.  All right.  So everybody has a Tunica County cell

25 phone?

Michael Strickland
September 29, 2016

| | | |
|---|---|---|
| 1 | A. | I believe the investigative staff does. |
| 2 | Q. | What about the command staff? |
| 3 | A. | Yes. |
| 4 | Q. | Would the command staff include Captain Jones? |
| 5 | A. | Yes. |

6    Q.    All right.  Would the command staff include the
7  Sheriff himself?

8    A.    Yes.

9    Q.    All right.  Do you recall whether Captain Jones was
10  talking to you on a County-issued cell phone or a personal cell
11  phone?

12    A.    I don't know to be honest.

13    Q.    Do you know if he had a personal cell phone in
14  addition to the County cell phone?

15    A.    I don't know.

16    Q.    Do you recall whether he called you on a County or a
17  personal cell phone?

18    A.    I don't know.

19    Q.    Okay.  Were you all ever -- your -- the Tahoe you
20  were driving on this date in question, is it equipped with the
21  ability to communicate with dispatch?

22    A.    Yes.

23    Q.    Do you remember whether that capability was on that
24  day, not working, but on, whether you were listening to
25  dispatch?

Michael Strickland
September 29, 2016

Page 44

1      A.   Yes.

2      Q.   Do you remember whether you or the --

3           (BRIEF INTERRUPTION FOLLOWED BY A BREAK IN THE

4           DEPOSITION.)

5  MR. TANNER CONTINUED:

6      Q.   All right.  So do you know whether you or Captain

7  Jones ever communicated with dispatch about these two stops

8  while y'all were making the stops?

9      A.   To my recollection, Captain Jones called the stop

10 out, which is procedure, which is protocol.

11     Q.   Do you know if those dispatch calls -- now, y'all

12 keep a dispatch log, right?

13     A.   Correct.

14     Q.   All right.  Do you know if those dispatch calls or

15 communications are recorded?

16     A.   You'll have to forgive me.  I'm not a dispatcher so I

17 don't really -- I don't know.

18     Q.   Okay.  Had you ever heard any talk in or around the

19 Sheriff's Department about proposed cuts to y'all's budget?

20     A.   No.

21     Q.   All right.  Do you know whether Captain Jones issued

22 on the date in question a ticket to Mr. Wiley?

23     A.   I don't know.

24     Q.   All right.  Do you know whether he cited him -- other

25 than a ticket, gave him a written warning or anything like

Michael Strickland
September 29, 2016

Page 45

1  that?

2       A.   I don't know.

3       Q.   Okay.  Do you know whether there was any -- whether

4  Mr. Wiley on the date in question had been observed to have

5  committed a crime?

6       A.   By me?

7       Q.   Sure, yeah, by you.

8       A.   No.

9       Q.   All right.  Do you know -- so you didn't personally

10  observe Mr. Wiley commit any offense or crime or anything?

11       A.   To get pulled over?

12       Q.   Right.

13       A.   Correct.

14       Q.   All right.  And when you first got behind

15  Captain Jones and you were traveling north on 61 behind him,

16  did you -- did you see at that point the vehicle that y'all

17  later stopped?

18       A.   I saw the vehicle when I turned around to get behind

19  Captain Jones, but I never paid any attention to it.  You know,

20  it was just a vehicle.

21       Q.   All right.  And what did you say -- I mean, excuse

22  me.  What did Captain Jones say to you when he reached you on

23  your cell phone?

24       A.   "Get with me."  Approximately, "get with me, we're

25  going to stop a vehicle," give or take.

Michael Strickland
September 29, 2016

1    Q.    Did he say that he was already in the presence of

2    that vehicle or the vehicle was in his eyesight already?

3    A.    Yes.

4    Q.    How long did it take you from the time you got that

5    call to get to where Captain Jones was?

6    A.    Not long at all.  I would say approximately two to

7    three minutes.

8    Q.    Okay.  How fast were you driving once you got on 61

9    and was trailing Captain Jones?

10    A.    The speed limit.

11    Q.    Which is what at that stretch of highway?

12    A.    I want to say by memory 55.

13    Q.    Okay.  So you were only doing 55?

14    A.    Correct.

15    Q.    And were you able to -- were you gaining on

16    Captain Jones or were you pacing him, basically?

17    A.    I was pacing him.

18    Q.    Okay.  All right.  And when you got -- how long did

19    it take you to cover this five- to seven-mile stretch, you

20    think, at 55 to the best of your recollection?

21    A.    Five to ten minutes.

22    Q.    All right.  So you got that five to ten minutes that

23    you were trailing him before the stop, plus you got the two

24    minutes or so that it took you to get to where he was, correct?

