Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT FOR THE
                NORTHERN DISTRICT OF MISSISSIPPI
 2                     OXFORD DIVISION

 3
        MICHAEL THOMPSON                      PLAINTIFF
 4
        VS.                       NO. 3:14cv274NBB-SAA
 5
        CALVIN HAMP, in his individual
 6      capacity and in his official
        capacity as sheriff of Tunica
 7      County, MS, JAMES JONES, in his
        individual capacity and in his
 8      official capacity as a captain in
        TUNICA COUNTY sheriff's office, and
 9      UNKNOWN DEFENDANTS "A", "B" AND "C"

                                             DEFENDANTS
10
11      **********************************************

12                  DEPOSITION OF JAMES JONES

13      **********************************************

14
15
                TAKEN AT THE INSTANCE OF THE PLAINTIFF
16      IN THE OFFICES OF TUNICA COUNTY SHERIFF'S DEPARTMENT
         5126 OLD MHOON LANDING ROAD, TUNICA, MISSISSIPPI
17        ON NOVEMBER 29, 2016, BEGINNING AT 3:40 P.M.
18
19                  APPEARANCES NOTED HEREIN
20
21      Reported by:  REGINA D. RUSSELL, RPR, CCR 1110

22                    ADVANCED COURT REPORTING
                           P.O. BOX 761
23                    TUPELO, MS 38802-0761
                         (662) 690-1500
24
25
```

ORIGINAL

Deposition of James Jones, taken November 29, 2016

Page 2

```
 1    APPEARANCES:

 2    For the Plaintiff:        E. CARLOS TANNER, III,
                                  ESQUIRE
 3                             Tanner & Associates, LLC
                               Post Office Box 3709
 4                             Jackson, MS  39207
                               (601) 460-1745
 5

 6    For the Defendants:       MICHAEL J. WOLF, ESQUIRE
                               Page Kruger & Holland
 7                             Post Office Box 1163
                               Jackson, MS  39215-1163
 8                             (601) 420-0333

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of James Jones, taken November 29, 2016

1                          TABLE OF CONTENTS

2

3    WITNESS                                              PAGE

4    JAMES JONES

5        Examination by Mr. Tanner.............     4

6

7    (NO EXHIBITS)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of James Jones, taken November 29, 2016

Page 4

```
 1              JAMES JONES, after being duly sworn,

 2   testified as follows:

 3                        EXAMINATION

 4   BY MR. TANNER:

 5       Q.   All right.  You are Mr. James Jones.  And

 6   I'm Carlos Tanner.  I represent Michael Thompson, the

 7   plaintiff in this case.  We're here in Michael

 8   Thompson versus Calvin Hamp -- excuse me, Hamp, James

 9   Jones and Unknown Defendants "A", "B" and "C" in

10   Civil Action Number 3:14cv274NBB-SAA in the United

11   States District Court for the Northern District of

12   Mississippi, Oxford Division.  And we are prepared

13   now to take the deposition of Defendant James Jones.

14   Mr. Jones is present represented by the Honorable

15   Michael J. Wolf.  And we are taking this deposition

16   pursuant to the rules of -- the Federal Rules of

17   Civil Procedure and the local rules for the Northern

18   and Southern Districts of Mississippi.

19           And Mr. Jones has been placed under oath.  And,

20   Mr. Jones, as you heard a moment ago when you were

21   here for Sheriff Hamp's deposition, I am going to ask

22   you just plain questions.  The only thing we ask you

23   is that you give truthful answers.  If there's any

24   point at which you do not understand something I ask

25   or if you need clarification, I beg you to please let
```

Deposition of James Jones, taken November 29, 2016

1   me know and I'll do my best to clarify my question or

2   rephrase it, if possible.  And if you have any

3   questions or need a break to consult with your

4   attorney, you know, you certainly have the right to

5   do that provided -- well, your attorney is very

6   capable, able and an experienced lawyer, he knows the

7   parameters.  But, you know, like I said, if you have

8   any questions or anything, or if you need me to

9   repeat something, just let me know.  Your attorney

10  also has the right to object as he sees appropriate,

11  but except with a few limited exceptions, even if he

12  objects you'll have to answer the question over the

13  objection basically.  Michael?

14          MR. WOLF:  Objections to form should

15  be stated on the record.  Other objections reserved.

