1    IN THE CIRCUIT COURT OF TUNICA COUNTY, MISSISSIPPI

2

3    MICHAEL THOMPSON,

4                                          APPELLANT

5    VS.                                   NO. 2014-0113

6    STATE OF MISSISSIPPI,

                                           APPELLEE

7

8    ********************************************************

9        TRANSCRIPT OF THE PROCEEDINGS HAD AND DONE IN

10   THE ABOVE STYLED AND NUMBERED CAUSE, BEFORE THE

11   HONORABLE JOHNNIE E. WALLS, JR., CIRCUIT COURT

12   JUDGE, ON MONDAY, NOVEMBER 10TH, 2014.

13   ********************************************************

14   APPEARANCES:

15   Representing the Appellant:

16       SCOTT COLOM, ESQ.
         Colom Law Firm, LLC
17       P.O. Box 866
         Columbus, MS  39703-0866
18

19   Representing the Appellee:

20       CAROL TURNER, ESQ.
         Special Prosecutor
21       Turner Law Group, PLLC
         Post Office Box 185
22       Charleston, MS  38921

23

24   REPORTED BY:  BARBARA L. CRAWFORD, CCR #1182
                    Official Court Reporter
25                  1633 CR 406
                    Houston, MS  38851

# TABLE OF CONTENTS

PAGE

Title & Appearances ........................... 1

Contents ....................................... 2

Exhibits Page .................................. 4

OPENING STATEMENTS:
  By Ms. Turner .............................. 7
  By Mr. Colom ............................... 7

WITNESSES/STATE
SHERIFF CALVIN "K.C." HAMP, SR.:
  Direct Examination by Ms. Turner ........... 11
  Cross-Examination by Mr. Colom ............. 22
  Redirect Examination by Ms. Turner ......... 53

MR. JAMES JONES:
  Direct Examination by Ms. Turner ........... 61
  Cross-Examination by Mr. Colom ............. 78
  Redirect Examination by Ms. Turner ......... 118
  Recross Examination by Mr. Colom ........... 139

1
MS. KAREN CARTER:

2      Direct Examination by Ms. Turner ............ 143

3      Cross-Examination by Mr. Colom .............. 152

4

5   Appellee Rests ................................. 158

6

7   Motion for Directed Verdict .................... 158

8

9   Appellant Rests ................................ 169

10

11  CLOSING ARGUMENTS:

12     By Ms. Turner ............................. 170

13     By Mr. Colom .............................. 173

14     By Ms. Turner ............................. 178

15

16  Judge's Ruling ................................. 191

17

18  Certificate Page ............................... 193

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

E-X-H-I-B-I-T-S

<u>PAGE</u>

Exhibit No. 1, Policy No. 4.14 ................  96

Exhibit No. 2, Memo dated December 7, 2012 ....  135

Exhibit No. 3, Unsigned Arrest Warrant ........  146

Exhibit No. 3(A), Driver Records Document .....  151

Exhibit No. 3(B), Abstract of Court Record ....  151

Exhibit No. 3(C), Abstract of Court Record ....  151

Exhibit No. 3(D), Copies of Tickets ..........  151

1     MS. THOMPSON:  Your Honor, moving

2  forward today in the Circuit Court of

3  Tunica County, Mississippi is

4  Michael Thompson, Plaintiff, vs. State of

5  Mississippi, Case No. 2014-0113.  This is

6  an appeal on the charges of driving with

7  license suspended filed by

8  Mr. Michael Thompson.

9     Your Honor, we have Mr. -- the State

10  and we'll have them introduce themselves

11  for the record.

12     THE COURT:  Yes.  Will the

13  attorneys --

14     MS. TURNER:  Yes, Your Honor.  May it

15  please the Court.  My name is

16  Carol Turner.  I'm here representing the

17  State in this matter, and I have the

18  witnesses here, at least Sheriff Hamp and

19  Officer James Jones.

20     THE COURT:  Okay.

21     MR. COLOM:  Good morning, Your Honor.

22  Scott Colom on behalf of Michael Thompson,

23  the defendant.

24     THE COURT:  All right.  Why don't all

25  the witnesses come around and let me swear

1      you in, all witnesses who expect to

2      testify.

3          MS. TURNER:  Your Honor, we do have

4      one other witness that's on the way at

5      this time.  It's the dispatcher for the

6      sheriff's department.  We can just -- she

7      can just be sworn when she arrives.

8          THE COURT:  Okay.

9  (ALL WITNESSES WERE SWORN.)

10          THE COURT:  All right.  Either

11      attorney desire to make an opening

12      statement?

13          MS. TURNER:  I'm sorry?

14          THE COURT:  Do you desire to make an

15      opening statement?

16          MS. TURNER:  Not really, but we did

17      speak a little bit about possibly having a

18      stipulation for the record, Your Honor.

19          MR. COLOM:  To be honest with you, I

20      don't mind giving an opening statement.

21          MS. TURNER:  Okay.

22          THE COURT:  All right.  Well, I would

23      appreciate something short on this case so

24      that --

25          MS. TURNER:  Oh, okay.

1    THE COURT:  -- I would have an idea --

2    MS. TURNER:  Oh, just to give you an

3    idea.

4    THE COURT:  -- of what this is about.

5    MS. TURNER:  Yes, Your Honor.  Very

6    brief.  As stated, we appear on a driving

7    while license suspended.  The defendant in

8    this case is Michael Lawrence Thompson.

9    The ticket was written on February 12th of

10   this year and it is -- this is an appeal

11   from municipal court.

12   THE COURT:  Okay.

13   MR. COLOM:  Your Honor, we would

14   contend the case is much more complicated

15   than that.  Mr. Thompson is the county

16   administrator for Tunica County, and the

17   facts will show that the sheriff's office

18   initiated an investigation into

19   Mr. Thompson prior to the date he was

20   given the ticket for driving with license

21   suspended.  They were concerned,

22   allegedly, with some conduct between the

23   county administrator and the comptroller.

24   During this investigation, this will

25   be admitted, that they determined -- they

1    learned that Mr. Thompson's license was

2    suspended.  After learning this, they,

3    coincidently, encountered Mr. Thompson in

4    the passenger seat of the vehicle with the

5    comptroller.  Capt. Jones will testify

6    that, allegedly, he saw Mr. -- the

7    comptroller, Mr. Wiley, swerving in the

8    road and that was the reason he pulled

9    Mr. Wiley over.

10         He will then -- he will also admit

11   that after he pulled Mr. Wiley over, he

12   ran Mr. Wiley's license.  And he will

13   explain that there was some issue with the

14   license of Mr. Wiley, but that the license

15   didn't come back suspended.  It was some

16   -- some -- something I've never heard of,

17   something he claimed gave him suspicion

18   that Mr. Wiley did not have a valid

19   license.

20         So, at that point, without giving

21   Mr. Wiley a ticket, without having any

22   evidence that Mr. Wiley's license was

23   suspended, he'll admit -- Capt. Jones will

24   admit that he told Mr. Thompson to drive

25   the vehicle.  He told Mr. Thompson to

1    drive the vehicle knowing Mr. Thompson's

2    license was suspended.

3         After telling Mr. Thompson to drive

4    the vehicle, he went and let Mr. Thompson

5    drive five or six miles, based on his own

6    testimony.  He pulled Mr. Thompson over

7    again for -- pulled Mr. Thompson over for

8    suspicion of being dishonest.  Because

9    Capt. Jones knew that Mr. Thompson's

10   license was suspended, that's the reason

11   he asked Mr. Thompson to drive.

12        So, at that point, he arrested

13   Mr. Thompson, took him to the jail based

14   on an arrest warrant that didn't -- that

15   doesn't exist and turned this in to the

16   local news station to try to embarrass

17   Mr. Thompson.  And this all was a scheme

18   by the sheriff of this county to try to

19   embarrass Mr. Thompson.

20        And, Your Honor, the scary thing

21   about this -- and these facts will not be

22   disputed.  We've already had a hearing

23   where Capt. Jones swore to this

24   information.  He swore that at the time he

25   pulled Mr. Thompson -- Mr. Wiley over, he

1   knew Mr. Thompson's license was suspended

2   and he swore that he told Mr. Thompson to

3   drive knowing his license was suspended.

4        So based on that, Your Honor, it's

5   classic entrapment.  In fact, under

6   Mississippi law, the entrapment is so

7   obvious, it's so bad that it's almost

8   entrapment, per se, because it's clearly

9   done -- it was clearly done with bad faith

10  conspiracy to try to embarrass the county

11  administrator by the sheriff's office.

12  So, based on that, we believe we have a

13  strong entrapment case and the evidence

14  will show it, Your Honor.

15       THE COURT:  You want to call your

16  first witness? (To Mr. Colom.)

17       MS. TURNER:  Well, I believe I should.

18       THE COURT:  All right.

19       MS. TURNER:  Yes.  I would call

20  K.C. Hamp, the sheriff, Your Honor.

21       THE COURT:  All right.

22       MR. COLOM:  And, Your Honor, I would

23  move that the rule be invoked.

24       THE WITNESS:  I didn't hear that.

25       MS. TURNER:  I have no objection about

Thompson vs. State, 11/10/2014                    11

1    the rule being invoked, to clear the

2    courtroom of witnesses.

3             THE COURT:  All right.

4             THE WITNESS:  I didn't hear that.

5    What was that?

6             THE COURT:  He asked that the rule be

7    invoked; that all witnesses who have to

8    testify after the first witness testifies

9    would have to be sequestered.

