1          witness?

2                THE COURT:  Yes, ma'am.

3    (A BRIEF PAUSE.)

4                MS. TURNER:  May I approach the

5          witness, Your Honor?

6                THE COURT:  Yes.

7      BY MS. TURNER:  (Continuing)

8       Q.    Do you recognize these?

9       A.    Yes, ma'am.

10      Q.    What are those?

11      A.    They are the dispatcher's log sheets for

12   Tunica County Sheriff's Office.

13      Q.    And what do they depict?

14      A.    They depict my radio traffic notes in

15   order to -- call-ins with the -- Alex Wiley's

16   original traffic stop saying the license came in

17   eligible, but valid DL.  That's what dispatch ran

18   that they logged in on the sheet here.  And on the

19   second sheet, it's my traffic stop with Mr. Thompson

20   saying his license --

21                MR. COLOM:  I'm going to object to him

22          testifying to what the document says if

23          it's not introduced into evidence.  I

24          mean, he can identify it, but it hasn't

25          been introduced into evidence.  So, it's

1    inappropriate for him to testify as to

2    what it says.

3         THE COURT:  He's identifying it now.

4         MS. TURNER:  He's identifying the

5    radio traffic and what he was telling the

6    dispatcher.

7         THE COURT:  He was testifying as to

8    what he's telling the dispatcher?

9         MS. TURNER:  Correct.

10        THE COURT:  He can testify to that.

11        THE WITNESS:  Okay.  And the second

12   one is when I did the second initial stop

13   and saying that Mr. Thompson's license

14   came back -- well, it was ran and came

15   back suspended.

16        MS. TURNER:  Okay.  I wasn't trying to

17   introduce them into evidence.

18  BY MS. TURNER:  (Continuing)

19   Q.   And what was the date that this occurred?

20   A.   February 12th.

21   Q.   Of this year?

22   A.   That's correct, 2014.

23        MS. TURNER:  That's all I have.

24        THE COURT:  You may cross-examine.

25        MR. COLOM:  Thank you, Your Honor.

1   CROSS-EXAMINATION BY MR. COLOM:

2        Q.    Good morning, Capt. Jones.

3        A.    Good morning, sir.

4        Q.    Now, I want to start by asking you about

5   this investigation you had into Mr. Thompson and

6   Mr. Wiley.  So, before February 12th, 2014, you

7   knew who Michael Thompson and Mr. Wiley were?

8        A.    I knew the names.

9        Q.    You knew their names?

10       A.    That's correct.

11       Q.    In fact, you knew that Mr. Thompson was

12  the county administrator and Mr. Wiley was the

13  county comptroller, right?

14       A.    That's correct.

15       Q.    And you also -- in fact, y'all were -- the

16  Tunica County Sheriff's Office had opened an

17  investigation into Mr. Thompson and Mr. Wiley,

18  right?

19       A.    Correct.

20       Q.    And that investigation was issues,

21  stuff -- business things referring to the county,

22  and him and Mr. Wiley in a business together?

23       A.    That's correct.

24       Q.    Now, the sheriff, he knew about that

25  investigation, didn't he?

1     A.    Yes.

2     Q.    So, when y'all were running these licenses

3 of county employees, was that before or after y'all

4 had started this investigation into Mr. Thompson?

5     A.    Before.

6     Q.    Before, okay. So, when y'all ran

7 Mr. Thompson's -- did you run the license?

8     A.    I ran Mr. Thompson's license -- well,

9 dispatch communications.

10    Q.    Okay. And that was before the

11 investigation or --

12    A.    I ran it before.

13    Q.    Did the sheriff know that you were running

14 Mr. Thompson's license?

15    A.    Yes. I informed the sheriff that

16 Mr. Thompson's license was suspended.

17    Q.    So, you informed him. Did he know

18 beforehand that you were going to run Mr. Thompson's

19 license as far as y'all's investigation into him?

20    A.    Yes, that's protocol.

21    Q.    Okay.

22    A.    That's in any investigation.

23    Q.    Okay. So, the reason y'all were running

24 Mr. Thompson's license was because you were

25 investigating some business thing between him and

1    Mr. Wiley, right?

2        A.    Correct.

3        Q.    All right.  Now, after you ran

4    Mr. Thompson's license, you found out it was

5    suspended, right?

6        A.    Yes, sir.

7        Q.    And you told the sheriff?

8        A.    Yes, sir.

9        Q.    Do you know when that was?

10       A.    I'm sorry?

11       Q.    Do you know when that was?  How soon to --

12   how close to February 12th was that?

13       A.    It wasn't far from February 12th.  I don't

14   know the exact time, sir, to be accurate with the

15   Court.

16       Q.    Now, when you worked with the sheriff, did

17   the sheriff and you work closely together?

18       A.    Yes.

19       Q.    Did the sheriff ever tell you about a

20   disagreement he had with Mr. Thompson over what

21   authority the county administrator had over the

22   Sheriff's office?

23       A.    No, sir.

24       Q.    Whose idea was it to initiate -- well, let

25   me strike that.

1    The sheriff is the top law enforcement officer
2  for the county, right?
3       A.    That's correct.
4       Q.    So, there was -- all investigations have
5  to be approved by him, right?
6       A.    No, sir.
7       Q.    Well, let me ask about the investigation.
8  Did an investigation with Mr. Thompson and
9  Mr. Wiley's business dealings together, did the
10  sheriff know about that investigation?
11       A.    Yes, sir, he did.
12       Q.    Did he approve of your investigation into
13  that?
14       A.    It's not about approval in order to get an
15  investigation started.  You know, I don't -- we
16  don't get approval.  I didn't get approved from the
17  sheriff to investigate anyone.
18       Q.    When did you inform him of the
19  investigation?
20       A.    I think, maybe, January.
21       Q.    What did he say in response to this
22  investigation into Mr. Thompson's business dealings?
23       A.    Just look into it.  That's pretty much it.
24       Q.    He told you to look into it?
25       A.    That's correct.

1          MR. COLOM:  Now, one second, Your

2      Honor.

3   BY MR. COLOM:  (Continuing)

4      Q.    So, a month before you arrested

5   Mr. Thompson for driving with a suspended license,

6   you and the sheriff had decided to do an

7   investigation into the dealings between Mr. Wiley

8   and Mr. Thompson, right?

9      A.    Not necessarily a -- no, no, sir, it's not

10  necessarily a month.  I don't want to put a -- say

11  something that's not true to the Court.  I couldn't

12  tell you, at this point in time, when it initially

13  started.

14     Q.    Well, you said -- you just testified it

15  was January 2014.

16     A.    That don't mean it's months, sir.  It

17  could be January 31st, 20th, you know, anytime.

18     Q.    So, it may have been January 31st, 2014?

19     A.    No, sir, I'm not saying that.  You are

20  saying that.

21     Q.    Do you know?

22     A.    I don't know the exact date like I told

23  you.

24     Q.    Do you have any idea?

25     A.    I just answered that, sir.

1    Q.    My question, do you have any personal
2  knowledge that you can tell the Court on what date
3  you initiated the investigation?
4    A.    I can't without being untruthful.  I'm not
5  going to do that.  No, I can't.
6    Q.    On the day you wrote Mr. Thompson a ticket
7  for driving with a suspended license, you were the
8  captain of Special Operations, correct?
9    A.    Yes, sir.
10    Q.    You were not patrolling, were you?
11    A.    Yes, sir.
12    Q.    You were not --
13    A.    I'm a deputy.  I'm a sworn deputy.  Every
14  deputy that -- commander, chief, on down will
15  patrol.  But deputies, first, and our second job
16  comes out to that because all of us will put on
17  uniform at any discretion and do our duties.
18    Q.    Now, you recall this isn't my first time
19  questioning you?
20    A.    No, sir.
21    Q.    You testified before under oath in this,
22  right?
23    A.    Justice court.
24    Q.    You recall previously, me previously
25  asking you were you a patrolman and your answer

Thompson vs. State, 11/10/2014

84

1    being, no, I was not a patrolman?

2        A.    No, sir, I'm not a -- I'm saying I'm not a

3    patrolman.  I wasn't a patrolman.  But what I'm

4    telling you is, in any given instance, we revert

5    back to being a patrolman.  We got to -- whether

6    you're an investigator, Special Ops, commander,

7    chief.  That's what we do here in Tunica.

8        Q.    But you were not a patrolman?

9        A.    No, sir.  I wasn't a deputy on patrol on

10   that particular day if that's what you're asking me.

11       Q.    You claim on February 12th, 2014 -- excuse

12   me -- yes, February 12th, 2014, you claim you were

13   conducting traffic control on that particular day,

14   correct?

15       A.    Yes, sir.  I was -- actually, I wasn't

16   conducting traffic control, sir.  I was just

17   traveling, just driving, just obtaining that

18   particular vehicle that came in -- that was doing

19   illegal violations.

20       Q.    Okay.  So, now -- now, your testimony is

21   you weren't conducting traffic that day?

22       A.    I'm always conducting traffic.

23       Q.    Okay.  So now --

24       A.    If that answers your question.

25       Q.    -- did you give anybody else a ticket on

1    that day?

2         A.    No, sir.

3         Q.    So, the only traffic citation you gave on

4    February 12th, 2014 was Mr. Thompson?

5         A.    That's correct.

6         Q.    Now, you were not in a marked police car,

7    were you?

8         A.    I wasn't.

9         Q.    And you claim that you were traveling down

10   Highway 61 North when you observed a Ford Explorer

11   type vehicle traveling in the northbound lane,

12   correct?

