1      Q.     Okay.  And they're for Michael Thompson?

2      A.     Correct.

3      Q.     All right.  So, when you received the call

4  from Sheriff Hamp, were you able to verify --

5            THE COURT:  Let me have the court

6            reporter mark these.

7            MS. TURNER:  You want each one marked,

8            Your Honor?

9            THE COURT:  You're introducing these

10           as Exhibit A?

11            MS. TURNER:  Well, it's Exhibit 3,

12           just cumulative, but if you want to have

13           each of them marked, we can.

14            THE COURT:  Could you just mark these

15           as a 3, 3(A), 3(B) and so on and let it

16           correspond with these that have already

17           been introduced.

18  (EXHIBIT NO. 3-A THROUGH D, DOCUMENTS, WERE MARKED.)

19            THE COURT:  The Court is going to

20           receive these as the arrest warrant and

21           then following that, the document will be

22           Mississippi Department of Public Safety

23           Records Bureau as Exhibit 3(A).  3(B) is

24           the State of Mississippi abstract, court

25           records.  3(C) has -- it's an abstract, as

1    well.

2         The first abstract, 3(B), is dated

3    11/07/2014.  3(C) -- 3(D), State of

4    Mississippi Uniform Traffic Ticket.  They

5    all have been marked separately as a

6    collective Exhibit 3 and it goes to

7    through 3(B), which is the traffic ticket;

8    3(A), 3(B), 3(C), three -- traffic tickets

9    is 3(D).  That will be received.

10   BY MS. TURNER:  (Continuing)

11      Q.    All right.  And, Ms. Carter, you were just

12   here today to testify regarding these documents that

13   have been moved into evidence, as well as the fact

14   that you did speak with Sheriff Hamp and you

15   notified him that the license of Mr. Montgomery

16   {Sic} was still suspended as of February 12th?

17      A.    Yes, ma'am.

18            MS. TURNER:  That's all I have, Your

19            Honor.

20            MR. COLOM:  May I proceed, Your Honor?

21            THE COURT:  Yes.

22   CROSS-EXAMINATION BY MR. COLOM:

23      Q.    Ms. Carter --

24      A.    Yes, sir.

25      Q.    -- do you recall when Sheriff Hamp called

1    you --

2        A.    Uh-huh, (affirmative).

3        Q.    -- and asked you about Mr. Thompson?  When

4    was it?

5        A.    Can I look?

6        Q.    Yes.

7        A.    Wait.  I don't have it anymore.  It's on

8    the abstract, the date I put on there.

9            MR. COLOM:  Does the Court have the

10            abstract?  May I approach, Your Honor?

11            THE COURT:  Yes.

12    BY MR. COLOM:  (Continuing)

13        Q.    That's 3(C).  Does that say when he called

14    you?

15        A.    2/13/2014.

16        Q.    Okay.

17            THE COURT:  That's 2:13 p.m.?

18            THE WITNESS:  No, February 13th, 2014.

19            THE COURT:  Okay.

20            THE WITNESS:  Actually, in the notes

21            it's got 2/12 I spoke with Mr. Hamp.

22    BY MR. COLOM:  (Continuing)

23        Q.    So, on February 12, 2014, document 3(C)

24    shows that you talked to Sheriff Hamp?

25        A.    Yes, sir.

1    Q.    And you recall having that conversation

2    with Sheriff Hamp?

3        A.    Yes, sir.

4            MS. TURNER:  Did she say the 12th or

5            the 13th?

6            MR. COLOM:  She says the 12th.

7            THE WITNESS:  That was in -- I'm

8            sorry.  That was in the court -- the court

9            case notes says 2/12 where I got in there

10           that I spoke to Mr. Hamp, February 12th,

11           2014.  Sorry about that.

12           MS. TURNER:  Okay.

13   BY MR. COLOM:  (Continuing)

14       Q.    What time did you talk with the sheriff?

15       A.    I don't know.

16       Q.    Was it in the afternoon?

17       A.    It was in the afternoon.

18       Q.    Okay.

19       A.    It was after lunch.

20       Q.    It was after lunch.  And you recall

21   Sheriff Hamp calling you to ask you about

22   Michael Thompson's license, right?

23       A.    Uh-huh, (affirmative).

24       Q.    Is that normal for Sheriff Hamp to call

25   you about somebody's license?

Thompson vs. State, 11/10/2014

1    A.    Not very.

2    Q.    Okay.

3    A.    I mean, occasionally, but not very.

4    Q.    All right.  And you told Sheriff Hamp that

5  Mr. Thompson's license was suspended, right?

6    A.    Uh-huh, (affirmative).

7    Q.    You got to say yes for the record.

8    A.    Oh, yes, sir.  I'm sorry.

9    Q.    And you are aware, based on being at the

10 previous hearing, Mr. Thompson was stopped by the

11 Tunica County Sheriff's Office later that day,

12 aren't you?  You're aware of that, aren't you?

13   A.    Oh, yes.

14         MS. TURNER:  Objection, Your Honor.

15         She can't be aware of what other people

16         testify to or what actually happened.

17         She's just here to testify about what she

18         knows.  She doesn't know any of that.

19         MR. COLOM:  Your Honor, she was at the

20         last hearing.  We didn't sequester the

21         witnesses.  She was there.  She heard the

22         testimony.  It was an in-court statement.

