Exhibit "E" (Part Two)
Case: 3:14-cv-00274-NBB Doc #: 67-8 Filed: 01/18/17 1 of 32 PageID #: 1027
Deposition of James Jones, taken November 29, 2016

Page 34

1    Q.    Did you write him a ticket?

2    A.    I didn't write him a ticket.  After I

3 stopped Mr. Wiley he told me who he was and who

4 Mr. Thompson was.  After I ran his license it came

5 back that, which I'd never heard of before.  I didn't

6 know what it was.  I didn't want to write somebody a

7 ticket for something that don't make any sense.  I

8 showed them professional courtesy and I let him go.

9 I didn't write him a ticket or anything like that.

10    Q.    And what about the SFSTs?

11    A.    What's that?

12    Q.    Standard field society test.  You're not

13 familiar with SFSTs?

14    A.    I'm familiar with what you just said.  I'm

15 not familiar with the abbreviation part of it.

16    Q.    Okay.  Sorry.  Have you had any experience

17 or training in how to perform standard field society

18 tests?

19    A.    Are you referring to just interview and

20 interrogation while you're on the side of the road or

21 are you referring to something like a DUI?

22    Q.    Isn't that what you suspected, sir, a DUI?

23    A.    Yeah.  I suspected it.  But after I talked

24 with him, then I realized that he wasn't drunk.

25    Q.    Okay.  So you didn't make him do heel to

Deposition of James Jones, taken November 29, 2016

```
 1   toe?

 2        A.    No, sir.  There was no need for this.

 3        Q.    The one leg stand?

 4        A.    There was no need for that.

 5        Q.    Portable breath test?

 6        A.    There was no need for that.

 7        Q.    Okay.  All right.  So when you made this

 8   stop, what did you say -- you said that you told

 9   Mr. Thompson -- I mean, you make this stop, right,

10   but you didn't know who you were stopping; is that

11   it?

12        A.    That's correct.

13        Q.    All right.  So once you make the stop you

14   just so happen to stop the two guys you were

15   investigating?

16        A.    Just so happened to stop them.  Those guys,

17   actually when I made the stop they introduced

18   themselves to me before I got to the vehicle.  They

19   was looking, hey, this is so and so and so and so,

20   Mr. Wiley explained.  And I came up to them and I

21   explained who I was, introduced myself to them.  From

22   that point, that's how it went.

23        Q.    Okay.  So then what happened?

24        A.    Mr. Wiley told me he had got a ticket

25   somewhere in D.C., I believe, that he hadn't paid it
```

Deposition of James Jones, taken November 29, 2016

1    but he sent the money later on, his license might be

2    suspended.  That's when I ran his licenses.  That's

3    when it came back eligible for reinstatement and

4    something else was on it.  I told him I didn't know

5    what it was.  So I called the dispatcher to find out

6    what does that mean.  And they said they didn't know

7    at the time.  So I think they called -- somebody in

8    dispatch, somebody contacted Memphis and they

9    informed them I think later -- we didn't get -- we

10   waited for a minute on the side of the road for an

11   answer because I didn't know what it was.  I wasn't

12   going to write him a ticket unless his license was

13   suspended, you know.  I was going to take him and let

14   him bond out like everybody else does, standard

15   procedure.  But I didn't know what it was so I

16   didn't.

17        Q.   Okay.  So when you say you didn't know what

18   it was, did you know it to be illegal?

19        A.   I didn't at the time.  I didn't know

20   whether his license was valid or invalid, to be

21   honest with you.

22        Q.   So, to your knowledge, you did not know him

23   to have committed a crime?

24        A.   What you mean by that?

25        Q.   Once you talked to dispatch, you didn't

Deposition of James Jones, taken November 29, 2016

1  know or you couldn't reach a conclusion that he was

2  in violation of the law with respect to his license

3  being suspended or not suspended?

4      A.   That's correct.

5      Q.   So what authority did you have to tell him

6  that somebody else needed to take control of the

7  vehicle?

8      A.   Because I couldn't get an answer whether

9  they were valid or they wasn't valid.

10      Q.   But that's not a basis for you to make him

11  get out of the driver's seat, right?

12      A.   I didn't make him get out of the driver's

13  seat.

14      Q.   That's not a basis for you to say that

15  somebody else needs to drive the vehicle?

16      A.   I couldn't let him drive the vehicle in

17  good faith.  I didn't know whether his license was

18  suspended or valid.  The dispatcher couldn't let me

19  know in a timely manner.  I didn't want to keep them

20  on the side of the road all night.  It was dark

21  outside.