25    A.    Correct.

Michael Strickland
September 29, 2016

Page 47

1       Q.   Do y'all have capability of talking to dispatch

2   through like some unit you're wearing, or do you have to do

3   that from the vehicle -- from the car?

4       A.   We have portable radios.

5       Q.   You have a portable.  Do you know whether

6   Captain Jones was communicating through dispatch while he was

7   standing outside of the vehicle he stopped?

8       A.   I don't know.

9       Q.   Okay.  All right.  Let me see.  Your position as a

10  narcotics investigator, is it -- is it a lot different from

11  what the patrolmen on the Tunica County Sheriff's Department

12  did during the year and a half you worked there?

13      A.   Typically, yes.

14      Q.   Okay.  How so, sir?

15      A.   Well, working as a narcotics investigator, it's more

16  -- what's the -- covert, so investigators speak by phone more

17  than radio --

18      Q.   Uh-huh.

19      A.   -- due to the covertness.  And, essentially -- and,

20  essentially, that's the biggest difference.

21      Q.   Okay.  All right.  And is it frequent that law

22  enforcement officers with the Tunica County Sheriff's

23  Department conduct routine traffic stops by themselves?

24      A.   Well, in fairness, a lot of times if I'm working in a

25  patrol capacity and I initiate a traffic stop, I'm going to be

Michael Strickland
September 29, 2016

Page 48

1  by myself until another officer arrives, you know, however long

2  that may take.

3      Q.  And, basically, that usually works by when you call

4  out what you've observed and you run a tag.  You call that into

5  dispatch, and then other officers are either dispatched out to

6  assist or you ask for backup; is that right?

7      A.  Well, here at Tunica County SO, the traffic stop is

8  called out via radio, the location and the tag and vehicle

9  description, et cetera.  And a deputy immediately goes to that

10  location.  You don't have to be dispatched, and it cuts out the

11  middle man, essentially.

12      Q.  Okay.

13      A.  It cuts the time.

14      Q.  I understand.  How many times in your year and a half

15  working here had Captain Jones asked you six hours prior to a

16  stop to assist him with a stop for a traffic offense?

17      A.  Never.

18      Q.  Okay.  That affidavit we mentioned, you said it

19  followed a conversation -- did that follow a conversation with

20  Mr. Thompson's prior attorneys or a series of conversations --

21  or a number of conversations?

22      A.  One conversation.

23      Q.  One conversation.  When you received that -- that

24  affidavit, did it accurately capture what you said during the

25  course of the conversation with Mr. Thompson's prior attorney?

Michael Strickland
September 29, 2016

1    A.    Yes.

2    Q.    All right.  And so when you signed it, you were

3  signing it as true to the best of your knowledge; is that

4  correct?

5    A.    Correct.

6    Q.    And you stand by that affidavit today?

7    A.    I do.

8    Q.    At the time you made the stop, did you know that --

9  or that you were asked to participate in this stop, did you

10  know that Captain Jones had already gathered information as to

11  whether Mr. Thompson's license had been suspended?

12    A.    No.

13    Q.    He didn't tell you that at twelve o'clock in the

14  afternoon when you met the first time and he told you he needed

15  you to assist with a stop?

16    A.    No.

17    Q.    He didn't tell you that when he called you six hours

18  later at six p.m. or thereabout and said, "Hey, I already" --

19  "I already know that this guy's license is suspended"?

20    A.    No.

21    Q.    Did you know that, or were you informed that at the

22  traffic stop when Mr. Thompson got out of the vehicle in the

23  middle of the traffic stop, walked around, and got in the

24  driver's seat?

25    A.    Repeat that question, please.

Michael Strickland
September 29, 2016

Page 50

```
 1       Q.   All right.  When Mr. Thompson -- when Captain Jones

 2   was at Mr. Thompson -- or at the vehicle Mr. Thompson and

 3   Mr. Wiley were driving, did you know at the time that

 4   Mr. Thompson got out of the passenger seat and walked around

 5   the vehicle and sat down, that at that point Captain Jones had

 6   already been made aware that Mr. Thompson's license was

 7   suspended?

 8       A.   No.

 9       Q.   All right.  Can you explain why Captain Jones

10   remarked to you, "Oh, I forgot to run the guy's license" if he

11   already knew that the man's license were suspended?

12            BY MR. WOLF:  Object to the form.  It calls for

13   speculation.

14       Q.   (By Mr. Tanner)  Do you know why?

15       A.   No.

16       Q.   Do you know whether there was any sort of

17   investigation ongoing into Mr. Thompson and Mr. Wiley at the

18   time this stop was conducted?

19       A.   No.

20       Q.   Okay.  Do you know whether as a matter of policy --

21   being that you were an investigator, whether it's a matter of

22   policy for the Tunica County Sheriff's Department to run an

23   investigation on all County employees?

24       A.   No.

25            BY MR. WOLF:  Object to the form.  It's vague
```

Michael Strickland
September 29, 2016

Page 51

1    and speculative.  Just ask him if his boss had run the

2    licenses.