16  Witness is going to read and sign.

17      Q.   (Mr. Tanner)  All right.  Sir, you are

18  Mr. James Jones?

19      A.   That's correct.

20      Q.   All right.  In 2014, February of 2014, you

21  were Captain James Jones with the Tunica County

22  Sheriff's Department?

23      A.   Yes, sir.

24      Q.   All right.  I understand that you have

25  since that time retired from Tunica County?

Deposition of James Jones, taken November 29, 2016

1     A.   Yes, sir.

2     Q.   And are you employed anywhere now?

3     A.   No, sir.

4     Q.   All right.  Did you ever become employed

5   anywhere after your retirement from Tunica County

6   Sheriff's Department?

7     A.   I worked briefly at Cohoama Community

8   College doing some education work, mentoring young

9   men.  I did that for a short period of time.  I

10   eventually let it go.  It tied up too much of my

11   time.

12     Q.   How long were you in law enforcement with

13   Tunica County Sheriff's Department?

14     A.   I got hired in Tunica County Sheriff's

15   Department March the 15th of 2010.

16     Q.   You were hired, I take it, by Sheriff

17   Calvin Hamp?

18     A.   Yes, sir.

19     Q.   Did you have any law enforcement experience

20   prior to joining the Tunica County Sheriff's

21   Department?

22     A.   Yes, sir.

23     Q.   And where was that, sir?

24     A.   I worked for the Mississippi Bureau of

25   Narcotics and I worked for the Panola County Task --

Deposition of James Jones, taken November 29, 2016

1    Panola County/Tate County Drug Task Force.  And I

2    worked for the Batesville Police Department.

3         Q.    How many years combined law enforcement

4    experience did you have?

5         A.    Twenty -- about maybe 23 hard years, that

6    and the military.

7         Q.    Okay.  And in what branch of the miliary

8    were you in?

9         A.    United States Army.

10        Q.    How long did you -- how much time did you

11   spend in the Army?

12        A.    I retired about twenty-six and a half

13   years.

14        Q.    Okay.  On February 12, 2014, you arrested a

15   man that you know to be Michael Thompson?

16        A.    Yes, sir.

17        Q.    All right.  And where did that arrest

18   occur?  I know that arrest occurred in Tunica County,

19   Mississippi.  Can you tell us where specifically it

20   occurred?

21        A.    On Highway 61 North about a mile or mile

22   and a half from Casino Strip and Highway 61

23   intersection.

24        Q.    Okay.  What was the basis for the stop,

25   sir?

Deposition of James Jones, taken November 29, 2016

Page 8

1        A.    I was traveling north on Highway 61.  I saw

2   a vehicle going in and out of lanes of traffic,

3   obscuring.  I didn't know what was going on, if he

4   was drunk or what was going on with it.  So I pulled

5   the vehicle over to see, make sure it was okay.  And

6   that's the nature of me pulling the vehicle over.

7        Q.    Okay.  Had you ever seen the vehicle

8   before?

9        A.    No.  Yeah, I think I've seen the vehicle

10  before.  I mean, that vehicle, there are many

11  vehicles like that vehicle.  But that particular

12  vehicle I hadn't seen it, you know what I'm saying.

13  I probably had seen it.  I don't know.  It's

14  different vehicles.

15       Q.    All right.  You didn't know what vehicle

16  you were stopping?

17       A.    No.

18       Q.    How many stops did you make that day?

19       A.    That's the only stop I made.

20       Q.    All right.  At that time, February of 2014,

21  what percentage of your time did you spend patrolling

22  for traffic violations?

23       A.    I didn't spend any percentage patrolling

24  traffic violations on that particular day.  I was

25  taking care of my personal paperwork and reports that

Deposition of James Jones, taken November 29, 2016

Page 9

1    I needed to get done from here to the sheriff's

2    office.

3         Q.    Okay.  When you conducted the stop of

4    Mr. -- all right.  On the night that you arrested

5    Mr. Thompson, he was traveling in what kind of

6    vehicle, sir?

7         A.    You know, I really can't recall what kind

8    of vehicle it was.

9         Q.    Was it a car, truck or SUV?

10        A.    Might have been a truck-like vehicle.  I'm

11   not for sure.

12        Q.    How many times that night on February 12,

13   2014, did you stop that particular vehicle?

14        A.    Twice.

15        Q.    All right.  During the first time that you

16   stopped that particular vehicle on February 12, 2014,

17   who was driving?

18        A.    I think Mr. Alex Wiley, I believe his name

19   was.

20        Q.    Had you heard that name before?

21        A.    I had.

22        Q.    In what capacity?  I mean, tell us the

23   circumstances.

24        A.    I know Mr. Alex's wife used to work at the

25   administration building for Tunica County.