10             THE WITNESS:  Okay.

11    (ALL WITNESSES LEAVE THE COURTROOM.)

12             THE COURT:  Okay.  Raise your right

13    hand again.

14             SHERIFF CALVIN "K.C." HAMP,

15    having previously been duly sworn, was re-sworn

16    and examined and testified as follows, to wit:

17             MS. TURNER:  May it please the Court,

18    Your Honor?

19             THE COURT:  Go ahead.

20    DIRECT EXAMINATION BY MS. TURNER:

21    Q.    Would you state your name for the record,

22    please.

23    A.    Calvin "K.C." Hamp, Sr.

24    Q.    And what is your position at the present?

25    A.    Tunica County Sheriff.

Thompson vs. State, 11/10/2014

12

1   Q.   How long have you been in that capacity?

2   A.   Two thousand -- January 2004 as sheriff.

3   Q.   So, for about ten years?

4   A.   Yes, ma'am.

5   Q.   And you've heard the opening statements of

6   counsel opposite, correct?

7   A.   That's correct, yes, ma'am.

8   Q.   And I would just like to get down to the

9   truth of what you're going to testify to today

10  involving Michael Thompson.

11  A.   Yes, ma'am.

12  Q.   I understand that you have a policy in

13  place regarding running drivers licenses of county

14  employees, correct?

15  A.   Yes, ma'am.  We have a Fleet Safety

16  Management Policy in place for operating of a county

17  fleet, county vehicles, any employee in the county

18  just for liability purposes and that's an annual

19  check we do every year on all county employees.

20  Q.   How long have y'all had that policy in

21  place?

22  A.   Since I've been sheriff, I know.  A long

23  time.  Since --

24  Q.   So, at least for ten years, y'all have

25  been doing this?

1    A.    Yes, ma'am.

2    Q.    Okay.  So, it's not an investigation that

3    targets any specific person; is that correct?

4             MR. COLOM:  I'm going to object.  It's

5             a leading question.

6             THE WITNESS:  No, ma'am, it's not a

7             target.  It's --

8             THE COURT:  Wait, wait, wait.  That's

9             sustained.

10    BY MS. TURNER:  (Continuing)

11    Q.    How many people are targeted in this

12    investigation when you run drivers licenses?

13    A.    I don't think "target" is an appropriate

14    word.

15    Q.    Well, how many people have their drivers

16    licenses ran?

17    A.    All the employees with Tunica County who

18    operate vehicles.

19    Q.    Every employee that operates a vehicle

20    that's a county vehicle?

21    A.    Absolutely, operate county equipment.

22    Q.    And do you know whether or not

23    Michael Thompson operates a county vehicle?

24    A.    Ma'am?

25    Q.    Do you know whether or not

1   Michael Thompson operates a county vehicle?

2       A.    Yes, ma'am, he do.  He did at the time.

3       Q.    And so, was his drivers license ran on any

4   particular day?

5       A.    I wasn't on that traffic stop.

6       Q.    Not on the traffic stop, but --

7       A.    To my knowledge?

8       Q.    To your knowledge, as far as a part of all

9   the county employees' drivers license being ran, was

10  Michael Thompson's also ran?

11              MR. COLOM:  I'm going to object to

12          that.  She --

13          THE WITNESS:  No, ma'am.

14              MR. COLOM:  -- hasn't laid the proper

15          foundation for this testimony.

16          THE COURT:  That's a standing

17          objection.

18              THE WITNESS:  Do I need to answer

19          that.  What was your question?

20              I didn't hear my attorney.

21              THE COURT:  Why don't you rephrase

22          your question.  He didn't hear you.

23              THE WITNESS:  Can you rephrase the

24          question?

25      BY MS. TURNER:  (Continuing)

1  Q.    Okay.  Do you recall Michael Thompson's

2  drivers license being ran as a part of all of the

3  employees' drivers licenses being ran?

4  A.    Based upon the information that I

5  received, there was a list sent over from the

6  county, as we do annually, from different department

7  heads in the county and a list was provided.  All

8  those people's information was ran.  There was one

9  other county employee who had a warrant and that

10  person was transported to the Desoto County

11  Sheriff's Office where he was facing criminal

12  charges.  This particular list that came over at

13  that particular time did not have Mr. Thompson's

14  name on that list because he was county

15  administrator.

16  Q.    Okay.  And why was his name not on the

17  list?  Do you have any knowledge as to why his name

18  would not have been on the list?

19  A.    I can't answer that.  I have no knowledge

20  why his name wasn't on the list.

21  Q.    In the past, has the county

22  administrator's drivers license been checked as a

23  part of the sweep?

24  A.    Normally, everyone is checked.  That

25  particular incident, it appears that this county

1   administrator's name was not on the list.  Everybody

2   who drove a county vehicle, including myself,

3   license was checked.

4      Q.    Okay.  At some point, was his license

5   checked that you're aware of?

6      A.    Yes, ma'am.

7      Q.    Okay.  When was that?

8      A.    Capt. Jones brought it to my attention and

9   stated that Mr. Thompson had a suspended drivers

10   license and he brought to my attention that

11   Mr. Thompson had --

12           MR. COLOM:  I'm going to object, Your

13           Honor.  It's hearsay.  If he is going to

14           offer hearsay, he needs to at least

15           identify the person to lay the foundation.

16           THE COURT:  Ms. Turner?

17           MS. TURNER:  Well, Your Honor, we're

18           not asking for the truth of the matter

19           asserted.  I'm just asking to find out

20           whether or not he has knowledge of whether

21           or not his license was ever checked, not

22           whether or not they were valid.

23           THE COURT:  Okay.  I'm going to allow

24           it.

25           THE WITNESS:  It was brought to my

1    attention that Mr. Thompson's name was not

2    on the list.

3        MR. COLOM:  Your Honor, I'm going to

4    object to it because, again, that's not

5    the foundation.  He can't say it was

6    brought to my attention.  He needs to say

7    who is the person who told it to him or

8    else.  He has to lay the foundation.

9        THE WITNESS:  I said that to begin

10   with.  I named Capt. Jones to begin with,

11   before I started speaking.  Capt. Jones

12   brought it to my attention that

13   Mr. Thompson, after checking all the

14   employees, the people's names that were

15   left off the list, they went back and

16   checked those people because he was in

17   Special Operations.  Mr. Thompson's name

18   was not on the list.  After checking

19   Mr. Thompson's, he come to find out that

20   he had a suspended license.

21       Now, normally, when a person has a

22   suspended license, that means that they

23   got old business out there.  They didn't

24   attend court somewhere and there may be a

25   bench warrant somewhere.  So, we checked

1      on that.

2            I personally called Ms. Karen Carter,

3      stated to her that Mr. Thompson had

4      unfinished business in Montgomery County.

5      She said, yes.  I asked did he have a --

6           MR. COLOM:  I'm going to object to

7      this witness as -- that's hearsay.

8           MS. TURNER:  We have her here to

9      testify, Your Honor.

10          THE COURT:  You have another witness

11     to testify to that?

12          MS. TURNER:  We have Ms. Carter here

13     to testify.

14          THE COURT:  All right.  Good.

15          THE WITNESS:  I asked --

16  BY MS. TURNER:  (Continuing)

17    Q.    Let me just stop you there.

18    A.    Okay.

19    Q.    So, you did speak with the clerk of

20  Montgomery County.  I'm not asking what she said,

21  but you did speak with her?

22    A.    I did.

23    Q.    Okay.  And did you take any further

24  actions in that investigation dealing with

25  Mr. Thompson and the other people whose licenses had

1    been suspended that were county employees?

2        A.    What?

3        Q.    Did you take any other action regarding

4    Michael Thompson or any of the other county

5    employees who you discovered had a suspended drivers

6    license?

7        A.    Thompson was the only one, to my

8    knowledge, who had a suspended drivers license.  The

9    other guy that was arrested had a warrant.

10       Q.    He had a warrant, but his license -- it

11   didn't show his license was suspended?

12       A.    Right.  It showed that he had a warrant

13   based on his background check.

14       Q.    All right.  And what happened to him?

15       A.    He was transported to the Desoto County

16   jail by Lt. Hopson for -- possession of stolen

17   property was his charge.  And that guy was a

18   maintenance director for Tunica County, and it was a

19   week prior to Michael Thompson's incident.

20       Q.    That was a week prior to his arrest?

21       A.    That's correct.

22       Q.    Okay.  And do you-all have policy and

23   procedures with regards to stops?

24       A.    That's correct, ma'am.

25       Q.    What would be that procedure in regards to

1    stopping someone without a valid drivers license?

2         A.    You mind if I read it to you?

3         Q.    Go ahead.

4         A.    A copy of the sheriff's office policy

5    4.14, traffic stops and enforcement.  I will read

6    No. 5 to you.  It states "Revoked or suspended

7    drivers license.  A driver may be arrested when an

8    officer has stopped a vehicle and identified the

9    driver as driving with a revoked or suspended

10   license.  If the officer is unable to stop the

11   individual in a timely manner, for example, if a

12   chase occurs or the person is injured and was

13   transported to the hospital, then he may seek a

14   warrant for the violator's arrest."

15                 THE COURT:  Sheriff, may I see that?

16                 THE WITNESS:  Yes.  It's No. 5 of

17            Tunica County sheriff's policy.  An

18            officer does have the power of discretion.

19     BY MS. TURNER:  (Continuing)

20        Q.    I'm sorry.  What did you say?

21        A.    I was just saying and the officer does

22   have the power of discretion.