13        A.    Yes, sir.

14        Q.    And you've seen that vehicle before,

15   right?

16        A.    Yes, sir.

17        Q.    Now, you knew that was Mr. Wiley then,

18   right?

19        A.    Didn't know whose vehicle it was.  I'm

20   sure it was.  I mean, I didn't know whose vehicle it

21   was at that time.

22        Q.    But you're sure it was Mr. Wiley?

23        A.    Yes.  He had a similar vehicle to that

24   nature.

25        Q.    Right.  And you claim that the driver of

Thompson vs. State, 11/10/2014                    86

1     this vehicle was traveling back and forth over the
2     yellow line, correct?
3          A.    Yes, that's correct.
4          Q.    You claim that you saw the driver swerve
5     twice in making an illegal lane change, correct?
6          A.    That's correct.
7          Q.    You claim that you didn't know whether the
8     driver was drunk or needed some assistance, right?
9          A.    That's correct.
10         Q.    At this particular time, you initiated
11    your blue lights and stopped the vehicle, correct?
12         A.    That's correct.
13         Q.    When you approached the vehicle, the
14    driver was Alex Wiley and not Mr. Thompson, correct?
15         A.    That's correct.
16         Q.    All right.  So, at that point,
17    Mr. Thompson was not driving with suspended license,
18    was he?
19         A.    He wasn't.
20         Q.    Mr. Wiley told you he was the comptroller
21    for the county, correct?
22         A.    Yes, sir.
23         Q.    Mr. Thompson was in the passenger side of
24    the vehicle, right?
25         A.    That's correct.

1     Q.    After you pulled Mr. Wiley over, you ran

2  his driver's license, correct?

3     A.    Yes, sir.

4     Q.    When you ran Mr. Wiley's license, they

5  came back valid, eligible for reinstatement,

6  correct?

7     A.    That's correct.

8     Q.    All right.  So, at that time, you had no

9  information that Mr. Wiley's drivers license was

10  suspended, did you?

11     A.    Or valid, that's correct.

12     Q.    Except for it said it came back valid,

13  eligible --

14     A.    -- eligible for DL.  That's -- that's

15  confusing.  I never heard of that in 20-plus

16  years --

17     Q.    Okay.

18     A.    -- of law enforcement.

19     Q.    Now, after hearing this from the

20  dispatcher, you asked Mr. Wiley what was going on

21  with his license, correct?

22     A.    Yes, sir.

23     Q.    Mr. Wiley told you he had gotten a ticket

24  in D.C., and you claim he told you he did not know

25  whether his license was valid or suspended?  You

1  claim that, don't you?

2      A.    That's correct, he did.

3      Q.    After you were told this, you asked

4  Mr. Thompson did he have a drivers license and

5  whether his license was valid, correct?

6      A.    Yes, sir.

7      Q.    And Mr. Thompson, you claim, told you his

8  license was valid, right?

9      A.    That's correct, he did.

10     Q.    Now, this is very important.  You then

11 told Mr. Thompson that you needed him to drive that

12 vehicle, didn't you?

13     A.    Needed him to drive the vehicle?

14     Q.    Those were your words; that you needed him

15 to drive the vehicle?

16     A.    Asked him would he -- could he drive -- if

17 the license was valid, could he drive the vehicle.

18 And I didn't force him to drive the vehicle if

19 that's what you're asking me.

20     Q.    Do you recall giving that previous

21 testimony?

22     A.    I recall you asking me that question.

23     Q.    And your testimony was, you then told

24 Mr. Thompson that you needed him to drive the

25 vehicle?  Wasn't that your testimony?

Thompson vs. State, 11/10/2014                    89

1      A.    I believe so, sir.

2      Q.    All right.  And that's the truth, isn't

3   it?  That's what you told Mr. Thompson?

4      A.    If I can relate to it, I believe so, sir.

5      Q.    All right.

6      A.    I don't have it in front of me, but I

7   believe so.

8      Q.    Now, at the time you told Mr. Thompson you

9   needed him to drive the vehicle, you knew his

10  license was suspended, didn't you?

11     A.    That's correct, previously.  Didn't know

12  whether he had gotten them valid or reinstated that

13  day or what, didn't know.

14     Q.    Right.  But you knew -- the last time you

15  had checked Mr. Thompson's drivers license, you knew

16  it came back his license was suspended, right?

17     A.    That's correct.

18     Q.    So, when you told him "you need to drive,"

19  you knew that there was a chance that he was going

20  to be driving with a suspended license, right?

21     A.    That's -- if he hadn't gotten it

22  reinstated, that's possible.

23     Q.    All right.  And your testimony was that it

24  was a practice at the time to run somebody's license

25  before you had them drive a vehicle?  Didn't you

1   testify to that?

2        A.    That's correct.

3        Q.    But you didn't follow that practice, did

4   you?

5        A.    That's correct.

6        Q.    And the reason you didn't follow that

7   practice, and be honest with the Court, is because

8   had you followed that practice, you wouldn't --

9   Mr. Thompson would have been informed his license

10  was suspended and you wouldn't have been able to

11  arrest him for driving with a suspended license

12  because, at that point, he hadn't driven; isn't that

13  true?

14       A.    Mr. Thompson knew his license was

15  suspended just like I did.

16       Q.    Okay.  Now, you testified to what

17  Mr. Thompson knew.  You're not Mr. Thompson, are

18  you?

19       A.    No, sir.

20       Q.    So, you can't testify to what Mr. Thompson

21  knows, can you?

22       A.    Sir?

23       Q.    So, you can't testify to what Mr. Thompson

24  knows because you're not him?

25       A.    I can't testify what he knows.

1    Q.    All right. Now, from that point,
2 Mr. Thompson left the scene; is that correct? He
3 drove off?
4    A.    Yes.
5    Q.    And about five or six miles later, you
6 pulled him over, right?
7    A.    No. Maybe, about two or three miles after
8 I got the -- after we got the initial report that
9 Mr. Wiley's license was valid, came back valid
10 through the Tennessee database.
11    Q.    Okay. Well, I want to understand. You're
12 saying within two or three minutes, you coincidently
13 got a call from Tennessee saying Mr. Wiley's license
14 was valid?
15    A.    That's correct.
16    Q.    All right. Now, you didn't give Mr. Wiley
17 a ticket for careless driving, did you?
18    A.    No.
19    Q.    That was the reason you pulled Mr. Wiley
20 over, wasn't it?
21    A.    As a professional courtesy at my
22 discretion, he wasn't given a ticket for careless
23 driving or any -- or illegal lane change. That's
24 strictly the officer's, police officer or a deputy's
25 discretion anywhere.

Thompson vs. State, 11/10/2014

92

1  Q.   So, you found it to give Mr. Wiley a
2  professional courtesy, but you didn't decide to give
3  that professional courtesy to Mr. Thompson, did you?
4  A.   I couldn't per policy.
5  Q.   Okay.  So, you're saying that a written
6  policy says you must arrest somebody for driving
7  with a suspended license?  You don't have any
8  discretion?
9  A.   Yes, sir.
10         MR. COLOM:  All right.  Your Honor,
11     may I approach?
12         THE COURT:  Yes.
13         MR. COLOM:  Where's the policy?
14     Didn't the Court have the policy?  May I
15     look at it?
16         THE COURT:  Yes.
17         MR. COLOM:  Thank you.
18 (A BRIEF PAUSE.)
19         MR. COLOM:  Your Honor, may I
20     approach?
21         THE COURT:  Yes.
22  BY MR. COLOM:  (Continuing)
23  Q.   Now, you point to me where in this policy
24  it says you have to arrest somebody for driving with
25  a suspended license.

Thompson vs. State, 11/10/2014

93

1      MS. TURNER:  Your Honor, I'm going to

2    object because he's not laid the proper

3    predicate that this is the entire policy

4    of the sheriff's department.

5      MR. COLOM:  Your Honor, this is the

6    policy they were referring to.

7      MS. TURNER:  It is the policy

8    regarding arrest, but not necessarily the

9    whole policy of the sheriff's department.

10      MR. COLOM:  Well, just let me ask my

11    question again, Your Honor.

12      THE COURT:  All right.

13  BY MR. COLOM:  (Continuing)

14    Q.    The policy that the sheriff's office

15  brought to court today, does that policy say

16  anywhere that you got to arrest a person who drives

17  with a suspended license?  You got no choice; you

18  got to arrest them?  Does that policy say that?

19    A.    Actually, it does if you're asking me.

20    Q.    Let me approach.

21    A.    "Revoked or Suspended Driver's License:  A

22  driver may be arrested when an officer has stopped a

23  vehicle and identified the driver as driving with a

24  revoked or suspended license."

25    Q.    Okay.

Thompson vs. State, 11/10/2014

94

1    A.    If the officer is unable to stop the
2  vehicle in a timely manner, he should {Sic} seek a
3  warrant for the violator's arrest.
4    Q.    Okay.
5    A.    It does say that.
6    Q.    All right.  Let me reverse it.  Now, you
7  understand the words "may be," don't you?
8    A.    I'm sorry?
9    Q.    You understand the word "may"?
10   A.    That's correct.
11   Q.    It doesn't say a driver shall be arrested,
12 does it?
13   A.    It doesn't.
14   Q.    It says a driver may be arrested.
15   A.    Okay.
16   Q.    And "may be arrested" means the officer --
17 he may not be arrested as well, doesn't it?  May
18 doesn't mean it's mandatory, does it?
19   A.    No, it doesn't.
20   Q.    Because shall -- if it was mandatory, the
21 policy would have said a driver shall be arrested,
22 wouldn't it?
23   A.    That's correct.
24        MR. COLOM:  Your Honor, I want to move
25        this into evidence.