23         This is cross-examination.  I can

24         establish through her if she heard -- if

25         she recalls, during that testimony,

Thompson vs. State, 11/10/2014

156

1    whether later that day the sheriff's

2    office stopped Mr. Thompson for driving

3    with a suspended license.  She can testify

4    what she recalls.

5         THE COURT:  Do you recall it like

6    that?

7         THE WITNESS:  Sir?

8         THE COURT:  Do you recall it on that

9    day?

10        THE WITNESS:  Honestly, I know they

11   talked about him being stopped, but I was

12   just ready to go home.  I wasn't paying

13   attention to what they --

14        THE COURT:  But it happened on that

15   particular day, at least you made a note

16   on the document.

17        THE WITNESS:  From what I remember

18   them saying, but I wouldn't -- I can't

19   swear to that because I was ready to go

20   home.  I wasn't listening.  I was through

21   with mine.  I was ready to go home.  But,

22   yes, I know they talked about he was

23   stopped around that time.

24   BY MR. COLOM:  (Continuing)

25     Q.    So, the same day that Sheriff Hamp found

Thompson vs. State, 11/10/2014

157

1    out Mr. Thompson's license was suspended, he had

2    Capt. Jones pull Michael Thompson over to --

3              MS. TURNER:  Objection, Your Honor.

4         There's no --

5              MR. COLOM:  I withdraw the question.

6         I withdraw the question.  No further

7         questions.

8              THE COURT:  Do you have another

9         witness?

10             MS. TURNER:  I don't, Your Honor.  I

11        rest.

12             THE COURT:  Are you ready to proceed?

13             MR. COLOM:  Your Honor, could I have

14        one more question?  I recall -- I didn't

15        get a chance to ask this.  It's just a

16        quick question.  It will be so short.

17             THE COURT:  All right.

18     BY MR. COLOM:  (Continuing)

19        Q.    Let's go to Exhibit C.  Now, this is with

20    the alleged arrest warrant for Mr. Thompson, right?

21        A.    Uh-huh, (affirmative)

22        Q.    Exhibit 3?

23        A.    Uh-huh, (affirmative)

24        Q.    That's not signed by the judge, is it?

25        A.    No.

Thompson vs. State, 11/10/2014

158

1     Q.    So, the arrest warrant was actually never

2  signed to be served on Mr. Thompson, was it?

3     A.    No.

4     Q.    In fact, it says "void" right there?

5     A.    Correct.

6          MR. COLOM:  All right.  Nothing

7          further, Your Honor.

8          THE COURT:  Any further questions?

9          MS. TURNER:  I rest.

10  (STATE RESTS.)

11  (MOTION FOR DIRECTED VERDICT.)

12          MR. COLOM:  Your Honor, at this time,

13          we would move for a directed verdict.

14          Based upon the law, it's clear that the

15          State of Mississippi through the Tunica

16          County Sheriff's Office entrapped

17          Mr. Thompson into driving with a suspended

18          license.

19          Your Honor, I will bring to the

20          Court's attention Beal vs. State of

21          Mississippi and, also, Pittman vs. State

22          of Mississippi, which I will provide a

23          copy to the Court, too, after I finish

24          this argument.  But Beal vs. State of

25          Mississippi, which is cited in --

Thompson vs. State, 11/10/2014

159

1          THE WITNESS:  Judge, may I step down?

2          THE COURT:  Yes, ma'am, you may step

3     down.

4          THE WITNESS:  I didn't want to walk in

5     front of him.

6          THE COURT:  You may -- do you have to

7     leave?

8          THE WITNESS:  I'd like to if I'm

9     through.

10         THE COURT:  Well, any objection to her

11    leaving?

12         MR. COLOM:  No, Your Honor.

13         MS. TURNER:  No.

14         THE COURT:  You may leave.

15         THE WITNESS:  Thank you.

16  (A BRIEF PAUSE.)

17         MR. COLOM:  The cite for this, Your

18    Honor, is 86 -- I'm just going to read

19    this for the record.  It's 86 So.3rd 887,

20    Beal vs. State of Mississippi.  It is a

21    Supreme Court of Mississippi case.  It

22    says entrapment is an affirmative defense

23    that must be proven by the defendant.

24    There's two types of entrapment.  One is

25    entrapment as a matter of law.

Thompson vs. State, 11/10/2014

160

1        Entrapment number -- actually, Your

2    Honor, I'm reading from a different case,

3    Pittman vs. State, and its cite is 987

4    So.2nd 1010.  It's another Supreme Court

5    case.  It says in the Pittman case

6    "Entrapment as a matter of law occurs when

7    the conduct by law enforcement is so

8    offensive as to require the discharge of

9    the defendant."  A common example of

10   entrapment as a matter of law is in a

11   supply and buy scenario where law

12   enforcement initially furnishes and later

13   purchases the contraband with which the

14   accused commits the crime.

15        I would submit to the Court that this

16   is worse than that senario.  If

17   necessary -- law enforcement, they get the

18   cocaine and give it to the defendant, and

19   then they buy it from the defendant.  So,

20   they entrap as a matter of law.  So

21   offensive that they entrap as a matter of

22   law.  But, in that situation, at least you

23   have a defendant who bought -- who decided

24   to sell the cocaine.