22      Q.   Because you did not know, and it's not that

23  you knew, because you did not know whether Alex

24  Wiley's license was suspended, you could not let Alex

25  Wiley drive; is that what you're saying?

Deposition of James Jones, taken November 29, 2016

Page 38

```
 1          A.    That's correct.

 2          Q.    Prior to making this stop you knew that

 3    Michael Thompson's license was suspended, right?

 4          A.    That's correct.

 5          Q.    But you told him you need to take control

 6    of this car?

 7          A.    I asked -- I didn't tell him that.  I asked

 8    Mr. Thompson, do he have his license, do he have a

 9    driver's license.  Mr. Thompson answered me and said

10    yes.  "Are your license valid, sir?"  He said, "Yes,

11    sir.  They are."  I didn't make him do anything.

12          Q.    I didn't say you made him.  I said, and you

13    correct me if I'm wrong, have you not testified prior

14    to today that you told Michael Thompson you need to

15    take control of the vehicle?

16          A.    Yes.  After he told me that his license was

17    great.

18          Q.    But you knew otherwise?

19          A.    I did.

20          Q.    So you violated what you just said in that

21    you let a man you knew to have a suspended license

22    drive a vehicle?

23          A.    No, sir.  Mr. Thompson lied to me.

24          Q.    All right.  Let's define lie.

25          A.    Okay.
```

Deposition of James Jones, taken November 29, 2016

Page 39

1      Q.    Lie means that I know something to be false

2    but I tell it to you; is that fair?

3      A.    That's true.

4      Q.    If I don't know something to be false and I

5    tell you something and it turns out not to be true, I

6    didn't lie, I was mistaken or did not know, right?

7      A.    Okay.    Explain to me where you're going

8    with it?

9      Q.    Do you have any proof that Michael Thompson

10   knew that his license was suspended?

11     A.    Do I have proof?    I know Michael Thompson

12   had got a citation by a trooper somewhere in

13   Montgomery County and that the ticket hadn't been

14   paid.    I don't know whether he knew that his license

15   was suspended or not.    I don't know.    I can't answer

16   that really.

17     Q.    You didn't know on February 12th whether he

18   knew that his license was suspended, February 12 of

19   2014?

20     A.    I can't speak for Mr. Thompson.    I don't

21   know whether he knew anything.    I don't know.

22     Q.    You don't know as you sit here today in

23   2016 whether Mr. Thompson knew that his license was

24   suspended?

25     A.    I don't know.    I believe -- my personal

Deposition of James Jones, taken November 29, 2016

Page 40

```
 1    opinion?  I believe he did.
 2         Q.   What proof do you have?
 3         A.   Just I believe he did.  After the initial
 4    stop and I talked with him, I asked him do he
 5    remember being stopped somewhere in Montgomery County
 6    and he say he did.
 7         Q.   You said after the initial stop.  Don't you
 8    mean after the second stop?
 9         A.   That's correct.  After the second stop, the
10    second initial stop.
11         Q.   You didn't ask him that during the first
12    stop, right?
13         A.   No.  Because Mr. Thompson was being
14    deceitful.
15         Q.   Deceitful means he knew he was telling you
16    an untruth, right?
17         A.   That's correct.
18         Q.   But you have no proof that he knew that
19    what he was saying was not true?
20              MR. WOLF:  Objection.  Asked and
21    answered.
22              MR. TANNER:  Well, he hasn't answered.
23              MR. WOLF:  Well, he kind of did.  Ask
24    it one more time.
25         Q.   (Mr. Tanner)  Again, my question is, you
```

Deposition of James Jones, taken November 29, 2016

Page 41

```
 1    have no proof that he knew for a fact that his
 2    license was suspended?
 3         A.    Do I have proof?  I don't have any proof on
 4    documents or anything of that nature.  But if I get a
 5    ticket or you get a ticket and if I don't pay that
 6    ticket, somewhere down the road, whether it's
 7    Carroll, Hinds, Pascagoula, DeSoto County, there's
 8    going to be a warrant issued for my arrest if I don't
 9    pay that ticket.  So the same thing occurs for you.
10    Because no one is above the law.  If I pay that
11    ticket, then I'm not concerned about that.  If I pay
12    it I'm going to keep my receipt and I'm going to call
13    and check and make sure my license are valid.  So if
14    Mr. Thompson knew he got a ticket and didn't pay it,
15    yes, I do believe he knew his license was suspended.
16         Q.    Do you know that -- so you don't know that
17    people often forget to pay speeding tickets?
18         A.    No, not that often.  I don't believe people
19    forget to pay speeding tickets.  I believe people
20    just refuse to pay the ticket.
21         Q.    A jury in the Southern District of
22    Mississippi is not going to think that nobody forgets
23    to pay speeding tickets.
24              MR. WOLF:  Objection.  Is there a
25    question?
```