3               BY MR. TANNER:  I don't want to ask that.

4               BY MR. WOLF:  Okay.  All right.  Answer it.

5      Q.  (By Mr. Tanner)  Do you know whether it's a policy

6    for the Tunica County Sheriff's Department to run

7    investigations on all County employees who are employed with

8    Tunica County?

9      A.  No.

10      Q.  All right.  Do you know whether they run the licenses

11    as a routine course of investigation on all the employees with

12    Tunica County?

13              BY MR. WOLF:  Object to the form.

14      A.  I'm -- I have to say yes to that.  My licenses were

15    ran prior to my employment and concurrently.

16      Q.  (By Mr. Wolf)  Okay.  So when Tunica County ran

17    driver's licenses, are you talking about at the beginning, like

18    where most jobs you have to get your license and your credit

19    and all that stuff run at the beginning to get the job?

20      A.  During background investigations, yes.

21      Q.  Okay.  I want to go back to this point and make sure

22    it's not -- and get an accurate statement on what this means.

23    You commented earlier that you were cited at one time or

24    another and you felt that it was because you were an aggressive

25    officer, right?

Michael Strickland
September 29, 2016

Page 52

1    A.    (Nods head.)

2    Q.    As far as an aggressive officer, are you referring,

3    at all, to any kind of brutality or anything like that?

4    A.    No.

5    Q.    All right.  You're talking about the frequency with

6    which you write tickets and, you know, the frequency -- part of

7    what you're talking about is the frequency with which you write

8    tickets, right?

9    A.    Correct.

10   Q.    And the frequency with which you, say, allow people

11   to pass if you see a crime committed.  You're going to be in

12   the high numbers in terms of percentage of those that you

13   actually stop and issue citations for.  Is that fair?

14   A.    Yes.

15   Q.    And is that part of what you meant when you said you

16   were an aggressive officer?

17   A.    Yes.

18   Q.    Okay.  (Reviews.)

19         What kind of security work do you do with Metro

20   Area Security and Subpoena?

21   A.    Well, that's a -- that's a broad question.

22   Basically, whoever pays me to do security, that's who I'll do

23   it for.

24   Q.    Okay.  That's fair.  Well, I'll narrow it a bit --

25   narrow it a bit.

Michael Strickland
September 29, 2016

1          Are these people typically hiring you for

2    personal security, or are they hiring you to secure an event or

3    -- you know, I'm trying to figure out what exactly you're hired

4    to do.

5        A.    Oh, okay.  Again, I would say that's a broad

6    question.  I've never been hired for a personal security to

7    bodyguard, essentially, but events, property.

8        Q.    Okay.  All right.  Were you able to hear what was

9    going on at the vehicle during the second stop?  And by second

10   stop, I mean the second time -- you know, the point at which

11   Captain Jones stopped -- stopped the vehicle when Mr. Thompson

12   was driving.

13       A.    I heard the conversation.  I don't remember

14   specifically what was said.

15       Q.    Okay.  Which one of these -- the departments,

16   Sheriffs and police departments you talked about, which one of

17   them is located in the biggest city?  Which is the biggest city

18   -- in which -- let me rephrase, if I can.

19            What was the biggest city in which you served as

20   a police officer or a sheriff's deputy?

21       A.    Biggest department or biggest --

22       Q.    Give me both, biggest department and biggest city.

23       A.    I would say Tunica was the biggest department.  And

24   the biggest city -- I'd say Byhalia was the biggest city.

25       Q.    Okay.

Michael Strickland
September 29, 2016

Page 54

1          BY MR. TANNER:  All right.  I believe that's all

2     I have.  Pass the witness.

3

4     EXAMINATION BY MR. WOLF:

5          Q.   Just a couple of quick followups.

6               The Paragraph 8 -- again, I know it was

7     described at one point.  Paragraph 8 of your affidavit I've

8     described.  And in considering your testimony, you don't have

9     any personal knowledge of whether or not Captain Jones was

10    targeting Alex Wiley's vehicle that day?  This is -- this

11    statement isn't based on personal knowledge.  It's based on

12    your personal opinion and experience, correct?