Deposition of James Jones, taken November 29, 2016

1      Q.   How did you know that?

2      A.   Just his name.  Just his name.  Of course,

3  we had an investigation looking into some stuff,

4  allegations pertaining to him and Mr. Thompson.

5      Q.   All right.  What were the -- tell us about

6  the investigation into -- did the investigation into

7  Mr. Wiley and Mr. Thompson relate?  Was it a single

8  investigation into the both of them?

9      A.   It was a single investigation into the both

10  of them.

11      Q.   All right.  Tell me the details of that

12  investigation, what it was about.

13      A.   Well, it was about them possibly, you know,

14  extorting money from a particular county, Tunica

15  County.

16      Q.   Extorting?

17      A.   Not necessarily.  I'm not going to use the

18  terminology extorting.  Them using their business

19  ties and their personal -- they had a business, their

20  personal, I think it was Thompson and Wiley Company.

21  And them just looking out for one another as far as

22  them getting tied up with Tunica County, working

23  together in Tunica County.  Looking at some ethics

24  violations pretty much so.

25      Q.   You were looking for some ethics

Deposition of James Jones, taken November 29, 2016

Page 11

1    violations?

2        A.    Yeah.   We had contacted the ethics

3    commission.   We were just working the case.   It was a

4    preliminary investigation.   We was working it.   We

5    contacted -- well, the sheriff contacted the ethics

6    commission from that point and just trying to find

7    out -- make sure everything was up and up with those

8    guys.

9        Q.    Okay.   Did you have -- did you find that

10   everything was on the up and up or that everything

11   was not on the up and up?

12       A.    Well, shortly after that, after the

13   investigation was going, it was a continuous

14   investigation, I couldn't say whether it was or it

15   wasn't.   Because after all of the arrest and things

16   like that occurred, then the sheriff contacted the

17   individuals from the ethics commission and some more

18   people and they met at a round table meeting here in

19   Tunica County.   They discussed everything.   They

20   took -- they gave all the evidence we had to them and

21   from that point they're dealing with that issue.

22       Q.    Okay.   So that round table meeting with the

23   ethics commission and who else was present?

24       A.    I think somebody from the AG's office, if

25   I'm not mistaken.

Deposition of James Jones, taken November 29, 2016

1     Q.   Okay.  So this round table meeting with the

2  ethics commission and the AG's office occurred after

3  the arrest you made of Mr. Thompson on February 12,

4  2014?

5     A.   That's correct.

6     Q.   All right.  When did the round table

7  meeting happen after the arrest?

8     A.   I couldn't tell you.  I don't know.  I'm

9  not accurate on the date.  I don't know.

10     Q.   Okay.  But you know it was after the arrest

11  itself?

12     A.   Yes.

13     Q.   All right.  When did you start your

14  investigation into Mr. Thompson and Mr. Wiley?

15     A.   It was maybe -- I don't know.  It was

16  before -- it was going on prior to February and it

17  was going on into January, in January.  I don't know

18  a particular date, but it was going on for a minute

19  before.  I don't know the exact date, sir.

20     Q.   Okay.  Now, you've had a lot of experience

21  investigating; would that be fair?

22     A.   Yes, sir.

23     Q.   All right.  And based on that investigative

24  experience, you know you have to be detailed and

25  thorough in investigating criminal activity; is that

Deposition of James Jones, taken November 29, 2016

Page 13

1    right?

2        A.    Yes, sir.

3        Q.    All right.  Do you take notes or make

4    reports of the steps you take and the findings you

5    reach in investigating criminal activity?

6        A.    It all depends.  There are different

7    criminal activity.  I can run a prostitution stand

8    and I don't need to take notes.  I don't need to do

9    any of that.  I can make a drug arrest, run a drug

10   operation, I have to take notes.  Or I can do a plain

11   investigation, and I take mental notes.  But if I'm

12   in a detail doing a homicide or cold case, then I'm

13   taking notes.

14       Q.    Okay.  Let's talk about this particular

15   investigation.  Did you make notes of the steps you

16   took to investigate Mr. Thompson and Mr. Wiley?

17       A.    What do you mean steps?

18       Q.    Investigative steps.

19       A.    Well, yes.  First, I didn't take notes on

20   it.  No, I didn't.

21       Q.    Did you write reports?

22       A.    No, I didn't write a report.

23       Q.    Did you write reports -- when I say

24   investigative steps, what I mean is today I did X.