23   (A BRIEF PAUSE.)

24     BY MS. TURNER:  (Continuing)

25        Q.    You didn't specify, but does that policy

1  also address whether or not a person's car is towed

2  or what will happen once the stop is made and the

3  driver's license is found to be invalid?

4        A.    Yes, ma'am.  Normally, when a person is

5  operating a vehicle on the roadway, if there's a

6  traffic infraction, that person is stopped.  If that

7  person has a passenger, then the officer will

8  normally, not all the time, but normal practice is

9  that before the passenger take that vehicle, after

10  it has been identified that the driver has a

11  suspended license, when the arrest is effected, if

12  there is a passenger with a valid driver's license,

13  the officer would normally allow the passenger to

14  take possession of that vehicle.

15        Q.    Instead of letting the vehicle be towed?

16  It's more expensive to tow?

17        A.    Absolutely, the cost is more expensive.

18        Q.    And so, that's just a professional

19  courtesy that's allowed, a policy of y'all's at the

20  sheriff's department?

21        A.    Yes, ma'am.

22        Q.    Okay.  Is that in the manual or not?

23        A.    Pardon me?

24        Q.    Is that part of the policy and procedure

25  that's documented or is that --

1    A.    No, ma'am, it's on discretion.

2    Q.    Discretion?

3    A.    That's a discretion.

4          MS. TURNER:  That's all I have of this

5    witness.

6          THE COURT:  You may cross-examine him.

7          MR. COLOM:  Thank you, Your Honor.

8    May it please the Court?

9          THE COURT:  Yes.

10   CROSS-EXAMINATION BY MR. COLOM:

11   Q.    Sheriff Hamp, you're familiar with the

12   laws of perjury, aren't you?

13   A.    Absolutely.

14   Q.    And you know, even as a sheriff, that you

15   can't say something not truthful while under oath,

16   right?

17   A.    That's correct.

18   Q.    That would be a felony, right?

19   A.    That's correct.

20   Q.    Even for a sheriff, wouldn't it?

21   A.    That's correct.

22   Q.    Okay.  So, you understand that you got to

23   be honest here today, don't you?

24   A.    Absolutely.

25   Q.    Now, I want to get straight to the point.

1   You were at the misdemeanor trial with Mr. Thompson

2   in justice court, weren't you?

3      A.   That's correct.

4      Q.   In fact, you were in the courtroom the

5   entire time, weren't you?

6      A.   That's correct.

7      Q.   And you heard Capt. Jones who worked with

8   you at the time, February 12th, 2013?

9      A.   That's correct.

10      Q.   2014, excuse me.  February 12th, 2014.  He

11   worked for the sheriff's office, right?

12      A.   That's correct.

13      Q.   And you heard him testify that he was

14   in -- he was a captain of Special Operations, right?

15      A.   That's correct.

16      Q.   In fact, he wasn't a normal patrol person,

17   was he?

18      A.   It's all the same.

19      Q.   But his duties weren't just to patrol the

20   streets?  He had a lot of other duties, right?

21      A.   He's a law enforcement officer.  It's all

22   the same.

23      Q.   Yes or no?  His duties were not only to

24   patrol the streets, was it?  He was head of -- he

25   was responsible for training, wasn't he?

1    A.    Absolutely.

2    Q.    Okay.  Now normal patrolmen, they're not

3    responsible for training, are they?

4    A.    There are some patrol officers who's

5    responsible for training, sir.

6    Q.    Okay.  But he had a lot of other duties

7    besides being a patrolman, right?

8    A.    That's correct, sir.

9    Q.    All right.  And you were there and you

10   heard him testify that y'all -- that the sheriff's

11   office instigated an investigation into

12   Mr. Thompson, didn't you?  You heard him say that,

13   right?

14   A.    Yes, sir.

15   Q.    And you also heard him testify under oath

16   that at the time of February 12th, 2014 when he

17   pulled Mr. Wiley over, he knew Mr. Thompson's

18   license was suspended.  You heard him testify to

19   that, right?

20   A.    That's correct.

21   Q.    In fact, you also testified that you knew

22   on that day Mr. Thompson's license was suspended?

23   A.    That's correct.

24   Q.    All right.  And, in fact, you heard

25   Capt. Jones says that somebody else was driving the

1     vehicle that Mr. Thompson was in, right?

2       A.    That's correct.

3       Q.    The comptroller for the county, a guy

4     named Mr. Wiley, right?

5       A.    That's correct.

6       Q.    You heard Capt. Jones testify that

7     Mr. Wiley was swerving in the road, right?

8       A.    That's correct.

9       Q.    And he pulled Mr. Wiley over, right?

10      A.    That's correct.

11      Q.    All right. And you heard him testify that

12    he didn't give Mr. Wiley a ticket for careless

13    driving or anything else, did he?

14      A.    Well, what he told me, he told me he gave

15    him a professional courtesy after he told him who he

16    was.

17      Q.    Okay.

18      A.    And --

19      Q.    My question, yes or no, do you recall

20    Capt. Jones testifying that he did not give

21    Mr. Wiley a ticket for careless driving, reckless

22    driving or anything else, did he?

23      A.    That's correct.

24      Q.    So, even though he claimed Mr. Wiley was

25    driving poorly, he didn't give Mr. Wiley a ticket

1  now, did he?

2      A.    He has the power of discretion.

3      Q.    So, he decided not to give Mr. Wiley a

4  ticket. Now, what he did do is he ran Mr. Wiley's

5  license, right?

6      A.    That's correct.

7      Q.    He told you that, didn't he?

8      A.    Yes.

9      Q.    He testified to that under oath?

10      A.    That's correct.

11      Q.    You recall that, right?

12      A.    That's correct.

13      Q.    He said he ran Mr. Wiley's license and

14  there was something strange they came back and said.

15  Eligible, but reinstated or something like that?

16      A.    I believe it was a possible -- I believe

17  it was not valid, but eligible for reinstatement.

18      Q.    I mean, that's something he just made up

19  to justify pulling Mr. Wiley over?

20      A.    No.

21            MS. TURNER:  Objection, Your Honor.

22            THE WITNESS:  No, the only -- he can

23        receive --

24            THE COURT:  Whoa, whoa, whoa.  State

25        your objection.

1    MS. TURNER: My objection is he's just

2    making statements instead of asking

3    questions.

4    THE COURT: Don't make statements.

5    MR. COLOM: Your Honor, I'll rephrase

6    the question.

7    THE COURT: All right. Rephrase.

8    Rephrase the question, Mr. Colom.

9    MR. COLOM: Yes, sir.

10    THE COURT: If you make a statement,

11    you're giving testimony. It's like

12    testifying and you're not a witness at

13    this point. You're on cross-examination.

14    MR. COLOM: Yes, Your Honor, that's my

15    intention.

16    BY MR. COLOM: (Continuing)

17    Q.   Now, Sheriff, you recall him saying that

18    there was something about valid, but reinstated or

19    something eligible for reinstatement; isn't that

20    correct? Don't you recall that?

21    A.   I recall Capt. Jones told me -- the only

22    information we have to really rely on is what's

23    coming from NCIC or Tunica County Communications

24    Division; that I believe it was -- his license came

25    back not valid, eligible for reinstatement. The

1    dispatcher couldn't understand the language.  So,

2    they ended up calling the Tennessee Division of

3    Public Safety to find out what that language means.

4    And I guess over in this hearing it will reflect --

5    the attorney's here -- the log book on the time

6    frame it took to get that information back.

7         Q.    Sheriff Hamp --

8         A.    I only can testify to what I heard in the

9    courtroom.  I can't testify to what was there on the

10   scene.  I was not on the scene.

11        Q.    Okay.  Do you recall Mr. -- at the trial,

12   do you recall Capt. Jones saying that he ran

13   Mr. Wiley's license and it came back valid, eligible

14   for reinstatement, yes or no?

15        A.    Yes.

16             MS. TURNER:  Your Honor, this has been

17             asked and answered.  This is the third

18             time he's asked the same question, and we

19             object.  He's already testified to what he

20             believes he heard in the courtroom.  He's

21             said it.

22             THE COURT:  I think you're right.

23             MR. COLOM:  I'll move on.

24             THE COURT:  Okay.

25   BY MR. COLOM:  (Continuing)

1    Q.    Now, at that point, you heard Capt. Jones

2    testify that he asked Mr. Thompson did he have a

3    drivers license and whether that license was valid,

4    correct?

5    A.    Yes.

6    Q.    Okay.  And after he asked Mr. Thompson

7    that, Mr. Thompson told him that his license was

8    valid, right?

9    A.    That's correct.

10    Q.    And then you recall Capt. Jones telling

11    Mr. Thompson he needed to drive the vehicle?  Don't

12    you recall him testifying that's what he told

13    Mr. Thompson?

14    A.    I heard him testify to that.

15    Q.    So, you would agree with me that the

16    Tunica County Sheriff's Office told Mr. Thompson

17    that he had to drive that vehicle on February 12th,

18    2014, correct?

19    A.    I wasn't on the stop.  I can't agree with

20    you, sir.  I mean, I know in justice court, things

21    can come about, just the way you were agressive in

22    posing the question.  I don't know how you jogged

23    the officer's memory.

24    Q.    My question is, you agree that Capt. Jones

25    was working for the Tunica County --

1    MS. TURNER:  Objection, Your Honor.

2    My objection would be, at this point, we

3    have Capt. Jones here.  He's willing to

4    take the stand and testify.  He's the best

5    person to testify as to what happened at

6    the scene and what he testified to in

7    court, instead of asking the sheriff all

8    these questions about testimony in a case

9    that happened months ago.