Thompson vs. State, 11/10/2014

95

1    MS. TURNER: Objection, Your Honor.

2    There's been no predicate laid that that's

3    the entire policy of the sheriff's

4    department.

5    MR. COLOM: Your Honor, this is the

6    policy that they gave to the Court to

7    read.

8    THE COURT: The sheriff gave that

9    policy to the Court, to me.

10    MS. TURNER: May the sheriff review it

11    to see if it's the whole policy? Let him

12    review it. I asked him to bring the

13    policy regarding stops only, nothing else.

14    MR. COLOM: Well, Your Honor, the time

15    for that correction has passed. They

16    introduced this into evidence --

17    MS. TURNER: We didn't introduce it.

18    MR. COLOM: Excuse me. Well, it's

19    improper for the Judge to look at it.

20    They gave it to the Court. The Court

21    looked at it. If it's not in evidence,

22    the Court shouldn't have been looking at

23    it.

24    MS. TURNER: It's not evidence. It

25    was --

Thompson vs. State, 11/10/2014

96

1    MR. COLOM: Okay. Well, Your Honor, I
2    move it into evidence. It's a document
3    that they provided. If they didn't
4    provide the entire policy, that's their
5    fault. That's not a basis not to
6    introduce it into evidence.
7        THE COURT: Well, I'm going to rule
8    that based on what the sheriff handed to
9    me that was handed to this witness.
10       MR. COLOM: Yes, sir.
11       THE COURT: And this witness then read
12   from that document that the sheriff handed
13   to me and, basically, said that that was
14   the policy.
15       MR. COLOM: Thank you, Your Honor.
16   (EXHIBIT NO. 1, POLICY, WAS ADMITTED INTO EVIDENCE.)
17       THE COURT: Now, let me just say this:
18   I'm not saying that's the entire policy,
19   but that document that you read from just
20   now --
21       THE WITNESS: Right.
22       THE COURT: -- was given to me by the
23   sheriff.
24       THE WITNESS: Yes, sir.
25       THE COURT: All right. I believe that

Thompson vs. State, 11/10/2014

97

1          document contains what was read by this

2          witness to you as the policy.

3                  MR. COLOM:  Right.  Thank you, Your

4          Honor.

5     BY MR. COLOM:  (Continuing)

6          Q.     Now, you weren't in here when the sheriff

7     happened to testify, but let me -- if Sheriff Hamp

8     testified that it was the policy of the sheriff's

9     office to give officer discretion when it came to

10    arresting a person who was driving with a suspended

11    license, that testimony would have been wrong?  Is

12    that what you're saying?

13         A.     Now, repeat that to me again.

14         Q.     Okay.  If Sheriff Hamp testified --

15         A.     Had testified?

16         Q.     -- testified that officers had discretion

17    over whether they arrested someone who was driving

18    with a suspended license, your testimony is that

19    would have been wrong; that's not possible?

20         A.     Are you saying that Sheriff Hamp testified

21    to that, or you're asking me something what he --

22         Q.     I'm asking you a question.  My

23    understanding is your testimony is that you don't

24    have any discretion, although the policy said may be

25    arrested, you don't have any discretion when --

Thompson vs. State, 11/10/2014

98

1    A.    Again --

2    Q.    Let me finish my question.

3    A.    Okay.

4    Q.    You don't have any discretion when it

5    comes to arresting somebody driving with a suspended

6    license?  You got no discretion?  Is that your

7    understanding of the policy or not?

8    A.    That's what -- my understanding of the

9    policy.  That's not the whole policy, sir.  I have

10   here, if you would like to read it --

11   Q.    No, I don't.  I want you to answer my

12   question.

13   A.    I'm sorry.  I can't answer that question.

14   I don't know what you're asking me about the policy.

15        I know it's not the whole policy, Your

16   Honor.  I can't quote.  You know, I mean, it's --

17   it's -- I'm sorry.  I don't know how to answer that.

18   Q.    Now, let me ask you this:  Before you

19   pulled over Mr. Thompson, he didn't commit any

20   traffic violation, did he?

21   A.    No, sir.

22   Q.    He didn't speed, right?

23   A.    No.

24   Q.    He didn't do a careless or reckless

25   driving?

1      A.    Well, I didn't -- I didn't see what he did

2  along the way.  Before I -- when I caught up with

3  Mr. Thompson, he was getting ready to turn into the

4  rear of the Wendy's, the BP/Wendy's.

5      Q.    All right.  So, again, you had no probable

6  cause that he committed any traffic violations, did

7  you?

8      A.    No, sir.

9      Q.    And so, in fact, the only reason you

10  pulled Mr. Thompson over was because you thought he

11  might be being deceptive, right?

12      A.    Yes, lying to me.

13      Q.    All right.  And so, your understanding is

14  and what you're telling the Court is, you as a

15  former police officer, you had the ability under the

16  laws of the United States' Constitution to pull

17  somebody over because you thought they were being

18  deceptive?

19      A.    That's -- one of my jobs as being a -- let

20  me answer your question -- as being a Special

21  Operations officer deals with individuals coming

22  through here with large quantities of narcotics all

23  through the day and night and people lie all the

24  time.  Being deceptive is one of the things that I'm

25  trained to key on when it comes down to interviewing

1    individuals inside of a vehicle and outside their
2    vehicles.  Mr. Thompson lied to me.  I'm not saying
3    that I'm going against the Constitution, but that's
4    what happened.
5         Q.    But here's what's important.  Are you
6    telling this Judge that you, as a police officer,
7    are allowed to pull somebody over because you think
8    that they are lying?
9         A.    No, sir.
10        Q.    All right.
11        A.    I'm not saying that.
12        Q.    So, really, you're admitting to the Judge
13   that you had no probable cause to pull Mr. Thompson
14   over, did you?  You had no probable cause that he
15   had committed a violation of any law, did you?
16        A.    I have probable -- I had no probable cause
17   -- my probable cause on Mr. Thompson is stop lying
18   to me.
19        Q.    Okay.  So, your understanding is you can
20   pull over any citizen in the State of Mississippi if
21   you think they're lying to you?
22        A.    No, sir, not any citizen.
23        Q.    And Mr. Thompson has the same rights as
24   every other citizen?
25        A.    That's correct.

1    Q.    Right?

2    A.    Yes, sir.

3    Q.    You can't pull over everybody because you

4    think they're lying. You can't pull over

5    Mr. Thompson if you think he's lying, can you?

6    A.    No. I didn't -- I didn't say I could pull

7    over Mr. Thompson or anybody or every other citizen

8    either, sir.

9    Q.    All right. Now, other than that one

10   instance when you saw Mr. Thompson driving with a

11   suspended license after you told him he needed to

12   drive, right, you never saw Mr. Thompson drive with

13   a suspended license again, did you?

14        MS. TURNER: Your Honor, he keeps

15        paraphrasing by saying you told him he

16        needed to drive. That wasn't the

17        testimony you heard today. He keeps

18        saying that over and over.

19        MR. COLOM: Your Honor, let me clear

20        this up.

21        MS. TURNER: He said he needed to

22        drive.

23        MR. COLOM: That, in fact, was his

24        testimony. And, in fact, we can clear it

25        up. We can go to his previous testimony

Thompson vs. State, 11/10/2014

102

1    if you want.

2    BY MR. COLOM:  (Continuing)

3       Q.    But let's be clear to the Court.  You told

4    Mr. Thompson he needed to drive, didn't you?  That's

5    what you previously testified to and that's what you

6    testified to today?

7       A.    Sir, I don't know exactly what I told

8    Mr. Thompson.

9       Q.    Okay.

10      A.    Now, I don't know where my -- what's going

11   on in the -- my statement or things like that, but

12   if you're saying that I forced him to drive a

13   vehicle, that's not true.

14      Q.    All right.

15      A.    If I said he needed to drive the vehicle

16   once he told me his license was valid, then I told

17   him he needed to drive the vehicle, but I don't

18   know.  I can't say right now.

19      Q.    You want me to refresh your recollection

20   as to your previous testimony?

21      A.    Yes, sir, you can.

22           MR. COLOM:  Your Honor, may I

23           approach?

24           THE COURT:  Yes, you may.

25   BY MR. COLOM:  (Continuing)

Thompson vs. State, 11/10/2014                    103

1      Q.    All right.  Go to Page 17 -- Page 7,
2   actually.  Go to Page 15 -- let's actually just --
3   let's start at line 11, okay?
4      A.    Okay.
5      Q.    You agree with me this is your testimony,
6   correct?
7      A.    Right.
8      Q.    All right.  Now, read silently while I
9   read out loud.  "From that point, I asked
10  Mr. Thompson to wait for awhile, for a minute.  And
11  after that particular point, I went and asked
12  Mr. Thompson do he have a drivers license.  He
13  stated, yes.  I asked him, are your license valid?
14  He said, yes.  I said, you need to take control of
15  the vehicle."  Didn't I read that testimony
16  correctly?
17     A.    That's correct.
18     Q.    Okay.
19     A.    That is what's written here.
20     Q.    In fact, let's go to another page where I
21  asked you about this again.  Let's go to page --
22  this is still your testimony.  Here, let's go to
23  Line 5.  This is a question from me.  "Well, he
24  didn't have time to drive the vehicle, did he --
25  excuse me.  Well, he didn't have to drive the

1    vehicle, did he? Somebody else. He could have left

2    the vehicle there." That's my question, right? I

3    read that correctly?