25        In this case, it's clear from the

1    evidence, Tunica County Sheriff's Office

2    did an investigation into Mr. Thompson

3    shortly after Mr. Thompson had an argument

4    with the sheriff where he told the sheriff

5    to get out of his office.

6         This investigation, unlike what the

7    sheriff said, Captain Jones was honest,

8    was -- it wasn't just about Mr. Thompson's

9    license.  Capt. Jones admitted it was --

10   it's some business dealings between the

11   administrator and the comptroller.  After

12   they were doing this investigation, they

13   found out that Mr. Thompson's license was

14   suspended.  Within a couple of weeks, they

15   found out.  Based on their testimony,

16   within a couple of weeks.

17        Now, from the clerk's testimony, they

18   found out that day he was pulled over

19   because she testified that on February

20   12th, sheriff made the call asking whether

21   Michael Thompson's license was suspended.

22   She said, yes.  Later that day,

23   Capt. Jones, coincidently, sees Mr. Wiley

24   and --

25        MS. TURNER:  Objection, Your Honor.

1    At this point, he's getting into stuff

2    that has not been testified here to today

3    as far as when, the sequence of events,

4    when the call was made, what time the

5    arrest happened.  He's getting into

6    testimony -- he's trying to pull in stuff

7    that we have never --

8        MR. COLOM:  Your Honor, this is

9    argument.

10        MS. TURNER:  I understand it's

11    argument, but he's referring to things

12    that weren't testified to.

13        MR. COLOM:  Your Honor, if counsel --

14    you can recall the testimony.  If my

15    recollection of the testimony is wrong,

16    you were there and you heard it.  This is

17    my recollection of the testimony.

18        But my recollection of that testimony

19    is the clerk said on February 12th

20    sheriff had called her, told her that the

21    license -- she told him the license was

22    suspended.  Later that day, she said

23    shortly after lunch.  Later that day,

24    around 6 when he pulled Mr. Thompson

25    over -- later that day he runs into

1    Mr. Wiley driving the vehicle. He admits
2    it. He said that Mr. Wiley was swerving,
3    but he doesn't give Mr. Wiley a ticket.
4    He said he runs Mr. Wiley's license and,
5    for the only time I've heard of,
6    somebody's license comes back as valid,
7    but eligible to be reinstated.
8        Now, he's got no evidence, other than
9    his own testimony, that that occurred;
10    that somebody told him that. That's just
11    his testimony, which is important because
12    he can't give -- he can't arrest
13    Mr. Thompson if Mr. Wiley is driving. He
14    needs Mr. Thompson to drive because he
15    knows Mr. Thompson's license is suspended.
16    He admitted that he knew that.
17        So after -- he claims that he heard
18    this from the dispatcher. He tells -- and
19    this is not disputed. He told
20    Mr. Thompson, "I need you to drive,"
21    inducing him into driving. Shortly after
22    telling Mr. Thompson he needed him to
23    drive, he pulls him over again under the
24    belief that he was being deceptive.
25        Your Honor, on the digressive, as the

1  Court's well aware, that's not probable
2  cause to pull Mr. Thompson over.  In fact,
3  Capt. Jones admitted as much.  He admitted
4  that he can't pull people over because he
5  thinks they are lying.  If that were true,
6  any citizen in the United States could be
7  pulled over.  The Fourth Amendment would
8  mean nothing.  An officer can always say,
9  "Well, I think Joe Blow is lying.  I'm
10  going to pull him over."
11       So, based on his own admission, he
12  knows that's not probable cause to pull
13  somebody over.  The prosecutor -- he
14  admitted the prosecutor, over break, told
15  him to say something about a Terry stop.
16       MS. TURNER:  Objection, Your Honor.
17  Again, he's putting words into the mouth
18  and saying things that are untrue.  He's
19  basically saying I'm telling people what
20  to say when that specifically is not what
21  Jones testified to.
22       MR. COLOM:  Your Honor --
23       MS. TURNER:  And I would ask him to
24  refrain from trying to defame me in court.
25       MR. COLOM:  Your Honor, I can promise

1   her I'm not trying to defame her.  I don't

2   know her personally at all.  But I'll tell

3   you what, I'm telling you based on my

4   evidence, this is what -- Capt. Jones said

5   during lunch there was a discussion

6   amongst the three of them and Terry stop

7   came up.  Okay.  That's all I'm saying.

8   He admitted it; that it came up during the

9   lunch break conversation with the two of

10  them.  So now, he's trying to say that's

11  the reason.  It was a Terry stop.

12          Well, of course, they couldn't

13  establish a foundation for a Terry stop

14  because a Terry stop is when you have

15  reasonable suspicion that somebody's

16  committing a crime, not reasonable

17  suspicion that somebody's lying.

18          So, even under their, you know,

19  theory that this may have been a Terry

20  stop, that's still not -- still no

21  probable cause to pull them over, right?