Deposition of James Jones, taken November 29, 2016

Page 42

```
 1              MR. TANNER:  That's fine.
 2        Q.   (Mr. Tanner)  All right.  So what I'm
 3   saying is, you have no proof that he knew that his
 4   license was suspended.  Do you have any proof that
 5   the court in Montgomery County contacted him to tell
 6   him his license was suspended?
 7        A.   I don't know anything about that.
 8        Q.   Do you know whether any police tried to
 9   serve a warrant on him at his home?
10        A.   I don't know anything about that.
11        Q.   Do you know how long Mr. Thompson lived in
12   Brandon, Mississippi, at the address you should have
13   found during your preliminary investigation of him?
14        A.   I don't know how long he lived there, but I
15   did find an address from Brandon, Mississippi.
16        Q.   All right.  And that's the one where you
17   say you believe he's from, right?
18        A.   I just saw that address there, southern
19   Mississippi.
20        Q.   And Michael Thompson showed up every day
21   throughout the time he was -- as far as you know, he
22   showed up every day right around the corner at the
23   county administrator's office to do his job right
24   here in Tunica County?
25        A.   I don't know.  I don't know what days he
```

Deposition of James Jones, taken November 29, 2016

Page 43

1    showed up.

2        Q.   Knowing that his license was suspended,

3    according to you?

4        A.   Yes.

5        Q.   Do you know how much Michael Thompson had

6    to pay to get his license reinstated from the

7    suspension?

8        A.   No, sir.  I don't.

9        Q.   Okay.  Do you know how much Michael

10   Thompson made in his job as county administrator?

11       A.   No, sir.  I don't.

12       Q.   Did you ever get a call back from dispatch

13   from Tennessee -- well, let's ask this a different

14   way.  All right.  So you stopped the vehicle of the

15   two guys that you happen to be investigating.  And

16   once you relinquished the vehicle to Mr. Thompson,

17   how long after that did you stop those vehicles

18   again?

19       A.   Well, after I made the first initial stop

20   and everything transpired with Mr. Wiley and

21   Mr. Thompson, Michael Thompson lied to me about his

22   license and things that it was valid, he got in the

23   vehicle and he drove down, he drove down and I

24   initiated another stop on him at Casino Way at the

25   Wendy's and gas station, Exxon on 61 North.  He

Deposition of James Jones, taken November 29, 2016

Page 44

1    pulled in that area after I initiated my blue lights,

2    he pulled into that lit area there.

3         Q.   How much time elapsed between Mr. Thompson

4    taking off from the first stop and you stopping him

5    the second time?

6         A.   Maybe a couple of minutes maybe.  I say

7    maybe a minute or two.

8         Q.   A minute or two?

9         A.   Yes.

10        Q.   All right.  And tell me the reason you

11   stopped Mr. Thompson at that point.

12        A.   Mr. Thompson was being deceitful.  He was

13   lying to me about his particular license.

14        Q.   You did not have probable cause to stop

15   him, did you?

16        A.   If I see an individual with suspended

17   license and me knowing that that license is

18   suspended, the probable cause is their suspended

19   license.

20        Q.   But he drove with a suspended license only

21   after you told him he needed to take control of the

22   vehicle?

23        A.   After I told him to take control of the

24   vehicle?

25        Q.   Yes.

Deposition of James Jones, taken November 29, 2016

Page 45

```
 1        A.    Mr. Thompson got out of the vehicle after I
 2   asked him a question and took control of it himself.
 3        Q.    I'm not saying what he did.
 4        A.    Right.  I didn't instruct him to take
 5   anything.  He did it on his own.
 6        Q.    You did not tell Mr. Thompson you need to
 7   take control of the vehicle?
 8        A.    Yeah.  I told him he needed to drive the
 9   vehicle.  I did do that.  Because Mr. Wiley's
10   license, I didn't know what was going on with his
11   license.
12        Q.    Can we agree that you told Mr. Thompson you
13   need to take control of the vehicle?
14        A.    That's correct.
15        Q.    All right.  The only time on February 12,
16   2014, that you had a basis for stopping Michael
17   Thompson for driving with a suspended license is
18   after you told him you need to take control of the
19   vehicle?
20        A.    That's correct.
21        Q.    All right.  So once you stopped
22   Mr. Thompson at the -- did you say Exxon or Wendy's?
23        A.    I believe it's Exxon and Wendy's.  It's
24   both.  It's tied into one.
25        Q.    Gas station kind of?
```