13              BY MR. TANNER:  Objection to the form.

14         A.   Yes.

15         Q.   (By Mr. Wolf)  Okay.  There was an earlier question

16    by counsel opposite about people with predispositions toward a

17    crime.  All right.  I want to understand what you understand

18    that word to mean in the context of entrapment.  You can't --

19    and you understand you can't entrap somebody who's predisposed

20    to do that crime, right?

21         A.   Correct.

22         Q.   Okay.  So if there -- it's not just that they weren't

23    going to do the crime, it's also that they're not inclined

24    toward that crime; correct?

25         A.   Correct.

Michael Strickland
September 29, 2016

Page 55

1      Q.   All right.  Is that your understanding of what

2  entrapment requires, that you -- you get somebody to do a --

3  commit a crime that they weren't predisposed to?

4           BY MR. TANNER:  Object to the form.

5      A.   Yes, uh-huh.

6      Q.   (By Mr. Wolf)  Okay.  And have you ever tried in any

7  way to define the word "predisposed" yourself?

8      A.   No.

9      Q.   Do you have some opinion as to what that word means?

10     A.   Yes.

11     Q.   Okay.  What is that opinion?

12     A.   My opinion of someone being predisposed to committing

13  a crime is someone who has committed that crime before and will

14  potentially commit it again.

15     Q.   Okay.  And that's what makes street level drug sales

16  so effective is, you know, you're not entrapping someone who's

17  willing to sell.

18     A.   Correct.

19     Q.   All right.  At the stop -- the very first stop, were

20  any other Sheriff Department vehicles there to your knowledge

21  besides yourself and Captain Jones?

22     A.   The first stop?

23     Q.   At the first stop, yes.

24     A.   To my recollection, no.

25     Q.   All right.  Did a third vehicle arrive on the scene

Michael Strickland
September 29, 2016

Page 56

1  after the stop had been made?

2      A.   I want to say yes, I think.  Correct.

3      Q.   All right.  And do you recall who that deputy was?

4      A.   Yes.

5      Q.   And who was that?

6      A.   At the time, it was Lieutenant Clayton.

7      Q.   Okay.  Now, earlier the question was asked had you

8  ever been told you might be needed to assist in a traffic stop

9  six hours ahead of it -- the time it occurs, that that's never

10 happened between you and Captain Jones.  In your experience,

11 have you ever been requested to be available to assist in any

12 kind of arrest at some later time?

13     A.   Yes.

14     Q.   All right.  And that's not just -- has that -- a

15 request like that come from officers other than Captain Jones?

16     A.   Yes.

17     Q.   All right.

18          BY MR. WOLF:  All right.  I have no further

19 questions.

20          (DEPOSITION CONCLUDED AT 11:53 A.M.)

21          BY THE COURT REPORTER:  Do you need a copy,

22 Mr. Tanner?

23          BY MR. TANNER:  Yes, I do.

24          BY THE COURT REPORTER:  Okay.  Thank you.

25

CERTIFICATE OF COURT REPORTER

I, KAREN CARNELL POPERNIK, MS CCR 1276, TN LCR 469, Notary Public commissioned by the State of Mississippi, do hereby certify that the foregoing pages, and including this page, contain a true and correct transcript of the testimony of the witness, MICHAEL STRICKLAND, as taken by me at the time and place heretofore stated, and later reduced to typewritten form to the best of my skill and ability; that I placed the witness under oath to truthfully answer all questions in this matter by the authority vested in me by the State of Mississippi and the State of Tennessee; that the signature of the witness was not waived; and that I am not in the employ of, or related to, any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceeding.

Witness my signature and seal on this the 11th day of October, 2016.

KAREN CARNELL POPERNIK,

MS CCR 1276, TN LCR 469

My Commission Expires:  3/5/20

Michael Strickland
September 29, 2016

Page 58

1                 DEPONENT'S CERTIFICATE

2        MICHAEL STRICKLAND, the Deponent in the foregoing

3    Deposition, do hereby certify that I have read the foregoing

4    pages and that the same, with corrections, the reason therefor

5    set forth on that page, is a true and correct transcript of my

6    deposition given at the time and place hereinbefore set forth.

7                              _____

8                              MICHAEL STRICKLAND

9    State of Mississippi

10   County of _____

11       Sworn to and subscribed to before me on this the _____ day

12   of _____, 2016.

13                              _____

14                              NOTARY PUBLIC

15                              My Commission Expires:

16   Page:     Line:     Correction:

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____