25   Yesterday I did Y.  I pulled stuff off the internet.

Deposition of James Jones, taken November 29, 2016

Page 14

1     These are steps you take.

2          A.    No, sir.

3          Q.    You took no reports -- you made no reports

4     of any of those steps?

5          A.    Are you referring to the initial

6     investigation of Thompson and Wiley?

7          Q.    Yes, sir.

8          A.    Which one are you referring to?

9          Q.    The initial investigation.

10         A.    Right.  We pulled stuff off the internet.

11    I did things like that.  Did the -- found stuff off

12    the internet, did things like that.  Yes.  Putting a

13    case file together?  Yes, sir.

14         Q.    All right.  So you made a case file?

15         A.    Yes.  We put the case together.

16         Q.    Did you make any reports or take any notes

17    of the stuff you gathered in your investigative file?

18         A.    Yes.  Everything should have been in the

19    investigative file.

20         Q.    My question is whether you personally took

21    notes or made reports of what you were doing as part

22    of the investigation?

23         A.    No, sir.  I didn't take notes.

24         Q.    All right.  You didn't write reports

25    related to what you were gathering in your

Deposition of James Jones, taken November 29, 2016

Page 15

1   investigation?

2         A.   No, sir.  I didn't write a report on that

3   particular thing.

4         Q.   So as we sit here today, you couldn't give

5   me, for example, any notes or reports that you wrote

6   related to this investigation?

7         A.   No, sir.  I can't.

8         Q.   Okay.  What triggered your investigation

9   into these people?

10        A.   Me -- my supervisor, my boss, Sheriff Hamp,

11  and individuals complained about those two

12  individuals.  So he called me and assigned me to look

13  into what was going on.

14        Q.   Who were the people that complained about

15  these two?

16        A.   I don't know.  You have to take it up with

17  the sheriff.  I don't know.  I couldn't tell you.  I

18  was informed after I was briefed by him.

19        Q.   So none of these people actually talked to

20  you, it was the sheriff telling you that these people

21  were complaining?

22        A.   That's correct.

23        Q.   All right.  So you didn't talk to -- so

24  other than pulling stuff off the internet, did you

25  talk to any witnesses about Mr. Thompson and

Deposition of James Jones, taken November 29, 2016

Page 16

1   Mr. Wiley in connection with your investigation into

2   their business?

3        A.    You know, I don't know.  I can't answer

4   that right now.  I'm really not sure.  Maybe I did,

5   maybe I didn't.  I don't know.

6        Q.    But you don't have any notes or reports

7   that would tell us whether you did or refresh your

8   recollection about who you might have talked to in

9   connection with that investigation?

10       A.    Not right now I can't recall, sir.

11       Q.    So basically your catalyst into

12  investigating these two is basically an instruction

13  from the sheriff based on what he said he heard from

14  citizens?

15       A.    That's correct.

16       Q.    All right.  Let's talk about -- now, the

17  vehicle you were traveling in on the night you

18  arrested sheriff -- I mean, arrested Michael Thompson

19  and Alex Wiley, or the night you stopped them and

20  arrested Michael Thompson, that was a county-issued

21  vehicle?

22       A.    Yes, sir.

23       Q.    It cannot record.

24       A.    No, sir.  It can't record.

25       Q.    Okay.  So you have no video or audio of

Deposition of James Jones, taken November 29, 2016

1    your stop that you or your vehicle made in connection

2    with the stop of Alex Wiley and Michael Thompson?

3         A.   My vehicle?  Not my vehicle.

4         Q.   All right.  Who else was on the scene that

5    night?

6         A.   I think Lieutenant Clayton, he was there.

7    He did have video.  His vehicle is a patrol unit, he

8    had video.  Michael, Mike Strickland, Michael

9    Strickland, I believe.

10        Q.   Okay.

11        A.   And a couple more people arrived.

12        Q.   Did you ask for backup during this stop?

13        A.   I called for backup.

14        Q.   All right.  Did you call them directly or

15   did you call them over dispatch?

16        A.   Over the radio.

17        Q.   All right.  Is that how they knew -- to

18   your knowledge, is that how they knew that you were

19   stopping a vehicle?

20        A.   Yes.  Over the radio traffic.

21        Q.   Was that your only time seeing Michael

22   Strickland that day?

23        A.   No.  I saw him earlier.

24        Q.   All right.  Tell us what happened and where

25   you saw him earlier that day.