10    MR. COLOM:  Your Honor, may I respond

11    to that objection?

12    THE COURT:  Yes, you may.

13    MR. COLOM:  Your Honor, the rules of

14    evidence are pretty discretionary on my --

15    on cross-examination.  I mean, simply

16    because I can ask these questions to

17    Officer Jones doesn't mean I can't also

18    ask them to the sheriff.  I mean, I can

19    ask him whether he recalls what

20    Capt. Jones said.  It's not hearsay

21    because it was in court.  And, in fact,

22    the sheriff has done a good job of

23    remembering testimony so far.

24    MS. TURNER:  My objection further

25    would be whether or not it happened in

1          court, it's still hearsay.

2               MR. COLOM: Well, Your Honor, hearsay

3          is an out-of-court statement. Those are

4          in-court statements. So, it's not

5          hearsay.

6               THE COURT: Is that witness going to

7          be called?

8               MS. TURNER: That witness will be

9          called.

10              THE COURT: I'll sustain that

11         objection until that witness is called.

12              MR. COLOM: Thank you, Your Honor.

13     BY MR. COLOM: (Continuing)

14       Q.    Now, do you recall when Mr. Thompson

15   started to work for the Tunica -- when he became

16   county administrator for Tunica County?

17       A.    I don't know what time. I know that he

18   started working as the county administrator.

19       Q.    Okay. What was the time frame?

20       A.    I can't recall the time frame, sir.

21       Q.    Okay. Do you know if it was 2013? 2012?

22       A.    Possibly the end of 2012. I can't recall.

23   Possibly the end of 2012.

24       Q.    Okay. So now, do you recall when you ran

25   -- you said that you run licenses every six months

1    for county employees?

2        A.    I don't run them.  I have people that are

3    in positions to run licenses.

4        Q.    Is that a written policy with the Tunica

5    County Sheriff's Office?

6        A.    It comes under the Fleet Safety Management

7    Policy dealing with our insurance company.

8        Q.    Yes or no?  Is that a written policy with

9    Tunica County?

10       A.    It's a fleet safety policy that we adopted

11   into our policy.

12       Q.    I don't think -- I don't believe you

13   answered my question.  Yes or no, is that a written

14   policy?

15       A.    If it's a written policy, it's written.

16           MS. TURNER:  Judge, I --

17           THE WITNESS:  We adopted it into my

18       policy.

19           MS. TURNER:  He keeps badgering the

20       witness.  He's answered it.  He said he

21       adopted it into their policy.

22           THE WITNESS:  It's a Fleet Safety

23       policy.  It's a liability policy.

24           THE COURT:  Well, he asked the

25       question.  He asked him was it a written

1          policy.

2               THE WITNESS:  It's a written policy

3          from a Fleet Safety Management policy that

4          we adopted.

5      BY MR. COLOM:  (Continuing)

6      Q.     Okay.  Is there a formal adoption of it?

7      A.     It should be a formal adoption of it in

8  our policy, but we use it for practice to keep the

9  county out of liability.

10     Q.     Okay.  Because I want to be clear on this.

11 So, you're saying that there's a policy in

12 Tunica County Sheriff's Office, a written policy,

13 that says somewhere that you are -- the sheriff's

14 office is running all the employees' drivers

15 licenses every six months?

16     A.     Absolutely.

17     Q.     Okay.  Do you know when that was adopted?

18     A.     It's in the policy book, sir.  Not off the

19 top of my head.  We have it.

20     Q.     Okay.  Now isn't it, in fact, true that

21 Mr. Thompson became county administrator December of

22 2013?  Isn't that true?  Does that refresh your

23 recollection?

24     A.     December 2013?

25     Q.     Right.

1    A.    Possibility.

2    Q.    All right.  Now, that was only two months

3 before he was pulled over for the suspended license,

4 correct?

5    A.    You have the hire date and date of arrest.

6 I mean, that's plain.

7    Q.    About two months, right?  Yes or no?

8    MS. TURNER:  Your Honor --

9    THE WITNESS:  December 13, January,

10 February.

11    MS. TURNER:  -- objection.  My

12 objection would be they've gone into this

13 numerous occasions when he was hired.  He

14 says he's not exactly certain.  He thinks

15 it was sometime around that time.  He

16 doesn't know for sure, and he's trying to

17 force him to say things that he doesn't

18 know for sure.

19    MR. COLOM:  Your Honor, these

20 speaking objections are inappropriate.  If

21 she has something on the rules of

22 evidence, then I'll move on.

23    MS. TURNER:  Asked and answered would

24 be my objection.  I'm just explaining the

25 objection.  It's asked and answered.  He's

1    stated before that he can't remember
2    exactly when he was hired. He's
3    speculating.
4        THE WITNESS: It doesn't have anything
5        to do with when he was hired.
6    BY MR. COLOM: (Continuing)
7    Q.    And now I have a new question, which is:
8    Between December 2nd, 2013 and February 2nd, 2014 is
9    two months? Yes or no?
10   A.    Yes, that's two months.
11   Q.    Now, isn't it true that during those two
12   months that you and Mr. Thompson had some encounters
13   over the budget he was doing for Tunica County?
14   Isn't that true?
15   A.    Other than my chief responding to
16   Mr. Thompson. Mr. Thompson has no authority over
17   the sheriff's office budget according to the law.
18   You should know the sheriff has exclusive control
19   over the sheriff's office. I deal with the board of
20   supervisors. I don't deal with Mr. Thompson.
21   Q.    Okay. Well, isn't it true that, in fact,
22   you and Mr. Thompson had an argument about that in
23   his office? Isn't that true?
24   A.    We had a disagreement and I was explaining
25   to Mr. Thompson that I report my budget to the board

1    of supervisors.  He has no authority over the

2    sheriff's office budget.

3         Q.    And you and him had that disagreement

4    before February 2nd, 2014, correct?

5         A.    We did.

6         Q.    All right.  And that was in Mr. Thompson's

7    office, right?

8         A.    That's correct.

9         Q.    And he ended up having to tell you to get

10   out of his office, didn't he?

11        A.    That's correct.

12        Q.    All right.  And the disagreement was about

13   what authority he had over the sheriff's office,

14   right?

15        A.    What was the question again?

16        Q.    The disagreement -- I think you've already

17   testified to this, but I want to be clear about it.

18        A.    Go ahead.

19        Q.    The disagreement was about what authority

20   he, as county administrator, has over your budget,

21   right?

22        A.    Right.

23        Q.    You disagreed with some of the decisions

24   he was making, right?

25        A.    He couldn't make a decision over the

1    sheriff's office budget.

2        Q.    Okay.  But he was trying to do something,

3    right?

4        A.    We had a conversation.  We were talking

5    about, I guess, the state or the county.

6        Q.    Right.  Do you recall when that was?

7        A.    When was the arrest?  February sometime?

8    Probably the last of January or first of February.

9    The first of February.

10        Q.    First of February?

11        A.    February, February.

12        Q.    So, first of February, you had a

13    disagreement with Mr. Thompson over what authority

14    he had over the Tunica County Sheriff's Office.  And

15    then, a couple of weeks later, Mr. Thompson is

16    arrested for driving with suspended licenses?

17            MS. TURNER:  Objection, Your Honor.

18        Again, he's testifying.  It's not a direct

19        question.

20            MR. COLOM:  Your Honor, I'm asking yes

21        or no, do you agree with that statement.

22            THE WITNESS:  What was your statement

23        again?

24            THE COURT:  I think he stated the

25        prior question.

1    BY MR. COLOM:  (Continuing)

2        Q.    My question -- your testimony -- tell me

3    if I'm wrong.  Your testimony is that early

4    February, you and Mr. Thompson had a disagreement

5    over his authority over the Tunica County Sheriff's

6    Office.  And, two weeks later or a short period

7    later, February 12th, Mr. Thompson was arrested by a

8    captain from the Tunica County Sheriff's Office for

9    driving with a suspended license.

10       A.    That's correct.

11       Q.    After being told by that captain, who knew

12   his license was suspended, to drive?

13           MS. TURNER:  Objection, Your Honor.

14           He has no knowledge as to what that

15           captain said to his client.

16           MR. COLOM:  I strike the question and

17           move on, Your Honor.

18           THE COURT:  All right.  Please do so

19           or else that will be -- that will be

20           hearsay.

21           MR. COLOM:  Thank you, Your Honor.

22    BY MR. COLOM:  (Continuing)

23       Q.    Now, after Capt. Jones -- to the best of

24   your knowledge, Capt. Jones arrested Mr. Thompson

25   when he found out he was driving with a suspended

1   license, right?

2       A.    Yes.

3       Q.    And he put the handcuffs on him and he

4   took him to jail and he booked him?

5       A.    That's correct.

6       Q.    Right?

7       A.    That's correct.

8       Q.    And, in fact, you talked to Mr. Jones,

9   Capt. Jones, while this was going on, didn't you?

10  Y'all had some conversations, didn't you?

11      A.    Well, I talked to him after the fact of

12  Mr. Thompson's arrest.

13      Q.    Okay.  What did he tell you?

14            MS. TURNER:  Objection, Your Honor.

15      This has no relevance at all on this case

16      as to whether or not his client is guilty

17      of driving with a suspended license.

18            THE COURT:  Any way you can make it

19      relevant?