4         A.    That's correct.

5         Q.    And your answer was "He could have called

6    his cousin from Chicago to get it. That's up to

7    him." My question, "So, you told him to drive the

8    vehicle?" Answer, "That's correct," right?

9         A.    That's correct what you're reading.

10        Q.    All right. Now, prior you said that

11   Mr. Thompson drove a county vehicle. Have you ever

12   seen him drive a county vehicle?

13        A.    Yes, sir, I have.

14        Q.    What kind of vehicle?

15        A.    It's a white, like Crown Vic type vehicle.

16        Q.    Okay. How many times did you see him

17   drive it?

18        A.    Once.

19        Q.    Once, okay. Was it before or after you

20   knew his license was suspended?

21        A.    Before.

22        Q.    Okay. Before. Now, after you found

23   out --

24        A.    My fault. Let me rephrase that. It was

25   before and after.

Thompson vs. State, 11/10/2014                    105

1    Q.    You saw him before and after?

2    A.    That's correct.

3    Q.    Okay.  So, when you saw --

4    A.    I saw him.  I saw him.  I saw him once.  I

5    don't know when his license was -- I do know when

6    his license got suspended, but it was before.

7    Q.    All right.  So, did you see him drive this

8    white Crown Victoria after you found out his license

9    was suspended?

10   A.    I really can't say to the Court.  I really

11   can't.

12   Q.    Okay.

13   A.    I'm being accurate.

14   Q.    Now, after you arrested Mr. Thompson, you

15   let Mr. Wiley drive that vehicle, didn't you?

16   A.    That's correct.  After, finally, his

17   license came back eligible.

18   Q.    Now, even though the policy says that you

19   may arrest a driver when they're driving with a

20   suspended license, you decided to arrest

21   Mr. Thompson, didn't you?

22   A.    That's correct.

23   Q.    When you arrested Mr. Thompson, you called

24   the sheriff, didn't you?

25   A.    I called, that's correct.  I did later on

1    when I -- after I got Mr. Thompson taken care of

2    down to the sheriff's office.

3         Q.    Why did you call the sheriff?

4         A.    To let him know that the county

5    administrator had got arrested, got arrested.

6         Q.    Okay.  What did you tell him?

7         A.    Same thing I just said.

8         Q.    Did you tell him anything else?

9         A.    No, sir.

10        Q.    Did you tell him anything about

11   Ellis Pittman or anything like that?

12        A.    No.

13        Q.    All right.  So, after he was arrested and

14   taken -- did you go with him when he was booked?

15        A.    That's correct.  I came.  I came there

16   right after they got Mr. Thompson down to the

17   sheriff's office.

18        Q.    Now, after Mr. Thompson was arrested,

19   somebody from the Tunica County Sheriff's Office

20   sent out a press release about his arrest; isn't

21   that true?

22        A.    I believe so.  That -- that -- I don't

23   know when, but I saw -- I'm sure I heard of it.

24        Q.    Okay.  Right.  And the reason they sent

25   out that press release notifying the public of

Thompson vs. State, 11/10/2014                    107

1    Mr. Thompson's arrest is because they wanted to

2    embarrass him, right?

3        A.    I don't know.

4        Q.    Do they always send out -- did the

5    sheriff -- in your experience, does the sheriff's

6    office always send out press releases announcing

7    people's arrest?

8        A.    On a lot of people, yes, sir.

9        Q.    Okay.  But not everybody?

10       A.    I don't know.  I don't get involved in

11   that.  So, I really can't testify to that.

12       Q.    How long have you been working for the

13   Tunica County Sheriff's Office, Officer Jones?

14       A.    Approximately, four years.

15       Q.    Four years.  I mean, I'm sure during those

16   four years you've given people tickets for driving

17   with suspended license before, right?

18       A.    Yes.

19       Q.    Any of those previous instances where you

20   gave that person a ticket for driving with a

21   suspended license, did y'all send out any press

22   releases notifying the public of that arrest?

23       A.    I think there's a list of individuals that

24   -- I really don't know what's the protocol on that.

25   So, it's hard for me to testify to that.  I don't

1     know.  I don't want to say anything that's not

2     accurate, nor true.  I don't know, sir.

3         Q.     So, to the best of your knowledge, did the

4     sheriff's office, other than on Mr. Thompson, send

5     out press releases?

6              MS. TURNER:  Objection, Your Honor.

7              This has been asked and answered.  He says

8              he doesn't know.

9              MR. COLOM:  I'll move on.

10             THE COURT:  What was his answer to

11             that?

12             MR. COLOM:  I'll move on.

13             THE COURT:  All right.

14    BY MR. COLOM:   (Continuing)

15        Q.     Now, when you told Sheriff Hamp that he --

16    that Mr. Thompson's license was suspended, did he

17    tell you that he was having any conflicts with

18    Mr. Thompson?

19        A.     No, sir.

20        Q.     To the best of your knowledge, did he tell

21    anybody at the Tunica County Sheriff's Office about

22    these disagreements he was having with Mr. Thompson

23    over the budget?

24        A.     I don't have a clue.

25        Q.     All right.  Now, would you agree with me

Thompson vs. State, 11/10/2014                    109

1    that if you had not told Mr. Thompson that he needed

2    to drive the vehicle or if you had -- excuse me.

3    Strike that.

4         You said that two or three minutes after

5    Mr. Thompson drove off, you found out that

6    Mr. Wiley's license was actually valid, right?

7         A.    That's correct, notified by Tennessee.

8         Q.    So, if you had waited a couple of more

9    minutes before telling Mr. Thompson he needed to

10   drive, Mr. Wiley would have been able to keep

11   driving, wouldn't he?

12        A.    That's correct.  That's possible.

13        Q.    So, Mr. Thompson wouldn't have been

14   driving?  You wouldn't have seen Mr. Thompson

15   driving?

16        A.    That's correct.

17        Q.    So, in fact, if you hadn't told

18   Mr. Thompson that he needed to drive, Mr. Thompson

19   wouldn't have been driving with suspended license

20   that day, would he?

21        A.    I'm sure he probably would have.  I didn't

22   make Mr. Thompson do anything, nor that -- I was

23   strict professional with Mr. Thompson.  He can

24   attest to that, nor did I advise Mr. Thompson to lie

25   to me.  I didn't do any of that.  If he had just

1    told me the truth, "I can't drive, sir.  My license

2    is suspended," yes, sir, it would have been done.

3         Q.    Now, you keep accusing Mr. Thompson of

4    lying.  You understand that, right?

5         A.    I understand that.

6         Q.    Okay.  You would agree with me for

7    somebody to be lying they got to know something

8    they're saying is false, right?

9         A.    That's correct.

10        Q.    All right.  And, again, we've already gone

11   over this.  You can't testify to what Mr. Thompson

12   knows, can you?

13        A.    I'm not trying to testify for

14   Mr. Thompson.  I'm trying to answer your question

15   that you asked me.

16        Q.    Okay.  So, you can't really say

17   Mr. Thompson lied to you when he told you his

18   license was valid?  He could have thought his

19   license was valid, couldn't he?

20        A.    That's possible.

21        Q.    He could have forgot that he got a ticket

22   in Montgomery County and that's why he forgot to

23   pay, right?

24        A.    He could have forgot.

25        Q.    Okay.  Mr. Thompson is the county

Thompson vs. State, 11/10/2014

111

1     administrator for Tunica County, right?

2       A.     That's correct.

3       Q.     So, he's not struggling for money, is he?

4     He can pay a ticket?

5       A.     I don't know. I don't know anything about

6     Mr. Thompson's financial ability.

7       Q.     You agree that people forget to pay

8     tickets sometimes, right?

9       A.     That's -- I'm sure it will slip their

10     minds.

11       Q.     Okay. So, you accused Mr. Thompson of

12     lying. When you say under oath Mr. Thompson lied to

13     you, that's something you really probably shouldn't

14     say?

15       A.     No, I should say it.

16           MS. TURNER: Objection, Your Honor.

17           He's going over this over and over whether

18           or not he was lying. He's already

19           testified that, in his mind, he was lying

20           to him. That was his belief at the time

21           that he lied.

22           THE WITNESS: That's correct.

23           MS. TURNER: That was the officer's

24           belief.

25           MR. COLOM: Can I just respond to that

Thompson vs. State, 11/10/2014                    112

1    for the record?  What the problem is, the

2    officer had no basis for that accusation.

3    And I understand it a little bit, but when

4    you accuse somebody of lying, as a sworn

5    officer via sworn testimony that

6    somebody's lying, you know, that's a

7    pretty strong accusation to make against

8    somebody who has integrity like

9    Mr. Thompson.

10        MS. TURNER:  Objection, Your Honor.

11   Now, he's testifying.

12        MR. COLOM:  I'm responding to your

13   objection, which I'm allowed to do for the

14   record.  So, let me finish, please,

15   responding to the objection.

16        When you assault someone's integrity

17   like this officer is doing, I have a right

18   to question the officer about the basis of

19   that thought accusation.  That's all I'm

20   doing, but I can move on.

21        THE COURT:  Okay.

22        MR. COLOM:  Your Honor, may I consult

23   with my client?

24        THE COURT:  All right.

25   (A BRIEF PAUSE.)

Thompson vs. State, 11/10/2014

113

1          MR. COLOM:   A few more questions, Your

2      Honor.

3     BY MR. COLOM:   (Continuing)

4      Q.    Do you know if there's an arrest warrant

5   for Mr. Thompson from Montgomery County?

6      A.    Yes.   There was an arrest warrant for

7   Mr. Thompson from Montgomery County.   I don't know

8   what's -- well, I don't know.   You're saying are

9   there arrest warrants now or then?