22  It still wasn't.

23          So, Your Honor, this is egregious

24  conduct by the sheriff of -- the

25  Tunica County Sheriff's Office.  It's

1    abuse of power of the highest degree if I
2    am mad at Mr. Thompson and I'm going to
3    use my law enforcement to try to arrest
4    him and embarrass him.
5         The sheriff said I don't know if I
6    sent out a press release or not.
7    Capt. Jones, the guy who chose to be
8    honest, admitted that somebody from the
9    office sent out a press release.  Why
10   would they do that?  Because they were
11   trying to embarrass Mr. Thompson.  And so,
12   it's egregious.  It's an abuse of power.
13   It's an enigma to the United States'
14   Constitution and Mississippi law.
15        Now, even if the Court doesn't say
16   this is entrapment as a matter of law,
17   even if you don't think that's outrageous
18   enough, it's still common law entrapment,
19   standard entrapment.  All that requires is
20   that the officer induced the person to
21   commit a crime.  There's no doubt that
22   Mr. -- and there's no testimony that
23   Mr. Thompson had intended to drive.
24        In fact, the testimony is Mr. Wiley
25   was driving.  In fact, Officer Jones

1    admitted that he had no reason to believe

2    if he hadn't stop Mr. Wiley that Mr.

3    Thompson was driving.  He had no reason to

4    believe that.  If he hadn't told

5    Mr. Thompson he needed to drive, he had no

6    reason to believe Mr. Thompson was going

7    to drive a vehicle that day.  So, he was

8    induced to drive.  There's no doubt about

9    that.  They offered no evidence that Mr.

10    Thompson was predisposed to drive with a

11    suspended license.

12        They keep assuming that Mr. Thompson

13    knew his license was suspended.  People

14    forget to pay tickets all the time and

15    when they forget to pay the ticket, they

16    don't know, but that -- their license get

17    suspended.  Mr. Thompson didn't know his

18    license was suspended.  They got no

19    evidence.  They just got no evidence that

20    Mr. Thompson knew his license was

21    suspended.  So, they got no evidence that

22    he was predisposed to drive with a

23    suspended license.  If he doesn't know his

24    license is suspended, he's not predisposed

25    to drive with a suspended license.

Thompson vs. State, 11/10/2014

168

1    And so, even under standard
2    entrapment, I don't believe the Court will
3    find a case where it is as clear as this
4    as someone entrapped to do something.
5    And what makes it -- it wasn't
6    entrapment just because they wanted to see
7    if he would drive with suspended license.
8    It wasn't part of a standard police
9    investigation. It's not coincidence. It
10   was done for political purposes. It was
11   done because they did not like
12   Michael Thompson's administration and they
13   conspired to embarrass him. Based on
14   that, it's entrapment as a manner of law.
15   THE COURT: Do you intend to call any
16   witnesses?
17   MR. COLOM: Your Honor, my position
18   will be that, at this time, based on the
19   Court's ruling that we -- you know, we
20   move for a directed verdict. If the Court
21   denies that directed verdict, I want to
22   consult with my client to determine
23   whether he wants to waive his rights.
24   THE COURT: I'm going to -- I'm not
25   going to do a directed verdict at this

Thompson vs. State, 11/10/2014

169

1              point.  I want to hear any testimony that

2              you have.

3                    MR. COLOM:  Thank you, Your Honor.

4              Your Honor, may I have a moment to consult

5              with my client?

6                    THE COURT:  Okay.

7  (A BRIEF PAUSE.)

8                    MR. COLOM:  Your Honor, we're not

9              going to call any witnesses.  We will

10             rest.

11  (APPELLANT RESTS.)

12                  THE COURT:  Okay.  All right.  If

13             that's the case, then the Court is going

14             to take this matter under advisement for

15             about -- what time we have?  It's 2:10.

16  (A BRIEF PAUSE.)

17                  THE COURT:  All right.  I'm going to

18             take it under advisement for about 20 or

19             30 minutes at the most.

20                   MR. COLOM:  Thank you, Your Honor.

21                 THE COURT:  I got to get a chance to

22             review what I heard and, also, the

23             exhibits that have been introduced, as

24             well as the cases that you cited.  I want

25             to get a chance to look at those.

Thompson vs. State, 11/10/2014

170

1        MR. COLOM: Thank you, Your Honor.

2        THE COURT: All right. So, we'll be

3 in recess until -- what time is it?

4        THE BAILIFF: Twelve after 2.

5        THE COURT: Twelve after 2. Would

6 either one of you like to make a closing

7 statement?

8        MS. TURNER: Yes, Your Honor. Your

9 Honor, we've heard a lot of testimony

10 today from several people. And,

11 obviously, there's no dispute here today

12 as to whether or not the defendant's

13 license was actually suspended on the day

14 in question when he was seen driving on

15 Highway 61 North.

16        The only testimony that's been

17 offered as any type of defense here is the

18 defense of entrapment. Your Honor, we

19 would like for the Court to take judicial

20 notice, basically, from the abstracts and

21 all the things that were brought in by

22 Karen Carter that Mr. Thompson's license

23 had been suspended as early as August of

24 2013. Several months had elapsed in that

25 period of time between August of 2013 and

Thompson vs. State, 11/10/2014

171

1    February of 2014.

2        During that time, Mr. Hamp, if you

3    recall, testified that he and other people

4    had seen Mr. Thompson driving the county

5    vehicle and other vehicles on more than

6    one occasion while his license was

7    suspended. Now, this is very important

8    because the defense, as they're talking

9    about entrapment, is someone is induced to

10    do something that they don't normally do.

11        In this case, it's clear Mr. Thompson

12    was driving with a suspended license on

13    numerous occasions and was going to

14    continue to do so. He, in fact, didn't

15    get his license reinstated until a later

16    date, passed the time that he was

17    arrested. So, there's no dispute that he

18    was driving with a suspended license on

19    the day in question. We were able to

20    show -- his identity was established and

21    the -- it's a prima fascia case.