Deposition of James Jones, taken November 29, 2016

1    A.    That's correct.

2    Q.    So after you stopped Mr. Thompson at the

3  Exxon/Wendy's, what did you say to Mr. Thompson when

4  you pulled up to the vehicle?

5    A.    I approached the vehicle and asked

6  Mr. Thompson for his license.  He gave me his

7  license.  I said, "Mr. Thompson, are your license

8  okay?"  I ran his license.  I didn't move from him.

9  I stayed right beside him.  He got out of his

10  vehicle.  As I ran his license he heard the traffic

11  coming by, status suspended out of Montgomery County,

12  failure to pay something, I'm not for sure.  He heard

13  the same traffic I heard.  From that point on he

14  said -- he just said damn.  And I told him his

15  license was suspended, you got to go in and asked him

16  why did he lie to me.

17    Q.    Okay.  So when you stopped Mr. Thompson,

18  where was he when you called the dispatch?

19    A.    What you mean where was he?

20    Q.    You stopped him.

21    A.    Yes.

22    Q.    Where was he?  Was he still in his vehicle

23  or was he outside the vehicle?

24    A.    Mr. Thompson was outside the vehicle

25  standing right beside me as I was running his

Deposition of James Jones, taken November 29, 2016

1   license.

2        Q.   That's normal?

3        A.   It can be normal.  What's normal?

4        Q.   You tell me.  Is that something you

5   normally do?  You talked about safety of police

6   officers and in the dark.  Is that something that

7   most police officers do?  Hey, suspect, come stand

8   beside me while I run your license?

9             MR. WOLF:  There's a whole lot of

10  question there.  I'm not sure of the question.

11           MR. TANNER:  That's fair.

12      Q.   (Mr. Tanner)  Is that a practice you

13  normally employ?

14      A.   Well, for Mr. Wiley and Mr. Thompson, who I

15  had already stopped and identified those individuals,

16  yes.  It wasn't nothing to treat them like a felony

17  stop or to be very disrespectful or embarrassing to

18  them, so I did that.  Normally, do I do it for

19  someone who wasn't a part of maybe the county or some

20  criminal element that I don't know anything about,

21  no, I wouldn't.  But we was in a lit up area.  There

22  was a lot of officers there who had responded to the

23  call and everything was on video.  So I treated them

24  with courtesy.

25      Q.   Okay.  All right.  So when Mr. Thompson --

Deposition of James Jones, taken November 29, 2016

Page 48

1     when you told Mr. Thompson that he needed to take

2     control of the vehicle, did you follow him

3     immediately?

4          A.    Yes.   After he left, I didn't follow him

5     immediately.   I still was waiting on dispatch to let

6     me know what that means.   And I got in my vehicle.

7          Q.    As to who?

8          A.    Mr. Wiley, the eligible for reinstatement.

9     We were still waiting on that.   And we went down,

10    went on and eventually I stopped -- I got out of my

11    vehicle and I stopped him.

12         Q.    Did you have -- after you decided to arrest

13    Michael Thompson, did you have the vehicle towed,

14    too?

15         A.    I'm not for sure.   I don't think I did.

16    Because they were at Wendy's.   It was parked there at

17    Wendy's.   I don't think I did.

18         Q.    Did you arrest Mr. Wiley?

19         A.    No, sir.   No, sir.

20         Q.    What happened to Mr. Wiley?

21         A.    I don't know.   Mr. Willie eventually came

22    down to the sheriff's office where Mr. Thompson was.

23         Q.    But you didn't have -- so, I mean, once you

24    make an arrest, isn't it part of y'alls policy to tow

25    vehicles unless somebody remaining with the vehicle

Deposition of James Jones, taken November 29, 2016

Page 49

1    can drive it away?

2         A.   No.   That's the officer's discretion.   If

3    you got someone that can get your vehicle or whatever

4    it is, they can call and get somebody there, then you

5    let them do it.