Deposition of James Jones, taken November 29, 2016

```
 1        A.    What do you mean?

 2        Q.    Where were you when you saw Michael

 3   Strickland earlier than your arrest?  Let's back up.

 4   On the day of your arrest of Michael Thompson, prior

 5   to that arrest when and where did you see Michael

 6   Strickland?

 7        A.    I saw him all throughout the day.  You want

 8   to be more specific what you're asking me?  He was

 9   working.  I'm his supervisor.  I saw him throughout

10   the day.

11        Q.    Do you remember where you saw him?

12        A.    At the sheriff's office here.  At the

13   special operations office over by the courthouse.

14   Driving and passing.

15        Q.    All right.  Did you have a conversation

16   with Michael Strickland on the day you arrested

17   Michael Thompson?

18        A.    Yes, sir.

19        Q.    Prior to your actual stop of Michael

20   Thompson?

21        A.    Yes, sir.

22        Q.    All right.  Can you tell us whether you

23   talked about making a stop later on the evening or

24   afternoon of February 12, 2014, when you talked to

25   Michael Strickland earlier on that day?
```

Deposition of James Jones, taken November 29, 2016

```
 1        A.   Yes, sir.  I was parked right behind
 2   special operations, my office.  I called Michael
 3   Strickland.  I was doing a report on my computer.  I
 4   informed him that stand by, I got some intel, might
 5   be a vehicle coming in out of Helena, Arkansas, with
 6   some drug trafficking.  We had popped a lot of -- we
 7   got about three or four ounces of cocaine and a
 8   couple of pounds of weed from the vehicle the
 9   following week.  An informant had give me a call.  I
10   didn't give him any information.  I told him to stand
11   by.
12        Q.   The week after you arrested Michael
13   Thompson?
14        A.   No, sir.  This was before, previously.
15        Q.   You mean the previous week?
16        A.   Previous week.
17        Q.   Okay.  So the reason you stopped -- the
18   reason you -- all right.  Tell us how that
19   conversation went between you and Michael Strickland
20   when you told him there was going to be an arrest?
21        A.   I didn't tell him there was going to be an
22   arrest.
23        Q.   Or when you told him that you had some
24   intel?
25        A.   I just told him, I just told him to stand
```

Deposition of James Jones, taken November 29, 2016

1    by, I got a vehicle that might be coming into town

2    that is going to possibly have narcotics involved in

3    it.  I said when you get off at 5:00 just stand by.

4    Your time will be taken care of.

5         Q.    What time was that vehicle supposed to come

6    through your area?

7         A.    I don't know, sir.  These are drug

8    traffickers.  I can't begin to tell you.

9         Q.    So how were you -- what -- how were you

10   going to capture these drug dealers coming through

11   your town?

12        A.    When they come through get from the

13   informant, get all the information from the

14   informant, which I had, and just know what I was

15   looking for.  I was going to get Deputy Mark, get him

16   to do a probable cause stop on that vehicle.  That's

17   what we normally do.

18        Q.    How were you going to do a probable cause

19   stop on the vehicle?  You were going to do a probable

20   cause stop on the vehicle.  How do you know you would

21   have probable cause?

22        A.    An experienced deputy can get probable

23   cause.

24        Q.    What do you mean by that?

25        A.    Exactly what I said.  An experienced deputy

Deposition of James Jones, taken November 29, 2016

1   can get probable cause to stop a vehicle. We spot

2   them from the end of the county to the other end of

3   the county. There might be some violation that

4   deputy is going to see that he can stop that

5   particular vehicle on.

6         Q.   So if you make your mind up that this

7   vehicle is one that needs to be stopped you can make

8   sure that there's going to be probable cause

9   somewhere during that stop?

10        A.   No, sir. That's not what I'm saying.

11        Q.   Well, please explain, sir.

12        A.   What I'm saying to you, any time -- your

13   deputy don't have a radar in that vehicle. But any

14   time you're following a vehicle or you're watching

15   for any violation of the law, whether it's my vehicle

16   or anybody's vehicle, an experienced deputy, an

17   experienced law enforcement officer, police, I'm sure

18   he can adhere to some probable cause. If he can't,

19   then let that vehicle go.

20        Q.   But you just said anybody can do it?

21        A.   That's correct.

22        Q.   So you're saying if you can't you let the

23   vehicle go. You just said --

24        A.   In other words, if you don't have probable

25   cause you don't stop that vehicle. But if you do,

Deposition of James Jones, taken November 29, 2016

Page 22

1   you get probable cause, you stop the vehicle.

2       Q.   Yeah.   But that applies to anybody.   Tell

3   me what you mean when you said an experienced law

4   enforcement officer can get probable cause.