20            MR. COLOM:  Yes, Your Honor.  It goes

21      to the defense of entrapment to show --

22      this testimony is important to what were

23      the motives of Capt. Jones in pulling

24      Mr. Thompson over and what knowledge did

25      the sheriff have about those actions.

1  MS. TURNER: And, again, my objection

2  would be that any conversations they had

3  after the arrest would have no bearing on

4  entrapment. If they're -- if he's trying

5  to implicate that there was some kind of

6  conspiracy, which is where his testimony

7  seems to be going, that would have been

8  long before the arrest was made.

9  THE WITNESS: That's correct.

10  MR. COLOM: Excuse me. But, Your

11  Honor, the conspiracy can be part of the

12  -- I mean, the fact if Capt. Jones called

13  Sheriff Hamp and the captain says, you

14  know, "Sheriff, I got him, we got him,"

15  that would certainly be strong evidence

16  that's how Capt. Jones' actions

17  were interpreted. So, these are

18  legitimate questions and it's

19  cross-examination.

20  THE COURT: Okay. It is

21  cross-examination.

22  THE WITNESS: Okay. I don't know if

23  I'm in entrapment court or traffic court.

24  I will tell you this: I did receive a

25  call from Capt. Jones. The call was that

1  Ellis Pittman, who is the county attorney,

2  was trying to reach him and he was trying

3  to reach me.  He told me what's going on

4  with Mr. Thompson's arrest.  That's when

5  he said that -- gave me the information

6  about the traffic stop.  So, therefore --

7  BY MR. COLOM:  (Continuing)

8  Q.   Let me stop you there.  What did he tell

9  you?  You said he gave you information on the

10 traffic stop.  What did he tell you?

11 A.   He told me that he arrested Mr. Thompson

12 for driving under a suspended license and

13 Ellis Pittman was on his way up to the office.  And

14 I do have a tape with the conversation with

15 Ellis Pittman and Michael Thompson on it regarding

16 the arrest.  So, I didn't get -- since Mr. Pittman

17 muddied the water on the things that were on this

18 tape and was talking in a monitored room -- I would

19 normally give someone an appearance bond, so to

20 speak, just to release him, but since he was there

21 representing him, muddying the water, I didn't get

22 involved in that.  So, I let it take its course.

23 Mr. Thompson said that he was feeling ill.

24 And, normal practice, they will call the EMS to make

25 sure that the arrestee was afforded medical

1   attention.

2        Q.    Sir, how did you find out about that; that

3   he said he was feeling ill?

4        A.    After the fact.  I found out after the

5   fact.

6        Q.    Who told you?

7        A.    The jail.  I spoke with someone at the

8   jail.

9        Q.    Oh, okay.  So, they told you Mr. Thompson

10  was feeling ill?

11       A.    Sir?

12       Q.    They told you that Mr. Thompson was

13  feeling ill?

14       A.    Yes.  Normally, when an ambulance is

15  called to the jail, the dispatcher will call and

16  tell me that someone is receiving medical attention

17  in the jail.

18       Q.    Did you do a press release to anyone about

19  Mr. Thompson's arrest?

20       A.    The media came to see me after the fact.

21  I didn't do an initial press release.  The county

22  attorney, Ellis Pittman, did a press release.

23       Q.    Okay.  So, did you contact the media at

24  all and tell them about the arrest?

25       A.    I doubt it.  What happened is that once a

1   person is arrested, we have a website.  We put it on

2   the website and people will go onto the website and

3   see the information.  So, if one gets arrested like

4   now, then that picture and information will go on

5   the website, public information site.

6        Mr. Ellis Pittman, the same eve of the

7   arrest, he did a press release, a press release.

8   Mr. Ellis Pittman, the county attorney.

9        Q.   How do you know he did a press release?

10       A.   It was on the news.

11       Q.   Well, are you saying it said on the news

12  that Mr. Pittman did a press release?  Did you see

13  Mr. Pittman do a press release?

14       A.   After the fact, I read in the paper.  I

15  looked online and saw Mr. Pittman gave the media

16  some information concerning Michael Thompson's

17  arrest.

18       Q.   You don't know if the media contacted

19  Mr. Pittman or Mr. Pittman contacted the media?  You

20  don't know who contacted who first?

21       A.   I don't know who contacted first.  I

22  wasn't there.

23       Q.   Okay.  Now, you said something

24  interesting.  You said you doubt that you did a

25  press release, right?

1    A.    I know I did not do a press release.  That

2 was after the fact.  During the time we were in

3 justice court is when the media talked to me.  That

4 was way down the road when the media talked to me.

5 During the time of Mr. Thompson's arrest, no, I did

6 not talk to the media.

7    Q.    You don't recall doing an interview with a

8 TV station about Mr. Thompson's arrest the night of

9 the arrest?

10    A.    No, not the night of the arrest.  I don't

11 recall that.

12    Q.    The next day, you didn't do a press

13 release?  You didn't do an interview with a

14 newspaper -- with a television station from Memphis?

15 You don't recall that interview, or newspaper, about

16 Mr. Thompson?

17    A.    That's been some while ago.  I remember

18 before we went to the court, justice court on a

19 traffic citation.  I remember doing a -- I was

20 questioned by the media prior to that based upon

21 Mr. Thompson's arrest.  I told them I couldn't

22 release anything; all the information was pending.

23    Q.    All right.

24    A.    Because it hadn't been heard in court.

25 That's what I released to the media.

1    Q.    Okay. Well, I submit to you that you did

2  an interview, but I'll move on. I'll move on.

3    A.    Okay.

4    Q.    Now, do you know if anyone in the

5  sheriff's office did a press release informing the

6  public of Mr. Thompson's arrest? Can you say yes or

7  no whether anybody did?

8    A.    No.

9    Q.    You can't say whether --

10    A.    I can't say. Ellis Pittman, the county

11  attorney, did a press release.

12    Q.    Okay. Listen to my question.

13  Ellis Pittman doesn't work for the sheriff's office,

14  does he?

15    A.    He does not.

16    Q.    My question is, yes or no, can you say

17  under oath that nobody from the Tunica County

18  Sheriff's Office did a press release notifying the

19  public of Mr. Thompson's arrest?

20    A.    I can't recall. No, sir.

21    Q.    All right. Can't recall. Now, do you

22  recall a meeting that you conducted with the

23  Tunica County Sheriff's Office employees, before

24  Mr. Thompson's arrest, where you discussed needing

25  to arrest Mr. Thompson?

1    A.    Oh, negative.  No, sir.

2    Q.    So, you're saying under oath you never had

3    a conversation with Capt. Jones about conspiring to

4    arrest Mr. Thompson because of the disagreement you

5    were having over his conduct with your budget?

6    A.    No, sir.  That officer had power of

7    discretion whether he make an arrest or not.

8    Q.    You never had a conversation with anybody

9    from Tunica County Sheriff's Office, nor employee,

10   about Mr. Thompson's license being suspended and the

11   need to arrest him?

12   A.    No, sir.  I spoke with Capt. Jones who

13   brought it to my attention that Mr. Thompson had a

14   suspended license.

15   Q.    That's the only conversation you had about

16   Mr. Thompson's license being suspended?

17   A.    He just had a suspended license.

18   Q.    Okay.

19   A.    Mr. Thompson drives a county vehicle

20   everyday.

21   Q.    What kind of vehicle does he drive?  What

22   kind is it?

23   A.    He drives a Tunica County vehicle

24   everyday.

25   Q.    Well, what type of vehicle?

1     A.    The one that's assigned to the county

2  administration's office.  Everybody in the county

3  knows it's there.

4     Q.    If you're so sure that Mr. Thompson drives

5  a county vehicle everyday, tell the Court what type

6  of vehicle he drives.

7     A.    Prior to his arrest, Mr. Thompson was seen

8  on numerous occasions driving the county

9  administrator's car, the ones that are assigned to

10  the county.

11      And where you're trying to lead to, if

12  Mr. Thompson was a target, we already knew that

13  Mr. Thompson -- I knew that he had a suspended

14  license versus -- on Ms. Karen Carter.  She'll

15  testify once she gets here.  If Mr. Thompson was a

16  target, he would have been arrested long ago before

17  his arrest date if he was a target.  He was no

18  target if that's what you're trying to lead to, sir.

19     Q.    You would agree with me if somebody to be

20  arrested for driving on a suspended license, they

21  got to be driving, don't they?

22     A.    Yes, sir.

23     Q.    All right.  Now, answer my question.  You

24  said Mr. Thompson was observed driving a county

25  vehicle, right?  Did you ever observe Mr. Thompson

1    drive a county vehicle?

2        A.    You're taking it out of context, sir.  I'm

3    not talking about the night of the arrest.  I'm

4    talking about prior.  See, you're trying to lead me

5    to say --

6            MR. COLOM:  I'm going to object, Your

7            Honor.  This is argumentative by the

8            witness here.  I'm not trying to lead him

9            to tell you -- I'm just trying to ask him.

10           He's being unresponsive.

11           THE WITNESS:  You are being --

12           MR. COLOM:  Excuse me, Your Honor.

13           I'm trying to object to the Court.  I'm

14           trying to ask him, yes or no, had he ever

15           seen Mr. Thompson drive a county vehicle.

16           That's a simple question.

17           THE WITNESS:  In the past, I have seen

18           Mr. Thompson drive a county vehicle.

19    BY MR. COLOM:  (Continuing)

20        Q.    Okay.  What type of vehicle?

21        A.    A white Crown Victoria that's assigned to

22    the county administration's office.