10      Q.    Let me ask you this:   When did you find

11   out about this arrest warrant from Montgomery County

12   for Mr. Thompson?

13      A.    February 12th.

14      Q.    February 12th.   How did you find out about

15   it?

16      A.    Sheriff Hamp notified me.

17      Q.    When did he notify you of this?

18      A.    That particular day.   I don't know a time

19   frame if that's what you're asking me.

20      Q.    Before or after you arrested Mr. Thompson?

21      A.    Before.

22      Q.    So, the conspiracy gets -- so, Mr. Hamp

23   knew there was an arrest warrant for Mr. Thompson

24   the same day you pulled Mr. Thompson over; isn't

25   that true?

Thompson vs. State, 11/10/2014                    114

1    A.    When I ran Mr. Thompson's license, it came
2  back suspended, failure to appear.  Every failure to
3  appear in the court, the State of Mississippi sends
4  us a warrant.  That's what that's saying.
5    Q.    On February 12th before you pulled
6  Mr. Thompson over, Sheriff Hamp told you there was
7  an arrest warrant for Mr. Thompson in
8  Montgomery County?
9    A.    That's correct.
10    Q.    So the day that you, coincidently, ran
11  into Mr. Wiley driving the vehicle and told
12  Mr. Thompson he needed to drive the vehicle, you
13  knew at that time that there was an arrest warrant
14  out for Mr. Thompson, didn't you?
15    A.    I knew it when I ran his license.
16    Q.    So, when you pulled Mr. Thompson over, why
17  didn't you just arrest Mr. Thompson at that point if
18  there was an arrest warrant out for him?
19    A.    Didn't -- didn't have the validity of the
20  warrant, sir.  Didn't know whether -- you can say it
21  was an arrest warrant.  I can say it's an arrest
22  warrant on you or me, but until you get it in hand
23  or do your homework on it, you know, you can't -- it
24  can't -- it can't become valid.
25    Q.    Okay.  So, because you didn't have the

1  arrest warrant on hand, you needed another reason to

2  arrest Mr. Thompson, didn't you?  And that's why you

3  told him you needed him to drive; isn't that the

4  truth?

5       A.    No, sir, that's not another reason.

6  That's just you talking, not me.  Those are your

7  words.

8       Q.    All right.  It turned out that there was

9  no arrest warrant, was there?

10      A.    There was an arrest warrant for

11 Mr. Thompson.

12      Q.    There is not an arrest warrant signed by a

13 judge from Montgomery County, is there?

14      A.    There was an arrest warrant --

15      Q.    Did you have it -- I'm sorry.

16      A.    Go ahead.

17      Q.    Okay.

18      A.    There was an arrest warrant for

19 Mr. Thompson.

20      Q.    Have you ever seen an arrest warrant from

21 Montgomery County signed by a judge?

22      A.    No, not signed by a judge, but I have an

23 arrest warrant.

24      Q.    You would agree with me for there to be a

25 warrant to arrest someone, it has to be -- you're a

Thompson vs. State, 11/10/2014                    116

1    law enforcement officer.  There has to be -- the

2    warrant has to be signed by a judge, doesn't it?

3         A.    That's correct.

4         Q.    All right.  So, since you've never seen a

5    warrant signed by a judge, you can't testify that

6    Mr. Thompson ever had an arrest warrant from

7    Montgomery County, can you?

8         A.    That's correct.

9              MR. COLOM:  One second, Your Honor.

10             THE COURT:  How much longer do you

11         think you're going to be?

12             MR. COLOM:  One final question.  I'm

13         almost done.

14             THE COURT:  What was that?

15             MR. COLOM:  One final question.

16             THE COURT:  Oh, all right.

17             MR. COLOM:  Thank you, Your Honor.

18         Thank you very much.

19    BY MR. COLOM:  (Continuing)

20         Q.    Why didn't the Tunica County Sheriff's

21    Office take Mr. Thompson to the hospital after y'all

22    arrested him?

23         A.    I'm sorry?

24         Q.    Why didn't y'all take Mr. Thompson to the

25    hospital after he told y'all -- why didn't y'all

Thompson vs. State, 11/10/2014                    117

1    call the ambulance and have the ambulance take

2    Mr. Thompson to the hospital?

3        A.    You say why didn't we or why did we?

4        Q.    Why did you not?

5        A.    We did.  There was an ambulance called for

6    Mr. Thompson.  Mr. Thompson was -- Mr. Thompson's

7    blood pressure -- he said his blood pressure was up.

8    We called the ambulance.  They checked him out.

9    They said everything was good.  We established --

10   Lt. Hopson took Mr. -- and another investigator took

11   Mr. Thompson to the Baptist Desoto Hospital, which I

12   have records of here, and he was checked.

13       Q.    You got copies of Mr. Thompson's medical

14   records?

15       A.    I don't have copies of Mr. Thompson's

16   medical records.  I have copies of the communication

17   between Lt. Hopson, who took Mr. Thompson to the

18   hospital.  Mr. Thompson know he was taken to the

19   hospital.

20              MR. COLOM:  No further questions.

21              THE COURT:  All right.  Let me

22              interrupt you for a second.  I think we

23              need to take a break.

24   (OFF THE RECORD.)

25              THE COURT:  Are you ready?

1        MR. COLOM:  I rest -- well, I tender

2    the witness, Your Honor.

3        THE COURT:  You have any other

4    witnesses?

5        MS. TURNER:  I was just going to

6    redirect.

7        THE COURT:  Okay.

8    <u>REDIRECT EXAMINATION BY MS. TURNER</u>:

9    Q.    Mr. Jones, I just want to go back to the

10   day in question, February 12th, and get a few

11   things clear in your testimony.  When you stopped

12   Mr. Wiley and Mr. Thompson, did you know ahead of

13   time who was driving the vehicle?

14   A.    No, ma'am, I didn't.

15   Q.    And once you discovered that Mr. Wiley's

16   license was in question; that you weren't sure about

17   whether it had been suspended or not, what did you

18   do next?

19   A.    I talked, started talking.  I asked

20   Mr. Thompson a couple of questions in reference to

21   his driver's license, the validity of his license.

22   I asked him was he licensed, did he have license.

23   He replied, yes, he did.

24        MR. COLOM:  I want to object, Your

25    Honor.  This is -- this testimony has

1    already been asked and answered. It's

2    cumulative. It's unnecessary to go over

3    it again, Your Honor.

4        MS. TURNER: Well, I'm just laying the

5    foundation for getting started back in

6    with what exactly happened that day. I

7    just want to clear up some things from his

8    previous testimony, Judge.

9        MR. COLOM: Clear up a few things? I

10    don't know what she needs to clear up.

11    She had a chance to read the record, but

12    if there's something specific she wants to

13    add, there's some new testimony that's

14    responsive to my cross-examination, I

15    think it would be, you know, for the sake

16    of expediency, just get to that.

17        MS. TURNER: That's what I'm trying to

18    do.

19        THE COURT: You may continue.

20  BY MS. TURNER: (Continuing)

21    Q.    All right. You were cross-examined

22  earlier by counsel opposite regarding a transcript

23  from justice court.

24    A.    Yes, ma'am.

25    Q.    Do you recall that?

1      A.     I recall it. I do.

2      Q.     Do you recall what actually happened that

3  day when you talked to Mr. Thompson?

4      A.     Yes, ma'am.

5      Q.     Okay. Could you tell the Court what

6  exactly you said and what exactly was said to you?

7      A.     Again, after the validity of Mr. Wiley's

8  license, we didn't know what was going on with him.

9  I asked Mr. Thompson do -- I had already made up my

10 mind that Mr. Wiley wasn't going to drive the

11 vehicle until we find out what's going on with his

12 license.

13         I asked Mr. Thompson two questions. I asked

14 him was his license valid. He replied, yes, they

15 were. He said, yes, sir. That's what he told me,

16 ma'am. And I asked him is his license -- do he have

17 license. I'm sorry. That's the first thing I asked

18 him. He said, yes, sir. I asked him again were

19 they valid. He said, yes, sir.

20     Q.     And then you stated earlier you felt like

21 he was being deceptive based on your training and

22 experience. What about his response made you feel

23 that way?

24     A.     When I talked with Mr. Thompson, he never

25 did make eye contact with me. He looked away from

Thompson vs. State, 11/10/2014

121

1   me. He answered the question, but didn't make eye

2   contact with me. From that point on, I knew

3   beforehand his license was suspended and I was

4   concerned why was he lying to me at that particular

5   time.

6       Q.   Now, you also testified that there was a

7   chance that, maybe, he'd gotten reinstated from the

8   time. Is it true that that's something --

9            MR. COLOM: I'm going to object.

10           THE WITNESS: Yes.

11           MR. COLOM: That's a leading question.

12        She's trying to lead the witness into the

13        answer she wants.

14           MS. TURNER: I'll rephrase the

15        question.

16           THE COURT: Okay. Please rephrase the

17        question.

18   BY MS. TURNER: (Continuing)

19       Q.   Do you recall your earlier testimony when

20   we were here today?

21       A.   Yes, ma'am.

22       Q.   Okay. What were some of the concerns you

23   had about his license?

24       A.   Well, were they still suspended or has

25   Mr. Thompson paid his fine to get his license

Thompson vs. State, 11/10/2014                    122

1    reinstated to Jackson.

2        Q.    Okay.

3        A.    Those were my concerns.

4        Q.    I just wanted to be clear because you say

5    you knew the license was suspended.  You knew at one

6    time?