22        And under the defense of entrapment,

23    Your Honor, usually that comes in -- in

24    the case that was cited, as far as <u>Pittman</u>

25    <u>v. State</u>, when, in fact, a law enforcement

1    officer does something like giving drugs
2    to an individual that doesn't normally
3    sell drugs and then going and making a buy
4    from them, well, that's not the case we
5    have here at all.  It's completely
6    distinguishable.
7           What we have here is a case where the
8    county administrator felt like he was
9    above the law, felt like he could continue
10   to drive however he wanted to.  And, in
11   fact, when he was pulled over, he told
12   Officer Jones who he was.  You know, I'm
13   the county administrator.  And he gave --
14   Mr. Jones gave the driver a professional
15   courtesy.  He didn't arrest him that day,
16   you know, even though he had committed
17   some traffic violations.  Both of the
18   individuals in the car, he gave them
19   professional courtesy.
20          It wasn't until he thought about it
21   and realized that he needed to make a stop
22   briefly just to check, to make sure,
23   because from his recollection, he believed
24   that his license was suspended and he, in
25   fact, told him a lie.  That, in fact, is

1   not entrapment because the individual had

2   been driving on numerous occasions already

3   with a suspended license.

4        Now, we haven't had an opportunity to

5   hear from the defendant today, but we've

6   heard from numerous people about evidence

7   that his license was suspended.  And, you

8   know, Your Honor, it's a prima facia case.

9   They've not been able to prove the defense

10  of entrapment.  We would submit that he's

11  guilty and he thought he was above the law

12  on that day as he had on several others.

13       MR. COLOM:  Your Honor, I'm going to

14  be short because I went over a lot of this

15  in my Motion for Directed Verdict.  But

16  I'll tell you, to believe Sheriff Hamp's

17  story, if you believe that sorry, I got a

18  bridge in Greenville I'll sell you.

19       I mean, to believe that all that's a

20  coincidence and they just coincidently ran

21  into Mr. Thompson, although they had these

22  arguments and although, you know, his

23  license, they just happen to find that

24  out, right?  I mean, you'd have to believe

25  a lot of stuff for you to believe that.

1    The bottom line is they say they saw
2    Mr. Thompson drive one or two times, but
3    they don't establish when that was.  All
4    right.  They're just -- they're
5    testifying -- if they knew his license was
6    suspended, they saw him driving, why
7    didn't they stop him?  So, that undermines
8    the credibility of that testimony.
9        In reality, if they found out his
10   license was suspended on February 12th,
11   then that's -- if he knew Mr. Thompson's
12   license was suspended before February
13   12th, why would he call Karen Carter and
14   ask her?  He called her because he didn't
15   know.  He found out and he decided he was
16   going to get back at his public enemy.
17       Now, this idea is -- the audacity for
18   this attorney to get up here and say the
19   defendant thinks he's above the law
20   because he's driving with a suspended --
21   without -- without -- with his license
22   being suspended.  Do you know how many
23   people in Mississippi are pulled over for
24   driving with suspended licenses and don't
25   realize it?  I mean, the State of

1    Mississippi gets a lot of money from

2    people driving with a suspended license

3    who's also unaware that they forgot to pay

4    their ticket.  I'm a city prosecutor.

5    It's happens all of the time.  So, the

6    idea he thought he was above the law is

7    crazy.

8        You know, the reality is he didn't

9    know how far the sheriff would go.  He

10   didn't know that Capt. Jones and

11   Sheriff Hamp had conspired to get him

12   arrested to try to embarrass him because

13   he's new to Tunica County.  I mean, the

14   reality is he didn't get hired until 2013.

15   Two months later, they're trying to get

16   rid of him.

17       THE COURT:  Do you believe that these

18   were intentional acts on behalf of the

19   sheriff's department and the deputies?

20       MR. COLOM:  No doubt about it, Your

21   Honor.  I have no doubt.  I think the

22   evidence establishes it.  For it not to be

23   intentional acts, you have to believe in

24   unbelievable consequences -- coincidences.

25   I mean, you have to believe it's a

1    coincidence that Sheriff Hamp called the

2    clerk February 12th, found out

3    Mr. Thompson's license is suspended and

4    then a captain, not a patrolman, a captain

5    in an unmarked vehicle coincidently that

6    same day ran into Mr. Wiley swerving and,

7    coincidently, Mr. Wiley's license came

8    back eligible -- valid, but eligible for

9    reinstatement. Something I've never

10   heard. Coincidentally, that happened.

11         And, coincidently, he asked -- he

12   told Mr. Thompson he needed him to drive.

13   Coincidentally, he told him he needed him

14   to drive even though he knew his license

15   was suspended. Because without

16   Mr. Thompson driving, they can't arrest

17   him. So, it's not a coincidence that

18   Mr. Wiley's license came back valid, but

19   eligible for reinstatement or that he

20   pulled over Mr. Wiley, but didn't give him

21   a ticket.

22         It's not a coincidence that he was in

23   an unmarked vehicle and didn't have his

24   recorder on so you can't testify as -- we

25   don't have any independent evidence of

1   what was said during the conversation.