6         Q.   Mr. Thompson --

7         A.   Or -- I'm sorry.   Go ahead.

8         Q.   Did Mr. Thompson tell you that he had

9    somebody he was calling that could get his vehicle?

10        A.   No.   Mr. Thompson didn't tell me anything

11   like that.   The vehicle was left along with officers

12   there by the vehicle.   I don't know what happened to

13   the vehicle at this particular time because it has

14   been a while.   I don't know.   I know Mr. Wiley showed

15   up at the sheriff's office later that -- shortly

16   afterwards.

17        Q.   By himself?

18        A.   I don't know.   I saw him there.   I don't

19   know if he was by himself or what.   I don't know,

20   sir.

21        Q.   All right.   Do you all have a policy at the

22   Tunica County Sheriff's Department that you're

23   familiar with with respect to the towing of vehicles

24   in traffic stops?

25        A.   Yes.   If you got, somebody got suspended

Deposition of James Jones, taken November 29, 2016

Page 50

1  license and they are arrested, you do what you call

2  search and seizure arrest.  There's no one that can

3  drive the vehicle that's not around that vehicle,

4  it's at the officer's discretion.  He can have the

5  vehicle towed or an individual can pull up beside

6  them and say this is my wife, this is my brother, can

7  they have my vehicle.  That's the officer's

8  discretion.

9       Q.   Was that the discretion you exercised that

10 night?

11      A.   Yeah.  When I left there, when I left there

12 I left the vehicle and Mr. Wiley with the other

13 officers that was there.  They was there for that

14 particular reason.  It's an officer's discretion.

15 You can ask me that five or six different ways, it's

16 still going to be the officer's discretion.

17      Q.   Okay.  When you -- with Mr. Wiley, didn't

18 you get a call during the arrest or before the arrest

19 of Michael Thompson, didn't you finally hear back

20 that his license was, in fact, valid?

21      A.   I can't recall, sir.  I really can't

22 recall.

23      Q.   You never heard back whether Mr. Wiley's

24 license was invalid?

25      A.   We waited -- I think later it came back.  I

Deposition of James Jones, taken November 29, 2016

Page 51

```
 1    believe later it came back.  I'm not for sure right
 2    now.
 3         Q.   When you say later, what time are you
 4    talking about?
 5         A.   I don't know, sir.  I don't know whether it
 6    was that night or that following day.  I don't know.
 7    I don't want to tell you something that's not
 8    accurate.
 9         Q.   Okay.
10         A.   It has been a while.  I don't know.
11         Q.   The officers, the two officers, Michael
12    Strickland, what was his rank?
13         A.   Just narcotics officer.
14         Q.   Under your supervision?
15         A.   That's correct.
16         Q.   All right.  Those two officers, Michael
17    Strickland and the other gentleman who were on scene
18    with you during the first stop of the vehicle when
19    you stopped Alex Wiley, did they accompany you on the
20    second stop?
21         A.   They did.
22         Q.   All right.  How did -- did they come based
23    on dispatch or did you call them?
24         A.   No.  They just came based on just following
25    me.  I didn't call them.
```

Deposition of James Jones, taken November 29, 2016

Page 52

```
 1        Q.    Isn't it true that they went the other way,
 2   one of them at least turned around and went south on
 3   61 before coming north where you were?
 4        A.    No.  I don't know anything about that.
 5        Q.    You didn't reach out to either one by phone
 6   to tell them to come and assist you with a stop?
 7        A.    On the second stop?
 8        Q.    Yes, sir.
 9        A.    Not that I know of.  Not to my knowledge,
10   no, sir.
11        Q.    All right.  Where were -- after you stopped
12   Alex Wiley and Michael Thompson drove off in the
13   vehicle, did you say anything to Officer Strickland
14   or the other officer that was on scene with you
15   during the first stop?
16        A.    Yes.  Strickland said he had a friend in
17   Memphis that might know, that he can call and find
18   out about what eligible for reinstatement means.  And
19   that's our conversation.
20        Q.    Was that the sum total of what you and
21   Officer Strickland or Deputy Strickland discussed at
22   the conclusion of your stop of Alex Wiley?
23        A.    That's it.
24        Q.    You didn't say any more to him?
25        A.    No, sir.
```

Deposition of James Jones, taken November 29, 2016

Page 53

1    Q.    What about the other officer, did you say

2    anything else to that officer between the time

3    Michael Thompson, you know, you arrested Michael

4    Thompson -- I mean, excuse me, if I can rephrase.

5    Did you say anything to the officer, the other

6    officer that was out there with you, not Michael

7    Strickland?

8    A.    Lieutenant Clayton?  No.

9    Q.    Lieutenant Clayton.  You didn't say

10   anything to him at the conclusion of your stop of

11   Alex Wiley?

12   A.    Not to my knowledge.  Not to my knowledge.

13   Q.    You didn't tell either of them, man, this

14   guy just lied to me or something to that effect?