5       A.   Exactly what I said.   An experienced law

6   enforcement officer can get probable cause.   If he

7   don't get it, then you let the vehicle go.   But any

8   violation of the law, whether you're weaving, you

9   come over in the other lane, or you go off the side

10  of the road, whatever it may be, you know, you can

11  get probable cause.

12      Q.   That's fair.   So where were you -- did you

13  know where the vehicle, like what highway this drug

14  vehicle was supposed to be traveling on?

15      A.   Yeah.   61 North.

16      Q.   61 headed north?

17      A.   That's correct.   Headed to Memphis.

18      Q.   Okay.   What was supposed to be in the car?

19      A.   Narcotics.   That's all the informant told

20  me, narcotics.

21      Q.   So the dope was supposed to be headed from

22  rural Mississippi to the big city of Memphis?

23      A.   No.   Arkansas to Memphis.

24      Q.   Okay.   West Arkansas to Memphis?

25      A.   West Helena -- coming through West Helena,

Deposition of James Jones, taken November 29, 2016

Page 23

1    Arkansas, which runs on 49 and intersects Highway 61.

2    Then 61 travels straight to Memphis.

3        Q.   Did you make a report of this?

4        A.   No.  Just intel from the incident

5    informant.  Same informant that gave me several

6    ounces a week or two before.  It was from the

7    informant.

8        Q.   So basically there are no notes, there's no

9    reports that I could pull or find that would show

10   that you had this intel?

11       A.   No, sir.  Just only mental notes.  An

12   informant -- let me tell you something about an

13   informant.  Some informants are good, some aren't.

14   Some lie.  Some are on point.  So I had to make a

15   mental note.  Now, if we had got the narcotics, that

16   would have been different.  Everything would have

17   been documented, a report would have been done and et

18   cetera, et cetera.

19       Q.   Okay.  Did you ever see the narcotics?

20       A.   Uh-huh (Indicating yes).

21       Q.   Did you ever -- did your snitch or whatever

22   ever touch base with you and tell you that the

23   narcotics came through like they said?

24       A.   No, sir.

25       Q.   Did your -- so was the snitch wrong or what

Deposition of James Jones, taken November 29, 2016

Page 24

1   happened?

2       A.   I don't know.  I don't know.  I didn't hear

3   back from him at the time.  I tried to call, call and

4   see if he would call me back and that was it.  By

5   that time there I saw Mr. Alex, whatever his name is,

6   the car on 61 driving in and out of the lanes.

7               THE COURT REPORTER:  In and out of the

8   lanes?

9               THE WITNESS:  Yes, ma'am.  Going in

10  and out of both lanes.

11      Q.   (Mr. Tanner)  How were you -- I mean, how

12  were you conducting your narcotics operation that

13  day?  Were you sitting on the side of the road or

14  were you traveling?  What were you doing?

15      A.   I was sitting on the side of the road.  I

16  was sitting by watching.

17      Q.   Sitting by watching?

18      A.   Uh-huh (Indicating yes).

19      Q.   So if we're going 61 North, were you on the

20  east side of the highway or the west side of the

21  highway?

22      A.   I was parked at McDonald's initially on the

23  east side of the highway in the center of town.

24      Q.   Okay.  And so then what happened?

25      A.   What do you mean what happened?

Deposition of James Jones, taken November 29, 2016

Page 25

1     Q.   You were parked there waiting to hear from
2 the narcotics informant, right?
3     A.   No.  I was just parked there.  I was just
4 moving around.  I wasn't waiting for anything.  I was
5 moving at my own disposal.
6     Q.   And around what time did your stop happen?
7     A.   I can't recall the time.  I don't know.  I
8 don't want to say something that's not accurate.
9     Q.   You said you told Michael Strickland, then
10 a police officer -- a sheriff's deputy with your
11 department to be on standby.  What does that mean?
12 What was he supposed to do?
13     A.   Stand by, I might need his assistance.
14     Q.   Was he supposed to be in a particular area?
15     A.   No, sir.
16     Q.   What was supposed to happen?
17     A.   No.  Wait on my radio traffic.
18     Q.   Okay.  And that's -- so after -- was that
19 the last conversation you had with Michael Strickland
20 prior to the arrest, the one where you told him you
21 had the intel and you were going to contact him if
22 the intel came through or whatever?
23     A.   I didn't tell him about any intel.  I told
24 him to stand by, I might need his assistance.  That's
25 what I told Mike Strickland.