23        Q.    How many times have you seen him drive a

24    white Crown Victoria?

25        A.    Probably once or twice.  I don't know.  I

1  don't go around monitoring folks. You know, I've
2  seen once or twice the county administrator.
3      Q.    Did you know his license was suspended the
4  times you saw him driving the white Crown Victoria?
5      A.    Personally, no.
6      Q.    You didn't know?
7      A.    Personally, no, sir.
8      Q.    Okay. Now, do you recall when you and
9  Mr. Jones had this conversation about Mr. Thompson's
10 license being suspended?
11     A.    I do.
12     Q.    When?
13     A.    He called me on the cell phone stating
14 that after checking our people that were ran, all
15 the county employees, there were some people --
16 well, Michael Thompson's name was not on the list,
17 being the county administrator. If mine's being
18 checked, then Mr. Thompson is going to be checked
19 on, too.
20     Q.    So, you told Capt. Jones to check
21 Mr. Thompson's license?
22     A.    To my knowledge, yes, sir. I mean, he's
23 in Special Operations. He's in training to make
24 sure that along with -- everybody was in line with
25 the Fleet Safety policy.

1       Q.      When did you have that conversation with

2    Capt. Jones?

3       A.      It had to been prior to his arrest

4    evidently.

5       Q.      Okay.  Do you know how soon prior to his

6    arrest you had that conversation?

7       A.      I don't know.

8       Q.      Now, after you had this conversation with

9    Capt. Jones, did Capt. Jones ever call you and tell

10   you that he checked Mr. Thompson's license and the

11   license was suspended?

12      A.      He told me and I made a call to Montgomery

13   County and spoke with the clerk.

14      Q.      Okay.  Now, you --

15      A.      After he checked -- he said it was NCIC.

16   After he was checked, along with all the other

17   county employees, he had a suspended license.  And I

18   confirmed it with Ms. Karen there at Montgomery

19   County and the license was suspended because she

20   sends those suspension notifications in.

21      Q.      Okay.  At that point, you knew

22   Mr. Thompson, right?  At that point, you knew

23   Mr. Thompson?

24      A.      Yes, I knew of Mr. Thompson.

25      Q.      You didn't -- at the point you found out

1  his license was suspended, you didn't call
2  Mr. Thompson up and say, hey, Mr. Thompson, you
3  know, you got a suspended license for failure to
4  appear?  You didn't do that, did you?
5      A.    No.
6      Q.    Okay.  Because you had decided that you
7  wanted to embarrass Mr. Thompson because y'all had
8  this disagreement?  Isn't that -- under oath, won't
9  you be honest and tell us that's the real reason --
10     A.    No.
11     Q.    -- you arrested Mr. Thompson.
12     A.    No.  People are arrested everyday with
13 suspended drivers license.
14     Q.    But not everybody is a county
15 administrator, right?
16     A.    What does that mean?  Nobody's above the
17 -- everybody's not -- nobody's above the law, sir.
18     Q.    But not -- yes or no, not everybody's a
19 county administrator, are they?
20     A.    No.  If I drive my car and got a suspended
21 license, then they handle me with cause, sir, if I'm
22 violating the law.
23     Q.    You would agree with me that Mr. Thompson
24 is -- has some authority over the Tunica County
25 budget, right?  I mean, he works closely with the

1    board of supervisors, right?

2        A.    He has authority over the Tunica County

3    budget, not the sheriff's office budget.  The

4    sheriff has exclusive -- you're an attorney.  You

5    should know the law.  The sheriff's office has

6    exclusive authority over its own budget.

7        Q.    And that bothers you, doesn't it, that --

8        A.    No.

9        Q.    -- Mr. Thompson --

10       A.    No, no.  You know what exclusive mean?

11       Q.    Let me ask my question.  Let me ask my

12   question.

13       A.    Okay.

14       Q.    That bothers you, doesn't it, that

15   Mr. Thompson thinks he has some authority over your

16   budget?  That bothers you.  That's why you decided

17   that you were going to try to embarrass him?

18       A.    No, sir.  That did not bother me because I

19   know the law and I understand the law.

20       Q.    So, you're trying to -- this is my last

21   question.  You're trying to tell this Judge, who's

22   been practicing law for years, that it's just a

23   coincidence that shortly after you found out

24   Mr. Thompson's license was suspended and shortly

25   after you had this argument with him about, you

1    know, what authority he has over your budget, it's

2    just a coincidence that shortly after that, he was

3    pulled over by your office for driving with a

4    suspended license and arrested for it?  That's just

5    a coincidence?

6         A.    Sir, I was not out there on no traffic

7    stop.

8              MR. COLOM:  No further questions.

9              THE WITNESS:  If he wants to embarrass

10        -- okay.

11             THE COURT:  You have anymore

12        questions?

13             MS. TURNER:  Yes.

14   REDIRECT EXAMINATION BY MS. TURNER:

15        Q.    Sheriff, I'm going to be brief.  Dependent

16   of what questions you've been asked today --

17        A.    Yes, ma'am.

18        Q.    -- an overarching goal or implication here

19   is that you have a vendetta against

20   Michael Thompson?

21        A.    No, ma'am.

22        Q.    And could you expound on what it would

23   mean if someone who was driving a county vehicle was

24   pulled over without a license, what that would mean

25   for the insurance company?

1    MR. COLOM:  I'm going to object, Your

2    Honor.  It's several objections.  Lack of

3    foundation, that's the first objection.

4    She hasn't established that he knows this

5    information to answer the question.

6         Two, it calls for speculation.  She's

7    asking the witness to speculate about what

8    would happen, which is inadmissible in

9    court.

10        MS. TURNER:  I'm not asking him to

11   speculate, Your Honor.  He's the law

12   enforcement officer who has a duty to

13   uphold the law.  He has a duty to make

14   sure that these county vehicles are being

15   operated in a proper manner.  He said

16   that's part of their policy and procedure.

17        Counsel opposite went into great

18   details to find out whether or not that

19   was part of the policy and procedure.  I'm

20   trying to figure out why that's such a big

21   deal to the sheriff's department that

22   people that are driving county vehicles

23   not be operating them without a -- with a

24   suspended license.

25        MR. COLOM:  Well, Your Honor, that's

Thompson vs. State, 11/10/2014                  55

1       the question she needs to ask.  She asked

2       him if.  Anytime you ask a question with

3       if at the beginning of it, that's calling

4       for the witness to speculate.

5           MS. TURNER:  No, it's not.

6           THE WITNESS:  May I ask my attorney a

7       question?

8           MS. TURNER:  No.

9           THE COURT:  No.

10          MS. TURNER:  No, you can't ask.

11          THE WITNESS:  Okay.  Thank you.

12          MS. TURNER:  I'll just rephrase it.

13          THE COURT:  Yes, rephrase it.  I think

14      you can get it by rephrasing it.

15    BY MS. TURNER:  (Continuing)

16      Q.    You've already testified that y'all had

17  this policy about running people's driver

18  licenses --

19      A.    Right.

20      Q.    -- that were driving county vehicles.  Why

21  is that?

22      A.    One, the county administrator has a policy

23  adopted by the board of supervisors that the county

24  administrator shall enforce.  And it states on --

25  the state's county employees that have a --

1    shouldn't operate county equipment or motor vehicles

2    without having a valid drivers license based on

3    liability. So, he has a policy, himself, through

4    the county administration's office that was adopted

5    by the county.

6           Two, is that it's our job to make sure that

7    the county is left out of any liability at all times

8    because of potential lawsuits.

9       Q.    Have you ever specifically targeted

10   Mr. Thompson?

11      A.    Ma'am?

12      Q.    Have you ever specifically targeted

13   Mr. Thompson?

14      A.    No, ma'am. Mr. Thompson was seen all over

15   the county by a number of people, employees,

16   attending meetings and everything else. His license

17   has been suspended for a long time. If I -- based

18   on my training experience, if I had targeted

19   Mr. Thompson, he would have been arrested in the

20   county administration's car if I had targeted him,

21   but there was no target or neither to try to

22   embarrass him.

23      Q.    And did you ever tell Mr. Jones,

24   Capt. Jones, to arrest Mr. Thompson?

25      A.    Capt. Jones --

Thompson vs. State, 11/10/2014                    57

1      Q.      Did you give him that directive?

2      A.      No, ma'am.  Capt. Jones has the power of

3    discretion to do what he wants to do.  He was on a

4    traffic stop and I was somewhere else.  I don't have

5    anything to do with Capt. Jones' stop, neither can I

6    testify for Capt. Jones.  The only thing I can

7    testify to is the Tunica County Sheriff's Office

8    policy.

9      Q.      There were also some questions regarding

10   Capt. Jones' duties as a law enforcement officer,

11   what his normal duties are on a daily basis.  I know

12   he's retired now; is that correct?

13     A.      That's correct, ma'am.

14     Q.      But, at the time he was working for the

15   sheriff's department, did he patrol and --

16     A.      Yes, ma'am.

17     Q.      -- did he write tickets?  What all did he

18   do?

19     A.      He did a number of things that a law

20   enforcement officer should do.  He's worked

21   narcotics.  He was over the Special Operations

22   Division.  That consists of a whole lot of other

23   things, training, warrants, executing warrants,

24   minor detail patrolling.  I mean, a number of

25   things.

Thompson vs. State, 11/10/2014                    58

1    Q.    So, he had several different --

2          MR. COLOM:  I'm going to object to

3    that, Your Honor.  That's leading.