7        A.    That's correct.  I knew his license --

8             MR. COLOM:  Objection.

9             THE WITNESS:  -- was suspended when I

10            ran them.

11            MR. COLOM:  Objection.  Again, leading

12            the witness.

13            MS. TURNER:  I'll strike that.  I

14            think I got the protocol.

15            THE COURT:  Well, I'm going to sustain

16            the objection.  Do not lead the witness.

17            So, are you going to continue the

18            examination?

19            MS. TURNER:  I am, Judge.

20    BY MS. TURNER:  (Continuing)

21        Q.    Okay.  So, after that, prior to

22    Mr. Thompson taking control of the vehicle, did you,

23    in any way, force Mr. Thompson to take control of

24    the vehicle?

25        A.    No, ma'am.

1    Q.    Okay. What precipitated him taking

2    control of the vehicle? What happened?

3    A.    When I asked him was his license valid,

4    Mr. Thompson answered, yes, yes, sir, they are.

5    From that point on, I -- I wasn't going to let --

6    Mr. Wiley couldn't drive the vehicle because we were

7    still waiting on Tennessee database or someone to

8    let us know what does "eligible for reinstatement"

9    mean.

10        From that point on, I asked Mr. Thompson to

11   take -- no, he has to drive -- he was going to have

12   to drive the vehicle. We can't, you know -- from

13   that point, he got in the vehicle and he traveled

14   Highway 61 North, started traveling north on Highway

15   61.

16   Q.    Okay. Why did you stop the vehicle at

17   that time?

18   A.    Well, I felt Mr. Thompson was being

19   deceptive. So, what I did was call a Terry stop on

20   him, a quick investigation to find out what was

21   going on with his license, things of that nature

22   with it.

23        MR. COLOM: Counselor, I want to

24        object to that. First of all, that

25        question was asked and answered. I'm

1    going to move to strike that answer
2    because now he's giving a completely
3    different answer than his previous
4    testimony.
5          And it's quite clear he's been
6    instructed to give that answer from the
7    prosecutor. So, you know, this is, oh, I
8    need to do a Terry stop. But, previously,
9    he testified the only reason he pulled
10   Mr. Thompson over was because he thought
11   that Mr. Thompson was being deceptive, and
12   he admitted that that was not probable
13   cause to pull somebody over.
14         Now, on the redirect, the prosecutor
15   has just gotten to offer completely new
16   testimony that it was something to do with
17   a Terry stop. He didn't testify to that
18   in his direct; he didn't testify to it in
19   his cross-examination. Now, on redirect,
20   he's offering completely new testimony.
21         MS. TURNER: Your Honor, he's not
22   objecting to my question. He's objecting
23   to the answer that he's given. He's
24   allowed to testify to what his memory is.
25   I'm trying to clear up what his leading

Thompson vs. State, 11/10/2014

125

1   testimony brought out based on all of
2   these speculations and innuendoes that
3   there was some kind of conspiracy going
4   on. He didn't object to my question.
5   He's objecting to his answer.
6       MR. COLOM: Your Honor, I object to
7   the question. It's asked and answered.
8   And the testimony, testimony can also be
9   objectionable. And hearsay is testimony,
10  but it's objectionable. I'm saying his
11  testimony is cumulative. He's offering
12  new testimony that is directly
13  contradicted from his own previous
14  testimony.
15      In fact, it is quite clear -- if the
16  Court gives me redirect, I'm going to --
17  I'll ask him. It's quite clear that the
18  prosecutor told him to say this. You
19  know, to offer it as new testimony to try
20  to justify the stop.
21      He's already said -- Your Honor, you
22  heard him -- I pulled him over because I
23  thought he was being deceptive and I admit
24  to you that under the Constitution I don't
25  really have probable cause to pull

1    somebody over because I think they're

2    being deceptive.

3         Now, he's saying it was a Terry stop.

4    Why didn't he mention that before?

5    Because the prosecutor had told him to say

6    that.

7         MS. TURNER:  Your Honor, he's

8    paraphrasing what he said earlier, and he

9    has every right to testify to what he

10    remembers happened that day.

11         THE COURT:  All right.  I'm going to

12    allow you to continue.  Ask that question

13    again.

14  BY MS. TURNER:  (Continuing)

15    Q.    Okay.  What I asked was what precipitated

16  the stop the second time on Mr. Thompson?

17    A.    Again, I felt Mr. Thompson was being

18  deceptive, lying to me about what was going on with

19  the validity of his license, things of that nature

20  right there.  So, I -- as he took control of the

21  vehicle, I did a Terry stop on him, a quick

22  investigative stop on Mr. Thompson, to find out -- I

23  found out then his license was suspended.

24    Q.    Okay.  When you pulled him over, do you

25  recall, approximately, how long it took for you to

1   pull him over?  From the time you pulled him over

2   'til the time that you were able to verify one way

3   or the other whether his license was valid, do you

4   recall how long that took?

5        A.    Maybe, a minute from the time I pulled him

6   over in Wendy's parking lot there and got him out.

7   Mr. Thompson stepped out of the vehicle.  He was

8   right beside me when everything was going on.  I ran

9   his license.  He heard dispatch say they came back

10  suspended from Montgomery County.  Mr. Thompson

11  asked me -- he was standing right beside me -- where

12  is that located at.  I told him between Grenada

13  County and Jackson.  He said, oh, I remember.

14       Q.    And, after that, that's when you made the

15  arrest?

16       A.    That's correct.  I told him, you know,

17  what the protocol was and made the arrest.

18       Q.    All right.  Earlier there was some

19  testimony about the policy of the sheriff's

20  department.  Do you recall the piece of paper that

21  was given to the Judge that was entered into

22  evidence?

23       A.    Yes, ma'am, I do.

24       Q.    All right.  And you had something in your

25  hand?

1    A.    Yes, ma'am.  I was holding it up earlier

2    trying to get someone's attention.  This is dated

3    December 7th, 2012, license suspension -- suspended

4    and revoked.

5            MR. COLOM:  I'm going to object to

6            that, Your Honor.  That document is

7            hearsay.  It has no foundation for it to

8            be admitted into evidence.

9            MS. TURNER:  I was about to do that.

10          He just kept talking.  Would you allow me,

11          Your Honor?

12          THE COURT:  Go ahead.

13    BY MS. TURNER:  (Continuing)

14    Q.    Okay.  Do you recall all the questions

15    about policy?  Is this some additional documentation

16    that you have for this Court regarding the policy of

17    the sheriff's department as it pertains to stopping

18    people who do not have a valid drivers license?

19    A.    Yes, ma'am.

20    Q.    Okay.  What is that?

21    A.    The pol -- the --

22    Q.    Is it a memo?

23    A.    It's a memo.

24          MS. TURNER:  Your Honor, may I

25          approach?  May I approach?

1          THE COURT:  Yes, ma'am.

2     BY MS. TURNER:  (Continuing)

3      Q.    What is this document?

4      A.    It's a memo, reference from Commander

5   Eugene Bridges dated December 7th, 2012, license

6   suspended --

7              MR. COLOM:  I'm going to object, Your

8              Honor.  The document is hearsay.  That

9              document is a memo from someone else other

10             than the witness.  The witness can't

11             authenticate it.  Only the person who

12             wrote the memo can authenticate that he

13             wrote that memo that was sent out.  And

14             so, he doesn't have the -- he doesn't have

15             foundation.  You can't make a foundation

16             to admit it into evidence.

17              MS. TURNER:  Your Honor, if we were

18             talking about policy and we entered the

19             whole policy of the sheriff's department,

20             we need this to also be entered into

21             evidence because this is part of the

22             policy.  If that document is not hearsay,

23             this is not hearsay.  It's all policy of

24             the sheriff's department.  That's what

25             this is, a memorandum regarding the policy

1   and procedure of the sheriff's department

2   as it pertains to this particular type of

3   stop.

4        MR. COLOM:  Your Honor, may I respond

5   to that?  Because that's not a basis to

6   get around the fact that they can't

7   authenticate the document if that document

8   was written by someone who's not here to

9   testify.  He just said a captain

10   such-and-such wrote that document.

11        THE WITNESS:  No, I didn't.

12        MR. COLOM:  So, if captain

13   such-and-such wrote that document, only

14   captain such-and-such can authenticate the

15   document.  Not the sheriff and, certainly,

16   not this witness.  They got to have the

17   person who wrote the document authenticate

18   that I wrote this document and I -- it was

19   a memo and I submitted it to the sheriff's

20   office.  They can't just have a witness

21   say such-and-such wrote this document.

22   They can't lay the foundation.

23        THE WITNESS:  He's here.

24        THE COURT:  How was that memo

25   circulated?

Thompson vs. State, 11/10/2014

131

1    THE WITNESS: The memo came from

2    Commander Eugene Bridges. He's in the

3    courtroom.

4        THE COURT: How was that circulated?

5        THE WITNESS: Circulated?

6        THE COURT: Yes.

7        THE WITNESS: You mean when?

8        THE COURT: I mean, what procedure did

9    the sheriff's department use for you to

10   get that memo?

11       THE WITNESS: Yes, it was in the file.

12   It's dated December 12th -- December 7th,

13   2012.

14       THE COURT: I mean --

15       THE WITNESS: This memo we had for all

16   patrol, captains, everybody, from

17   Commander Eugene Bridges, the commander

18   who patrols everyone and this is his memo

19   dated -- putting out to all of us.

20       THE COURT: Did all of the deputies

21   get that --

22       THE WITNESS: All sworn deputies, yes,

23   sir.