2   Those are not coincidences, Your Honor.

3         And it's not a coincidence that he

4   told Michael Thompson, knowing that the

5   man's license was suspended, knowing that

6   Mr. Thompson got behind that wheel and

7   drove that he could arrest him.  Knowing

8   that, he told Mr. Thompson "I need you to

9   drive."  Knowing that and two minutes

10  later he found out, coincidentally, that

11  Mr. Wiley's license was actually valid

12  and, coincidently, he decided that he had

13  probable cause to pull Mr. Thompson over

14  because I think he's lying to me.

15        Your Honor, that's not probable cause

16  to pull somebody over.  He had no probable

17  cause to pull Mr. Thompson over.  And any

18  information he found out subsequent to

19  that is the fruit of an illegal stop.

20        You know, those are the factual

21  circumstances which show that they had the

22  intent to embarrass Mr. Thompson.  Why

23  would they send out a press release?

24  Because, normally, a person getting

25  arrested for driving with suspended

1    license, that's not newsworthy. But if

2    you send out a press release on the county

3    administrator, you let the media know the

4    county administrator got arrested, he

5    might be fired. And so, they won't admit

6    that they had the intent to do it, but to

7    believe otherwise is just -- it's just --

8    it's beyond what's reasonably credible.

9    It's just too many coincidences. Two

10   weeks after Mr. Thompson slammed the door

11   and told him to get out of his office, he

12   gets Mr. Thompson arrested.

13        So, based on that, it's classic

14   entrapment. They had no evidence that he

15   was predisposed to drive with a suspended

16   license. They had no evidence he knew his

17   license was suspended.

18        This idea that he's above the law, it

19   doesn't -- it's complete speculation on

20   their part. No evidence. He was not the

21   driver that day. He was the passenger.

22   They made him drive. Nothing further.

23        THE COURT: Ms. Turner, do you have

24   anything?

25        MS. TURNER: Yes, I would just like to

1    respond.  Basically, what we have here is

2    a complete speculation on the part of the

3    defense saying that there was this great

4    big conspiracy to target Mr. Thompson and

5    all these things just happen to fall in

6    place.

7         Sheriff Hamp testified himself that

8    the real reason he called Ms. Carter, not

9    only to check the validity of the license,

10   but to see if he had an active warrant or

11   not.  She told him that he did.  At that

12   point, he had every right -- if he wanted

13   to, he could have really embarrassed him,

14   gone in his office and arrested him for an

15   active warrant if he really wanted to

16   embarrass him.  That's one of the --

17        MR. COLOM:  I want to object to that.

18   That's false testimony.

19        MS. TURNER:  No, that's --

20        MR. COLOM:  Let me finish.  Let me

21   state my objection like I let you state

22   yours.

23        MS. TURNER:  Go ahead.

24        MR. COLOM:  The evidence shows the

25   arrest warrant was never signed by a

Thompson vs. State, 11/10/2014

180

1   judge.  So, this idea there was an active

2   arrest warrant, that's false testimony.

3         THE COURT:  All right.  I want you two

4   young attorneys to have more respect for

5   each other.

6         MR. COLOM:  Well, Your Honor, I was

7   speaking for the record.  She's the one

8   being disrespectful to me.  I mean, this

9   is professional.  It's not a personal

10  thing.  I mean, she's cutting me off left

11  and right.

12        THE COURT:  Both of y'all are

13  passionate about your arguments.  So, I

14  want you to both treat it that way.

15        MR. COLOM:  Thank you, Your Honor.

16        THE COURT:  I'm going to let you

17  finish, Ms. Turner.

18        MS. TURNER:  Yes, sir.

19        THE COURT:  And then, Mr. Colom, if

20  you have anything further, I want you to

21  state it.

22        MR. COLOM:  Thank you, Your Honor.

23        MS. TURNER:  Your Honor, there has

24  been no evidence submitted here today

25  there was any conduct to harp on the

1    situation wherein Mr. Thompson was the
2    target of anything specific.
3          If they wanted to embarrass him, as
4    counsel opposite keeps referring to, they
5    would have gone about it in a completely
6    different manner.  Whenever Ms. Carter
7    told him there was an active warrant,
8    whenever she told the sheriff that, he
9    could have just as easily, as I said, gone
10   into his office and embarrassed him by
11   arresting him on an active warrant and
12   hauled him into jail.  He did not have to
13   wait until he was driving a vehicle.
14         In fact, the sheriff testified that
15   he, himself, as well as other people knew
16   that Mr. Thompson had been driving, had
17   been driving the county vehicle on more
18   than one occasion after his drivers
19   license had been revoked.
20         Once Mr. Hamp got this information,
21   had he really wanted to, in any way,
22   defame Michael Thompson or target him,
23   they would have waited until he got behind
24   the wheel of the vehicle and pulled him
25   over or either arrested him on the

1   warrant.  This all just came into play.

2   It wasn't coincidence.

3           Mr. Jones, Capt. Jones testified that

4   when he saw the vehicle he did not know

5   who was in the vehicle.  He did not know

6   who the driver was and he didn't know who

7   the passenger was.  He saw someone that

8   was committing violations on the road,

9   traffic violations, so he pulled them

10  over.

11          All these things just kind of

12  happened.  It's not like he went out there

13  that day and said, "Oh, I'm going to look

14  for Mr. Thompson and any chance that I

15  have to arrest him, I'm going to get him."