15   A.    I can't recall.  I can't recall.

16   Q.    You just told us the sum total of the

17   conversation, right?

18   A.    Right.  I just told you what I can recall.

19   I don't have anything in front of me or my statement.

20   I mean, I don't know.  I don't know.  I really don't

21   know.

22   Q.    Did you let either of them know that you

23   let a man drive off that you knew had a suspended

24   license?

25   A.    Let them know?  No.

Deposition of James Jones, taken November 29, 2016

Page 54

1        Q.   Is there any reason why you left them in

2  the dark about that detail?

3        A.   What detail?

4        Q.   That you had just let a suspect drive off

5  who you knew to have a suspended license?

6        A.   Well, at that time they was on a need to

7  know basis. I needed to let them know what was going

8  on at the time. All I needed them was just backup,

9  you know what I'm saying, or some assistance. There

10  was an ongoing investigation. I didn't need to let

11  them know anything what was going on.

12        Q.   All right. When you -- when did you find

13  out that Michael Thompson's license was suspended?

14        A.   I ran Mr. Thompson's license February -- I

15  don't know. It was before the 12th. I don't know.

16  That's when it came back, you know, suspended. I

17  don't know what exact day it was or date.

18        Q.   Would you quarrel with me if I said it was

19  either the 11th or the 12th?

20        A.   I don't know.

21        Q.   Okay. When did you find out -- was it in

22  January that you ran Mr. Thompson's license?

23        A.   Sir, I don't know. I can't give you

24  something that's not accurate. I don't know. I

25  don't want to tell you something that's not true.

Deposition of James Jones, taken November 29, 2016

Page 55

```
1        Q.    When did you find out that Michael Thompson
2   had a warrant for his arrest?
3        A.    Well, I found out that he possibly might
4   have a warrant, I think the sheriff briefed me on
5   that, that he could possibly have a warrant.  And
6   after running his license for failure to pay a fine,
7   and I figure the next procedure or protocol is to get
8   a warrant for an individual.
9        Q.    Did you have a warrant?
10       A.    No, sir.  I didn't have a warrant in hand.
11       Q.    All right.  Had you ever seen a warrant, a
12  valid warrant that Michael Thompson had a warrant for
13  his arrest?
14       A.    No, sir.
15       Q.    When did you find out from Sheriff Hamp
16  that there was, quote, possibly, end quote, a warrant
17  for Michael Thompson's arrest?
18       A.    You know, I don't know.
19              MR. WOLF:  Can we take a quick minute
20  here?
21              MR. TANNER:  Sure.
22              (Off record discussion.)
23       A.    I don't know.  I talked with him.  I don't
24  know.  I can't recall.  It was in February.  That was
25  in February.  I don't know the particular date.
```

Deposition of James Jones, taken November 29, 2016

Page 56

```
 1        Q.   (Mr. Tanner)  Okay.  What about week?  Do
 2    you know whether it was the first week or the second
 3    week of February?
 4        A.   No, sir.  I don't.
 5        Q.   Okay.  And would you quarrel with me if I
 6    said -- well, you were in the room just a moment ago
 7    when Sheriff Hamp said he told you on the 12th, the
 8    same day that you arrested Michael Thompson, that
 9    Michael Thompson's license was suspended.  Did you
10    hear him when he said that?
11        A.   I don't know if I heard that particular
12    point.  I'm not saying he didn't say it.  But I don't
13    know what he told me.  I really can't answer that.
14        Q.   So whatever he says at this point you can't
15    quarrel with what he said because you don't know?
16        A.   I can't recollect the time and the day he
17    told me, right now I can't.  See, I've been out now.
18        Q.   Is there anything that will refresh your
19    memory as to when you heard that from the sheriff?
20        A.   Mainly if I see some paperwork, maybe from
21    my file, or something of that nature right there.
22    Other than that, I don't know.
23        Q.   All right.  Well, if there was a warrant, a
24    valid warrant in place to arrest Michael Thompson,
25    you can arrest him pretty much anywhere, right?
```

Deposition of James Jones, taken November 29, 2016

1    A.    Yes, sir.

2    Q.    Including at the county administrator's

3    office?