Deposition of James Jones, taken November 29, 2016

1    Q.    Okay.  Let's back up.  Tell me the sum

2  total of what you told Michael Strickland about this

3  whole standby, I might need you.  Tell me everything

4  you told him about that situation.

5    A.    Okay.  Let me repeat to you again.  I

6  called Michael to me, I gave Michael something, I

7  don't know what it was.  I don't know what it was.  I

8  told Michael to stand by, I might need him for later

9  on.  I didn't give him any intel, I didn't tell him

10  anything.  I know he told me he get off at 5:00.  I

11  said, that's fine.  From that point I told him just

12  hold tight before he clocked out and get up with me

13  before he clocked out and I'd take care of his time.

14  And that was it.

15    Q.    That's all you told him?

16    A.    That was it.

17    Q.    Did you end up ever calling him for the

18  standby situation?

19    A.    I'm sorry?

20    Q.    Did you end up contacting him like you said

21  about the situation for your standby?

22    A.    I called him.  When I saw the vehicle in

23  and out of traffic, I needed some assistance.  It was

24  dark.  You never stop a vehicle in the dark alone if

25  you're a deputy out here.

Deposition of James Jones, taken November 29, 2016

1      Q.   Okay.  And when you say you called him, do

2  you mean over dispatch?  Earlier you said he listened

3  to your traffic.  Are you saying something different

4  now?

5      A.   No, no.  I'm not saying anything different.

6      Q.   All right.  Did you make a phone call to

7  him after 5:00 p.m. on the date of the arrest?

8      A.   I don't know if I called him on the phone

9  or whether I called him on the radio.  I don't know.

10  I really can't recall.

11      Q.   Okay.  And if he just listened to your

12  dispatch, I mean, that's usually like anybody in the

13  area come out, I'm about to make a stop, right?

14      A.   That's correct.

15      Q.   But if you called him on the phone

16  specifically, that's hey, I want you to come help me

17  out; is that accurate?

18      A.   That's kind of accurate.

19      Q.   All right.  But you don't know which of

20  those two it was?

21      A.   I don't know because more than him showed

22  up.

23      Q.   Did you tell anybody else that you had this

24  standby stop?

25      A.   No.  It had to be on the radio because

Deposition of James Jones, taken November 29, 2016

1   Lieutenant Clayton showed up.  So I think I had to

2   have put it out on the radio.

3        Q.   And you had not told Lieutenant Clayton

4   that you were going to be making a stop or that you

5   had this intel?

6        A.   No.  No one.

7        Q.   All right.  And so when you saw this

8   vehicle weaving in and out of traffic, did you think

9   that this might be the one that your drug snitch told

10  you about?

11       A.   No, sir.  I thought it was a drunk.

12       Q.   All right.  When you testified at Michael

13  Thompson's municipal court trial and at his appeal,

14  did you ever mention this information about the drug

15  court's snitch -- I mean, the drug informant or

16  anything like that?

17       A.   No, it never came up.

18       Q.   All right.  So while you were waiting on

19  the informant to call you back, what exactly was it

20  that you were doing in the meantime?

21       A.   I probably was just -- I don't know.

22  Probably was driving back and forth, posted up on

23  highways just waiting.  That was it.

24       Q.   Waiting on the call?

25       A.   Waiting on the call.  Waiting to respond.

Deposition of James Jones, taken November 29, 2016

1    Just moving around.  Moving around the county, back

2    and forth on Highway 61.

3         Q.    All right.  Now, on this particular day --

4    now, you stopped -- what time -- how long have you

5    been in this county working?

6         A.    March 2010 to February 2014.

7         Q.    You left in February 2014?

8         A.    I retired the 28th.  February 28th I

9    retired.

10        Q.    So two weeks after this stop you retired?

11        A.    Yes.  It was already on go.  I had already

12   planned that.

13        Q.    So when you -- so being here for

14   approximately four years, you knew what time city

15   offices closed?

16        A.    I'm sorry?

17        Q.    What time do the county offices close

18   around here?

19        A.    Universal it's 5 o'clock.

20        Q.    Five o'clock?

21        A.    Uh-huh (Indicating yes).  All over the

22   state of Mississippi.