4          THE COURT:  I'm going to overrule it.

5    BY MS. TURNER:  (Continuing)

6    Q.    You can answer it.

7    A.    Can you ask me the question again, ma'am?

8    Q.    Did he have several different duties

9    involved with his job?

10   A.    Yes, ma'am, he did.  Those duties were to

11   include, but not limited to patrolling, training

12   officer, Special Operations, a captain at the

13   sheriff's office, whatever a law enforcement

14   officer's duty is.  To protect and serve, ma'am.

15   Q.    And you've already testified you weren't

16   at the scene?

17   A.    I was not at that scene, ma'am.

18   Q.    Do you recall whether or not you were

19   called shortly after the arrest or when you were

20   called to be notified about what had happened?

21   A.    I was called after the arrest.

22   Capt. Jones called me to state that Ellis Pittman,

23   the county attorney, had called him inquiring about

24   the arrest of Michael Thompson.  He shared with me

25   that Michael Thompson was arrested for driving with

1    a suspended license.  I had no other details.

2    That's all I knew that he was -- I didn't know

3    anything about the stop, things of that nature.

4          I just know that Capt. Jones called me.  He

5    said he was contacted by Ellis Pittman because he

6    had stopped Mr. Thompson and arrested him for

7    driving with a suspended license.  That's what he

8    gave me and said that Mr. Pittman was trying to

9    contact me and he was up at the sheriff's office.

10         Q.    So, he was trying to let you know that

11   Ellis was trying to contact you?

12         A.    That's correct.

13         Q.    All right.  Did you ever make contact with

14   Mr. Pittman?

15         A.    No, I did not.

16         Q.    And there were some questions regarding

17   press releases issued from the sheriff's department?

18         A.    Correct.

19         Q.    You're the sheriff, correct?

20         A.    That's correct.

21         Q.    Okay.  So, is there any policy in place as

22   to who in the sheriff's department is allowed to

23   give press releases?  Is there anyone other than you

24   that's allowed to give press releases?

25         A.    It's not a written policy, but my chief

1    deputy, Randy Stewart.  Then, it was Commander

2    Eugene Payne, who is now retired.  And, also,

3    there's a Commander Cedric Davis who's in charge of

4    the Criminal Investigation Division.  Those are the

5    only three allowed to make press releases.

6        Q.    And you said that wasn't a written policy,

7    but that's a policy that your sheriff's department

8    has?

9        A.    Well, it's not a written policy.  It's a

10   verbal policy.

11       Q.    A what?

12       A.    A verbal policy, verbal.  Just chain of

13   command.

14       Q.    A verbal policy, okay.

15       A.    Just chain of command.

16            MS. TURNER:  That's all I have.

17            THE COURT:  You may step down,

18        Sheriff.

19            THE WITNESS:  Sir?

20            THE COURT:  You may step down.

21            THE WITNESS:  Thank you, Your Honor.

22            THE COURT:  Who is your next witness?

23            MS. TURNER:  I call James Jones.

24            THE COURT:  He's in the jury room.

25        They got to go get him.

1   (A BRIEF PAUSE.)

2                  THE COURT:   Raise your right hand.

3                  MR. JAMES JONES,

4        having previously been duly sworn, was re-sworn

5   and examined and testified as follows, to wit:

6                  MS. TURNER:   Judge, may I approach the

7                  witness?

8                  THE COURT:   You may.

9   DIRECT EXAMINATION BY MS. TURNER:

10       Q.    I'm handing you a copy of a ticket that I

11  have.  Do you recognize that?

12       A.    Yes, ma'am, I do.

13       Q.    What is that?

14       A.    It's a ticket that occurred on Highway 61

15  North.  It's me, my handwriting, my signature.  It

16  was issued to Mr. Michael Thompson, Lawrence

17  Thompson, on February 12th.

18       Q.    Okay.  You're stating it happened on

19  February 12th?

20       A.    (Witness nodded head affirmatively.)

21                  MS. TURNER:   Your Honor, at this time,

22                  I would move to have the ticket, itself,

23                  amended.  There's a scribner's error

24                  wherein the date of the ticket, the actual

25                  issuance date, was not filled in.  I would

1       like to have that amended where the

2       scribner's error is concerned.

3               THE COURT:  Do you have any objection

4       to that?

5               MR. COLOM:  No, Your Honor.

6               THE COURT:  Okay.

7   BY MS. TURNER:  (Continuing)

8       Q.    And, on the day in question, do you recall

9   everything that happened that day in regards to your

10  arrest of Michael Thompson?  Is your memory clear

11  today?

12      A.    Yes, ma'am.

13      Q.    And you've testified in this case before,

14  correct?

15      A.    I have.

16      Q.    And what was your -- what time did you

17  come on to your job that day?  Do you recall?

18      A.    Don't know the exact time, to be accurate

19  with the Court, but it was sometime in the morning.

20  It was between -- it wasn't -- it was before

21  lunchtime.

22      Q.    Before lunch?

23      A.    Yes, ma'am.

24      Q.    And, that day, what was your plan to work?

25  What -- what -- you had several duties.  What are

1    your duties with the sheriff's department?

2      A.    Well, I was a captain, retired now,

3    supervisor of Special Operations Division.  That

4    consists of narcotics, traffic.  I was a cold case

5    investigator.  I did numerous -- tact commander at

6    the sheriff's office.  I did numerous roles at the

7    sheriff's department, at the sheriff's office during

8    that time frame during my employment here.

9      Q.    Do you recall when you went on patrol?

10      A.    Yes, I'm always on patrol.  I mean, I'm

11    out, you know, doing things all the time.  It's not

12    a particular time that I go on patrol.  I just go.

13    I don't have a marked unit.  I have a -- you know,

14    I'm always on patrol.

15      Q.    So, when you're at work, you may sometime

16    be doing this at the office, but you're on patrol

17    whenever you're in your car?

18      A.    Yes, I'm a sworn deputy.

19      Q.    Okay.

20      A.    I was a sworn deputy.

21      Q.    And, on the day in question, do you recall

22    who you encountered on Highway 61 North as driving

23    the vehicle in question?

24      A.    Yes, encountered Mr. Alex T. Wiley and

25    Mr. Michael Thompson as the passenger.  Alex T.

1  Wiley was the driver of the particular vehicle.

2      Q.    Had you seen that particular vehicle

3  before?

4      A.    Yes, I had seen it before.

5      Q.    And did you know Mr. Wiley?

6      A.    No, I didn't know Mr. Wiley. Never met

7  him before.

8      Q.    You had never met him?

9      A.    No, ma'am.

10      Q.    And why did you make the stop?

11      A.    Well, Mr. Wiley was traveling down Highway

12  61 North going towards the casinos in the

13  Robinsonville area. I saw that vehicle go over the

14  yellow line several times. He made an illegal lane

15  change. From that point, I activated my blue lights

16  and I stopped him right before the intersection on

17  Highway 61 and Casino Strip, that intersection

18  there.

19      Q.    And when you pulled him over, you

20  obviously approached the vehicle, correct?

21      A.    That's correct.

22      Q.    And Mr. Wiley was on the driver side?

23      A.    That's correct, he was.

24      Q.    And, at that time, would you just tell

25  us -- lead us to the arrest. What happened next?

Thompson vs. State, 11/10/2014

65

1    A.    Yes.  When I approached the vehicle, I

2  asked Mr. Wiley, I asked Wiley was he -- was

3  everything okay.  He said, yes, yes, sir, it was.

4    Q.    Why did you ask that question?

5    A.    Just to make sure he wasn't a drunk

6  driver, no one drinking or something to that nature

7  right there, make sure everything was good, make

8  sure he wasn't on any kind of controlled substance

9  or medication, things of that nature.  Just normal

10  protocol --

11    Q.    Okay.

12    A.    -- to ask.

13    Q.    And then what happened next?

14    A.    Mr. Wiley introduced himself to me as the

15  comptroller.

16    Q.    Of Tunica County?

17    A.    Of Tunica County, that's correct.

18    Q.    Okay.  And when he did that, what happens

19  next?

20    A.    After he introduced himself as the

21  comptroller, I looked down and saw Mr. Thompson to

22  my right here in a gray suit and tie.  He introduced

23  himself as the county administrator to me.

24    Q.    So, prior to stopping the vehicle, did you

25  know that Michael Thompson was in the passenger side

1   of the car?

2       A.    No, ma'am.

3       Q.    Do you know that -- prior to stopping the

4   vehicle, were you aware who the driver was?

5       A.    No, ma'am.

6       Q.    So, you really didn't know who you had

7   pulled over?

8       A.    No, ma'am.  There's vehicles -- ma'am,

9   all -- so many vehicles come through this area, it's

10  unheard of.

11      Q.    Then what happens next after he tells you

12  he's the comptroller and Michael Thompson introduces

13  himself, as well?

14      A.    I asked Mr. Thompson was he okay -- not

15  Mr. Thompson, but Mr. Wiley.  He gave me his

16  license.  I ran his license through National

17  Criminal Information Center.  His license came back

18  reinstated, eligible for valid, DL, something.

19          Of course, I didn't know what that mean.

20  So, I asked the dispatch what did that mean.  They

21  said that they didn't have a clue what that mean.  I

22  never heard it before.  In conversating with

23  Mr. Wiley, he told me he had gotten a ticket in D.C.

24      Q.    In Washington, D.C.?

25      A.    That's correct.  He had been up there

1   working or something to that nature.  And he told me

2   that he didn't know whether it was valid or there

3   was a -- something was going on with his license.