24       THE COURT: -- get that memo?

25       THE WITNESS: All sworn deputies, yes,

Thompson vs. State, 11/10/2014

132

1    sir.

2         THE COURT:  Is that something that

3    normally happens --

4         THE WITNESS:  Yes, sir.

5         THE COURT:  -- in the sheriff's

6    department?

7         THE WITNESS:  Yes, sir, that's

8    protocol.

9         THE COURT:  Okay.  I'm going to

10   overrule the objection.

11        MR. COLOM:  Thank you, Your Honor.

12   BY MS. TURNER:  (Continuing)

13   Q.   Could you just tell us, basically, what is

14   the policy regarding stopping someone who's found to

15   have an invalid drivers license?  What is --

16        MR. COLOM:  I'm going to object, Your

17   Honor.  This is beyond the scope of my

18   cross-examination.  Can I look at that?  I

19   haven't had a chance to look at it.

20        MS. TURNER:  Sure.  I showed it to

21   you.  Your Honor, it's perfectly within

22   the scope because we got into the policy.

23   He even wanted to enter the policy into

24   evidence.  This is part of the policy.

25   It's clearly within the scope.

Thompson vs. State, 11/10/2014

133

1   THE COURT: Does anybody have that
2   original policy that the sheriff -- that
3   was introduced through the sheriff's
4   testimony?
5   MS. TURNER: Yes. I'm sorry. What
6   was the question?
7   THE COURT: Does anybody have a copy
8   of that policy that was introduced through
9   the sheriff's testimony?
10  MS. TURNER: The only copy I knew of
11  was the copy that was given to Your Honor.
12  I don't have another copy of that if
13  that's what you're asking.
14  MR. COLOM: Where's the exhibit?
15  MS. TURNER: Here's the exhibit.
16  THE COURT: Now, is that document now
17  offered as an exhibit?
18  MS. TURNER: Yes. This is Exhibit
19  No. 2.
20  MR. COLOM: And my objection, you
21  can't authenticate this document. He
22  didn't write it.
23  THE COURT: Did you receive that
24  document as part of your job as deputy
25  sheriff?

Thompson vs. State, 11/10/2014

134

1          THE WITNESS:  Yes, sir.  Every

2     sworn --

3          THE COURT:  Is that memo part of what

4     is normally circulated to the deputies

5     from the sheriff?

6          THE WITNESS:  Yes, sir.  From the

7     chain of command, that's correct.  Yes,

8     sir.

9          MS. TURNER:  And, Your Honor --

10         THE WITNESS:  It's protocol.

11         THE COURT:  Through the chain of

12    command?

13         THE WITNESS:  That's correct.

14         MS. TURNER:  And, Your Honor, it would

15    be -- it would be a record.  It would be a

16    business record, as well.

17         THE WITNESS:  We all have access to

18    it.  We all get it, everyone.

19         THE COURT:  So, that's a business of

20    the sheriff's office?

21         THE WITNESS:  Sir?

22         THE COURT:  That constitutes part of

23    the business for the sheriff's department?

24         THE WITNESS:  Yes.

25         THE COURT:  Is that memo put in a

1        particular file?

2          THE WITNESS:  That's correct, memos

3     are put in files, kept, when they're

4     circulated through the sheriff's

5     department to all sworn deputies.  That's

6     correct.

7          THE COURT:  I'm going to overrule

8     that, as well.

9          MS. TURNER:  Mark that as an exhibit.

10         THE COURT:  Would that be Exhibit 2?

11         MS. TURNER:  Yes, sir.

12 (EXHIBIT NO. 2, MEMO DATED DECEMBER 7TH, WAS ADMITTED

13 INTO EVIDENCE.)

14   BY MS. TURNER:  (Continuing)

15    Q.   I'm handing you what's been marked as

16 Exhibit 2.  Can you tell us what the policy is in

17 that memo regarding stopping someone who's found to

18 have an invalid drivers license?

19    A.   (Reading) Reference:  Licenses suspended

20 or revoked.  Please be advised that on this date,

21 December 7th, 2012, on any traffic stops where the

22 driver is driving on a suspended or revoked license,

23 the driver will be transported to the Tunica County

24 jail.  If any deputy fails to comply with this memo,

25 disciplinary actions -- disciplinary action will

Thompson vs. State, 11/10/2014

136

1    be -- will be action.  For any questions or

2    concerns, please contact me immediately.  That's

3    chain of command.

4         Q.     So, earlier when counsel opposite was

5    making a big deal about whether or not you had

6    discretion to actually make an arrest on

7    Mr. Thompson, did you have any discretion?

8         A.     No, ma'am.  Discretion was to follow that,

9    follow protocol, follow chain of command.

10        Q.     So, you did what you felt you had to do?

11        A.     Yes, ma'am.

12        Q.     Otherwise, you'd be disciplined?

13        A.     Exactly.

14        Q.     You were also asked about press releases

15   and stuff.  Is that something that you normally have

16   personal knowledge of?  Like, do you issue press

17   releases to the press on behalf of the sheriff's

18   department?

19        A.     No, ma'am.

20        Q.     Okay.  Do you know who all has the

21   authority to do that?

22        A.     Whoever the sheriff designate.  It

23   normally would be the chief deputy or possibly a

24   commander.  That's how it go, or the sheriff

25   himself.

1    Q.    Okay. Do you know who issued this press

2    release that counsel opposite keeps saying was

3    issued? Do you know who did that?

4    A.    No, ma'am.

5    Q.    But did you have anything to do with it?

6    A.    No, ma'am.

7    Q.    And when you got to the police station --

8    I mean, the sheriff's department with

9    Michael Thompson, did you go ahead and book him in

10   and all that? What was the procedure?

11   A.    You follow process. You follow protocol.

12   I did the necessary paperwork on Mr. Thompson. I

13   made sure Mr. Thompson was in a comfortable setting,

14   talked with him, and everything was taken care of

15   for Mr. Thompson.

16   Q.    There was some talk about whether or not

17   he went to the hospital. Was he given a bond?

18   A.    He was given a bond, but before that,

19   Mr. Thompson said that he wasn't feeling good, his

20   blood pressure was up. So, we contacted the

21   ambulance service here. They came to the jail.

22   From that point, they checked Mr. Thompson's blood

23   pressure and other things and stated that he wasn't

24   -- he didn't need to be transported by the

25   ambulance.

1        So, when that occurred, we all -- we got

2   with Lt. Hopson and told him to take another

3   investigator, and they took Mr. Thompson to Baptist

4   Desoto, themselves, and they had his blood pressure

5   and everything checked there.  Everything was fine

6   and they brung Mr. Thompson back.  Mr. Thompson got

7   back and that's when Mr. Thompson bonded out.

8        Q.    And you heard some of the earlier

9   objections from counsel opposite regarding your and

10  my communications, didn't you?

11       A.    Yes, ma'am.

12       Q.    You're aware of that?

13       A.    Yes, ma'am.

14       Q.    What, if anything, have I advised you?

15       A.    Nothing.

16       Q.    Okay.

17       A.    To tell the truth.

18       Q.    To tell the truth?

19       A.    That's it.

20            MS. TURNER:  Court's indulgence for

21            just a minute.

22            THE COURT:  Okay.

23  (A BRIEF PAUSE.)

24            MS. TURNER:  That's all I have.

25            MR. COLOM:  Your Honor, a brief

Thompson vs. State, 11/10/2014

139

1    recross?  There was some testimony that

2    was --

3         MS. TURNER:  Your Honor, I would

4    object.  We did not -- we stayed within

5    the scope, clearly stayed within the

6    scope.

7         MR. COLOM:  I'll be brief, Your Honor.

8         THE COURT:  You object to this

9    exhibit?

10        MR. COLOM:  Your Honor, briefly, may I

11   look at it again?  May I question him on

12   it?

13        THE COURT:  I'm going to allow him to

14   question him on it.

15        MR. COLOM:  Thank you.

16        THE COURT:  And, Ms. Attorney, if you

17   have any additional questions, I'm going

18   to allow you also.

19        MS. TURNER:  Okay.

20   RECROSS-EXAMINATION BY MR. COLOM:

21   Q.    Now, you understand you're under oath?

22   A.    That's correct.

23   Q.    You said under oath this attorney didn't

24   tell you anything about the word "Terry" stop?

25   A.    Terry stop came up when I talked with the

1    attorney during our break.

2        Q.    Okay.  So, the attorney did bring up to

3    you Terry stop?

4        A.    No.  The attorney -- Terry stop came up

5    when we talked ourselves, all of us, during the

6    break, sir.

7        Q.    By you talking yourselves, you're talking

8    about the attorney and Mr. Hamp, I mean the sheriff,

9    Mr. Hamp, right?

10       A.    That's correct.

11       Q.    So, during the lunch break, Terry stop,

12   while y'all were talking, that came up, right?

13       A.    That's correct.

14       Q.    I mean, that's why you offered that new

15   testimony?  When she questioned you, that came

16   about.  She told you to say that?

17       A.    No, no, sir.  No, sir, that's not true at

18   all.

19       Q.    It just happen to come up during the

20   break?

21       A.    That's correct.  And I wanted to answer it

22   a different way.  I couldn't answer.  You wouldn't

23   allow me to get to the -- you know, get a word in,

24   so.