16  That's not what occurred.  That's not what

17  occurred that day, Your Honor.

18          He was a passenger in the vehicle

19  with Mr. Wiley when he was pulled over.

20  He was not induced into driving.  He was

21  asked do you have a valid drivers license,

22  wherein he stated that he did.  Well, at

23  the time, Capt. Jones had reasons to

24  believe he was not being honest.  So, if

25  he wanted to drive that vehicle, he wasn't

1    forced to. He drove that vehicle on a
2    suspended license and we've been able to
3    prove here today that he drove that
4    vehicle on a suspended license. He'd been
5    driving around the county for months on a
6    suspended license.
7         And all of this testimony that there
8    was some kind of conspiracy going on,
9    there's been absolutely no testimony to
10   support that theory. There may have been
11   some disagreements or some issues between
12   these two individuals, Mr. Hamp and --
13   Sheriff Hamp and Mr. Thompson. That
14   doesn't mean that he was targeted on this
15   day and induced into driving. I mean,
16   there's just been no evidence of that.
17        Officer Jones stated he had a
18   reasonable suspicion to believe that a
19   crime was being committed. If he had
20   overlooked that, if something had
21   happened, it would have been on his
22   conscious. So, he did what every law
23   enforcement officer, every reasonable law
24   enforcement would do under the
25   circumstance, make a brief stop, as he

Thompson vs. State, 11/10/2014                    184

1   said, a Terry stop. It took him about a
2   minute to run his license and then he was
3   able to determine that, in fact,
4   Mr. Thompson was not being truthful about
5   that; that his licenses were, in fact,
6   suspended.
7        Furthermore, Your Honor, counsel
8   opposite continues to harp on this press
9   release. There's been no testimony here
10  today that anybody from the sheriff's
11  department, in fact, put out a press
12  release. He keeps insinuating that. He
13  wants that to be the case. The only
14  person who testified regarding a press
15  release was -- Sheriff Hamp testified that
16  he believes Ellis Pittman did, but not
17  anybody from the sheriff's department that
18  he was aware of. And he, certainly,
19  didn't do it. He said he never did that
20  to try to embarrass Michael Thompson.
21       There's a lot of things that could
22  have happened a lot differently to really
23  hurt Mr. Thompson had they wanted to if
24  that had been their goal, okay? Whenever
25  he found out there was an active warrant,

1    he could have said go arrest him right
2    now. There's an active warrant. Go pick
3    him up. He didn't do that.
4          Your Honor, I would submit that the
5    defense of entrapment doesn't stick. It
6    doesn't fit. It's completely outside of
7    the scope of what happened that day and he
8    should be found guilty by this Court.
9          MR. COLOM: Your Honor, briefly, I
10   want to clear some stuff up with actual
11   evidence. Because counsel opposite keeps
12   saying there was an active arrest warrant
13   for Mr. Thompson. She kept saying he
14   could have arrested him, active arrest
15   warrant. She said they could have picked
16   him up with his active arrest warrant.
17         Your Honor, look at Exhibit 3. This
18   is the arrest warrant, an arrest warrant
19   that's not signed by a judge. Where in
20   America -- I guess, maybe, Tunica County
21   Sheriff's Office thinks you can do this,
22   but in America you can't arrest somebody
23   on a valid arrest warrant unless the judge
24   signs the arrest warrant. There's no
25   signature on there.

Thompson vs. State, 11/10/2014

186

1    In fact, Capt. Jones testified to
2    that. He said I didn't have an arrest
3    warrant with me. That's why I didn't
4    arrest him. If I had had the arrest
5    warrant that day, I would arrest him. But
6    this idea that there was an active arrest
7    warrant, this is not true. An arrest
8    warrant has to be signed by the judge.
9    She knows that. So, for her to keep
10   saying that, it's just false.
11       And, Your Honor, he certainly was
12   suspended. In January or not -- in
13   August, they -- in fact, they really
14   hadn't authenticated that his license was
15   suspended. The clerk can't establish his
16   license was suspended. She does haven't
17   power to suspend licenses. Only the
18   Mississippi Department of Transportation
19   can do that. The sheriff's office, he
20   might can think he can do it, but he can't
21   suspend drivers licenses.
22       So, they really haven't authenticated
23   that Mr. Thompson's license was actually
24   suspended. They certainly haven't given
25   you the date that it was suspended. They

Thompson vs. State, 11/10/2014

187

1    haven't done that. So, this idea that
2    they kept seeing Mr. Thompson driving and
3    they didn't want to embarrass him, they
4    were trying to do him a favor, that -- if
5    they wanted to do that, they would have
6    arrested him. They would have pulled him
7    over, arrested him if they wanted to
8    embarrass him.
9        That's exactly what they did, Your
10   Honor. That's what they did. They
11   arrested him. If they wanted to do him a
12   professional courtesy -- if they wanted
13   to, you know, not embarrass Mr. Thompson,
14   they could have told him. Capt. Jones
15   could have said, Mr. Thompson, I think
16   your license may be suspended. I called
17   your license in and it came back
18   suspended. The sheriff could have said I
19   just talked to the clerk and your license
20   was suspended and you shouldn't drive.
21       Instead, they tried to -- there is no
22   dispute they tried to trick Mr. Thompson.
23   They knew his license was suspended and
24   they tried to get him to drive, so.
25       And she still has not established any