4    A.    Yes, sir.

5    Q.    Including at a county meeting or anything

6    like that?

7    A.    Anywhere, anybody, anywhere, any place.

8    Q.    If there was a valid warrant for Michael

9    Thompson's arrest, is there any reason that you can

10   think of why you wouldn't have just gone and served

11   the warrant?

12   A.    No, there's no reason.  I didn't receive a

13   valid warrant for Michael Thompson's arrest, sir.

14   Q.    All right.  At the time you arrested

15   Michael Thompson, did you believe there to be a valid

16   warrant?

17   A.    I was -- I did believe there was a valid

18   warrant, there was a warrant for his arrest for the

19   traffic ticket, because I ran it and it came back

20   NCIC.  So I had reasonable suspicion to believe that

21   there possibly was a warrant for his arrest.

22   Q.    Okay.  But you had not seen one?

23   A.    I hadn't seen one.  I didn't see it, sir.

24   Q.    All right.  Now, you and I know that NCIC,

25   that when you say I ran NCIC and it came back, NCIC

Deposition of James Jones, taken November 29, 2016

1    would tell you whether there's a warrant or whether a

2    license was suspended, and those are two separate

3    issues, right?

4         A.    That's correct.

5         Q.    All right.  Your license can be suspended

6    without there being a warrant; isn't that right?

7         A.    Yes, sir.

8         Q.    All right.  So when you ran NCIC, did it

9    say there was a warrant or did it say that the

10    license was suspended?

11         A.    I think it said license was suspended.  We

12    know that's true.  I can't recall what the other part

13    of NCIC said.  But I didn't have a warrant for

14    Mr. Thompson in hand.  I wasn't going after

15    Mr. Thompson because I had a warrant or -- my belief

16    and suspicion could have been anything, but I was

17    going on fact that his license was suspended.

18         Q.    Have you ever had a situation other than

19    Mr. Thompson where you told a person that you knew

20    had a suspended license that he needed, he or she

21    needed to take control of a vehicle?

22         A.    No, sir.

23         Q.    In 20-something years of law enforcement,

24    Michael Thompson was the first that you did that

25    with?

Deposition of James Jones, taken November 29, 2016

Page 59

1       A.   What question are you asking me?  Ask me
2   that again.
3       Q.   Well, I'll ask my second question again.
4   In 20 plus years of law enforcement experience,
5   Michael Thompson was the first person who you knew to
6   have a suspended license and yet you told them you
7   need to take control of the vehicle?
8       A.   After my initial investigation with
9   Mr. Thompson on his driver's license, Mr. Thompson
10  could very well have paid that ticket and had his
11  license reinstated, just on the computer or sending
12  money down to get it down.  My initial thing was
13  Mr. Thompson was being deceptive.  If he knows his
14  license was suspended, which he did, why are you
15  lying to me?  That's what I'm asking myself.  When I
16  ran his license I did the initial second stop on
17  Mr. Thompson.  When I ran his license and they came
18  back with him there beside me, suspended, failure to
19  pay something in Montgomery County.  That's when I,
20  you know, everything just came into play he, well, he
21  knew his license was suspended.  He lied to me.  He
22  was being very deceptive.
23      Q.   As a law enforcement officer, did you have
24  a reasonable lawful basis to stop Alex Wiley?
25      A.   I did.

Deposition of James Jones, taken November 29, 2016

Page 60

```
 1          Q.   When you stopped Alex Wiley, were you
 2    within your rights and authority as a police officer
 3    to ask him for his license to run his license?
 4          A.   Yes, sir.
 5          Q.   Would it also have been within your
 6    authority as a police officer to ask Michael
 7    Thompson, the passenger, for his I.D. and to run it
 8    prior to letting him drive?
 9          A.    That's true.  I asked Mr. Thompson was his
10    license valid because I knew Mr. Wiley wasn't
11    going -- we weren't going to let him drive a vehicle
12    because we didn't know whether his license was
13    suspended or were they valid.  Like I said, in my
14    20-something years I never heard of a license being
15    eligible for reinstatement.  I never heard that
16    before.  And it took the communication people a while
17    to understand and figure out what that meant.  From
18    that point I put my trust in Mr. Thompson that he
19    would be honest, on good faith and be honest.  We
20    both are county employees.  Instead of don't be
21    honest.  If you're honest with me, there's no issue.
22          Q.   Uh-huh (Indicating yes).
23          A.   But if you lie to me --
24          Q.   So you were expecting him to say yes, my
25    license is suspended?
```