23        Q.    All right.  And how much after 5 o'clock

24   was it that you stopped Alex Wiley and Michael

25   Thompson?

Deposition of James Jones, taken November 29, 2016

Page 30

```
1        A.    You know, I don't know the time I stopped
2   them.  I can't recall it.  I don't have anything in
3   front of me.  I don't know.  Something that's not
4   accurate, I don't want to give you something that's
5   not accurate.
6        Q.    You had this investigation going.  Will 61
7   lead you to Memphis from Tunica?
8        A.    Yes, sir.
9        Q.    All right.  Did your investigation reveal
10  that Michael Thompson or Alex Wiley were from
11  Memphis?
12       A.    My investigation revealed that Mr. -- the
13  Thompson originally from South Mississippi, I believe
14  the Brandon area maybe, I believe, I'm not for sure.
15  But I don't know where Thompson was from -- not
16  Thompson, Mr. Wiley was from.
17       Q.    So you saw no ties -- you knew nothing
18  about them having any ties to Memphis?
19       A.    Let me do my best to do the Thompson and
20  Wiley thing, I got some documents said that, I think
21  the business, I'm not for sure where the business was
22  located at, their front.  I don't know.  I don't
23  know -- I don't even know where he was living at
24  that particular time, Mr. Thompson nor Mr. Wiley.
25       Q.    You had no information at this point in
```

Deposition of James Jones, taken November 29, 2016

1　your thorough detailed investigation that either of

2　these gentlemen happened to be from Memphis?

3　　　　　　MR. WOLF:  Objection to the form.

4　Vague as to time, argumentative, misstates the prior

5　testimony.

6　　　　Q.　(Mr. Tanner)  Was your investigation into

7　these gentlemen detailed and thorough?

8　　　　A.　It was detailed.

9　　　　Q.　Was it thorough?

10　　　　A.　It all depends.  What are you referring to?

11　First on Thompson and Wiley?

12　　　　Q.　Yes, sir.

13　　　　A.　I pulled documents off the internet, I

14　pulled documents I needed to pull, background, et

15　cetera, on individuals.

16　　　　Q.　Yeah.  And as a law enforcement officer you

17　have a lot of resources at your disposal, don't you?

18　　　　A.　That's correct.

19　　　　Q.　NCIC?

20　　　　A.　Yes, sir.

21　　　　Q.　III?

22　　　　A.　That's correct.

23　　　　Q.　And if you believe people are into criminal

24　activity, one of the things you undoubtedly would

25　have done is pull criminal background checks, right?

Deposition of James Jones, taken November 29, 2016

Page 32

```
 1        A.    That's correct.
 2        Q.    All right.  Did you pull NCIC on these
 3   guys?
 4        A.    I did.
 5        Q.    NCIC didn't tell you anything about where
 6   these guys were from?
 7        A.    It told me something but to be honest with
 8   you, I can't remember now.  It has been -- man, I
 9   mean, February 2014.  So we're almost in 2017.  I
10   can't remember unless it's something in front of me.
11        Q.    Well, you know what, Mr. Wiley's I.D., you
12   would have seen that, right?
13        A.    Yeah.  I seen it.  I ran his license.
14        Q.    Right.  That's part of the normal
15   background checks that y'all run, right?
16        A.    Yes.
17        Q.    What state was that license from, sir?
18        A.    I'm sorry.  I really can't remember.
19   Tennessee or Mississippi.  I don't know.  You got to
20   understand, it has been a while.  I've been retired
21   for a minute.  I don't know.  I know his license came
22   back reinstate -- it's something that was crazy.
23   Eligible for reinstatement, and I didn't understand
24   what that meant.
25        Q.    From what state, sir?
```

Deposition of James Jones, taken November 29, 2016

Page 33

```
1        A.    Sir, I don't know.

2        Q.    You don't know?

3        A.    Not right now I don't know.  I really

4   don't.  I'm being honest with you.  It was either

5   Tennessee or Mississippi, one of the two, but I

6   can't --

7        Q.    You're sure about that?

8        A.    I don't know.  I don't have it in front of

9   me.

10       Q.    So other than your saying it, you weren't

11  in a vehicle that would have shown us by recorded

12  video that Mr. Wiley was weaving in and out of

13  traffic or whatever you say?

14       A.    No, sir.

15       Q.    All right.  When you say he was weaving in

16  and out of traffic, tell us what you mean by that.

17       A.    He was going side -- 61, we got a

18  four-lane.  You're traveling north, you got two

19  lanes.  Of course, if you're traveling south you got

20  two lanes.  Mr. Wiley was traveling north.  He was in

21  the westbound lane.  Then he'd come from the

22  westbound lane and he'd come over in the eastbound,

23  then he would ride the center line.  Then he'd go

24  from both lanes.  I thought he was drunk literally.

25  That's what I mean weaving.
```