4   We waited and ran it through the Tennessee database.

5   We waited, we waited.  We didn't get a response back

6   in a timely manner.

7        Q.    So, you didn't get a response in a timely

8   manner?

9        A.    No, ma'am.

10        Q.    What did you do next?

11        A.    At that point in time, I approached Mr. --

12   as a courtesy to Mr. Wiley -- I knew another

13   passenger was in the vehicle, Mr. Thompson.  Showing

14   him courtesy, I could have wrote him several

15   violations, but I didn't.  Showing him courtesy, I

16   asked Mr. Wiley -- Mr. Thompson, Mr.

17   Michael Thompson, is his license valid.  He said,

18   yes, they are.  I asked him, well, can you drive

19   this vehicle for Mr. Wiley and he said, yes.  And

20   that's when he took control of the vehicle.

21        Q.    Why did you ask him if he could drive the

22   vehicle?

23        A.    Because we didn't have -- didn't have

24   information on Mr. Wiley at the time, his license.

25   I never heard of the valid, eligible for DL before

1    and the dispatcher didn't have a clue what was going

2    on.  That's why we were waiting on Tennessee to let

3    us know something.

4         Q.    Do y'all have a policy about -- in the

5    sheriff's department about letting passengers drive

6    vehicles when someone is pulled over for invalid

7    drivers license?

8         A.    No, they can't drive.

9         Q.    Who can't drive?

10        A.    The individuals whose licenses are

11   suspended or something going on with their license.

12   We're not going to let them drive.  That's the

13   policy.

14        Q.    Okay.

15        A.    That's the law, rather.

16        Q.    Right.  And so, do you know whether or not

17   the sheriff's department has a policy regarding how

18   that situation is handled, whether or not the car is

19   towed or someone is called or --

20        A.    Yes.  If an individual has a suspended

21   license or something of that nature, protocol is

22   they're transported to the Tunica County Detention

23   Center.  From that point, their vehicle is towed.

24        Q.    And what if they have people in the

25   vehicle with them?

Thompson vs. State, 11/10/2014

69

1    A.    They can take possession of that

2  particular vehicle, the individual in question, if

3  there are two people in the vehicle.  If there's one

4  with their drivers license suspended or something

5  going on with their license, they're not able to

6  drive.  If there's someone in there with license

7  that's good and legit, they can take control of the

8  vehicle.  They can take control of the vehicle.

9    Q.    And so --

10    A.    If their license are legit.

11    Q.    If their license are non-suspended?

12    A.    That's correct.

13    Q.    Do you normally run the drivers license of

14  the passenger before they take control of the

15  vehicle or not?

16    A.    Normally, we do.

17    Q.    Normally, you do?

18    A.    That's correct.

19    Q.    Did you do that in this incidence?

20    A.    I didn't run them directly when he took

21  control of the vehicle.  We were still waiting.  So

22  much was going on.  We were waiting on Mr. Wiley's

23  information to come back and I -- you know, when I

24  asked Mr. Thompson about his license, were they good

25  license, Mr. Thompson was very deceptive to me.  I

1    knew he was lying to me at that particular time

2    about his license being legit, being -- not -- not

3    -- being not suspended, that nature right there.

4    Unless he had gotten them done, you know, maybe,

5    later that day or that late afternoon.

6        Q.    So, you had reason to believe that he may

7    not have a valid drivers license, but you weren't

8    certain; is that correct?

9        A.    That's correct.

10       Q.    Are you stating that you had knowledge

11   because you had run his license before?

12       A.    Yes, ma'am.

13       Q.    And why did you do that?

14       A.    Well, during the -- we had a mission,

15   investigation going on pertaining to a lot of things

16   going on within the county.  And Mr. Wiley -- we

17   have a -- we have a -- running driving license,

18   names of all individuals in the county, registered

19   county vehicle and their license are ran through --

20   it's policy actually.  Mr. Thompson's name -- I

21   think he sent out the list over to the sheriff's

22   department, but his name wasn't on the list to get

23   his license ran.

24           So, we had just recently -- there's a

25   supervisor of maintenance, director of maintenance

Thompson vs. State, 11/10/2014

71

1  had -- it's right here, had got his license ran,

2  protocol for the county, and it came back they had a

3  warrant for him in Desoto County.  And what we did,

4  he was placed under arrest.  He was transported to

5  Desoto County.  There's a list as I see right -- I'm

6  looking at right here, ma'am.

7      Q.    Okay.  And why was Mr. Thompson's license

8  ran before the stop?

9      A.    For the initial -- we had an investigation

10  pertaining to Mr. Thompson and Wiley pertaining to

11  some -- we didn't know whether this guy existed, who

12  he was.  There was nothing -- we didn't know who

13  this gentleman was doing the -- authorizing the --

14  everybody else's license to be ran but his.  We

15  didn't know anything pertaining to him.  We know

16  there was some type of business deal between him and

17  Mr. Wiley that was going on.  We were looking out

18  for the best interest of this county.

19      Q.    So, as part of all county employees'

20  licenses being ran, you also ran his?

21              MR. COLOM:  I'm going to object.

22              THE WITNESS:  Yes.

23              MR. COLOM:  That's a leading question.

24      In fact, it's contradictory to his

25      testimony.  She's leading the witness.

Thompson vs. State, 11/10/2014

72

1          MS. TURNER:  I'll ask it another way.

2          THE COURT:  All right.  Go ahead.

3    BY MS. TURNER:  (Continuing)

4      Q.    So, there was a list of several county

5    employees whose licenses were ran, correct?

6      A.    That's correct.

7      Q.    And was it because they drove county

8    vehicles?

9      A.    That's correct.

10     Q.    Do you know whether or not Mr. Thompson,

11   at the time, was driving a county vehicle?

12     A.    Yes.  Yes, ma'am, he was.

13     Q.    So, is that the reason why his license was

14   ran?

15     A.    That's correct.  That's the reason his

16   license was ran?  You're asking me that?

17     Q.    That's what I'm asking.

18     A.    Yes, yes, that's correct.

19     Q.    Okay.

20     A.    His license was left off the list we

21   normally ran for the county.

22     Q.    So, after Mr. Thompson tells you he has a

23   valid license, what happens next?

24     A.    Mr. Thompson leaves and heads back to 61

25   North.  I get -- he goes down a way.  We finally got

Thompson vs. State, 11/10/2014

73

1   the information from NCIC, Tennessee database, that

2   said that Mr. Wiley's license was okay.  After that,

3   after he had left, I got -- initiated another

4   traffic stop on Mr. Thompson.  He was driving the

5   vehicle at the BP/Wendy's on Highway 61 North right

6   there in Robinsonville.

7        From that point, I approached the vehicle.

8   I advised Mr. Thompson that I then wanted his

9   license.  He gave me his license through the window.

10  Actually, he stepped out of the vehicle.  As I run

11  them through the NCIC database, they came back

12  suspended, failure to appear, Montgomery County.

13      Q.   And why did you initiate that stop?

14      A.   To get -- to make -- to check

15  Mr. Thompson's license.  I figured he was being very

16  deceptive.  Basically, was lying to me.

17      Q.   Okay.  And because of your prior knowledge

18  of that?

19      A.   That's correct.

20          MR. COLOM:  I'm going to object, Your

21          Honor.  That's a leading question.

22          MS. TURNER:  I'll rephrase.

23          THE COURT:  Rephrase that question.

24          MS. TURNER:  I'll strike.

25          THE COURT:  Okay.

1    BY MS. TURNER:  (Continuing)

2        Q.    And so, after you pulled over

3    Mr. Thompson, were you able to determine whether or

4    not his license was valid?

5        A.    Yes, ma'am, I was.

6        Q.    And what was the end result of that?

7        A.    As I ran Mr. Thompson's license through

8    the NCIC, National Criminal Information database,

9    the license came back -- dispatch advised the

10   license came back suspended for failure to appear in

11   Montgomery County.

12       Q.    So, what did you do at that time?

13       A.    At that point in time, Mr. Thompson asked

14   me where is Montgomery County located at and I told

15   him between Grenada County and Jackson, Mississippi

16   and asked him was he familiar with the ticket.  He

17   had gotten tickets there -- got a ticket there.

18   That's it and I told him -- followed protocol and

19   placed him, and we transported him to the

20   Tunica County Detention Center.

21       Q.    And, at that point, he was arrested for

22   driving without {sic} a suspended license.  Was

23   there anything else he was arrested for?

24       A.    No, ma'am.

25       Q.    Okay.  And I just want to go ahead and ask

1    you some questions based on some of the testimony

2    we've already heard today.  Were there ever any

3    conversations between you and the sheriff regarding

4    whether or not Mr. Thompson should be arrested?

5        A.    No.  I didn't talk with the sheriff.

6    That's on my officer's discretion.

7        Q.    And did this happen in Tunica County?

8        A.    Yes, ma'am.

9        Q.    What judicial district?

10       A.    Third Judicial District.

11       Q.    Okay.  And do you see Michael Thompson in

12   the courtroom?

13       A.    Yes, ma'am.

14       Q.    Where?

15       A.    Black male to my right, dark suit, white

16   shirt, tie and glasses, brown shoes, black socks.

17            MS. TURNER:  May the record reflect

18            that he's identified him, Mr. Thompson.

19            THE COURT:  The record may reflect he

20            has thoroughly identified him.

21            MS. TURNER:  May I have just a moment,

22            Your Honor?

23            THE COURT:  Okay.

24   (A BRIEF PAUSE.)

25            MS. TURNER:  May I approach the