25       Q.    Well, I mean, she directed you, didn't

Thompson vs. State, 11/10/2014

141

1   she?  Before I questioned you, she questioned you,
2   right?
3        A.    That's correct.
4        Q.    And when she questioned you, you didn't
5   say anything about a Terry stop, did you?
6        A.    She didn't ask me the same question you
7   did, sir.
8        Q.    Now, this policy that's dated
9   December 12th -- December 7th, 2012, you didn't
10  write this, did you?
11       A.    No, sir.
12       Q.    All right.  And you say this was in some
13  type of file.  You got any proof that this was in
14  some file?
15       A.    That's -- I don't have -- I'm sure.  I
16  mean, I don't have proof with me right now if that's
17  what you're asking me.
18       Q.    Yes.
19       A.    But it does go in a file memo.
20       Q.    Isn't it true that you could have wrote
21  this today?
22       A.    No, sir.
23       Q.    Typed this out -- let me finish my
24  question.  You could have took a Tunica County
25  letterhead, right, and wrote this out?

1    MS. TURNER:  Objection, saying he

2    could have.  He's asking him totally

3    irrelevant, speculative --

4         THE COURT:  Let me just ask him.  Did

5    you write that today --

6         THE WITNESS:  No, sir.

7         THE COURT:  -- after lunch --

8         THE WITNESS:  No, sir.

9         THE COURT:  -- when we took lunch?

10        THE WITNESS:  No, sir.  No time today,

11   Your Honor.

12   BY MR. COLOM:  (Continuing)

13   Q.    Now, you weren't in here when the sheriff

14   testified though, were you?

15   A.    No, sir.

16   Q.    And you didn't hear the sheriff say, in

17   fact, despite this alleged memo that patrolmen have

18   discretion about whether they arrest somebody when

19   they are pulled over for driving with suspended

20   licenses?  You didn't hear him say that?

21   A.    No, sir.

22   Q.    He's the top officer there at the

23   sheriff's office, right?

24   A.    Yes, that's correct.

25   Q.    His policy, it's higher than whoever this

Thompson vs. State, 11/10/2014

143

1     alleged person is, Eugene Bridges.  Eugene Bridges

2     is in the chain of command under the sheriff, right?

3          A.    That's correct.

4                    MR. COLOM:  No further questions.

5                    THE COURT:  Do you wish to question

6          this witness?

7                    MS. TURNER:  I don't have anymore

8          questions of this witness.

9                    THE COURT:  All right.  Call your next

10         witness then.

11                   MS. TURNER:  Karen Carter.

12    (A BRIEF PAUSE.)

13                   THE COURT:  Is he going to be finally

14         excused?

15                   MS. TURNER:  Yes, Your Honor.  I have

16         no plans to recall him.

17                   MR. COLOM:  I have no intentions on

18         calling him again, Your Honor.

19                   THE COURT:  All right.

20                   MS. TURNER:  May it please the Court?

21                   THE COURT:  Go ahead.

22                    MS. KAREN CARTER,

23         having been duly sworn, was examined

24         and testified as follows, to wit:

25    EXAMINATION BY MS. TURNER:

Thompson vs. State, 11/10/2014

144

1    Q.    Would you state your name for the record,
2  please.

3    A.    Karen Carter.

4    Q.    Ms. Carter, what is your position?

5    A.    Justice Court Clerk, Montgomery County.

6    Q.    Okay.  How long have you been in that
7  capacity?

8    A.    Fourteen years.

9    Q.    And, as part of your job, do you
10 frequently give information to other law enforcement
11 agencies regarding the status of people in your
12 system, warrants and things of that nature?

13   A.    Yes, ma'am.

14   Q.    Do you recall speaking to the sheriff
15 that's here today, Sheriff Hamp?

16   A.    Yes, ma'am.

17   Q.    And do you remember, approximately, when
18 that was?

19   A.    Not without looking.  I probably put a
20 note on the computer, but right off the top of my
21 head, no.

22   Q.    And do you recall what y'all discussed?

23   A.    A ticket on Mr. Thompson.

24   Q.    And do you remember what information was
25 supplied to the sheriff regarding that?

1    A.    That we had it suspended and the address I

2    had was in Brandon, and I don't send warrants to

3    Jackson because they don't help out, and that's when

4    he told me he was in his county.

5    Q.    And when you say it was suspended, are you

6    talking --

7    A.    His drivers license, yes, ma'am.  I'm

8    sorry.

9    Q.    You were just confirming that to the

10   sheriff?

11   A.    Right.  Because the ticket had not been

12   paid and that I had sent it -- we had sent in the

13   paperwork to Jackson to suspend the drivers license,

14   yes.

15        MS. TURNER:  May I approach the

16        witness, Your Honor?  May I approach the

17        witness?

18        THE COURT:  Yes.

19   BY MS. TURNER:  (Continuing)

20   Q.    I'm going to have you take a look at these

21   documents and let you tell me what they are.  And

22   then, after you tell me what they are, we'll get

23   into some more testimony.  If you could just

24   identify each one, first.

25   A.    There's two court abstracts, one from each

Thompson vs. State, 11/10/2014

146

1    ticket.  There is a warrant for the speeding ticket,

2    a copy of both of the tickets, and the paperwork we

3    send to the Department of Public Safety for

4    suspension.

5         Q.     Okay.  And are these records all part of

6    your job?  Do you keep control of these records,

7    your office?

8         A.     Yes.

9         Q.     And I see they have a stamp at the bottom.

10   You certify all of these documents, right?

11        A.     Yes.

12        Q.     And did you come here today to testify

13   about these?

14        A.     Yes, ma'am.

15               MS. TURNER:  At this time, Your Honor,

16          I would like to admit these into evidence

17          as State's Exhibit 3.

18               THE COURT:  It may be received.

19               MS. TURNER:  And that's cumulative,

20          Your Honor, because there's several

21          different pieces of paper, but I will have

22          her identify each one as she testifies

23          about it.

24               THE COURT:  Okay.

25   (EXHIBIT NO. 3, COURT DOCUMENTS, WAS ADMITTED INTO

1  EVIDENCE.)

2   BY MS. TURNER:  (Continuing)

3   Q.   This first one, this marked Exhibit 3,

4  could you just tell us what that is?

5   A.   That's an arrest warrant.

6   Q.   And who is that arrest warrant on?

7   A.   Michael Lawrence Thompson.

8   Q.   Okay.  Does it give you an address for

9  Mr. Thompson?

10   A.   A Brandon address.

11   Q.   Okay.  What is that?

12   A.   227 Turtle Lane.

13   Q.   What about a drivers license number?

14   A.   You want me to tell it?  It's on here.  Do

15  you want me to tell you what's on it?

16   Q.   Yes, ma'am.  It's not a Social Security --

17        MR. COLOM:  Objection, Your Honor.

18        It's not relevant to give his drivers

19        license number.  It's in the records.

20        MS. TURNER:  It's just for

21        identification purposes; that it is the

22        same Michael Thompson that the ticket was

23        written to.

24        THE COURT:  I'm going to allow that.

25   BY MS. TURNER:  (Continuing)

1      Q.      It's not a Social Security Number,
2  correct?

3      A.      Correct.

4      Q.      What is that number?

5      A.      801248705.

6      Q.      Okay.  And do you have a date on that
7  warrant?

8      A.      February 12th, 2014.

9      Q.      Okay.  I'm going to hand you another piece
10  of paper.  What is this?

11      A.      That is a court abstract on the speeding
12  ticket.

13      Q.      Okay.  And what does that speeding ticket,
14  court abstract tell us?  What information about the
15  ticket is on there?

16      A.      That it was found guilty.

17      Q.      That Mr. Thompson was found guilty?

18      A.      Yes.

19      Q.      And when was that court date held?

20      A.      Court date was August 6th, 2013.

21      Q.      Okay.  And does it tell whether or not
22  Mr. Thompson showed up for court or was it a guilty
23  plea or how did he -- how was he found guilty?  Does
24  it state?

25      A.      I don't think it does state on here.  It

1    does on our computer, but I don't think it does on

2    our abstract.

3        Q.    Okay.  It just says he was found guilty?

4        A.    Right.  The judgement of the court was

5    found guilty.

6              THE COURT:  Are those documents

7              retained by you in the normal course of

8              your business as the clerk?

9              THE WITNESS:  Yes, sir.

10    BY MS. TURNER:  (Continuing)

11        Q.    And this is another one that you brought.

12    Could you identify that document?

13        A.    That's the court abstract on the ticket

14    for no or expired inspection sticker.

15        Q.    Okay.  And what was the disposition on

16    that?

17        A.    That one was dismissed.

18        Q.    Okay.  And could you tell us what this is?

19        A.    This is the form that we send in to

20    Mississippi Department of Public Safety for whatever

21    reason if we have to send it in to Jackson to

22    suspend, be it failure to pay or failure to appear.

23        Q.    And who is that letter on?  Who is it

24    about?

25        A.    Michael Thompson.

Thompson vs. State, 11/10/2014

150

1    Q.    Okay.  And what does the letter say?

2    A.    That it was a failure to appear.

3    Q.    Okay.  And --

4    A.    Yes.  This is what we send to Jackson to

5    suspend.

6    Q.    Okay.  So, that letter was actually sent

7    to the Department of Public Safety?

8    A.    Correct.

9    Q.    By y'all's office?

10   A.    Correct.

11   Q.    To suspend the license of Mr. Thompson?

12   A.    Correct.

13   Q.    Okay.  Do you know when that letter was

14   sent?

15   A.    August 6th, 2013.

16   Q.    2013?

17   A.    Uh-huh, (affirmative)

18   Q.    And you may or may not -- you brought

19   these, but do you recognize those?

20   A.    Those are the tickets that we receive from

21   the highway patrol.

22   Q.    So, would those be the tickets that are

23   associated with the two court abstracts that you

24   read from previously?

25   A.    They are.