Thompson vs. State, 11/10/2014

188

1    probable cause for that stop. I mean,
2    under her argument, the prosecution -- I
3    mean, the police, they have this invisible
4    authority to pull over anybody anytime
5    they want. I mean, we'd be China or
6    Russia. I mean, there would be nothing to
7    stop the police officers from just acting
8    as the police did. Thankfully, we got the
9    United States' Constitution for that.
10         THE COURT: Do you think that China
11   would welcome all of us over there?
12         MR. COLOM: I didn't hear your
13   question, Your Honor.
14         THE COURT: Do you think China would
15   welcome all of us over there in this case?
16         MR. COLOM: Say that again. I can't
17   hear. I'm sorry.
18         THE COURT: Do you think China or
19   Russia would welcome us with this case?
20         MR. COLOM: Would they? No, they'd
21   kill Mr. Thompson. That's what they do in
22   China. If you disagree with the person
23   that charged you, they kill you. There's
24   no due process. So, thankfully, we have
25   due process.

Thompson vs. State, 11/10/2014

189

1    But for the Fourth Amendment to mean

2    something, judges have to stand up to law

3    enforcement because, otherwise, law

4    enforcement, they would just do whatever

5    they want.  The only person who can

6    impartially enforce people's

7    constitutional rights are judges.  The

8    only people that can do it.  The only

9    check the sheriff has on violating

10   people's constitutional rights are judges

11   and juries.  Otherwise, the Fourth

12   Amendment doesn't mean anything because

13   it's -- nobody is going to enforce it.

14        THE COURT:  Okay.  Anything further,

15   Ms. Turner?

16        MS. TURNER:  Uh?

17        THE COURT:  I'm going to give all --

18   both of you get a chance to say whatever

19   you want.

20        MS. TURNER:  Well, Your Honor, I

21   believe I've said everything I could.  Do

22   you need me to do -- research any case law

23   to help you?

24        THE COURT:  What was that?

25        MS. TURNER:  Would you like for me to

Thompson vs. State, 11/10/2014

190

1     look up any cases?

2        THE COURT:  You think you can really

3     do that in the next 30 minutes?

4        MS. TURNER:  That's what I'm saying.

5     I, you know, really didn't have time to

6     prepare on that, but I can look.

7        THE COURT:  All right.  You know, the

8     clerk and deputy clerk are looking at me

9     like y'all should have been gone from up

10    here a long time ago.  But, anyway, I'm

11    going to give you a chance and let's say

12    -- how much time you think it would take

13    you?

14        MS. TURNER:  I'll look for the next 15

15    minutes.  If I don't see anything, I'll

16    let you know.

17        THE COURT:  What was that?

18        MS. TURNER:  Fifteen minutes.

19        THE COURT:  Fifteen, all right.  Let's

20    say -- actually, I expect that we'll have

21    a ruling by 4:00.  I expect it.  You take

22    the next 15 minutes and I'll consider what

23    has already been given to me and the

24    record.  The court reporter, I may ask her

25    some things from the record.  So, I'd like

Thompson vs. State, 11/10/2014

191

1        to have a ruling by 4:00. What time is it

2        now?

3              MS. TURNER: It's 2:30.

4              THE COURT: Let's say by 3:30?

5              MS. TURNER: Yes, Your Honor.

6              THE COURT: All right. Let's say I'll

7        be ready to make my ruling by 3:30.

8              MS. TURNER: Yes, Your Honor.

9              THE COURT: All right. Court will be

10       in recess until 3:30.

11 (OFF THE RECORD.)

12            THE COURT: This matter is on appeal

13      by Michael Thompson, driving with

14      suspended license. The Court has

15      considered the testimony and the facts

16      surrounding the charges. After

17      considering the testimony of the

18      witnesses, the evidence presented and the

19      case law cited by the attorneys, the Court

20      finds that the charge of driving with a

21      suspended license is dismissed. In other

22      words, the Court finds in favor of

23      Mr. Thompson.

24            MR. COLOM: Thank you, Your Honor. Do

25      I need to prepare an order or do I need to

1        have --

2                THE COURT:  I have one.  I have one.

3                MS. THOMPSON:  The order has already

4        been prepared.

5                MR. COLOM:  Oh, it's been prepared.

6                THE COURT:  It's been prepared, yes.

7                MR. COLOM:  Thank you, Your Honor.

8                THE COURT:  All right.  Court will be

9        adjourned.

10   (COURT ADJOURNED.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### COURT REPORTER'S CERTIFICATE

STATE OF MISSISSIPPI
COUNTY OF HINDS

    I, Barbara L. Crawford, Certified Court Reporter and Notary Public for the State of Mississippi, do hereby certify that the foregoing pages contain a true and correct transcript of testimony taken by me at the time and place heretofore stated, and later reduced to typewritten form by computer-aided transcription under my supervision to the best of my skill and ability.

    I further certify that all the witnesses were placed under oath to truthfully answer all questions in this matter, and I am not in the employ of or related to any counsel or party in this matter, and have no interest in the final outcome of the proceedings.

    The undersigned assumes no responsibility for the accuracy of any reproduced copies not made under my control or direction.

    This the 23ed day of May, 2015

Barbara L. Crawford,
Certified Court Reporter