Deposition of James Jones, taken November 29, 2016

Page 61

1      A.    No.   I was expecting him to say no, sir, my
2   license is suspended, I can't drive.   But he lied.
3      Q.    My question was, could you have run Michael
4   Thompson's license as the passenger of a vehicle?
5      A.    Yes, sir.
6      Q.    You could have done that?
7      A.    Yes, sir.
8      Q.    Did you ask Alex Wiley whether his license
9   were suspended?
10      A.    Whose license?   Alex Wiley?
11      Q.    Yes, when you stopped him.
12      A.    No, sir.
13      Q.    You didn't ask him?
14      A.    He was driving.   I need to run his license,
15   make sure it was good.   He was weaving all over the
16   road.   That's protocol.
17      Q.    So you wouldn't take his word for it?
18      A.    No.   You run the license.   He's the driver.
19      Q.    Okay.   And Michael Thompson the driver
20   after he got in the driver's seat, right?
21      A.    Yes.   I asked him on good faith.   I was
22   hoping he wouldn't lie to me, but he lied to me.
23            MR. TANNER:   All right.   I pass the
24   witness.
25            MR. WOLF:   I have no further

Deposition of James Jones, taken November 29, 2016

Page 62

1    questions.    Thank you.

2                    MR. TANNER:    Thank you, sir.

3                    (Deposition concluded at 4:48 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of James Jones, taken November 29, 2016

Page 63

C E R T I F I C A T E

1

2  STATE OF MISSISSIPPI          )

3  COUNTY OF LEE                 )

4  RE:  ORAL DEPOSITION OF JAMES JONES

5      I, Regina D. Russell, RPR, CCR 1110, a Notary

6  Public within and for the aforesaid county and state,

7  duly commissioned and acting, hereby certify that the

8  foregoing proceedings were taken before me at the

9  time and place set forth above; that the statements

10 were written by me in machine shorthand; that the

11 statements were thereafter transcribed by me, or

12 under my direct supervision, by means of

13 computer-aided transcription, constituting a true and

14 correct transcription of the proceedings; and that

15 the witness was by me duly sworn to testify to the

16 truth and nothing but the truth in this cause.

17     I further certify that I am not a relative or

18 employee of any of the parties, or of counsel, nor am

19 I financially or otherwise interested in the outcome

20 of this action.

21     Witness my hand and seal on this 10th day of

22 December, 2016.

23

24  My Commission Expires:      _____

25  January 27, 2020            CCR 1110
                                Notary Public

**ADVANCED COURT REPORTING**
**662-690-1500**

Deposition of James Jones, taken November 29, 2016

Page 64

```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                    NORTHERN DISTRICT OF MISSISSIPPI
 2                          ABERDEEN DIVISION

 3     MICHAEL THOMPSON                           PLAINTIFF

 4     VS.                             NO. 3:14cv274NBB-SAA

 5     CALVIN HAMP, ET AL                         DEFENDANTS

 6

 7                           CERTIFICATE

 8          I, JAMES JONES, have read the foregoing pages,

 9     1-61, of the transcript of my deposition given on

10     November 29, 2016, and it is true, correct and

11     complete to the best of my knowledge, recollection

12     and belief except for the list of corrections, if

13     any, attached on a separate sheet herewith.  Witness

14     my hand, this the _____ day of _____,

15     2016.

16

17                          _____
                                      JAMES JONES
18                           CERTIFICATE

19          Subscribed and sworn to before me, this the

20     _____ day of _____,

21     2016.

22

23                          _____
                            Notary Public in and for the
                            County of _____
24     My Commission        State of Mississippi
       Expires: _____
25
```

Deposition of James Jones, taken November 29, 2016

Page 65

ADVANCED COURT REPORTING
P.O. BOX 761
TUPELO, MISSISSIPPI 38802-0761

CORRECTION LIST

MICHAEL THOMPSON                           PLAINTIFF
VS.
CALVIN HAMP, ET AL                        DEFENDANTS

Federal - No. 3:14cv274NBB-SAA

_____
CAPTION

NOVEMBER 29, 2016          JAMES JONES
_____
DATE OF DEPOSITION         DEPONENT'S NAME

PAGE   LINE    CORRECTION              REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

                    _____
                    JAMES JONES